UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

RICARDO COPANTITLA, DIEGO DIAZ DE LA
VEGA, IGNACIO GARCIA, FREDDY GUACHUN,
JULIO LANTIGUA, MANUEL LIZANDRO, MARTIN
LOPEZ, SEBASTIAN LOPEZ, AUGUSTIN
MALDONADO, HENRY MATUTE, JOELITO
MELENDEZ, AUSSENCIO RAMIREZ, AND JOSE
LUIS VARGAS,

                         Plaintiffs,

                  -against-

FISKARDO ESTIATORIO, INC. d/b/a THALASSA
RESTAURANT, GEORGE MAKRIS, JULIA MAKRIS,
STEVE MAKRIS, and FANTIS FOODS, INC.,

                        Defendants.

-------------------------------------------------------------------x

Case No. 09 Civ. 1608
(RJH)(JCF)

---

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT AND TO DISMISS CERTAIN PLAINTIFFS

---

**LOWENSTEIN SANDLER PC**
1251 Avenue of the Americas
New York, New York  10020
212-262-6700
Attorneys for Defendants
Fiskardo Estiatorio, Inc. d/b/a Thalassa Restaurant,
George Makris, Julia Makris, Steve Makris, and
Fantis Foods, Inc.

Of Counsel:

David W. Field, Esq.
Stephanie L. Aranyos, Esq.
Eric Jesse, Esq.

## TABLE OF CONTENTS

**Page**

Table of Authorities ...................................................................................................... iii

Preliminary Statement ................................................................................................... 1

Statement of Facts ......................................................................................................... 2

Legal Argument ............................................................................................................. 2

I.    THE COURT MUST INITIALLY ADDRESS PLAINTIFFS'
      COUNSELS' CONFLICT OF INTEREST ........................................................... 2

II.   GEORGE MAKRIS AND JULIA MAKRIS ARE NOT "EMPLOYERS"
      OF PLAINTIFFS AND SHOULD BE DISMISSED FROM THIS
      LAWSUIT ............................................................................................................. 4

      A.    Julia And George Makris Are Not "Employers" under the FLSA or
            NYLL. ......................................................................................................... 4

      B.    Julia and George Makris are not "Employers" under the NYSHRL
            and NYCHRL. ............................................................................................ 6

III.  FANTIS FOODS IS NOT AN "EMPLOYER" OF PLAINTIFFS ....................... 7

IV.   JOSE LUIS VARGAS'S FALSE IMPRISONMENT CLAIM MUST BE
      DISMISSED .......................................................................................................... 11

V.    PLAINTIFFS WERE NOT REQUIRED TO WEAR "UNIFORMS" AS
      DEFINED UNDER NEW YORK LAW ............................................................... 17

VI.   JOELITO MELENDEZ'S ALLEGATIONS ARE INSUFFICIENT TO
      SUPPORT A CLAIM FOR A HOSTILE WORK ENVIRONMENT
      UNDER THE NYSHRL AND NYCHRL ............................................................. 18

      A.    Melendez's Allegations of Sexual Harassment ....................................... 18

      B.    Joelito Melendez's Hostile Work Environment Claim Under
            NYSHRL Fails. .......................................................................................... 20

      C.    Joelito Melendez's Claims Under the NYCHRL Fail. ............................. 22

      D.    Joelito Melendez Was Not Constructively Discharged. ........................... 23

VII.   DIEGO DIAZ DE LA VEGA'S ALLEGATIONS ARE INSUFFICIENT
       TO CONSTITUTE QUID PRO QUO SEXUAL HARASSMENT ...............................24

       A.   Plaintiff Cannot Support a Quid Pro Quo Claim of Sexual
            Harassment Under the NYSHRL or NYCHRL ....................................27

VIII.  DEFENDANTS DID NOT RETALIATE AGAINST PLAINTIFFS IN
       VIOLATION OF NEW YORK LABOR LAW ..................................................30

       A.   Plaintiffs Lantigua, Diaz De La Vega, and Lizandro..............................34

       B.   Plaintiffs Melendez, Maldonado, S. Lopez, and Vargas and
            Copantitla...........................................................................................38

       C.   Plaintiffs are Not Entitled to Punitive Damages Under NYLL§215 ....................41

IX.    PLAINTIFFS ARE BARRED FROM ASSERTING CERTAIN CLAIMS
       BASED ON THE DOCTRINES OF COLLATERAL ESTOPPEL,
       JUDICIAL ESTOPPEL, AND ELECTION OF REMEDIES ...........................................42

       A.   Collateral Estoppel Precludes Certain Plaintiffs From Re-litigating
            Facts Decided by the NLRB ALJ ...........................................................42

       B.   Judicial Estoppel Bars Diaz de la Vega's Sexual Harassment Claim...................43

       C.   Diaz de la Vega Must Choose Between Inconsistent Remedies............................44

X.     IGNACIO GARCIA'S ALLEGATIONS RELATING TO HIS
       RETALIATION CLAIM, WHICH HE VOLUNTARILY DISMISSED,
       SHOULD BE STRICKEN.................................................................................45

XI.    MARTIN LOPEZ'S CLAIMS SHOULD BE DISMISSED WITH
       PREJUDICE BECAUSE HE FAILED TO APPEAR FOR DEPOSITION....................47

XII.   RICARDO COPANTITLA'S CLAIMS SHOULD BE DISMISSED
       BECAUSE OF HIS FAILURE TO COMPLY WITH HIS DISCOVERY
       OBLIGATIONS.............................................................................................48

XIII.  CERTAIN PLAINTIFFS ARE NOT ENTITLED DAMAGES OUTSIDE
       THE STATUTE OF LIMITATIONS ................................................................49

Conclusion .........................................................................................................50

# TABLE OF AUTHORITIES

**Pages**

CASES

Albury v. J.P. Morgan Chase,
   No. 03-2007 ..............................................................................................14, 16, 17

Altschuler v. Samsonmite Corp.,
   109 F.R.D. 353 (E.D.N.Y. 1986) ...............................................................48

Arrington v. Liz Claiborne, Inc.,
   260 A.D.2d 267 (1st Dep't 1999) ...............................................................16

Arroyo v. WestLB Admin., Inc.,
   54 F. Supp. 2d 224 (S.D.N.Y. 1999)......................................................21, 24

Bartle v. Mercado,
   235 A.D.2d 651 (App. Div. 1997) ...............................................................28

Bates v. Long Island R.R. Co.,
   997 F.2d 1028 (2d Cir. 1993)......................................................................43

Blumenfeld v. Harris,
   3 A.D.2d 219 ............................................................................... passim

Bompane v. Enzolabs, Inc.,
   608 N.Y.S.2d 989 (Sup. Ct. 1994)...............................................................41

Carter v. Dutchess Cmty. Coll.,
   735 F.2d 8 (2d Cir. 1984) .......................................................................4, 8

Carter v. New York City Dep't of Corr.,
   7 Fed. Appx. 99,103 (2d Cir. 2001).............................................................31

Cellamare v. Millbank, Tweed, Hadley & McCloy LLP,
   03-CV-0039, 2003 WL 22937683 (E.D.N.Y. Dec. 2, 2003)............................14, 15

Chan v. Triple 8 Palace, Inc.,
   2006 U.S. Dist. LEXIS 15780 (S.D.N.Y. March 31, 2006.) .............................18, 19

Chao v. Vidtape, Inc.,
   196 F. Supp. 2d 281 (E.D.N.Y. 2002) ......................................................4, 5

Chernoff Diamond & Co. v. Fitzmaurice, Inc.,
   651 N.Y.S.2d 504 (N.Y. App. Div. 1996) .....................................................23

Chicarelli v. Plymouth Garden Apartments,
    551 F. Supp 532 (E.D. Pa 1982) ....................................................13

Christopher-Ketchum v. Agway Energy Products,
    988 F.Supp. 610 (N.D.N.Y. 1997)................................................24

Concord Limousine, Inc. v. Orezzoli,
    No. 19347/03, 2005 WL 1224972 (N.Y. Sup. Ct. May 20, 2005) .........................29

Conway v. Microsoft Corp.,
    414 F. Supp. 2d 450 (S.D.N.Y. 2006)..........................................24

Cruz v. Coach Stores, Inc.,
    202 F.3d 560 (2d Cir. 2000).....................................................21

DuBois v. Brookdale Univ. Hosp.,
    No. 6062-04, 2004 WL 3196952 (Sup. Ct. Dec. 1, 2004)............................. passim

Espaillat v. Breli Originals, Inc.,
    227 A.D.2d 266 .................................................................30

Faragher v. City of Boca Raton,
    524 U.S. 775 (1998)............................................................20

Feliciano v. Alpha Sector,
    No. 00 Civ. 9309 (AGS), 2002 U.S. Dist. LEXIS 12631, 2002 WL 1492139
    (S.D.N.Y. July 11, 2002) .......................................................21

Frida v. Henderson,
    No. 99-10749, 2000 WL 1772779 (S.D.N.Y. Nov. 30, 2000).......................32

Galabya v. New York City Bd. of Educ.,
    202 F.3d 636 (2d Cir. 2000)....................................................31

Goldberg v. Whitaker House Co-op, Inc.,
    366 U.S. 28 (1961)..............................................................7

Goyette v. DCA Adver., Inc.,
    830 F. Supp. 737 (S.D.N.Y. 1993)...............................................6

Gruenewald v. 132 West 31st Street Realty Corp.,
    613 N.Y.S.2d 39 (App. Div. 1994)..............................................41

Guangyu Zhao v. Time, Inc.,
    2010 U.S. Dist. LEXIS 87586 (2d Cir. August 13, 2010.)........................22

Harris v. Forklift Systems, Inc.,
    210 U.S. 17 (1993)............................................................21

Hayut v. State University of New York,
   352 F.3d 733 (2d Cir. 2003)..........................................................................20

Herman v. Blockbuster Entm't Group,
   18 F. Supp. 2d 304 (S.D.N.Y. 1998)...........................................................5, 6

Hernandez v. Jackson, Lewis, Schnitzler & Krupman,
   997 F. Supp. 412 (S.D.N.Y. 1998)................................................................29

Hollingsworth v. City of New York,
   1997 WL 91286 (S.D.N.Y. Mar. 4, 1997) ...................................................49

Hull v. Celanese Corp.,
   513 F.2d 568 (2d Cir. 1975).............................................................................3

Interscope Records v. Gilsa Barboasa,
   2006 U.S. Dist. LEXIS (E.D.N.Y. Dec. 29, 2006) ......................................48

Jackson v. City Univ. of New York,
   No. 05-8712, 2006 WL 1751247 (S.D.N.Y. June 23, 2006) ........................32

Jacques v. DiMarzio, Inc.,
   200 F. Supp. 2d 151 (E.D.N.Y. 2002) ..............................................35, 37, 39

Kader v. Paper Software, Inc.,
   111 F.3d 337 (2d Cir. 1997)...........................................................................23

Karibian v. Columbia Univ.,
   14 F.3d 773 (2d Cir. 1994)...............................................................27, 28, 29

Katz v. Beth Israel Med. Ctr.,
   No. 95-7183, 2001 WL 11064 (S.D.N.Y. Jan. 4. 2001) ........................37, 38

Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,
   957 F.2d 59 (2d Cir. 1992).............................................................................21

Lee v. Bankers Trust Co.,
   No. 96 Civ. 8153 (DAB), 1998 WL 107119 (S.D.N.Y. Mar. 11, 1998) ...................13, 14, 15

Lopez v. Silverman,
   14 F. Supp. 2d 405 (S.D.N.Y. 1998)............................................................7, 8

Lu v. Jing Fong Rest., Inc.,
   503 F. Supp. 2d 706 (S.D.N.Y. 2007)..................................................... passim

Lucas v. South Nassau Communities Hosp.,
   54 F. Supp. 2d 141 (E.D.N.Y. 1998) ............................................................21

Luncente v. Int'l Business Machines Corp.,
    310 F.3d 243 (2d Cir. 2002).................................................................44

Mack v. Otis Elevator Co.,
    326 F.3d 116 (2d Cir. 2003)...............................................................20

Majer v. Metro. Transp. Auth.,
    1992 WL 110995 (S.D.N.Y. 1992)......................................................41

McCavitt v. Swiss Reinsurance Am. Corp.,
    89 F. Supp. 2d 495 (S.D.N.Y. 2000)...................................................41

McDonald v. Head Criminal Court Officer,
    850 F.2d 121 (2d Cir. 1988)................................................................49

McGullam v. Cedar Graphics, Inc.,
    609 F.3d 70 (2d Cir. 2010)..................................................................20

Melendez v. Int'l Serv. Sys., Inc.,
    No. 97-8051, 1999 WL 187071 (S.D.N.Y. Apr. 6, 1999) ....................6, 7

Merck Eprova AG v. Prothera, Inc.,
    670 F. Supp. 2d 201 (S.D.N.Y. 2009)...................................................3

Mitchell v. Washingtonville Ctr. School Dist.,
    190 F.3d 1 (2d Cir. 1999) ...................................................................43

Mormol v. Costco Wholesale Corp.,
    364 F.3d 54 (2d Cir. 2004).................................................................28

Motorola Credit Corp v. Uzan,
    No. 02-0666, 2007 WL 1098689 (S.D.N.Y. Apr. 11, 2007) ................44

Nat'l Labor Relations Bd. v. Thalbo Corp.,
    171 F.3d 102 (2d Cir. 1999)................................................................42

NHL v. Metro Hockey Club,
    427 U.S. 639 (1976)...........................................................................48

Nicholls v. The Brookdale Univ. Hosp. Med. Ctr.,
    No. 03-6233, 2004 WL 1533831 (E.D.N.Y. July 9, 2004)...................32

Nichols v. Mem'l Sloan-Kettering Cancer Ctr.,
    829 N.Y.S. 2d 22 (App. Div. 2007) ....................................................31

Nieves v. City of New York,
    208 F.R.D. 532 (S.D.N.Y. 2002) ........................................................47

Padilla v. Manlapaz,
  643 F. Supp. 2d 301 (E.D.N.Y. 2009) ................................................................4

Petrosino v. Bell Atl.,
  385 F.3d 210 (2d Cir. 2004).............................................................................37

Quinn v. Green Tree Credit Corp.,
  159 F.3d 759 (2d Cir. 1998).............................................................................21

Radder v. CSX Trans., Inc.,
  893 N.Y.S. 2d 725 (App. Div. 2009) ..............................................................3, 4

Raniola v. Bratton,
  243 F.3d 610 (2d Cir. 2001).............................................................................21

Richardson v. New York State Dep't of Corr. Serv.,
  180 F.3d 426 (2d Cir. 1999).............................................................................20

Sease v. Doe,
  No. 04-5569, 2006 WL 3210032 (S.D.N.Y. Nov. 6, 2006)....................................47

Seever v. Carrols Corp.,
  528 F. Supp. 2d 159 (W.D.N.Y. 2007) .............................................................32

Spence v. Maryland Casualty Co.,
  995 F.2d 1147 (2d Cir. 1993).............................................................................23

Tabachnik v. Jewish Theological Seminary,
  No. 03-CV-2759, 2004 WL 414826 (S.D.N.Y. Mar. 4, 2004) ..............................29

Terry v. Ashcroft,
  336 F.3d 128 (2d Cir. 2003).............................................................................23

Thoreson v. Penthouse Int'l, Ltd.,
  80 N.Y.2d 490, 591 N.Y.S.2d 978 (1992) ..........................................................41

Truck Drivers Local Union No. 807 v. Reg'l Import & Export Trucking Co., Inv.,
  944 F.2d 1037 (2d Cir. 1991).............................................................................42

Wickham Contracting Co. v. Bd. of Educ.,
  715 F.2d 21 (2d Cir. 1983)...............................................................................42

Williams v. New York City Housing Authority,
  872 N.Y.S.2d 27 (N.Y. App. Div. 2009) ..............................................22, 23, 30

Wilson v. N.Y.P. Holdings, Inc.,
  2009 U.S. Dist. LEXIS 28876 (S.D.N.Y. Mar. 31, 2009) ...............................20, 21

Wine Markets Int'l, Inc. v. Bass,
        177 F.R.D. 128 (E.D.N.Y. 1998) ............................................................46

