UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

RICARDO COPANTITLA, DIEGO DIAZ DE LA
VEGA, IGNACIO GARCIA, FREDDY GUACHUN,
JULIO LANTIGUA, MANUEL LIZANDRO, MARTIN
LOPEZ, SEBASTIAN LOPEZ, AUGUSTIN
MALDONADO, HENRY MATUTE, JOELITO
MELENDEZ, AUSSENCIO RAMIREZ, AND JOSE
LUIS VARGAS,

          Plaintiffs,

-against-

FISKARDO ESTIATORIO, INC. d/b/a THALASSA
RESTAURANT, GEORGE MAKRIS, JULIA MAKRIS,
STEVE MAKRIS, and FANTIS FOODS, INC.

          Defendants.

-----------------------------------------------------------------x

Case No. 09 Civ. 1608
(RJH)(JCF)

**DECLARATION OF
TOMMY ZIOTAS**

TOMMY ZIOTAS, of full age and duly sworn, hereby says:

1. I am the Vice President of Fiskardo Estiatorio, Inc. d/b/a Thalassa Restaurant ("Thalassa"). I submit this Declaration in opposition to plaintiffs' motion for partial summary judgment.

2. Thalassa is a fine dining Greek restaurant. It opened in November 2002 and offered a sit down dining experience in the main dining room and wine cellar. Thalassa also offered its space to host private parties (commonly referred to as "banquets"). In or about 2004, Thalassa expanded by adding a third dining room, the gallery loft.

3. Banquets are parties that include, among other things, pre-planned menus.

4. Although Thalassa provides marketing materials and price ranges to clients, banquets are always negotiated by customers who want input on all menu items, décor and, most importantly, prices. Frequently, customers have specific budgets which drive the details of each banquet.

F1451/99
12/17/2010 16356241.2

-2-

5. Thalassa imposed certain standard terms on each banquet, including a service charge, which were non-negotiable.

6. Thalassa imposed a mandatory service charge on all banquets, which included a tip component for the wait staff, as well as a marketing and miscellaneous component for the Restaurant. This was because Thalassa, having experience with how customers negotiate, wanted to ensure that the wait staff received a fair gratuity from the banquets. Therefore the service charge included a tip component.

7. Thalassa's customers are not concerned about what portion of the service charge the wait staff received as a gratuity or with any other aspect of compensation. Rather, the customers were only concerned with the total contract price for the banquet.

8. Although rare, when one of Thalassa's customers wished to provide an additional gratuity, they have done so explicitly at the conclusion of the event by adding another small dollar amount or percentage to the total bill, further demonstrating the customers' knowledge that the service charge was not intended just as a gratuity for the servers. See sample of banquet receipt and document attached hereto as Exhibit A.

9. Generally, Thalassa imposed a 20% service charge on all banquets. The distribution of the service charge was as follows: 25% of the 20% is retained by the Restaurant and is used to pay for marketing, to promote banquets advertisements, and promotions, among other things; 2.5% goes to the banquet manager (frequently, plaintiff Henry Matute was the banquet manager and beneficiary of the additional distribution); and the remainder was distributed into the tip pool.

10. Thalassa paid sales tax on the portion of the service charge it retained.

11. Thalassa's practice regarding retention of banquet service charges was customary within the restaurant industry in New York City and Thalassa operated in good faith under the working assumption that its mandatory service charge could not be deemed a "gratuity" because, unlike gratuities, it was a mandatory charge imposed on its customers for each event.

12. Accordingly, since the service charge added to the banquets was a mandatory service charge, Thalassa was not required to distribute it to the wait staff and was entitled to pay wages of part-time employees and the banquet manager from the service charge.

13. If a customer asked about the service charge it would be explained to them that it included a tip component for the wait staff and a portion for administrative expenses.

14. In the Fall of 2008, Thalassa revised its banquet contracts to explain the service charge. The revisions included providing the customer the following explanation under the title **"Tax, Service and Processing Fees"**:

> A 20% service fee will be added to your bill. Generally 15% of this fee will be provided to the service staff as a gratuity, although for certain events the service staff's share may be a few percentage points higher or lower. Generally, 5% of the service fee (or remaining percentage in certain circumstances) will be retained by the house for non-service staff who have worked on your event. The portion of the service fee provided to the service staff as a gratuity is not subject to customer sales tax. Feel free to inquire about the allocation of the service fee at your event and/or any additional gratuity payment you may care to make.

A copy of the Fall 2008 Banquet Contract, dated November 20, 2008, is attached hereto as Exhibit B.

15. In or about December 2008, Thalassa revised the banquet contracts further. The latest revision and current contract, includes telling the customers that a "15% gratuity is added to your bill." Thalassa does not retain any portion of the 15% gratuity. A copy of a December 18, 2008 banquet contract is attached hereto as Exhibit C.

16. Thalassa has always paid overtime to its hourly workers. For example, during the pay-period ending April 7, 2006, plaintiff Freddy Guachun worked 40.59 hours. Mr. Guachun received $210.00 as a wage for 40 hours worked ($5.25 an hour) and $4.65 for the 0.59 hours of overtime worked ($7.88 per hour and 1.5 times his $5.25 hourly wage). See payroll records attached hereto as Exhibit D.

17. In addition, from 2002 to 2006, the Restaurant paid captains an additional $25 for each lunch shift worked. For example, Mr. Matute worked 2 lunch shifts during the pay

period 11/03/03 to 11/09/03. Accordingly, he was paid $50 for those 2 shifts. In addition, for pay period 10/27/03 to 11/02/03, he worked 1 lunch shift and was paid $25 for that shift. This "special" payment effectively increased the captains hourly rate and covered the spread of hours requirement. A copy of Mr. Matute's pay stubs for periods 11/03/03 to 11/09/03 and 10/27/03 to 11/02/03 is attached hereto as Exhibit E.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the above statements are true and correct.

Dated: December 17, 2010

*[signature]*
Tommy Zlotas