Zheng v. Liberty Apparel,
        355 F.3d 61 (2d Cir. 2003) ...........................................................9, 10

**STATUTES**

29 U.S.C. §§203(e)(1) and 203(g) (2009) ..................................................7

N.Y. Lab. Law. §§ 198(3), 663(3) ............................................................49

New York Executive Law §296(1)(a) .........................................................20

NYLL § 201(d) ..........................................................................................41

NYLL §215 ......................................................................................... passim

NYLL §215.1 .............................................................................................41

NYLL §215.2 .............................................................................................41

NYLL §215, and (6) ..................................................................................51

NYLL §740 ...............................................................................................41

NYLL §740(5) ...........................................................................................41

U.S.C. § 255(a) .........................................................................................49

**RULES**

Fed. R. Civ. P. 8(a) ...................................................................................44

Fed. R. Civ. P. 37(b)(2)(A)(v) ..............................................................47, 48

Rule 12(f) of the Federal Rules of Civil Procedure ..................................45

N.Y. Rules of Professional Conduct 1.7(a) ..................................................3

Rule 12(f) ..................................................................................................45

Rule 37 .....................................................................................................47

Rule 37(b)(2)(A) ...................................................................................47, 48

Rules 37(b), (d) and 41(b) ........................................................................47

Rule 37(d) ................................................................................................47

Rule 37 and Rule 41(b) ...........................................................................................47

Rule 41(b) ...............................................................................................................47

Rule 56.1 .................................................................................................................39

**REGULATIONS**

N.Y. Comp. Codes R. & Regs. tit. 12, §137-3.13 .......................................................17

**OTHER AUTHORITIES**

1 N.Y. Jur. 2d, <u>Actions</u> §9 ........................................................................................44

18 <u>Moore's Federal Practice</u>, § 131.13[5][a] ...............................................................44

Both <u>Gruenwald</u> ......................................................................................................41

<u>False Imprisonment and Malicious Prosecution</u> §11 ................................................13

<u>Restatement (Second)</u>, Torts §§38-41.......................................................................13

## PRELIMINARY STATEMENT

Plaintiffs are current or former employees of defendant Fiskardo Estiatorio, Inc. d/b/a Thalassa Restaurant ("Thalassa" or the "Restaurant") who bring various claims arising out of their employment.  Defendants George Makris and Fantis Foods, Inc. seek dismissal because they are not "employers" of plaintiffs.  In addition, although she is the sole shareholder of the Restaurant, defendant Julia Makris never had any control over plaintiffs and is also not an "employer" within the meaning of the Fair Labor Standards Act ("FLSA"), 29 U.S.C.§206(a), New York Labor Law ("NYLL"), New York State Human Rights Law ("NYSHRL") New York State Executive Law §296, and the New York City Human Rights Law, Administrative Code of the City of New York §8-107("NYCHRL").  Plaintiffs' claims fail because, as the documentary record makes clear, they were not employees of J. Makris or Fantis Foods, and the protections under the FLSA, NYLL, NYSHRL, and NYCHRL on which those claims are based are unavailing.

Moreover, all defendants move for summary judgment on plaintiffs' Eighth, Tenth, Eleventh, Twelfth, and Thirteenth Counts because there is no triable issue of fact regarding: (1) compliance with regulations regarding expenses resulting from maintenance of uniforms (Eighth Count); (2) compliance with NYLL §215 of the NYLL (Tenth Count); (3) Vargas's allegation of false imprisonment (Eleventh Count); and (4) Melendez's and Diaz de la Vega's claims of hostile work environment and quid pro quo sexual harassment under the NYSHRL and NYCHRL (Twelfth and Thirteen Counts) should also be summarily dismissed as a matter of law.

Finally, all defendants move to dismiss the claims of plaintiff Martin Lopez for his failure to appear for deposition and plaintiff Ricardo Copantitla for his failure to comply with his discovery obligations.  Defendants further seek to strike certain allegations pleaded by Ignacio Garcia in the Second Amended Complaint ("SAC"), which relate to his for retaliation claim, which was previously voluntarily withdrawn.

### STATEMENT OF FACTS

The uncontested material facts are set forth fully in the Statement of Undisputed Material Facts In Support of Defendant's Partial Motion For Summary Judgment.[1]

### LEGAL ARGUMENT

**I.   THE COURT MUST INITIALLY ADDRESS PLAINTIFFS' COUNSELS' CONFLICT OF INTEREST**

As a threshold matter, the Court should address a conflict of interest that has arisen from counsel's representation of all 13 plaintiffs.  During discovery, plaintiffs' counsel presented a claim on behalf of certain plaintiffs -- busboys and waiters (i.e. "correctly tipped employees") -- where, if they prevail, will expose other plaintiffs -- "polishers" and "managers" (i.e. "incorrectly tipped employees") -- to liability.  Accordingly, the Court should determine whether the appropriate remedy is for counsel to withdraw from representation or, in the alternative, require dismissal of that claim if current counsel will remain in the case.

At the outset, the conflict was not evident.  The initial complaint did not specifically allege which plaintiffs sought recovery of tips distributed to other Thalassa employees.  However, during discovery, the issue became clear as plaintiffs were seeking to recover tips for the "correctly tipped employees" from amounts that were paid to the alleged "incorrectly tipped employees."  For example, during depositions plaintiffs accused other plaintiffs (by name) of improperly participating in the tip pool.  Plaintiff Diego Diaz de la Vega testified that plaintiff Henry Matute was not entitled to receive tips when he worked as "temporary manager."  (Ex. QQ, Diaz de la Vega  40:12-16.)  According to Diaz de la Vega, "as long as [Matute] didn't take orders or participate in service … he didn't have the right."  (Id. 40:9-11.)  Upon learning the specifics of these claims, defendants responded to the second amended complaint by including a counterclaim for a set-off from the "incorrectly tipped employees" who are named as plaintiffs

---

[1] The procedural history of this case, including the related matter In Re Fiskardo Estiatorio, Inc., before the National Labor Relations Board, is set forth in the Affirmation of Stephanie L. Aranyos, Esq. ("Aranyos Aff.") For purposes of this brief all exhibits annexed to the Aranyos Aff. are cited as "Ex. ____."

for any amounts they were improperly paid.  As a result, plaintiffs now have caused claims by and between themselves which prevents one counsel (or here, three firms serving jointly as co-counsel) from representing all 13 plaintiffs.  The Court needs to address this issue before proceeding to the merits of the parties' cross-motions for partial summary judgment.

"Attorneys historically have been strictly forbidden from placing themselves in a position where they *must advance, or even appear to advance, conflicting interests*."  Radder v. CSX Trans., Inc., 893 N.Y.S. 2d 725, 728 (App. Div. 2009) (citations omitted) (emphasis added).  It is axiomatic that it is "improper for an attorney to simultaneously represent a client and another party with interests directly adverse to that client."  Merck Eprova AG v. Prothera, Inc., 670 F. Supp. 2d 201, 208 (S.D.N.Y. 2009).  This is because attorneys have an ethical obligation to exercise independent judgment on behalf of their clients.  Id.; N.Y. Rules of Professional Conduct 1.7(a).

If the "correctly tipped employees"[2] ultimately prevail on their claim that fellow plaintiffs improperly received tips, defendants' counterclaim seeks to recover the tips paid to polishers and managers (as a set-off to damages awarded, if any).  (Countercl. ¶¶ 279; 284, 289, 294, 299, 304, 310, 316.)[3]  As a result, prevailing on this claim in favor of the "correctly tipped employees" exposes counsels' "incorrectly tipped" clients to liability.

Defendants submit that there are two ways to resolve the conflict.  The usual, but more severe, remedy is disqualification of the conflicted counsel.  Merck Eprova AG, 670 F. Supp. 2d at 208; Hull v. Celanese Corp., 513 F.2d 568, 571 (2d Cir. 1975).  In the alternative and given the stage of this case, plaintiffs can eliminate the conflict by dismissing their illegal retention of tips claim stemming from the presence of alleged "incorrectly tipped employees" in the tip pool. In that event, the "correctly tipped employees" are not without a remedy for this claim (if it is

---

[2] It appears that the plaintiffs whose tips were allegedly diluted by including polishers and managers in the tip pool are I. Garcia, Guachun, Maldonado, and Vargas.

[3] Defendants seek a set-off against plaintiffs Copantitla, Diaz de la Vega, Lizandro, M. Lopez, S. Lopez, Melendez, who were alleged to be "polishers" and Matute and Lantigua, who sometimes served as banquet managers.

meritorious).  They can bring an action against their counsel for breaching their duties.  <u>See</u> <u>Radder</u>, 893 N.Y.S. 2d at 728. It must be clear, however, that all claims that tips were unlawfully retained must be dismissed, including but not limited to Count Seven of the SAC.

## II.   GEORGE MAKRIS AND JULIA MAKRIS ARE NOT "EMPLOYERS" OF PLAINTIFFS AND SHOULD BE DISMISSED FROM THIS LAWSUIT

Plaintiffs allege that Julia and George Makris are liable individually for wage and hour violations, retaliation, and sexual harassment claims because they are an employer of plaintiffs. Indeed, demonstrating that Julia and George Makris are employers is an essential element for plaintiffs to recover, which plaintiffs cannot establish based on the undisputed facts.  As such, summary judgment in their favor is appropriate.

### A.    Julia And George Makris Are Not "Employers" under the FLSA or NYLL.

Summary judgment in favor of Julia and George Makris on all Counts is appropriate because they are not employers, as defined under the FLSA and NYLL.  To determine whether an individual qualifies as an "employer" who is subject to liability under both the FLSA and NYLL, courts apply an "economic reality test."  <u>Carter v. Dutchess Cmty. Coll.</u>, 735 F.2d 8, 12 (2d Cir. 1984); <u>Padilla v. Manlapaz</u>, 643 F. Supp. 2d 301, 314-315 (E.D.N.Y. 2009) (applying the economic reality test to determine who is an employer under both the FLSA and NYLL). The "economic reality test" has four factors that ask whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules and conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records.  <u>Carter</u>, 735 F.2d at 12.  Courts look to the totality of circumstances when considering these four factors, as no one factor standing alone is dispositive. <u>Chao v. Vidtape, Inc.</u>, 196 F. Supp. 2d 281, 290 (E.D.N.Y. 2002).

In <u>Vidtape</u>, the court found that the father of two "employers" was not himself an employer, even though he occasionally attended employee meetings, visited the factory for a few hours, and some employees considered him a "boss."  <u>Id.</u> at 291.  Instead, the court relied on the fact that the father was "never an owner, shareholder, or officer of Vidtape."  <u>Id.</u>  The father did

not receive a paycheck and "never gave orders, hired, fired or set policies for the employees."
Id.  In sum, he was not an employer because "he did not hold an integral role in Vidtape's
operations, or in setting work policies, schedules or conditions of employment."  Id.

Based on these four factors, considered in light of the undisputed material facts, George
Markis clearly is not an "employer" of any plaintiff.  Plaintiffs cannot establish that George
Markis had <u>any</u> involvement in the operation or management of the Restaurant, let alone any
participation in its employment-related matters.  Any contact George Makris had with employees
of Thalassa was limited to being a customer of the Restaurant or by being an officer of Fantis
Transfer, the company that is the landlord of the Restaurant.

Like the father in <u>Vidtape</u>, George Markis has never been a shareholder, director, officer,
or employee of Thalassa and never received a paycheck from it.  (G. Makris Dec. ¶5.)  Likewise,
he never had any involvement in setting conditions of employment for plaintiffs (or any other
employees), including employment policies, hiring and firing decisions, rate of pay, or
scheduling of employees, or maintaining any employee records.  (Ex. BB, G. Makris 52:12-25;
Dec. ¶6; Ex. CC, S. Makris 63:24-64:5; 64:21-64:2.)  George Makris also did not offer "advice
to any managers at the restaurant" and did not confer with them about the Restaurant's
operations because he has "no idea about the restaurant business."  (Ex. BB, G. Makris 45:15-
24.)  This lack of interaction with the Restaurant's operations also extended to receiving and/or
addressing employee complaints and the events of October 1 and 2.  (Id. 50:13-52:11.)  In the
end, he was only at the Restaurant about once a week -- and then only to eat.  (Id. 30:9-20.)  If
necessary, he would visit the building in which the Restaurant is located as the landlord to
address upkeep or maintenance issues.  (Id. 30:21-31:13.)

Likewise, Julia Makris does not meet the test to be considered an "employer."  Although
she is the sole shareholder of Fiskardo Estiatorio, Inc., that has been her only involvement with
the restaurant since 2003.  Absent evidence of control, her status as shareholder is insufficient for
her to be an employer.  <u>Herman v. Blockbuster Entm't Group</u>, 18 F. Supp. 2d 304, 313
(S.D.N.Y. 1998).  In November 2002, when the Restaurant opened, Julia Makris' essentially

only delegated duties to others.  (Ex. AA, J. Makris  18:3-9; 42:15-23.)  As a result of an illness that she still suffers from, Ms. Makris ceased being involved with Thalassa in February 2003.  (Id. 19:25-20:9; 43:15-23.)  Like her husband, Julia Makris has no knowledge of or involvement in setting employee compensation, hiring and firing employees, determining the Restaurant's tip policy, receiving and addressing employee complaints, or making any other employment decisions.  (Id. 26:11-15; 29:20-23; 30:22-32:5; 32:16-19; Ex. CC, S. Makris 17:9-11, 17:21-18:4; 18:19-23.)  She does not directly or indirectly communicate with the front of the house staff, including plaintiffs, (except to order meals as a patron) or exercise any other control over them.  Moreover, she is not consulted by decision makers about employment decisions and she is not aware of the Restaurant's operations as it pertains to banquets.  (Ex. AA, J. Makris 23:14-25:2; 39:9-15.)

**B.      Julia and George Makris are not "Employers" under the NYSHRL and NYCHRL.**

Just as Julia and George Makris are not "employers" under federal and state wage and hour statutes, they are not "employers" for the purposes of liability for plaintiffs' sexual harassment claims under the state and city Human Rights Laws.  Accordingly, the Court should grant summary judgment in their favor on the Twelfth and Thirteenth Counts.

When deciding whether an individual is an employer under the state and city human rights laws, courts consider: whether the supposed employer: (1) had the power of the selection of the employee; (2) paid the employee; (3) had the power of dismissal over the employee; and (4) had the power to control the employee's conduct.  Goyette v. DCA Adver., Inc., 830 F. Supp. 737, 746 (S.D.N.Y. 1993).  These factors are applicable to such employer determinations under both the NYSHRL and NYCHRL.  Melendez v. Int'l Serv. Sys., Inc., No. 97-8051, 1999 WL 187071, at *9 (S.D.N.Y. Apr. 6, 1999).

For the reasons stated in Section II.A. and B., supra, neither Julia nor George Makris are "employers" within the meaning of the NYSHRL and NYCHRL. Id. at *10 (the court considered wage and hour cases to determine who is an employer under state and city sexual harassment

law).  As discussed, Julia and George Makris had no involvement in any employment issue at Thalassa, including payment of wages, decisions to hire and fire, or control over such employee's duties, as they relate to plaintiffs asserting sexual harassment claims.  (Ex. BB, G. Makris  45:15-24; 52:12-25.)  In fact, Julia and George Makris do not even know who Diego Diaz de la Vega or Joelito Melendez are.  (Id.  54:21- 55:3; Ex. AA, J. Makris  32:25-33:2; 36:11-13)  Therefore, summary judgment in favor of Julia and George Makris is appropriate.

## III.   FANTIS FOODS IS NOT AN "EMPLOYER" OF PLAINTIFFS

Plaintiffs' incorrectly allege that Fantis Foods is a proper party to the action because it was plaintiffs' "employer" within the meaning of the FLSA, NYLL, the NYSHRL and NYCHRL and "through its agents exercised sufficient control over the terms and conditions of Plaintiffs' employment to render it an employer of the Plaintiffs."   (SAC  ¶¶33 and 146.)  Plaintiffs have not and cannot establish a connection between claims against Thalassa and Fantis Foods, because there is none.  Fantis Foods is simply not an "employer" of plaintiffs.

The FLSA defines "employee" as "any individual employed by an employer" and defines "employ" as "to suffer or permit to work."  29 U.S.C. §§203(e)(1) and 203(g) (2009).  The Supreme Court established that a company "suffers or permits" a person to work if that company functions as the person's employer as a matter of "economic reality."  Goldberg v. Whitaker House Co-op, Inc., 366 U.S. 28, 33 (1961).  This test "requires a full inquiry into the true economic reality of the employment relationship based on a particularized inquiry into the facts of each case."  Lopez   v. Silverman, 14 F. Supp. 2d 405, 413 (S.D.N.Y. 1998) (citations omitted).  Furthermore, "the goal of the analysis is to determine whether the employees in question are economically dependent upon the putative employer."  Id. at 414.  Here, Fantis never was plaintiffs' joint employer.

The Second Circuit has found that an entity may be deemed a joint employer (1) if it exercises "formal" control over an employee or (2) where another entity lacks "formal" control, it exercises "functional" control over the worker sufficient to be considered a "joint employer".

However, "no one aspect of the relationship may be treated as dispositive; rather, "the test is based on a totality of the circumstances," so that any relevant evidence may be considered and mechanical application of the test is to be avoided." Lopez, 14 F. Supp. 2d at 414.  Here, the "economic reality" is that Fantis Foods never exercised either "formal control" or "functional control" over plaintiffs.

      **(a)**      **Formal Control**

In Carter the Second Circuit established a four-part test to determine whether an entity exercised sufficient formal control over employees to be deemed the employees' employer.  See 735 F.2d at 12 (set forth in Section II.A.)  Under the Carter analysis, Fantis Foods does none of the four factors with respect to employees of Thalassa.

Plaintiffs' attempt to create a relationship between Fantis Foods and Thalassa through Steve Makris and Tommy Ziotas.  However, any involvement by Steve Makris with Thalassa had nothing to do with his employment or position with Fantis Foods, but was solely because of his mother's illness and his residence being located above Thalassa.  As set forth in detail in the Declarations of Tommy Ziotas and Jerry Makris, Thalassa hired its own employees through its Chef or General Manager and Steve Makris would give final approval.  Even plaintiffs alleged and testified that Thalassa's maitre d' hired and fired at the Restaurant.  And, while that fact is contested, it does make it clear that this factor weighs in favor of Fantis Foods because it is undisputed that Thalassa had exclusive control over the hiring and firing of all employees.

Plaintiffs' allege that Ziotas, "[w]hile employed by Fantis…was the person primarily responsible for managing Thalassa Restaurant's payroll." Plaintiffs further allege that during the relevant time period, Ziotas was employed only by Fantis Foods and not by Fiskardo Estiatorio, Inc.  In addition, plaintiffs allege that the Restaurant's payroll records were routinely sent to the Fantis offices in Carlstadt, New Jersey and that Ziotas and Fantis had custody and control over the Restaurant's payroll documents.  (SAC ¶¶142-144.)

Although some of Thalassa's payroll records were sent to Tommy Ziotas, in New Jersey, Fantis Foods did not "maintain" Thalassa's payroll.  Tommy Ziotas, as Vice President and

employee of Thalassa merely received the payroll information and forwarded that information to the payroll company.

There is no question that Fantis Foods lacks formal control over plaintiffs: (1) Fantis Foods never hired or fired employees; (2) Fantis Foods never supervised or controlled the plaintiffs' work schedules or conditions of employment; (3) Fantis Foods never determined the rate or method of payment of the plaintiffs; and (4) Fantis Foods never "maintained" the employment records of plaintiffs.

### (b)     Functional Control

In <u>Zheng v. Liberty Apparel</u>, 355 F.3d 61 (2d Cir. 2003), the Second Circuit set forth additional factors to consider whether an entity exercised "functional" control over employees sufficient to create a "joint employer" relationship.  To determine whether a joint employment relationship exists, it is necessary to consider "the circumstances of the whole activity" in light of "economic reality."  The court identified six factors that should be evaluated in making the joint employer analysis: (1) whether defendants' premises and equipment were used for plaintiff's work; (2) whether the referral agencies had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiff performed a discrete line-job that was integral to defendants' process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the defendants or their agents supervised plaintiff's work; and (6) whether plaintiff worked exclusively or predominantly for the defendants.

The facts that the Second Circuit considered were, however, drastically different than the facts at issue here.  In <u>Zheng</u>, plaintiffs were piece-rate garment assemblers who worked in a Chinatown factory where six different contractors conducted business.  Plaintiffs sued their immediate employers alleging FLSA and NYLL violations.  The immediate employers could not be located or had ceased doing business.  Therefore, plaintiffs also sued Liberty Apparel Company ("Liberty"), a company that had contracted with their immediate employers, alleging that Liberty was their joint employer and thus liable for FLSA violations.  Liberty was a

manufacturing company that contracted out the last portion of its production process to plaintiffs' immediate employers. Liberty developed the garment patterns, cut the samples, and purchased and cut the fabric, and then delivered the cut fabric and essential materials to contractors for final assembly. Liberty employed individuals to monitor the garments during assembly by the contractors, but the extent of the monitoring was disputed by the parties. The Second Circuit remanded the case to the District Court for further proceedings in light of the new six-factor test. The purpose of the <u>Zheng</u> test is to impose joint employer liability on those arrangements which are nothing more than "a mere subterfuge to avoid complying with labor laws," while at the same time respecting legitimate outsourcing and subcontracting arrangements. <u>Zheng</u>, 355 F. 3d at 74.

Under the factors in <u>Zheng</u>, Fantis Foods is not a joint employer of plaintiffs: (1) plaintiffs worked exclusively on Thalassa's premises and not on the premises of Fantis Foods; (2) Thalassa and Fantis Foods are in two distinct and different lines of business; (3) plaintiffs work exclusively for Thalassa and their worked never shifted to Fantis Foods -- nor could it. Fantis Foods as a food importer and distributor has no use for waiters, busboys, etc.; (4) Thalassa's responsibilities do not and could not shift to Fantis Foods; (5) Fantis Foods employees did not supervise plaintiffs; and (6) plaintiffs never worked for Fantis Foods or performed any services for those entities (except when Fantis Foods was a paying customer of Thalassa).

Because Fantis Foods was never involved in plaintiffs' actual work, formally or functionally, Fantis Foods cannot be a joint employer of plaintiffs. That Thalassa payroll information was forwarded to Thalassa employees, who happened to be doing their work from the Fantis Foods office in Carlstadt, before sending it to the outside payroll company is not enough to create a joint employer relationship, in light of the totality of the circumstances. In sum, an entity with no direct involvement in or control of an individual's actual work is not a joint employer of that individual.

Here, there is no evidence that Fantis Foods had any authority to set Thalassa employees' schedules or determine the rate of pay.  Nor did Fantis Foods and Thalassa share or co-determine employment conditions of Thalassa's employees.  Thalassa hires its own employees, establishes and pays their wages.  Thalassa exercises sole authority to effectively discipline and discharge the employees, and to assign, schedule, and supervise the employees on a day-to-day basis. Furthermore, the fact that Thalassa employees forward the payroll information to another Thalassa employee at Fantis Foods' facility in Carlstadt for processing and submission to an independent payroll company is insufficient to create joint employer status.  Moreover, Thalassa and Fantis Foods maintain separate payroll and account information and records.  The "economic reality" test fails to establish Fantis Foods as a "joint employer."[4]  Thus, all claims against Fantis Foods should be dismissed.

## IV.   JOSE LUIS VARGAS'S FALSE IMPRISONMENT CLAIM MUST BE DISMISSED

On October 1, 2008, a group of approximately 25 people, including one current and two former Thalassa employees, entered into the Restaurant en masse during the dinner service hours and attempted to deliver a letter to S. Makris.  (Ex. FF, Zapantis 181:6-184:8; Ex. CC, S. Makris 126:11-127:23; Ex. GG, Zapantis NLRB 41:23-43:22; Ex. KK, Kurt NLRB 722:16-724:12.) The group surrounded the hostess station and Kurt.  (Ex. FF, Zapantis 181:6-184:8; Ex. KK, Kurt NLRB 724:18-725:5.)  Kurt observed one male "quite large in size" walking behind everyone; Kurt became "concerned about him" because the man was "acting off balance."  (Ex. KK, Kurt NLRB 725:6-14.)  The group caused such a stir on the floor that Zapantis received a call telling him, to go upstairs immediately.  (Ex. FF, Zapantis 181:6-184:8; Ex. GG, Zapantis NLRB 81:14-17.)  When Zapantis arrived, he saw the group had surrounded Kurt.  (Ex. FF, Zapantis 181:6-

---

[4] The Second Circuit also recognizes the joint employer test in Title VII cases, and likewise NYSHRL and NYCHRL. See Eaton v. Goodstein Mgmt., Inc., 1999 U.S. Dist. LEXIS 17655 (S.D.N.Y. 1999); see also Gore v. The RBA Group, Inc., 2008 U.S. Dist. LEXIS 25912 (S.D.N.Y. 2008). For the reasons discussed in Section III, supra, plaintiffs' claims against Fantis Foods fail under the NYSHRL and NYCHRL.

184:8; Ex. GG, Zapantis NLRB 82:15-20.)

In the attempt to deliver the letter to Kurt, Lantigua shook and waved the envelope in Kurt's face.  (Ex. FF, Zapantis 181:6-184:8. Ex. KK, Kurt NLRB 726:8-16.)  Kurt declined to accept it, stating, in words or in substance, that "I don't have authority to accept [the letter]." (Ex. FF, Zapantis 181:6-184:8; Ex. GG, Zapantis NLRB 42:21-24; Kurt NLRB 726:8-16.) Neither Kurt nor Zapantis were informed of the contents of the letter.  (Ex. GG, Zapantis NLRB 83:21-24; 85:6-16; Ex. KK, Kurt NLRB 727:13-18.)

The group was asked to leave.  (Ex. KK, Kurt NLRB 726:25-727:12.)  Initially, the group refused to leave, but eventually left.  (Id. 726:17-24.)   While leaving, the group started "cheering" and "clapping" in front of the Restaurant.  (Ex. FF, Zapantis 181:6-184:8; Ex. GG, Zapantis NLRB 83:25-84:23.)  Vargas (who was off-duty on October 1) was part of the group that tried to deliver the letter.  (Ex. FF, Zapantis 185:2-9; Ex. XX, Vargas NLRB 488:18-489:1.)

The letter was not opened in the Restaurant, and it was not left at Thalassa that evening. (Ex. PP, Lantigua NLRB 342:4-7.)  It was not until Friday, October 3, 2008, when the Restaurant received a letter from the Urban Justice Center that attached the letter from Shearman & Sterling LLP, that Thalassa first learned the contents of the letter that the group tried to deliver, and what the employees' complaints were.  (Ex. CC, S. Makris 168:16-169:12; Ex. GG, Zapantis NLRB 69:11-15; 85:9-16; Ex. DD, S. Makris NLRB 132:15-22; 150:20-152:2.)

On the night of October 1, 2008, S. Makris was in New Jersey.  He received a call from someone at the Restaurant informing him what had happened.  S. Makris was very concerned by what he heard and left his office and went to the restaurant.  (Id. 128:8-129:2.)

On October 2, 2008, Vargas reported to work.  (Ex. GG, Zapantis NLRB 45:19-46:11; 46:18-47:1; Ex. DD, S. Makris NLRB 131:21-132:1.)   S. Makris was in New Jersey when Zapantis called him to say Vargas had arrived at work.  (Ex. CC, S. Makris 139:23-141:2.) Because S. Makris was concerned for the safety of his family, who live above the Restaurant, and for the Restaurant's customers, he wanted to know who the large group was and why they had entered Thalassa during business hours.  (Ex. CC, S. Makris 143:9-25; Ex. DD, S. Makris

NLRB 132:15-22; 134:16-135:3.)  S. Makris went to Thalassa, and Vargas was asked to go to the General Manager's office where he was questioned.   (Ex. FF, Zapantis 187:9-188:12; 188:21-189:13; Ex. CC, S. Makris 144:13-19. Ex. GG, Zapantis NLRB 48:2-4; Ex. DD, S. Makris NLRB 132:6-8; 134:6-8; Ex. II, R. Abrante NLRB 554:17-25.)  Vargas now contends that the meeting with S. Makris amounted to a false imprisonment under New York common law.  For the reasons set forth below, Vargas' claim fails.

Defendants are entitled to summary judgment on Vargas's false imprisonment claim (Eleventh Count) because, even assuming that Vargas's accusations are true, he cannot make out a <u>prima facie</u> case under New York common law.  To establish a claim of false imprisonment, plaintiff must show that: (1) defendant intended to confine plaintiff; (2) plaintiff was conscious of the confinement; (3) plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged.  <u>See</u> 52 NY Jur. 2d, <u>False Imprisonment and Malicious Prosecution</u> §11; <u>see also</u> <u>Blumenfeld v. Harris</u>, 3 A.D.2d 219, <u>aff'd</u> 3 N.Y.2d 905, <u>cert. denied</u> 356 U.S. 930. Here Vargas not confined and he consented to meet with and remain with S. Makris in the office.

"A false imprisonment claim requires a <u>prima facie</u> showing of actual confinement or threatening conduct," <u>Lee v. Bankers Trust Co.</u>, No. 96 Civ. 8153 (DAB), 1998 WL 107119, at *4 (S.D.N.Y. Mar. 11, 1998), <u>aff'd</u> 166 F.3d 540 (2d Cir. 1999) (citations omitted). Confinement may be effected by physical barriers or physical force, by submission to a threat to apply physical force, or by taking a person into custody under an asserted legal authority. <u>Restatement (Second)</u>, Torts §§38-41.   The confinement within the boundaries fixed by defendant must be complete; if there is a known, safe means of escape, involving only a slight inconvenience, there is no false imprisonment.  <u>Chicarelli v. Plymouth Garden Apartments</u>, 551 F. Supp 532, 541 (E.D. Pa 1982).

Furthermore, unless physical force or physical barriers are used, there must be some sort of verbal threat to effect plaintiff's confinement.  <u>Id</u>.  A fear of being arrested or fired if he/she left does not constitute the detaining force necessary to establish the tort of false imprisonment. <u>See</u> <u>Blumenfeld</u>, 3 A.D.2d at 220.  In <u>Blumenfeld</u>, plaintiff entered into the back room of his

employer's store for questioning.  The court held that the employer's threats to invoke processes of law unaccompanied by force or any other form of restraint, cannot constitute false imprisonment.  See Id.

In Lee, 1998 WL 107119, at *5 the court dismissed plaintiff's false imprisonment claim where security personnel from plaintiff's employer, who called plaintiff into a meeting for a five-hour interrogation session over alleged wrongdoings, did "not indicate an intent to confine" since defendant's actions "did not amount to an actual confinement or anything more than a lengthy interview."   The court held that plaintiff's allegations that "three of Defendant's high level security personnel told him that they were former FBI agents" and "prepared a confession for him to sign without permitting Plaintiff to add anything to the statement" did "not amount to an actual confinement or anything more than a lengthy interview," and noted that "[s]ummoning an employee into an interview in familiar surroundings . . . does not indicate an intent to confine." Id.

Likewise, in Cellamare v. Millbank, Tweed, Hadley & McCloy LLP, 03-CV-0039, 2003 WL 22937683, at *2 (E.D.N.Y. Dec. 2, 2003), plaintiff claimed that defendants falsely imprisoned her when defendants called plaintiff into a meeting at their office, questioned her for over five hours and called her a liar.  Relying on Lee, the court held that plaintiff failed to show that the encounter was "anything more than a lengthy interview by an employer" because defendants did not tell plaintiff that "she was not free to leave and there [was] no allegation that [defendant] forced her to stay." Id.

Similarly, in Albury v. J.P. Morgan Chase, No. 03-2007, 2005 WL 746440 (S.D.N.Y. Mar. 31, 2005), plaintiff sued her employer for false imprisonment.  Plaintiff claimed that defendant falsely imprisoned her when plaintiff met with the manager in his office to discuss the reasons for her termination, and the manager closed his office door, yelled at plaintiff and called her a liar.  Plaintiff testified that the meeting lasted only eight minutes, she was not sure whether the door was locked, the manager never touched her, she never told the manager that she felt uncomfortable and that her sister was sitting directly outside the office door during the meeting.

Plaintiff argued that she did not feel free to leave the office during the meeting but cited no reason for this belief other than the fact that the office door was closed, and that the manager yelled at her.  The court, relying on both <u>Lee</u> and <u>Cellamare</u>, held that there was insufficient evidence to establish a claim for false imprisonment and granted summary judgment in defendant's favor.  In reaching its decision, the court noted that "[a] lengthy interview of an employee by an employer, without more, does not support a claim for false imprisonment." <u>Id.</u> at *13 (<u>quoting</u> <u>Lee</u>, 1998 WL 107119 at *4).

In addition, the court found that plaintiff failed to offer sufficient evidence of a <u>prima facie</u> case of false imprisonment, particularly with respect to the manager's intent to confine plaintiff in his office.  As plaintiff admitted in her deposition testimony, plaintiff did not see the manager lock the office door nor did the manager verbally or physically communicate an intent to restrain plaintiff from leaving his office.  "Summoning an employee into an interview in familiar surroundings in the employer's office does not indicate an intent to confine." <u>Id.</u> (Plaintiff's reliance on the fact that the manager yelled at her and called her a liar, while certainly not pleasant, does not rise to the level of false imprisonment.)

Likewise, here, Vargas has failed to offer sufficient evidence to establish a <u>prima facie</u> case of false imprisonment.  The evidence adduced shows unequivocally that Vargas was not confined, Steve Makris did not intend to confine Vargas, and Vargas consented to the meeting.

Steve Makris requested a meeting with Vargas to discuss the events of October 1, where a large group attempted to deliver a letter in a very unorthodox manner, which caused S. Makris concern for the safety of his family.  Vargas met with S. Makris in the office located on the lower level of the Restaurant, which was the same office in which several employees initiated a meeting with Kurt in the Spring of 2008.  While Vargas was in the office at least one door to the office was open.  (Ex. CC, S. Makris 149:10-155:25; Ex. NN, Giakoumis 76:21-25; Kurt 334:20-335:6; 336:5-24.)

Steve Makris requested the presence of police officers to ensure that the meeting remained cordial.  As one officer testified, it was an uneventful encounter in his day as a New

York City police officer.  (Ex. MM, Conway 74:2-5) During the meeting Steve Makris asked who the group was from October 1, 2008 and what was it that they wanted.  Steve Makris never threaten Vargas with arrest; never asked the uniformed officers to arrest Vargas, nor did he ask whether Vargas has been to jail. (Ex. CC, S.Makris 158:11-159:13.)

Notably, when Vargas did ask to leave the room to get his attorney's business card, he was able to leave.  (Abrahante 43:22-44:23.) At no time did any of the defendants' employees stop Vargas from leaving the room or the Restaurant.  Given the fact that the Vargas was in a familiar office, during normal business hours, and got up and left the room, no reasonable jury could find that a reasonable person would not have felt free to leave.

Even assuming arguendo that Steve Makris threatened to arrest Vargas,[5] the mere threat to arrest does not constitute confinement.  Blumenfeld, 3 A.D.2d at 220.  The fact that a plaintiff merely believes he is not free to leave is not enough to support a claim of false imprisonment.  Arrington v. Liz Claiborne, Inc., 260 A.D.2d 267 (1st Dep't 1999) (finding plaintiff did not satisfy the first two elements of the tort of false imprisonment because plaintiffs merely "believed" that the door to the office was locked and they "felt" that the were not free to leave because they were told if they did not cooperate and sign written agreements, the police would be called.")

Further, even assuming arguendo that Vargas was confined, no jury could find that Vargas did not consent to the confinement.  This is an independent reason to grant summary judgment as to this claim.  See Albury, 2005 WL 746440, at *14. Vargas voluntarily met with Steve Makris, never tried to exit the open door, never asked either the plainclothes police officers or the uniformed police officers to be allowed to leave the office (except to get the lawyer's card) or to be allowed to return to work or to go home.  (Ex. WW, Vargas 138:17-19.)  Vargas consented and stayed in the office.  (Id. 134:24-135:25.)  Further, even when he was alone in the

---

[5] Steve Makris and the two police officers who testified at depositions all deny that Vargas was ever threatened with arrest. (Ex. NN, Giakoumis 117:6-118:21; Ex. MM, Conway 71:21-73:25; Ex. CC, S. Makris 158:11-159:13.)

office, with the door open, he remained in the office.  (Id. 134:24-135:25; 143:3-5.)  Thus, according to Vargas's own testimony, there is no evidence from which a reasonable jury could find that plaintiff did not consent to the meeting.

## V.   PLAINTIFFS WERE NOT REQUIRED TO WEAR "UNIFORMS" AS DEFINED UNDER NEW YORK LAW

All plaintiffs, except Aussencio Ramirez, allege that defendants required to them to wear a uniform, the cost of which would be deducted from plaintiffs' paychecks.  Further, those plaintiffs allege that defendants failed to reimburse them for the costs of purchasing, cleaning and maintaining the uniforms.  (Eighth Count) It is uncontested that (1) the Restaurant provided busboys with a black apron, which was always laundered at the Restaurant's expense, (2) the busboys purchased their own black shirt, black pants, and black shoes, and (3) that captains (a/k/a waiters) purchased their own business suits, shirts, ties, and shoes.  (Ziotas Dec. ¶¶40, 43, 45.) None of the clothing worn by any plaintiff had the name or logo of the Restaurant.  To the contrary, all of that clothing was the property of each plaintiff, who could wear it socially and kept it when their employment ended.  (Id. ¶ 45.)  Indeed, several employees used personal clothing that they had previously purchased to work at other restaurants.  (E.g. Ex. R, I. Garcia 22:8-15; Ex. YY, Guachun 24:8-10.)

Employers are not required to compensate employees for "clothing that may be worn as part of an employee's ordinary wardrobe."  N.Y. Comp. Codes R. & Regs. tit. 12, §137-3.13.  In a 1998 Opinion Letter, the New York Dep't of Labor stated that tan shorts, tan pants, black belt, white tennis shoes, and black shoes may be worn as part of an employee's ordinary wardrobe and only stated that a polo shirt with the restaurant's logo may not be worn as part of the employee's ordinary wardrobe.  See N.Y. Dep't. of Labor Opinion Letter (Sept. 29, 1998).

Here, the clothing worn by plaintiffs did not contain the Restaurant's logos or other unique marking which would prevent the clothes from being wearable as part of a normal wardrobe.  Plaintiffs wear "black shirt, black pants, black shoes," for the busboys, and suits, shirts, ties, and shoes" for the captains.  Therefore, these items do not qualify as a "uniform."  Lu

v. Jing Fong Rest., Inc., 503 F. Supp. 2d 706, 712 (S.D.N.Y. 2007) (granting summary judgment in favor of defendants where plaintiffs attire at the restaurant did not qualify as a "uniform.")

Moreover, plaintiffs have failed to offer any proof that their cleaning costs reduced their wages to below minimum wage.  Chan v. Triple 8 Palace, Inc., 2006 U.S. Dist. LEXIS 15780 at *78 n.39 (S.D.N.Y. March 31, 2006.) (stating that the provision only applies if the employees' expenditures for uniform-maintenance purposes would reduce their wages to below minimum wage.)  Thus, plaintiffs' claim fails.

**VI. JOELITO MELENDEZ'S ALLEGATIONS ARE INSUFFICIENT TO SUPPORT A CLAIM FOR A HOSTILE WORK ENVIRONMENT UNDER THE NYSHRL AND NYCHRL**

In the Twelfth and Thirteen Counts, Joelito Melendez alleges that he was subjected to "hostile work environment" sexual harassment by Kurt, in violation of the NYSHRL and NYCHRL.  Melendez alleges that he resigned from the Restaurant in approximately March 2008 because of that sexual harassment.  Melendez claims that Kurt touched him in a sexually explicit manner and this touching constituted harassment.  Yet, based upon the deposition testimony and the applicable law, Melendez cannot establish a prima facie case of "hostile work environment" sexual harassment, because the purported conduct was not "severe or pervasive".  Moreover, Melendez fails to state a claim for constructive discharge.  Thus, the Twelfth and Thirteenth Counts should be summarily dismissed as a matter of law.

**A.  Melendez's Allegations of Sexual Harassment**

Melendez alleged that: (1) during his employment at the Restaurant Kurt inappropriately touched him by placing his hands on Melendez's back on approximately five occasions; and (2) while cleaning up after a private party on the second floor, Kurt allegedly rubbed Melendez's back and then rubbed up against him.  (Ex. BBB, Melendez 71:10-73:11.)  Notwithstanding Kurt's denial of each otherwise unwitnessed, alleged incident, all allegations, taken together or separately are insufficient to establish a claim for sexual harassment.

According to Melendez, on five occasions Kurt placed his hand on Melendez's shoulder while he discussed work related matters and after Kurt finished explaining things, "he put his hand on my back as to say <u>that's all</u>."   (<u>Id.</u>, 84:9-13.)   However, Kurt rested his hand on Melendez's shoulders for "mere seconds." (<u>Id.</u>, 84:14-15; 85:8-11.)  Melendez never asked Kurt to remove his hand.  (<u>Id.</u>, Melendez 72:8-9; 94:11-13.)  Indeed, Melendez dismissed the back rubbing and testified that he "didn't pay him much attention." (<u>Id.</u>, 66:23-24.)  Melendez never alleged that Kurt's placing his hand on his shoulder was sexual in nature or that it was accompanied with any sexually explicit language.  Melendez never testified that Kurt used sexually charged language. (Ex. BBB, Melendez 83:18-25.)The only other harassing conduct Melendez alleged was a single occurrence where Kurt grazed against Melendez's back while they were both clearing up after a private party.  Yet again, this was not accompanied by any sexually explicit language or by any sexual innuendo.  (<u>Id.</u>)

The second purported incident occurred while Melendez and Kurt were cleaning up after a private party in the second floor loft.  Melendez claimed that Kurt began rubbing his back and then came close up behind him and rubbed his genitals on his back.[6]   (<u>Id.</u> 74:24-75:3.) According to Melendez, "it didn't last more than some seconds" because he immediately "pushed him off and ran downstairs to the main floor." (<u>Id.</u>, 67:5-6; 74:24-75:3.)   Melendez never told anyone about the incident.  (<u>Id.</u>, 67:15-19; 80:2-6.)   The only person Melendez allegedly told was his roommate, Katty Diaz, who was not an employee of Thalassa.  (<u>Id.</u>, 80:10-11; 80:19-20; 81:19-20.)

Kurt vehemently denies ever touching Melendez.  (Ex. JJ, Kurt  331:4-8.)  Likewise, Kurt stated that he never stood behind Melendez and put his hands on his hips, nor stand behind Melendez and rub up against him.  (<u>Id.</u> 332:2-9.)  Moreover, Kurt testified that not only did he not recall ever touching anyone on their shoulders, but that no one ever complained to him about touching them in an inappropriate manner.  (<u>Id.</u> 322:15-23.)

---

[6] There is no evidence that Kurt was exposed when he allegedly rubbed himself against Melendez.

**B.**      **Joelito Melendez's Hostile Work Environment Claim Under NYSHRL Fails.**

Under New York Executive Law §296(1)(a) it is an unlawful discriminatory practice for an employer to discriminate against an individual in the conditions of their employment because of their gender.  To prevail on a hostile work environment sexual harassment claim a plaintiff must show "'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 79 (2d Cir. 2010) (quoting Harris, 510 U.S. at 21).[7]  In order to "survive a motion for summary judgment, a plaintiff claiming that he or she was the victim of an unlawful hostile work environment must elicit evidence from which a reasonable trier of fact could conclude . . . that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his or her work environment."  Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003) (brackets omitted) (quoting Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 436 (2d Cir. 1999)).[8]  Moreover, "conduct must be extreme to amount to a change in the terms and conditions of employment."  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).

In order for discriminatory intimidation to be severe or pervasive enough to alter the conditions of the work environment, "[t]he plaintiff must subjectively experience the working environment as abusive and the Court must be satisfied objectively that it is abusive."  Wilson v. N.Y.P. Holdings, Inc., 2009 U.S. Dist. LEXIS 28876, at *80 (S.D.N.Y. Mar. 31, 2009) (quoting Hayut v. State University of New York, 352 F.3d 733, 745 (2d Cir. 2003)).  To determine if the working environment is abusive, courts examine the "totality of the circumstances."  Id. at *81

---

[7] A sexual harassment claim based on a hostile work environment has the same elements as a hostile work environment sexual harassment claim under Title VII.  Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295, 305 n. 3 (N.Y. 2004) ("The standards for recovery under the New York State Human Rights Law (see Executive Law § 296) are the same as the federal standards under title VII of the Civil Rights Act of 1964 . . . .").

[8] The same analysis applies to same-sex sexual harassment claims.  Fenn v. Verizon Communications, Inc., 108 Fair. Empl. Prac. Cas. (BNA) 1383, 1393 (S.D.N.Y. Mar. 15, 2010).

(citing Quinn v. Green Tree Credit Corp., 159 F.3d 759, 767 (2d Cir. 1998)).  Relevant factors include "the frequency of the discriminatory conduct; its severity, whether it is physically threatening or humiliating, . . . and whether it unreasonably interferes with an employee's work performance." Id. (quoting Harris v. Forklift Systems, Inc., 210 U.S. at 23).  The incidents of alleged harassment "must be repeated and continuous; isolated acts or occasional episodes will not merit relief." Lucas v. South Nassau Communities Hosp., 54 F. Supp. 2d 141, 149 (E.D.N.Y. 1998) (citing Kotcher v. Rosa and Sullivan Appliance Ctr., Inc., 957 F.2d 59, 62 (2d Cir. 1992)). An isolated incident of harassment only creates a hostile work environment if the incident was "extraordinarily severe." Wilson, 2009 U.S. Dist. LEXIS 28876, at *80 (citing Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)).

Here, Melendez failed to adduce evidence sufficient to support a finding that he was subject to abuse of sufficient severity or pervasiveness as to alter the condition of his employment. Harris, 510 U.S. at 21.  The alleged conduct consists of infrequent, sporadic occasions where Kurt allegedly rubbed Melendez's shoulders and one occasion where Kurt grazed against Melendez for mere seconds.  (Ex. BBB, Melendez 84:14-15; 85:8-11.)  Even assuming arguendo that Kurt acted as Melendez alleged, Kurt's isolated and infrequent conduct was not severe or pervasive.  Such discrete, isolated incidents cannot sustain a hostile work environment claim. Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998) (finding lack of sufficient evidence where defendant told plaintiff that "she had been voted the 'sleekest a**' in the office" and had "deliberately touched [her] breasts"); see also Osorio v. Source Enters., 05 Civ. 10029 (JSR), 2006 U.S. Dist. LEXIS 63032, 2006 WL 2548425, at *5 (S.D. N.Y. Sept. 5, 2006) (showing a pornographic movie was not enough to create hostile environment); Feliciano v. Alpha Sector, No. 00 Civ. 9309 (AGS), 2002 U.S. Dist. LEXIS 12631, 2002 WL 1492139, at *9 (S.D.N.Y. July 11, 2002) (finding that an attempt to hug, requests to date, and statement of desire to "lay with" plaintiff do not give rise to hostile work environment); Arroyo v. WestLB Admin., Inc., 54 F. Supp. 2d 224, 230-31 (S.D.N.Y. 1999) (finding limited number of incidents spanning two year period insufficient to show hostile work

-21-

environment); cf. Raniola v. Bratton, 243 F.3d 610, 621 (2d Cir. 2001) (finding triable issues of fact where plaintiff was subjected to daily sex-based remarks, disproportionate work assignments, workplace sabotage and physical threats for over two years).

As a matter of law, the environment created by Kurt's behavior was not objectively offensive to a reasonable person.  Accordingly, the Twelfth Count, as to Melendez, should be dismissed because he cannot prove a prima facie case of hostile work environment.

### C.      Joelito Melendez's Claims Under the NYCHRL Fail.

Section 8-107 of the Administrative Code of the City of New York makes it an unlawful discriminatory practice for an employer or one of its employees or agents to discriminate against a person in the conditions of employment based on gender.

NYCHRL claims must be evaluated separately from its federal and state counterpart claims.  Guangyu Zhao v. Time, Inc., 2010 U.S. Dist. LEXIS 87586, *66 (2d Cir. August 13, 2010.)  A plaintiff alleging hostile work environment sexual harassment under NYCHRL must establish by a preponderance of the evidence that they were treated "less well than other employees because of [their] gender."  Williams v. New York City Housing Authority, 872 N.Y.S.2d 27, 39 (N.Y. App. Div. 2009).  Employers have an affirmative defense against liability when they can establish that the alleged conduct is "nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences."  Id. at 40-41 (internal quotation marks omitted).

Here, even applying the NYCHRL's liberal standards, Melendez cannot prove by a preponderance of the evidence that he was treated "less well than other employees" because of his gender.  Although Melendez claims that Kurt rubbed his back about five times and once rubbed up against him, Melendez has set forth no facts to show that, even if such conduct occurred, they were motivated or made because of his sex and gender.  Moreover, as set forth above, Melendez failed to establish that he was subjected to "egregious conduct" under the NYSHRL and his claims are equally deficient under the NYCHRL.  Guangyu Zhao v. Time,

Inc., 2010 U.S. Dist. LEXIS 87586, *68 (2d Cir. August 13, 2010)(finding plaintiff's hostile work environment claim under the NYCHRL deficient because the hostile work environment claim was "glaringly deficient" under Title VII's "severe or pervasive" standard and while the NYCHRL requires "less egregious conduct" than Title VII, plaintiff had not shown that she was subjected to conduct that was "egregious," "hostile," or abusive.")

Moreover, even if such conduct occurred (which it did not), it was nothing more than a "petty slight" or "trivial inconvenience" and therefore not actionable. Williams, 872 N.Y.S. 2d at 18. Here, Melendez's allegations that Kurt placed his hand on his shoulder on a few occasions and brushed up against him on one occasion, for mere seconds, could not be found by a trier of fact to be more than a mere trivial inconvenience. Accordingly, for the reasons set forth above, Melendez's claims also fail under the NYCHRL.

### D.      Joelito Melendez Was Not Constructively Discharged.

Melendez alleges that his resignation constituted a constructive discharge under the NYSHRL and NYCHRL. (SAC ¶¶208 and 215.) But, he offers insufficient facts to support his constructive discharge, and no reasonable jury could find that working conditions were so intolerable as to amount to constructive discharge. Thus, this Court should grant summary judgment in defendants' favor.

Under New York law, "[c]onstructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." Kader v. Paper Software, Inc., 111 F.3d 337, 339 (2d Cir. 1997) (citations and internal quotations omitted); Chernoff Diamond & Co. v. Fitzmaurice, Inc., 651 N.Y.S.2d 504, 506 (N.Y. App. Div. 1996). "Working conditions are intolerable when, viewed as a whole, they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Terry v. Ashcroft, 336 F.3d 128, 152 (2d Cir. 2003) Plaintiff must establish that the defendant "deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." Spence v. Maryland

Casualty Co., 995 F.2d 1147, 1156 (2d Cir. 1993) (citations and internal quotations omitted); see also Conway v. Microsoft Corp., 414 F. Supp. 2d 450, 468 (S.D.N.Y. 2006) ("With respect to the intent requirement [of a constructive discharge claim], the plaintiff must show that the employer engaged in deliberate action.").

Moreover, a plaintiff asserting constructive discharge must meet a higher burden than that requires for a hostile work environment. "The plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." Christopher-Ketchum v. Agway Energy Products, 988 F.Supp. 610, 617 (N.D.N.Y. 1997) (citations and internal quotations omitted); see also Arroyo, 54 F. Supp. 2d at, 231-32 ("The [constructive discharge] standard is not easily met.") (indicating that a "plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment" for a constructive discharge claim.)

Here, Melendez attributed his "forced" resignation to the acts of Kurt. But, as set forth above Kurt's conduct was not "severe or persuasive" the conduct allegedly suffered by Melendez does not meet this heightened standard. Moreover, there is no evidence that the employer deliberately created working conditions which were so difficult or unpleasant that a reasonable person in the Melendez's shoes would feel compelled to resign. Melendez was exposed to this supposedly "intolerable" atmosphere for only a few seconds. These facts, even drawing every reasonable inference from them in Melendez's favor, are insufficient to establish constructive discharge. Thus, summary judgment should be granted in defendants favor.

## VII. DIEGO DIAZ DE LA VEGA'S ALLEGATIONS ARE INSUFFICIENT TO CONSTITUTE QUID PRO QUO SEXUAL HARASSMENT

In the Twelfth and Thirteen Counts, Diaz de la Vega alleges quid pro quo sexual harassment, in violation of the NYSHRL and NYCHRL. Diaz de la Vega's claim should be dismissed because he cannot establish a prima facie case of quid pro quo sexual harassment. Moreover, Diaz de la Vega alleges that he was fired by Thalassa in approximately April 2008 because he refused to engage in sexual acts with Kurt. (SAC ¶130.) However, during his

deposition, Diaz de la Vega admitted that Kurt did not do or say anything to him that could form the basis for a viable quid pro quo sexual harassment claim.  (Ex. QQ, Diaz de la Vega 69:18-19.)  Thus, summary judgment is appropriate.

At the outset, there is an important history to Diaz de la Vega's baseless allegations. Diaz de la Vega was a charging party in a related proceeding before the NLRB.  (Aranyos Aff. ¶3; Ex. A.)   The hearing in this matter commenced on September 15, 2009 and closed on September 21, 2009. (Aranyos Aff.¶4.)   In that matter, Diaz de la Vega alleged that the Restaurant terminated him in retaliation for engaging in protected concerted activities.  However, according to Kurt, Diaz de la Vega sought permission to take the day off in order to work at a new job he had taken at the Tribeca Grand Hotel.  (Ex. KK, Kurt NLRB 718:9-19.)  During that evening of Friday, April 25, 2008, Diaz de la Vega told Kurt and Steve Makris that he could not work the following day (a Saturday which is the Restaurant's busiest day).  Kurt was standing next to Steve Makris when Diaz de la Vega made his request.  (Id. 718:14-16.)  On September 17, 2009, it was Diaz de la Vega's sworn and unequivocal testimony that he was "fired" by Thalassa on Friday, April 25, and "never" worked at or found employment with the Tribeca Grand before April 25.   (Ex. RR, Diaz de la Vega NLRB 440:21-23; 456:7-13; 457:9-15, 476:11-22)

On or about November 18, 2009 the parties filed their post-hearing briefs.  (Aranyos Aff. ¶5.) On November 23, 2009, in connection with this federal court action, plaintiffs belatedly produced documents responsive to defendants' September 4, 2009 request for production of documents.  (Id. ¶6.)  Contained in that production of documents was an Earnings Statement for Diaz de la Vega from the Tribeca Grand Hotel, Inc. stating that Diaz de la Vega's net pay, for period ending April 24, 2008 was $302.50.  (Ex. B.)  Subsequently, the Restaurant moved to reopen the NLRB record because that document directly contradicted Diaz de la Vega's testimony about his termination of his employment from Thalassa Restaurant.   The ALJ reopened the record by Order dated December 8, 2009. (Ex. C.)

A supplemental hearing was held on January 15, 2010 at which time the Tribeca Grand Hotel payroll evidence was introduced.  (Ex. RR.)  Thereafter, Counsel for the General Counsel presented additional testimony from Diaz de la Vega and Sara Legenhausen, a former employee at Tribeca Grand, in an attempt to explain away the information contained in the Earnings Statement.  (Ex. RR, Diaz de la Vega NLRB 766:9-791:22; 793:10-801:7.)  Diaz de la Vega conceded that he "found the job at Tribeca [Grand] <u>before</u> April 25, 2008."  (<u>Id</u>. 783:23-784:1) (emphasis added)  Moreover, before April 21, Diaz de la Vega had been assigned an Employee Number and a Department at the Tribeca Grand, and made a declaration of the number of his dependents in order for taxes to be deducted from the wages paid by the Tribeca Grand.  (<u>Id</u>. 781:21-782:1.)  Additionally, Diaz de la Vega had worked on April 21, 22, 23 and 24, 2008. (Ex. B.)  Diaz de la Vega further testified that, in his opinion, he had only accepted employment at Tribeca Grand Hotel as of April 24.  (Ex. RR, Diaz de la Vega NLRB 772:17-773:4; 782:14-18.)  Clearly, Diaz de la Vega "found" the job prior to April 25, thereby thoroughly contradicting his earlier sworn testimony.

After assessing the testimony given by both sides, the ALJ found that "Diaz de la Vega was not a truthful and reliable witness" and he "was not truthful in testifying about the circumstances of finding and accepting a new job at the Tribeca Grand Hotel."  (Ex. D, ALJ Op. at 31:4-5; 8-9).  Ultimately the ALJ concluded that Diaz de la Vega was not fired but voluntarily quit working at the restaurant.  Indeed, Diaz de la Vega quit because "he could no longer work at the restaurant because he had another job."  (<u>Id.</u> at 31:23-24; 36-37.)

Having lost his NLRB claim for past damages and reinstatement of employment at Thalassa, Diaz de la Vega now alleges a <u>quid</u> <u>pro</u> <u>quo</u> sexual harassment claim.  He does not contend that Kurt fired him because he refused to engage in sexual acts.  Rather, he claimed that the alleged sexual harassment was "part of one big process, of a sequence of things that grew." (Ex. QQ, Diaz de la Vega  69:14-15.)  Specifically, Diaz de la Vega claimed that Kurt asked him to go to the movies or to visit his home, or to go out to eat.  In addition, Diaz de la Vega claimed that Kurt touched him on his shoulders as if giving a massage, on one occasion touched his penis

and on two other occasions Kurt allegedly asked Diaz de la Vega to show his penis.  (Id. 69:19-70:14.)

Diaz de la Vega contends that the first incident occurred when Kurt was a waiter at Thalassa, prior to his promotion to maitre d'.  He testified that the two were "working an event or at a banquet" and Kurt "started asking me personal questions," about whether he had "a boyfriend or girlfriend, and if it's true that Latinos are horny or excitable.  And, well, he started to hug me like this, with one arm.  But always, like, massaging me.  A different hug."  (Id. 71:24-73:6.) Diaz de la Vega claims that two workers were present, but no one ever witnessed the events that he claims occurred.  And no one over heard the conversations.  (Id. 71:24-73:6.)

Diaz de la Vega never reported any of these actions or conversations to management at Thalassa.  (Id. 74:5-7; S. Makris Dec. ¶ 18.)

### A.    Plaintiff Cannot Support a Quid Pro Quo Claim of Sexual Harassment Under the NYSHRL or NYCHRL

As set forth in Section X, infra, Diaz de la Vega's sexual harassment claim should be banned because of the doctrines of collateral estoppel, judicial estoppel, and election of remedies.  Notwithstanding Diaz de la Vega fails to prove a prima facie case of quid pro quo sexual harassment.  "Quid pro quo" sexual harassment occurs when individuals are deprived of benefits to which they are entitled because they refuse to submit to sexual demands." Karibian v. Columbia Univ., 14 F.3d 773, 777 (2d Cir. 1994).  Other than the passing reference to the term "quid pro quo" in the complaint, Diaz de la Vega provided absolutely no testimony supporting any such "quid pro quo" sexual harassment by anyone.  To establish a prima facie case of quid pro quo harassment, a plaintiff must prove that he "was subject to unwelcome sexual conduct, and that [his] reaction to that conduct was then used as a basis for decisions affecting the compensation, terms, conditions or privileges of [his] employment."[9]  Id.  The key inquiry is

---

[9] When determining if quid pro quo discrimination has occurred, courts apply virtually identical standards under the NYSHRL and Title VII.  Messer v. Fahnestock & Co. Inc., no. 03-4989, 2008 WL 4934608, at *7 (E.D.N.Y. Nov. 18, 2008) (citing Petrosino v. Bell Atl., 385 F.3d 210, 220 n.1 (2d Cir. 2004)); Walsh v. Covenant House, 244 A.D.2d 214, 215 (N.Y. App. Div. 1997).

"whether the supervisor has linked tangible job benefits to the acceptance or rejection of sexual advances."   Id. at 778.   A plaintiff must demonstrate (1) unwelcome sexual conduct, (2) a decision altering the terms or conditions of employment, and (3) a casual connection between the employment decision and the plaintiff's reaction to the unwelcome sexual conduct.   Here, plaintiff cannot establish any of the these requirements.

First, Diaz de la Vega denied that Kurt ever made any sexual demand of him:  Kurt "didn't explicitly ask me to engage in a sexual act, or to have sex."[10]  (Ex. QQ, Diaz de la Vega 69:18-19.)  Where, as here, no explicit demand is made, courts express doubt that an alleged harasser's conduct is sexually motivated if the offending behavior occurred infrequently and out in the open.  See Bartle v. Mercado, 235 A.D.2d 651, 653-54 (App. Div. 1997) (concluding that conduct was not sexual in nature where no sexual advances were made, the frequency and intensity of the alleged contact did not increase, and the alleged contacts occurred in public even though the opportunity for private interaction was available).

Second, a plaintiff alleging quid pro quo discrimination must demonstrate that he was subject to a tangible employment action that "altered the terms or conditions of [his] employment because of [his] sex."  Mormol v. Costco Wholesale Corp., 364 F.3d 54, 57 (2d Cir. 2004).  A tangible employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change to benefits."  Mormol, 364 F.3d at 57 (quoting Ellerth, 524 U.S. at 761).  Here, Diaz de la Vega chose to leave the Restaurant to work at the Tribeca Grand. There is no evidence that Diaz de la Vega suffered any adverse employment action by the Restaurant.  Because he cannot demonstrate that he was threatened, implicitly or explicitly, with any adverse employment action if he refused to accede to any sexual demands (which, he admitted, were never made), his claim fails.

---

[10] Indeed, Kurt strongly denies all of Diaz de la Vegas allegations. (Ex. JJ, Kurt 330:9-331-3.)

Finally, the plaintiff must present some evidence of a causal connection between the alleged sexual advances and the tangible employment action.  Messer, 2008 WL 4934608, at *15; Tabachnik v. Jewish Theological Seminary, No. 03-CV-2759, 2004 WL 414826, at *2 (S.D.N.Y. Mar. 4, 2004).  The plaintiff's evidence is only sufficient if it shows that the alleged harasser (1) was a supervisor with the authority to take a tangible employment action against the plaintiff, e.g., Heskin v. Insik Advertising, Inc., no. 03-2598, 2005 WL 407646, at *17 (S.D.N.Y. Feb. 22, 2005); and (2) used the plaintiff's submission or rejection as a basis for a decision altering the terms or conditions of the plaintiff's employment, e.g., Karibian, 14 F.3d at 778; Messer, 2008 WL 4934608, at *15.  A plaintiff can also establish a causal connection between his reaction and the tangible employment decision by providing evidence that the alleged harasser overtly threatened adverse consequences if the plaintiff did not accede to sexual demands.  Messer, 2008 WL 4934608, at *15.  Here, there is no evidence that Kurt made any threats in connection with the alleged conduct.  Even assuming arguendo that Diaz de la Vega was terminated by the Restaurant, he must still demonstrate not only that the alleged harasser had the ability to affect the terms of his employment, but that the harasser actually altered such terms as a result of the plaintiff's acceptance or rejection of his sexual advances.  Karibian, 14 F.3d at 778; Messer, 2008 WL 4934608, at *15.

Moreover, Kurt was not a supervisor of Diaz de la Vega and could not affect the conditions of his employment Hernandez v. Jackson, Lewis, Schnitzler & Krupman, 997 F. Supp. 412, 417 (S.D.N.Y. 1998) ("[I]f an alleged harasser possesses no authority to affect the benefits or privileges of the harassed plaintiff's employment, plaintiff cannot sustain a Title VII claim of sexual harassment under a quid pro quo theory").  Even if Kurt were found to have the ability to affect Diaz de la Vega's conditions of employment, summary judgment is still appropriate because Diaz de la Vega fails to establish a link his reaction to the request to a tangible employment action.  See Concord Limousine, Inc. v. Orezzoli, No. 19347/03, 2005 WL 1224972, at *2, *6 (N.Y. Sup. Ct. May 20, 2005) (granting defendant summary judgment on plaintiff's quid pro quo claim even though she alleged that her harasser frequently requested her

to engage in sexual activity with him, touched his genital area in her presence, grabbed her buttocks, and showed her pornographic material); <u>see also</u> <u>Espaillat v. Breli Originals, Inc.</u>, 227 A.D.2d 266 267-68 (NY App. Div. 1996) (dismissing plaintiff's <u>quid</u> <u>pro</u> <u>quo</u> claim where her supervisor allegedly made offensive sexual remarks to her, touched her without permission, and raped her).

Here, Diaz de la Vega failed to adduce sufficient evidence to establish a <u>quid</u> <u>pro</u> <u>quo</u> sexual harassment claim under the NYSHRL and summary judgment should be granted in favor of defendants.

Similarly, Diaz de la Vega's claim fails even under the liberal NYCHRL. For the reasons set forth in detail above, Diaz de la Vega cannot prove "by a preponderance of the evidence" that he has been treated less well than other employees because of his gender.  <u>Williams</u>, 872 N.Y.S.2d27, at 39.  Moreover, Diaz de la Vega's claims fail because of the absence of any sexual demand, the absence of a causal link between the conduct and his alleged termination, and the fact that there is a legitimate reason for his departure.  Thus, as a matter of law, defendants are entitled to summary judgment on Diaz de la Vega's NYCHRL claims.

## VIII.  DEFENDANTS DID NOT RETALIATE AGAINST PLAINTIFFS IN VIOLATION OF NEW YORK LABOR LAW

Plaintiffs' allegation that defendants retaliated against Copantitla, Diaz de la Vega, Lantigua, Lizardo, S. Lopez, A. Maldonado, Melendez, Vargas in violation of NYLL §215 (Tenth Count), following complaints about tips is unsupported by the evidence and cannot be sustained as a matter of law.  Instead, the undisputed evidence demonstrates that the retaliatory acts alleged in the SAC did not occur, do not amount to a violation of NYLL §215 as a matter of law, or are not causally connected to plaintiffs' complaints.  Accordingly, summary judgment in favor of defendants is appropriate on this claim.

Under NYLL §215, employers are prohibited from taking adverse employment action against an employee because he or she complains about violations of the Labor Law.  The statute provides, in pertinent part that "[n]o employer … shall discharge, penalize, or in any other way

discriminate against any employee because such employee has made a complaint to his employer … that the employer has violated any provision of the" Labor Law.  NYLL §215.  "To satisfy this claim the evidence must show, at a minimum, that the actions here complained of constitute adverse employment action taken *because of* the complaints under the Labor Law."  Lu, 503 F. Supp. 2d at 712 (emphasis added) (internal quotation marks omitted).  Therefore, for liability to attach to an employer the following elements must be met: (1) the employee must make a complaint of a labor law violation; (2) the employer must be aware of the complaint; (3) the employee must suffer an adverse employment action; and (4) there must be a causal connection between the complaint and the adverse employment action.  See id.; cf. Nichols v. Mem'l Sloan-Kettering Cancer Ctr., 829 N.Y.S. 2d 22, 23-24 (App. Div. 2007).

An adverse employment action involves a "materially adverse change in the terms, privileges, duration and conditions of employment.  To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or alteration of job responsibilities."  DuBois v. Brookdale Univ. Hosp., No. 6062-04, 2004 WL 3196952, at *8 (Sup. Ct. Dec. 1, 2004) (citing Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)).  Notably, *mere threats* to act do not amount to an adverse employment action and are not retaliatory acts.  See Carter v. New York City Dep't of Corr., 7 Fed. Appx. 99,103 (2d Cir. 2001) (finding no retaliation under the NYSHRL for threats); DuBois, 2004 WL 3196952, at *8 ("disciplinary notices, threats of disciplinary action and excessive scrutiny are not adverse employment actions in the absence of "other negative *results*" (in the discrimination context) (emphasis added)).  This is sensible because the statute prohibits concrete action (i.e. "discharge," "penalize") and not mere words.  See NYLL §215.  Moreover, an employer will avoid liability under this statute if it has a non-retaliatory justification for its actions.  See Lu, 503 F. Supp. 2d at 713; see also Nichols, 829 N.Y.S.2d at 23.  Likewise, "an adverse employment action is not established by proof of excessive work, denials of requests for leave with pay and a supervisor's general negative treatment … or by evidence of being *yelled* at, receiving unfair criticism, or receiving *unfavorable work schedules or work assignments*."

DuBois, 2004 WL 3196952, at *6 (emphasis added); accord Frida v. Henderson, No. 99-10749, 2000 WL 1772779, at *7 (S.D.N.Y. Nov. 30, 2000); see also Jackson v. City Univ. of New York, No. 05-8712, 2006 WL 1751247, at *3 (S.D.N.Y. June 23, 2006) (changes in shift and work-site does not amount to "adverse employment action" (in the ADA retaliation context)).

Importantly, for an employee to recover for retaliation resulting from a complaint under NYLL §215, the employee must adequately plead the complaint that he or she made to the employer and the Labor Law provision that the employer allegedly violated. See Nicholls v. The Brookdale Univ. Hosp. Med. Ctr., No. 03-6233, 2004 WL 1533831, at *5 (E.D.N.Y. July 9, 2004); see also Seever v. Carrols Corp., 528 F. Supp. 2d 159, 166 (W.D.N.Y. 2007). Accordingly, to the extent that any plaintiff also claims retaliation for complaints not identified in the pleadings, that plaintiff cannot recover for such alleged complaints. In this case, certain plaintiffs only pled that they complained about Thalassa's alleged NYLL violations in March and October 2008, which supposedly resulted in retaliation. As such, plaintiffs cannot rely on any other complaints they may have made (or raised in depositions) -- and failed to plead with no reference to the NYLL provision supposedly violated -- in connection with any purported retaliation.

Plaintiffs Copantitla, Diaz De La Vega, Lantigua, Lizandro, Maldonado, Melendez, S. Lopez, and Vargas all alleged that Defendants retaliated against them in response to two separate complaints about gratuities and wages -- one in March 2008 and the other in October 2008. (SAC ¶¶109; 119-121.) The supposed retaliatory acts took the form of discharge, threats of discharge, threats of physical harm, and reduction in work hours. (SAC ¶¶112-116.) Near the end of March 2008[11], on a Saturday night after the Restaurant opened for business, a number of front-of-house employees stopped working and left the floor. (E.g. Ex. SS, Lizandro 122:13-123:2; 124:19-22.) Those employees went to the Restaurant's office on the lower level and

---

[11] Matute, whose last day of work at Thalassa was April 9, 2008, testified that the March 2008 complaint happened approximately two weeks before he left Thalassa, placing the complaint in the end of March. (Ex. AAA, Matute 92:16-22.)

confronted Kurt, the maître d', about tips that the employees believed should have received from a wedding held at the restaurant.  (Ex. JJ, Kurt 192:22-193:18.)  With Matute acting as a translator, Kurt (who does not speak Spanish) explained that he did not know what happened with the tips and asked the employees to return to the floor to continue food service.  (Id. 193:13-194:20; Ex. SS, Lizardo 124:15-18.)  Far from retaliating against the employees after this walk off, the restaurant corrected the mistake and gave busboys an extra point in the tip pool.[12]  (Ex. SS, Lizardo 129:17-23; 130:12-14; Ex. QQ, Diaz de la Vega 60:10-24; Ex. KK, Kurt NLRB 715:15-23; Ex. PP 223:13-25; 224:10-11.)

The second alleged complaint occurred on October 1, 2008 when a large group of individuals, including only one current and at least two former Thalassa employees, attempted to deliver a letter to S. Makris.[13]  Kurt, who was surrounded by the group at the hostess station, declined to accept the letter despite repeated demands and profanity by the group.  (Ex. GG, Zapantis NLRB 42:21-24.)  After initially refusing to leave, the group eventually did in a disruptive manner while clapping and cheering. (Ex. FF, Zapantis 178:21-24; Ex. GG, Zapantis NLRB 83:25-84:23.) Neither Kurt nor Zapantis (who came to the floor after the group arrived) were informed of the letter's contents.  (Ex. GG, Zapantis NLRB 83:21-24; 85:6-16; Ex. KK,

---

[12] The Restaurant did not have any knowledge of the employees' purported complaints. The Spring 2008 complaints were directed towards Mr. Kurt, a co-worker and member of the tip pool. Consequently, those conversations can only be viewed as gripes among co-workers. Furthermore, to the extent the workers objected to the amount of tips from one wedding, that mistake was promptly corrected once reported. Accordingly, the Restaurant did not have any knowledge that the employees were engaged in activity that might be subject to the protections of the retaliation provision.

[13] To the extent Lantigua, Diaz de la Vega, Lizardo, and Melendez assert that they were retaliated against based on the October 2008 complaint (SAC ¶119), such a position is untenable. There is no dispute that each of these plaintiffs ceased working at the restaurant months prior to this alleged complaint.  (Ex. OO, Lantigua  195:24-196:2 (end of July 2008); Ex. QQ, Diaz de la Vega  13:14-16 (April 25, 2008); Ex. SS, Lizardo  41:2-7 (mid June 2008); Ex. BBB, Melendez 16:15-17 (March 2008).)  It is axiomatic that when an employee stops working for his employer *before* engaging in a protected activity no adverse employment action can follow and the retaliation claim must fail.  See Gonzalez v. El Acajutla Rest. Inc., No. 04-1513, 2007 WL 869583, at *9 (E.D.N.Y. Mar. 20, 2007); Ayres v. 127 Rest. Corp., 12 F. Supp. 2d 305, 311 (S.D.N.Y. 1998).

Kurt NLRB 727:13-18.) There is no dispute that the letter was not opened or left at the restaurant that evening.  (Ex. PP Lantigua NLRB 324:4-7.)  S. Makris and Zapantis reported the incident to the police later that evening.  (Ex. GG, Zapantis NLRB 44:13-19.)  Only on October 3, 2008, when the restaurant received the letter, did it learn of the content of the letter.  (Ex. CC, S. Makris 168:23-169:12; Ex. GG, Zapantis NLRB 69:11-15, 85:9-16; Ex. DD, S. Makris NLRB 150:20-152:2.)

### A.    Plaintiffs Lantigua, Diaz De La Vega, and Lizandro

The SAC alleges that only Plaintiffs Diaz de la Vega, Lantigua, and Lizandro were discharged as a result of their complaints; Lizandro alleges he was constructively discharged. (SAC ¶¶115-116.)   The undisputed evidence demonstrates that these plaintiffs were not discharged or otherwise retaliated against.  They voluntarily left their employment at Thalassa to pursue other opportunities: Lantigua left Thalassa to attend law school on a full-time basis and never worked while in law school; Diaz de la Vega left Thalassa to work at another job with the Tribeca Grand Hotel; and Lizandro left to take care of his newborn baby and attend school because, as he claimed, he had enough money saved.

Lantigua's allegation in the SAC that defendants retaliated against him for complaining about gratuities after the March 2008 walk-off is unsupported by the evidence and appropriate for summary judgment.  Lantigua cannot demonstrate and the evidence does not show that he was terminated (or otherwise retaliated against) because of that complaint.  Indeed, a causal linkage is crucial.  See Lu, 503 F. Supp. 2d at 712.  The evidence shows that Lantigua left Thalassa on his own -- months after the complaint -- not due to retaliatory act but because he was planning on attending law school as a full time student in August 2008, which was only days after his employment ended.  (Ex. OO, Lantigua 149:4-8; 195:24-196:6; 197:14-16; Ex. CC, S. Makris 42:18-24.)  In fact, in April 2008 -- after the March 2008 complaint occurred -- Tasso Zapantis even presented Lantigua with a favorable recommendation letter for his law school

application.  (Ex. OO, Lantigua 146:6-17; 188:16-18; Ex. PP, Lantigua NLRB 254:21-24; Ziotas Dec., Ex. G.)  This is not the conduct of an employer acting in a retaliatory manner.

In addition, courts recognize that the proximity of the retaliatory act with the complaint can give rise to an inference of a causal link.  Jacques v. DiMarzio, Inc., 200 F. Supp. 2d 151, 162 (E.D.N.Y. 2002); DuBois, 2004 WL 3196952, at *8.  Here, however, no such inference can be made.  Lantigua left Thalassa approximately four months after the March 2008 complaint at the end of July 2008.  (Ex. OO, Lantigua  195:24-196:2.)  Moreover, from the time Lantigua left the restaurant to the date of his deposition (and while in law school), he has not worked.[14] Therefore, Lantigua cannot demonstrate that such a causal link existed and defendants are entitled to summary judgment on his claim.

With no link between the March 2008 complaint and the cessation of his employment in July, it is not surprising that Lantigua, during his deposition, did not state he was not retaliatory discharged when asked about his retaliation claims.  Instead, he only claimed a scheduling and a reduction in hours as retaliation.  (See Ex. OO, Lantigua  139:11-140:2.)  In typical fashion for plaintiffs, however, Lantigua's conclusory assertion is contradicted by his own testimony and documentary evidence and, importantly lacks the critical causal link to the March 2008 complaint.  First, Lantigua testified that he "probably" continued to work a 40-plus-hour shift through the end of June 2008.  (Id. 196:3-6.)  Moreover, the documentary evidence reflecting the hours Lantigua worked over the course of his employment shows no appreciable decline in hours or that he was scheduled in less lucrative shifts.  (Ex. X.)  In fact, in the periods following the March 2008 complaint, Lantigua's hours and monthly pay actually increased in April, May, and June, which the ALJ also acknowledged.  (Ex. D, ALJ Op. at 12:43-44; 13:27-28.)

The reduced hours in July 2008 are attributable not to retaliation but to his own failure to appear for scheduled shifts, as well as the restaurant's closure to re-polish its floors over the July 4 holiday.  (Ex. GG, Zapantis NLRB 97:2-98:21; 100:5-14.)  For example, Lantigua failed to

---

[14] Despite being a full-time student, Lantigua continues (through the date of his deposition) to receive unemployment compensation benefits.  (Ex. OO, Lantigua  198:24-199:2.)

appear at work to set-up following the re-polishing and work a lunch shift that same day. (Id. 97:2-98:21.)  Later that week he arrived at work so late that his services were no longer needed. (Id. 100:5-14.)   Following these incidents, Lantigua did not show up for work and Thalassa concluded that he abandoned his job.  Weeks later, Lantigua telephoned Kurt to advise him that he was only available to work on weekends (the most lucrative shifts).  (Id. 100:15-101:18; Ex. KK, Kurt NLRB 720:22-721:5.)  The Restaurant declined his offer.

Diaz de la Vega's allegation that he was terminated is unsupported by the facts and not causally linked to the March 2008 complaint.  Instead, the uncontroverted record as well as the factual findings made by the ALJ[15] demonstrates that Diaz de la Vega left Thalassa so he could work at another restaurant -- the Tribeca Grand Hotel -- which he had recently started on April 21, 2008 prior to leaving Thalassa on April 25.  (Ex. QQ, Diaz de la Vega 168:9-11; Ex. CC, S. Makris 45:25-46:24; Ex. D, ALJ Op. at 31:9-11; 14-16.)  By April 24 he had passed the Tribeca Grand exam and was offered a job that he admits he accepted.  (Ex. D, ALJ Op. at 31:10-12; Ex. RR, Diaz de la Vega NLRB 772:17-773:4; 782:14-18.)  Diaz de la Vega was scheduled to work at both Thalassa and the Tribeca Grand on the evening of Saturday, April 26, 2008.  (Ex. RR, Diaz de la Vega 108:9-18; Ex. KK, Kurt NLRB 784:6-19.)  The day before he asked Thalassa for Saturday off -- the restaurant's busiest day -so that he could work at the Tribeca Grand. (Ex. QQ, Diaz de la Vega 108:9-18; Ex. D, ALJ Op. at 31:20-24.)  However, he was not fired when after making that request.  Instead, he chose to work at the Tribeca Grand instead of Thalassa on April 26 and worked there from 4:15p.m. to 3:30a.m.  (Ex. QQ, Diaz de la Vega 108:9-11; Ex. KK, Kurt NLRB 784:6-19.)  Consequently, Diaz de la Vega was not discharged for complaints about tips in March 2008 but left to pursue another employment opportunity.[16]

---

[15] As discussed in Section X, infra, the doctrine of collateral estoppel bars  Diaz de la Vega from changing his prior sworn testimony to re-litigate facts decided by the NLRB ALJ.

[16] To the extent Diaz de la Vega claims retaliation by having to bus larger tables, such a claim is not retaliatory as a matter of law. See Lu, 503 F. Supp.2d at 713(waiting tables in the "most onerous party in the restaurant" is not an adverse employment action.)

Likewise, the ALJ did not find that Kurt fired Diaz De La Vega when he asked for the time off and instead conclusively found that he "could no longer work at the restaurant because he had another job" and that he "quit his job at Thalassa before the busiest day of the week without giving the restaurant the courtesy of any notice." (Ex. D, ALJ Op. at 31:36-37.) In fact, after April 25, 2008 and while working at the Tribeca Grand, Diaz De La Vega held only one job, demonstrating that he only intended to work one job. Moreover, in any event, Diaz de le Vega's last day of work -- April 25, 2008 -- is sufficiently distant from the March 2008 event to further negate any causal link between the complaint and alleged retaliation. Jacques, 200 F. Supp. 2d at 162.

Plaintiff Manuel Lizandro's claim that he was constructively discharged by Thalassa because of the March 2008 complaint is unavailing. As discussed at Section VI.D., supra, constructive discharge occurs when an employer "intentionally creates a work environment so intolerable that [the employee] is forced to quit involuntarily." Petrosino v. Bell Atl., 385 F.3d 210, 229-30 (2d Cir. 2004) (internal quotation marks omitted). Here, there is no evidence that Thalassa created an intolerable work environment that, when viewed objectively, would force Lizandro to quit. Instead, he left voluntarily (without informing the restaurant). (Ex. SS, Lizandro  113:23-114:10.) Furthermore, there is no evidence that any supposed acts resulting in his alleged constructive discharge were because of his March 2008 complaint. For example, Lizandro claimed that Kurt changed his schedule to "complicate my life." (Id. 142:15-17). However, this schedule change could not have been in response to the complaint because the schedule change occurred in February 2008 -- weeks before the March 2008 complaint. (Id. 142:8-25.) Moreover, receiving unfavorable work schedules does not amount to an adverse employment action as a matter of law and cannot give rise to constructive discharge. Cf. DuBois, 2004 WL 3196952, at *6; Katz v. Beth Israel Med. Ctr., No. 95-7183, 2001 WL 11064, at *12 (S.D.N.Y. Jan. 4. 2001).

Lizandro also claims that he was yelled at on a single occasion by Zapantis when he asked to see the tip book, resulting in (subjective) embarrassment and that Steve Makris asked

him to sporadically perform additional duties (during work hours) around the restaurant  (Ex. SS, Lizandro 113:3-11; 137:6-24.)  Even if true, neither of these incidents rises to the level of being objectively "intolerable" or an adverse employment action. <u>DuBois</u>, 2004 WL 3196952, at *6 (yelling and additional work is not an adverse employment action.); <u>Lu</u>, 503 F. Supp. 2d. at 713 (assignment of different duties was "too trivial" to be an adverse employment action); <u>Katz</u>, 2001 WL 11064, at *12.  Instead, Lizandro voluntarily resigned because he "had money saved up and [] didn't need to work," to take care of his newborn child, and because he was going back to school.  (Ex. SS, Lizandro 121:10-13.)  Indeed, he does not even receive unemployment benefits because "they didn't fire me.  I quit by myself."  (<u>Id</u>. 133:25-134:5.)

### B.   **Plaintiffs Melendez, Maldonado, S. Lopez, and Vargas and Copantitla**

Plaintiff Melendez left Thalassa in March 2008, but does not allege in the SAC that he was terminated because of his purported involvement in the March 2008 complaint or any other. (Ex. BBB, Melendez 16:15-17.)  Instead, his claimed reason for leaving the restaurant was because of alleged sexual harassment by the maitre d', discussed in Section VI, <u>supra</u>, (<u>Id</u>. 67:13-68:5.) Moreover, there is no evidence that Melendez participated in the March 2008 complaint or suffered any other retaliatory acts as a result of the complaint.  (<u>Id.</u> 114:6-14.)  He resigned from the restaurant and his last day of work was March 12, 2008 -- before the walk-off complaint. (Ex.X.)  Moreover, Melendez admits that he made complaints only to his co-workers, not to Thalassa.  (Ex. BBB, Melendez 114:15-24.)

Plaintiffs Maldonado, S. Lopez, and Vargas likewise cannot demonstrate retaliation arising out of the March 2008 and October 2008 complaints.  To the extent these plaintiffs allege a schedule reduction, such an act does not constitute an adverse employment action, <u>DuBois</u>, 2004 WL 3196952, at *6, is not borne out by the documentary evidence, (Ex. X) and is attributable to the depressed economic climate towards the end of 2008.

Plaintiff Maldonado left his employment in June 2009 -- after the filing of this lawsuit -- because his "schedule wasn't well.  I wasn't working enough days and I needed bills to earn

more money to pay my rent and my bills." (Ex. ZZ, Maldonado 31:20-25.)  This does not rise to retaliation nor is there any evidence of retaliation in the record.  Maldonado does not assert that his hours were reduced.  In fact, the documentary evidence demonstrates that his net weekly pay did not decline after either of the complaints and that his schedule was not significantly reduced in the weeks following either complaint.  (Ex. X.)  Moreover, there is no evidence that these claimed scheduling issues were a consequence of any of his complaints of wage and hours laws.  Instead, Maldonado's testimony indicates that he simply left Thalassa because he needed a higher paying job.

Plaintiff S. Lopez also claimed he was scheduled for fewer hours for four of five months in 2009.  (See Ex. UU, S. Lopez 111:14-24.)  These hours were later restored after that four to five month period, according to S. Lopez.  (Id.)  However, S. Lopez does not assert that this constitutes retaliation and demonstrates no causal link to the March 2008 or October 2008 complaints.  First, the supposed reduction of hours in 2009 is too far removed from the complaints to be causally linked.  Jacques, 200 F. Supp. 2d at 162.  Second, in 2008 S. Lopez's hours showed no significant changes following events.  (Ex. X.)  Instead, any claimed reduction in hours in 2009 is attributable to the effects of the recession and to the beginning the year being a traditionally slow season for the restaurant industry.

Similarly, the evidence also demonstrates that Vargas, who continues to work at the Restaurant, did not encounter retaliation arising out of his complaints in March or October 2008.  First, Vargas does not allege -- and offers no evidence -- that there were retaliatory acts taken after the March 2008 complaint (but prior to the October 2008 complaint).  Second, following the October 2008 complaint, the events alleged do not rise to the level of retaliation or are not causally linked to the complaint.  As discussed in the Rule 56.1 Statement, on October 2, 2008, Vargas met with S. Makris to discuss the attempted delivery of a letter by a large group of people the day before.  The letter was thereafter mailed and was not received until the following day, October 3, 2008 and so S. Makris had no knowledge of its content at the time he met with Vargas.  (Ex. CC, S. Makris 168:23-169:12.)  Indeed, employer knowledge of the complaint of

Labor Law violations is a necessary element for retaliation.  See Lu, 503 F. Supp. 2d at 712.  As a result, with no knowledge of the existence of the complaint, S. Makris could not "retaliate" against Vargas because of it.

Moreover, the purpose of the meeting was not to retaliate, but was motivated by S. Markis' safety concerns; the delivery of the letter involved a large, boisterous crowd and S. Markis and his family live above the restaurant. (S. Makris 130:16-25.) Lastly, to the extent Vargas alleges that S. Markis threatened him with loss of his job or otherwise, such threats do not amount to retaliation.  See, e.g., DuBois, 2004 WL 3196952, at *8.  In fact, Vargas remains employed at Thalassa.  Although Vargas was sent home after the October 2 meeting and remained at home on October 3, he was paid for both shifts[17], suffering no damages.  (Ziotas Dec. Ex. E.) His hours following the October 2008 complaint also remain steady.  (Ex. X.) Furthermore, as noted the fact that Vargas was allegedly asked to perform certain additional tasks -- during work hours -- (Ex. WW, Vargas  159:21-160:4.) does not amount to a retaliatory act.  DuBois, 2004 WL 3196952, at *6; Lu, 503 F. Supp. 2d. at 713.

Lastly, the record is also devoid of any evidence that Thalassa retaliated against Copantitla or that he complained to them.  He remains employed by the Restaurant.  In addition, the documentary evidence does not bear out any evidence of retaliation.  In the weeks following the March 2008 complaint, Copantitla's hours did not diminish; they either remained steady or increased.  Although Copantitla's hours did decline after the October 2008 complaint, he presents no evidence that the hours reduction was because of that complaint; instead, business declined in the fourth quarter of 2008 as a result of the recession.  In any event, schedule reductions do not amount to adverse employment actions.  See DuBois, 2004 WL 3196952, at *6.

---

[17] The ALJ conclusively found that Vargas was not suspended and was paid for October 2 and 3. (Ex. D, ALJ Op. at 36:5-6.) As discussed in Section X.A., supra, Vargas is collaterally estopped from re-litigating the ALJ's findings of fact.

### C.      Plaintiffs are Not Entitled to Punitive Damages Under NYLL §215

Assuming certain plaintiffs are entitled to compensatory damages under NYLL §215, they improperly seek punitive damages are awardable.  (SAC ¶198.)  Such a claim is in error as punitive damages are not available under New York's anti-retaliation statute.  Cf. Gruenewald v. 132 West 31st Street Realty Corp., 613 N.Y.S.2d 39, 40 (App. Div. 1994); Bompane v. Enzolabs, Inc., 608 N.Y.S.2d 989, 994 (Sup. Ct. 1994).   NYLL §215.2 does not give courts jurisdiction to order punitive damages for violations of NYLL §215.1.  NYLL §215.2 provides:

> The court shall have jurisdiction … to order all appropriate relief, including rehiring … payment of lost compensation, damages and reasonable attorneys' fees.

Both Gruenwald and Bompane denied plaintiff-employees punitive damages for retaliatory acts brought under New York's whistleblower law, NYLL §740, which is analogous to NYLL §215.  Both courts looked to the statute and found that it did not expressly provide for punitive damages.   "Where the legislature created a new cause of action not previously cognizable at common law, one looks to the statute to determine whether punitive damages are permissible."  Bompane, 608 N.Y.S.2d at 994; see also Thoreson v. Penthouse Int'l, Ltd., 80 N.Y.2d 490, 591 N.Y.S.2d 978 (1992) (holding that the NYSHRL does not provide for punitive damages.   "[T]he logical inference, of course, from the Legislature's action in expressly permitting punitive damages in housing cases is that such damages were then not recoverable for discrimination in other areas including employment."); McCavitt v. Swiss Reinsurance Am. Corp., 89 F. Supp. 2d 495 (S.D.N.Y. 2000) (striking demand for punitive damages under NYLL § 201(d), finding no mention of punitive damages or legislative intent to provide for them); Majer v. Metro. Transp. Auth., 1992 WL 110995 (S.D.N.Y. 1992) (striking plaintiff's demand for punitive damages under NYLL §740(5)).  Accordingly, plaintiffs are not entitled to punitive damages as a matter of law for any NYLL §215 violations.

IX.  **PLAINTIFFS ARE BARRED FROM ASSERTING CERTAIN CLAIMS BASED ON THE DOCTRINES OF COLLATERAL ESTOPPEL, JUDICIAL ESTOPPEL, AND ELECTION OF REMEDIES**

A.  **Collateral Estoppel Precludes Certain Plaintiffs From Re-litigating Facts Decided by the NLRB ALJ**

Collateral estoppel bars Plaintiffs Diaz de la Vega, Vargas, and S. Lopez from re-litigating certain findings of fact made by the NLRB administrative law judge.  For collateral estoppel to apply, four factors must be met: (1) the issues in both proceedings are identical; (2) the issue in the prior proceeding was actually litigated and actually decided; (3) there was a full and fair opportunity to litigate in the prior proceeding; and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits.  Nat'l Labor Relations Bd. v. Thalbo Corp., 171 F.3d 102, 109 (2d Cir. 1999).  The Second Circuit recognizes that administrative agency decisions, including those of the NLRB, can be entitled to preclusive effect in Federal court.  Truck Drivers Local Union No. 807 v. Reg'l Import & Export Trucking Co., Inv., 944 F.2d 1037, 1043 (2d Cir. 1991); Wickham Contracting Co. v. Bd. of Educ., 715 F.2d 21, 26 (2d Cir. 1983).

Several of issues and many facts in the NLRB proceeding overlap in this action.  Indeed, to the extent a factual finding was made in the NLRB action and is raised in this action, it is issue precluded because it has already been litigated.  This is true for Diaz de la Vega, S. Lopez, and Vargas because they did not raise exceptions to the ALJ's opinion; as such, the ALJ's findings as to those plaintiffs will inevitably become final making issue preclusion appropriate.  See Wickham Contracting, 715 F.2d at 26.  Moreover, there was a full and fair opportunity to litigate before the ALJ.  The charging parties had the opportunity to testify, subpoena witnesses, and cross-examine witnesses before a neutral third party.  Finally, the charging parties were zealously represented by the Urban Justice Center, who is counsel for plaintiffs in this suit.

For example, collateral estoppel is particularly appropriate for the ALJ's factual findings regarding Diaz de la Vega.  Counsel for the General Counsel alleged that Thalassa discharged

Diaz de la Vega for engaging in protected concerted activities in violation of the National Labor Relations Act.

After assessing the testimony given by both sides, the ALJ discredited Diaz de la Vega's testimony that he was fired and that the reason he could not work on Saturday, April 26, 2008 was because "his cousin was flying in and did not know the United States." (Ex. D, ALJ Op. at 31:16-18.)  The ALJ found that "Diaz de la Vega was not a truthful and reliable witness" and he "was not truthful in testifying about the circumstances of finding and accepting a new job at the Tribeca Grand Hotel." (Id. at 31:4-5; 8-9).  Ultimately the ALJ concluded that Diaz de la Vega was not fired but voluntarily quit working at the restaurant -- a finding that was necessary to support the merits of her decision.  Indeed, Diaz de la Vega quit because "he could no longer work at the restaurant because he had another job." (Id. at 31:23-24; 36-37).  Diaz de la Vega went so far as to try to call his new employer as a witness and still failed to prove his claim.

With this factual finding by the NLRB ALJ, Diaz de la Vega cannot now have a second chance re-litigate the very same facts in this action.  The ALJ plainly found that he quit. Therefore, he cannot prevail on his claims of sexual harassment and retaliation, in which he alleges he was fired.

### B.     Judicial Estoppel Bars Diaz de la Vega's Sexual Harassment Claim

Judicial estoppel also bars Diaz de la Vega from asserting facts before other judicial bodies, such as the NLRB, and then asserting an inconsistent factual position in this lawsuit. "Judicial estoppel prevents a party from asserting a factual position previously taken by [that party] in a prior legal proceeding" that "was adopted in some manner by the first tribunal." Mitchell v. Washingtonville Ctr. School Dist., 190 F.3d 1, 7 (2d Cir. 1999).  This doctrine also extends to positions asserted before administrative agencies, see id., and therefore applies to Diaz de la Vega's positions before the NLRB.  Part of the purpose of judicial estoppel is to preserve "the sanctity of the oath by demanding absolute truth and consistency in all sworn positions." Bates v. Long Island R.R. Co., 997 F.2d 1028, 1038 (2d Cir. 1993).

In the NLRB action, Diaz de la Vega claimed that he was terminated from Thalassa for engaging in protected activities.  Now, in this action, he asserts that he was terminated for refusing to engage in sexual acts. (SAC ¶130.)  Ultimately, the ALJ concluded that Diaz de la Vega lacked credibility and found that he voluntarily left Thalassa (with no notice) to work at a job that he started the week before he quit the Restaurant.  Having failed in one forum, judicial estoppel is necessary to preclude Diaz from getting a second chance to tell another contrary story under oath.  Therefore, Diaz de la Vega's sexual harassment claim should be dismissed.

### C.   Diaz de la Vega Must Choose Between Inconsistent Remedies

The doctrine of election of remedies also bars Diaz de la Vega's inconsistent factual positions, based on a single course of events.  Election of remedies bars "[o]ne who, with full knowledge of facts upon which inconsistent claims for relief may be predicated, requires his adversary to defend against a version of the facts marshaled in support of one theory [from] pursu[ing] a claim resting upon repugnant factual or legal basis."  18 Moore's Federal Practice, § 131.13[5][a]; accord Luncente v. Int'l Business Machines Corp., 310 F.3d 243, 258 (2d Cir. 2002) ("the law simply does not … permit a party to exercise two alternative or inconsistent … remedies." (internal quotation marks omitted)); 1 N.Y. Jur. 2d, Actions §9.  As a result, it is applicable in this case, "where the second remedy is clearly inconsistent with the first." Motorola Credit Corp v. Uzan, No. 02-0666, 2007 WL 1098689, at *1 (S.D.N.Y. Apr. 11, 2007).

This is not the case of permissibly pleading in the alternative, based on a consistent set of fact, which is permitted under Fed. R. Civ. P. 8(a) or where there are "different theories of recovery relating to the same injury."  Id.  Instead, Diaz de la Vega asserts inconsistent claims because those claims are predicated on a conflicting set of facts.  First, in this action, Diaz de la Vega alleges two inconsistent claims with conflicting facts: (1) that he was terminated for refusing to engage in sexual acts with Kurt (SAC ¶130) and (2) that he was terminated in retaliation for Labor Law violations (SAC ¶115)  Second, between this action and the NLRB action, Diaz de la Vega has similarly asserted conflicting positions – before the NLRB he was

allegedly fired for engaging in protected activities and in this action he was supposedly fired for refusing sexual advances and in retaliation for complaints. Instead of asserting inconsistent positions, election of remedies requires Diaz de la Vega to elect the truthful reason for why he was allegedly terminated; he cannot have it both ways. Therefore, the Court should dismiss all of Diaz de la Vega's retaliation and sexual harassment claims.

## X.  IGNACIO GARCIA'S ALLEGATIONS RELATING TO HIS RETALIATION CLAIM, WHICH HE VOLUNTARILY DISMISSED, SHOULD BE STRICKEN

Recognizing that his retaliation claim was meritless, Plaintiff I. Garcia agreed to voluntarily dismiss it with prejudice. (Ex. R, Garcia 9:24-11:3.)[18] In light of the dismissal of the retaliation claim, as it pertains to I. Garcia, defendants seek pursuant to Rule 12(f) of the Federal Rules of Civil Procedure, to strike paragraph 110 and the reference to I. Garcia in paragraph 115 from the SAC.[19] It is appropriate for the Court to strike both paragraphs because they each provide erroneous statements that are directly contradicted by I. Garcia's deposition testimony, have no relation to the remaining counts, and are prejudicial to the defendants.

Rule 12(f) allows the Court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f)[20]. To strike

---

[18] At the time the parties drafted the consent order dismissing the Tenth Cause of Action, plaintiffs' motion to amend the First Amended Complaint was still pending before the Honorable James C. Francis IV, U.S.M.J. Because plaintiffs filed the SAC, the consent order applies to the Tenth Cause of Action of the SAC.

[19] During the parties' discussions regarding the scope of the Consent Order, defendants sought to strike paragraph 107 of the Amended Complaint (now, paragraph 110 of the Second Amended Complaint). (Ex. T.) Counsel for I. Garcia refused to consent. The position of I. Garcia's counsel is surprising as they agreed that all aspects of the claim are being withdrawn. (Ex. R, I. Garcia 10:19-23.)

[20] Rule 12(f) allows the Court to strike a pleading's statement on its own or by motion from the parties filed within 21 days after being served with the pleading. Fed. R. Civ. P. 12(f). Because the Rule allows courts to strike statements from a pleading on its own initiative, that provision has been interpreted to allow courts to grant meritorious motions to strike even when they are untimely. G-I Holdings, Inc. v. Baron & Budd, 238 F. Supp. 2d 521, 554 (S.D.N.Y. 2002) (internal quotation marks omitted); accord 5A Wright & Miller, Federal Practice and Procedure 2d, § 1380).

impertinent or immaterial matter from the complaint, the defendant must demonstrate (1) that no evidence in support of the allegation of would be admissible, (2) that the allegations have no bearings on the issue in the case, and (3) that to permit the allegations to stand would result in prejudice to the movant.  Wine Markets Int'l, Inc. v. Bass, 177 F.R.D. 128, 133 (E.D.N.Y. 1998); see also G-I Holdings, 238 F. Supp. 2d at 555. ("Allegations may be striken if they have no real bearing on the case, will likely prejudice the movant, or where they have criminal overtones.").

Paragraph 110 and the reference to I. Garcia in Paragraph 115 should be striken. (SAC ¶¶110 and 115.)  First, the evidence needed to support the allegations in Paragraphs 110 and 115 is not only inadmissible because I. Garcia's retaliation claim's was dismissed -- but more importantly, such evidence is not even available.  Paragraph 110 and 115 erroneously allege that I. Garcia complained to Thalassa's management about "the illegal retention of tips."  However, as I. Garcia's deposition testimony makes clear, he never voiced a concern to the Restaurant's management regarding the tips and wages he was paid.  (See Ex. R, Garcia 63:17-21; 68:12-24; 77:20-78:3.)  Likewise, paragraph 115 wrongly asserts that I. Garcia was terminated because of those non-existent complaints.[21]  I. Garcia's testimony offers a wide array of different and contradictory reasons for why he left the restaurant, but retaliatory discharge is not one of them. (Id., 29:4-7; 45:16-21; 69:5-8; 70:6-8.)  As such, I. Garcia's deposition testimony demonstrates that allegations of paragraph 110 and 115 are unsupported by the evidence.  Second, the allegation's presence in the complaint is unnecessary because I. Garcia's retaliatory discharge claim has been dismissed.  They have absolutely "no bearing on the case." Without such linkage to a cause of action, they are immaterial and impertinent.  Therefore, this Court should grant the defendants' motion to strike paragraph 110 and the reference to I. Garcia in paragraph 115.

---

[21] It is puzzling that the allegations in paragraph 110 and 115 and the retaliatory discharge claim were even included in the initial complaint.  I. Garcia testified that he reviewed the initial complaint, (see I. Garcia  85:10-86:6.), but apparently did not advise his counsel of the erroneous factual statements, as illustrated by his deposition testimony that highlights those errors.

**XI.   MARTIN LOPEZ'S CLAIMS SHOULD BE DISMISSED WITH PREJUDICE BECAUSE HE FAILED TO APPEAR FOR DEPOSITION**

Plaintiff Martin Lopez's failure to schedule and appear for a noticed deposition -- repeatedly requested by defendants' counsel -- demonstrates that he has no desire to prosecute his claims.  Accordingly, the Court should dismiss, under Rules 37(b), (d) and 41(b), all of his claims with prejudice for his failure to appear for his deposition and prosecute his case.  Sease v. Doe, No. 04-5569, 2006 WL 3210032, at *6 (S.D.N.Y. Nov. 6, 2006).

Rule 37(d) provides that the court may order Rule 37(b)(2)(A) sanctions, "including dismissing the action," Fed. R. Civ. P. 37(b)(2)(A)(v), against a party who fails to appear for his deposition.  A Rule 37 dismissal serves an important function of "penaliz[ing] those whose conduct warrant such a sanction [and] to deter those who might be tempted to such conduct in the absence of such a deterrent."  See Sease, 2006 WL 3210032, at *2 (internal quotation marks omitted).  It also "ensur[es] the disobedient party does not benefit from non-compliance." Nieves v. City of New York, 208 F.R.D. 532, 535 (S.D.N.Y. 2002).  When addressing dismissal under Rule 37, courts consider the following factors: the duration of non-compliance, whether the non-compliant party has been warned of the consequence of noncompliance, the efficacy of lesser sanctions, and the willfulness of the non-compliant party.  See Sease, 2006 WL 3210032, at *3 (citing Nieves, 208 F.R.D. at 535).

Rule 41(b) provides that dismissal is appropriate "[f]or failure of the plaintiff to prosecute or comply with these rules…"  Accord Sease, 2006 WL 3210032, at *3-4 (dismissing case because plaintiff's failure to appear for a deposition amounted to a failure to prosecute); Nieves, 208 F.R.D. at 536 n.3.  In addition to the factors considered under Rule 37, court also consider whether the defendant is likely to be prejudiced by further delay and the balance between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard.  See Sease, 2006 WL 3210032, at *4.  Nieves, 208 F.R.D. at 536 n.3

Based on the Rule 37 and Rule 41(b) factors, dismissal is warranted.  On September 4, 2009, defendants noticed his deposition.  (Ex. F.)  Since March 2010, counsel for defendants

actively attempted, through numerous letters, to schedule the deposition of M. Lopez, but to no avail. (Exs. G, I, J, L.)  It appears that M. Lopez is no longer in the country.  (Ex. K.)  In fact, only days before filing of this motion, M. Lopez's counsel advised us of his "intent to return to the United States by February 2011." (Ex. P.)[22]  Discovery has closed.  Trial is scheduled. Previously, M. Lopez's counsel expressly acknowledged that "there would be necessary consequences" if M. Lopez failed to appear for his noticed deposition.  (Ex. M.)  That time has come.

## XII.   RICARDO COPANTITLA'S CLAIMS SHOULD BE DISMISSED BECAUSE OF HIS FAILURE TO COMPLY WITH HIS DISCOVERY OBLIGATIONS

The failure to meet his discovery obligations warrants the dismissal of Ricardo Copantitla's claims.  Rule 37(b)(2)(A) provides that if a party "fails to obey an order to provide or permit discovery" the court may issue further just orders including, "(v) dismissing the action or proceeding in whole or in part."  The Court has broad authority to impose sanctions for discovery violations, and deliberate defiance of its orders. NHL v. Metro Hockey Club, 427 U.S. 639, 642 (1976).  "Federal courts have the inherent power to manage their own proceedings and control the conduct of those who appear before them."  Interscope Records v. Gilsa Barboasa, 2006 U.S. Dist. LEXIS at *7 (E.D.N.Y. Dec. 29, 2006).  This would include the power to enforce its own orders.

Defendants respectfully submit that Copantitla's conduct here warrants dismissal of his claims.  See Fed. R. Civ. P. 37 (b)(2)(A)(v); Altschuler v. Samsonmite Corp., 109 F.R.D. 353 (E.D.N.Y. 1986) (adopting recommendation to dismiss for repeated discovery violations).

---

[22] M. Lopez's feeble gesture to supposedly appear for deposition in February 2011 is too little, too late.  His absence effectively ensured that defendants could not move against M. Lopez on the merits.  This Court should not reward M. Lopez's months of indifference to this case.  Doing so would demonstrate to parties that it is acceptable to make themselves unavailable during fact discovery to avoid the consequences of dispositive motion practice, but then appear at deposition just before trial.  Moreover, fact discovery closed months ago and no request was made to keep it open for M. Lopez's deposition.

Although dismissal is a harsh remedy, this case clearly warrants a dismissal.  Each of the factors federal courts review in determining whether to dismiss an action weigh overwhelmingly in favor of dismissal here, namely (i) the party's history of non-compliance, (ii) whether the party had sufficient time to comply, (iii) whether the party had received notice that further delays would result in dismissal, and (iv) the extent of prejudice to the adverse party.  Hollingsworth v. City of New York, 1997 WL 91286 at *2 (S.D.N.Y. Mar. 4, 1997).

Here, the record is replete with plaintiff's history of non-compliance.  Neither plaintiff nor his counsel permitted defendants to even confirm Copantitla's identity.  Plaintiffs produced no records pertaining to any one with the name Ricardo Copantitla, and deliberately obstructed the attempts deposition of Copantitla.  (Ex. W, Copantitla 5:19-19:12; 10:22-11:4; 12:8-10.)  The Second Circuit has held that all litigants have an obligation to provide discovery and when they flout that obligation they should suffer the consequences.  McDonald v. Head Criminal Court Officer, 850 F.2d 121, 124 (2d Cir. 1988).  In this case, plaintiff Ricardo Copantitla has failed to provide any discovery.  Accordingly, defendants respectfully ask the Court to dismiss all of his claims.

## XIII.  CERTAIN PLAINTIFFS ARE NOT ENTITLED DAMAGES OUTSIDE THE STATUTE OF LIMITATIONS

Assuming plaintiffs are entitled to damages under the FLSA or NYLL, plaintiffs are not entitled to damages outside of the applicable statute of limitations period.  The FLSA has a statute of limitations of two years or three years, if the employer willfully violates the statute. 29. U.S.C. § 255(a).  Under the NYLL, the statute of limitations period is six years.  N.Y. Lab. Law. §§ 198(3), 663(3).

Certain plaintiffs and defendants executed a Tolling Agreement from October 31, 2008 to January 16, 2009 -- a period of seventy-seven days.[23]  (Ex. E).  The initial complaint was filed on

---

[23]  The plaintiffs who are parties to the Tolling Agreement are Lantigua, Lizardo, Vargas, Copantitla, Maldonado, Diaz de la Vega, S. Lopez, I. Garcia, and Melendez.  Plaintiffs Guachun, M. Lopez, Matute, and Ramirez are not parties to the Tolling Agreement.

February 20, 2009.  Therefore, plaintiffs who are parties to the Tolling Agreement are not entitled to damages under (i) the NYLL that arose prior to December 6, 2002 or (ii) under the FLSA prior to December 6, 2006 or December 6, 2005 (if the violations are willful).  As for plaintiffs not a party to the Tolling Agreement, they are not entitled to any damages under the NYLL that arose prior to February 20, 2003.  They are likewise barred from recouping damages under the FLSA prior to February 20, 2007 or February 20, 2006 (if the violations are determined to be willful).

The limitation of a possible damages award is particularly appropriate for plaintiffs Copantitla, Guachun, Matute.  Plaintiffs Guachun and Matute were employed by the Restaurant starting in January and October 2002, respectively.  (See Ziotas Dec. ¶ 53).  Neither is a party to a statute of limitations tolling agreement with the Restaurant.  (Ex. E.)  Therefore, any potential FLSA damages from prior to February 20, 2007 (or February 20, 2006, should a willful violation be found) are not awardable.  Likewise, defendants are not liable for any NYLL damage awards for the period prior to February 20, 2003.

Plaintiff Copantitla, who started his employment at the Restaurant in December 2002, is a party to a tolling agreement with Thalassa.  Therefore, Copantitla is not entitled to any potential NYLL damage award prior to December 6, 2002 and FLSA damage award prior to December 6, 2006 (or 2005, if a willful violation is found).

## **CONCLUSION**

For the foregoing reasons, defendants respectfully request that the Court (1) enter summary judgment as to the Eighth Count (Uniforms), Eleventh Count (False Imprisonment), Twelfth Count (NYSHRL Sexual Harassment), Thirteenth Count (NYCHRL Sexual Harassment), (2) dismiss all claims of plaintiffs Copantitla and M. Lopez, (3) dismiss all claims against defendant Julia Makris, George Makris, and Fantis Foods, Inc. (4) dismiss certain

allegations concerning I. Garcia, (5) strike plaintiffs' claims for punitive damages under NYLL §215, and (6) resolve plaintiffs' counsel's conflict of interest.[24]

Dated:   New York, New York
         November 15, 2010

                                        Respectfully submitted,

                                        **LOWENSTEIN SANDLER PC**


                                        By:    s/ Stephanie L. Aranyos
                                               Stephanie L. Aranyos (SA-1657)
                                               1251 Avenue of the Americas
                                               New York, New York  10020
                                               (212) 262-6700
                                               saranyos@lowenstein.com
                                               Attorneys for Defendants

---

[24] If this Court grants defendants' motion in its entirety, plaintiffs' following causes of action remain for trial: First Count for failure to pay minimum wage under the FLSA; Second Count for failure to pay minimum wage under NYLL; Third Count for Overtime under the FLSA; Fourth Count for Overtime under NYLL; Fifth Count for Spread of Hour payments under NYLL; and the Ninth Count for failure to pay plaintiffs call-in-pay.