UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
RICARDO COPANTITLA, DIEGO DIAZ DE LA : 
VEGA, IGNACIO GARCIA, FREDDY GUACHUN, :
JULIO LANTIGUA, MANUEL LIZANDRO, MARTIN :
LOPEZ, SEBASTIAN LOPEZ, AUGUSTIN :
MALDONADO, HENRY MATUTE, JOELITO :
MELENDEZ, AUSSENCIO RAMIREZ, AND JOSE :   Case No. 09 Civ. 1608 (RJH)(JCF)
LUIS VARGAS, :
                                        :
                     Plaintiffs, :
                                        :
                     -against- :
                                        :
FISKARDO ESTIATORIO, INC. d/b/a THALASSA :
RESTAURANT, GEORGE MAKRIS, JULIA MAKRIS, :
STEVE MAKRIS, and FANTIS FOODS, INC. :
                                        :
                     Defendants. :
                                        :
------------------------------------------------------------------ x

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION
FOR PARTIAL SUMMARY JUDGMENT AND TO DISMISS CERTAIN PLAINTIFFS**

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
(212) 848-4000
(212) 848-7179 (facsimile)

CHADBOURNE & PARKE LLP
30 Rockefeller Plaza
New York, New York 10112
(212) 408-5100
(212) 541-5369 (facsimile)

URBAN JUSTICE CENTER
123 William Street, 16th Floor
New York, New York 10038
(646) 602-5600
(212) 533-4598 (facsimile)

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF FACTS ..................................................................................... 2

LEGAL ARGUMENT.......................................................................................... 2

I.      Julia Makris, George Makris, and Fantis Foods Are Plaintiffs' Joint Employers. ............. 3

        A.      Julia Makris, the Sole Shareholder of Thalassa Restaurant, Is an Employer. ........ 3

        B.      Disputed Facts Regarding George Makris's Involvement in the Restaurant's
                Operations Preclude Summary Judgment on his Liability as an Employer............ 5

        C.      Facts Showing Fantis Foods' "Interlocking" Relationship with Thalassa
                Preclude Summary Judgment as to its Joint Employer Status............................... 7

II.     Defendants Falsely Imprisoned Mr. Vargas, as Plaintiffs Will Show at Trial. ................ 10

        A.      The Evidence Shows That Defendants Falsely Imprisoned Mr. Vargas. ............. 11

        B.      Mr. Vargas Has Made a *Prima Facie* Showing of Actual Confinement and
                Threatening Conduct.......................................................................... 14

        C.      Genuine Disputes of Material Fact Preclude Summary Judgment on False
                Imprisonment. .................................................................................. 16

III.    Plaintiffs Have Adequately Alleged Claims For Sexual Harassment Which Cannot
        be Decided on Summary Judgment. ................................................................. 17

        A.      Disputed Issues of Material Fact Preclude Summary Judgment on Both
                Plaintiffs' State HRL Claims Based on a Hostile Work Environment. ............... 18

        B.      Disputed Issues of Material Fact Preclude Summary Judgment on Plaintiffs'
                City HRL Claims Based on a Hostile Work Environment. .................................. 21

        C.      Disputed Issues of Material Fact Preclude Summary Judgment on the *Quid
                Pro Quo* Claims of Diaz de la Vega under the State and City HRLs. .................. 23

        D.      Disputed Issues of Material Fact Preclude Summary Judgment on the
                Constructive Discharge Claims of Melendez under the State and City HRLs. .... 24

IV.     Defendants Unlawfully Required Plaintiffs to Pay for Uniform Purchase, Cleaning,
        and Maintenance. ...................................................................................... 25

        A.      Plaintiffs' Work Clothing Constituted "Required Uniforms" Under New
                York Law and Defendants Illegally Charged Plaintiffs for These Items.............. 26

B.      Defendants Failed to Reimburse Plaintiffs for Uniform Cleaning and
        Maintenance. ................................................................................................ 28

V.      Defendants Illegally Retaliated Against Plaintiffs. ............................................. 29

A.      Defendants' Attacks on Plaintiffs' Retaliation Claims Fail, and, At Best,
        Raise Disputed Issues of Fact That Preclude Summary Judgment. ...................... 30

B.      Punitive Damages Are Available for Retaliation .................................................. 37

VI.     Defendants' Myriad Procedural Attacks Are All Meritless. ................................. 37

A.      There is No Conflict of Interest Among Plaintiffs and Defendants'
        Counterclaims for "Setoff" Fail as a Matter of Law. ........................................... 37

B.      Collateral Estoppel, Judicial Estoppel, and the Doctrine of Election of
        Remedies Do Not Apply to Plaintiffs' Claims. .................................................... 39

C.      Ricardo Copantitla Did Not Fail to Comply With His Discovery Obligations
        and His Claims Should Not Be Dismissed. .......................................................... 44

D.      Martin Lopez's Claims Are Established by Documentary Evidence and
        Should Not Be Dismissed. ................................................................................... 46

E.      There Is No Legal Basis for Striking Ignacio Garcia's Allegations. .................... 47

F.      Statutes of Limitations Do Not Significantly Affect Plaintiffs' Claims. .............. 49

CONCLUSION ............................................................................................................... 51

# TABLE OF AUTHORITIES

## CASES

*Altschuler v. Samsonite Corp.*, 109 F.R.D. 353 (E.D.N.Y. 1986) ................................................46

*Ansoumana v. Gristedes Operating Corp.*, No. CV 00-253(AKH), 2003 WL 30411
   (S.D.N.Y. Jan. 3, 2003)..................................................................................................38

*Ayres v. 127 Rest. Corp.*, 12 F. Supp. 2d 305 (S.D.N.Y. 1998)..................................................29

*Baba v. Grand Cent. P'ship*, No. CV 99-5818, 2000 WL 1808971
   (S.D.N.Y. Dec. 8, 2000)..................................................................................................50

*Barfield v. N.Y.C. Health and Hosps. Corp.*, 537 F.3d 132 (2d Cir. 2008) ....................................7

*Bates v. Long Island R.R. Co.*, 997 F.2d 1028 (2d Cir. 1993) .......................................................43

*Bd. of Educ. of the City of N.Y. v. Nyquist*, 590 F.2d 1241 (2d Cir. 1979) ....................................39

*Bobal v. Rensselaer Polytechnic Inst.*, 916 F.2d 759 (2d Cir. 1990)............................................47

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)..............................................................20

*Burns v. Lopez*, 256 N.Y. 123 (1931) .......................................................................................38

*Campoverde v. Sony Pictures Entmn't*, No. CV 01-7775 (LAP), 2002 WL 31163804
   (S.D.N.Y. Sept. 30, 2002)........................................................................................10, 15

*Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8 (2d Cir. 1984) .......................................................3, 6

*Cayuga Indian Nation of N.Y., et al., v. Cuomo*, 667 F. Supp. 938 (N.D.N.Y. 1987)..................43

*Chan v. Triple 8 Palace*, No. CV 03-6048, 2006 U.S. Dist. LEXIS 15780
   (S.D.N.Y. March 31, 2006)..............................................................................................29

*Chao v. Vidtape, Inc.*, 196 F. Supp. 2d 281 (E.D.N.Y. 2002) .......................................................3

*Como v. Commerce Oil Co., Inc.*, 607 F. Supp. 335 (S.D.N.Y. 1985).........................................39

*Copantitla v. Fiskardo Estiatorio, Inc.*, No. CV 09-1608 (RJH)(JCF), 2010 WL 1327921
   (S.D.N.Y. Apr. 5, 2010)....................................................................................................7

*Cruz v. Coach Stores, Inc.*, 202 F.3d 560 (2d Cir. 2000) ...........................................................19

*Cuzco v. Orion Builders, Inc.*, No. CV 06-2789 (KMW) (THK), 2010 WL 2143662
(S.D.N.Y. May 26, 2010)...................................................................29

*DeCintio v. Westchester Cnty. Med. Ctr.*,  821 F.2d 111 (2d Cir. 1987).....................................33

*Distasio v. Perkin Elmer Corp.*, 157 F.3d 55 (2d Cir. 1998)...........................................18

*Donovan v. Captain Bill's, Inc.*, No. CV 82-06-4, 1982 WL 2103
(E.D.N.C. June 20, 1982)...................................................................26

*Fenn v. Verizon Commc'ns, Inc.*, No. CV 08-2348, 2010 WL 908918
(S.D.N.Y. Mar. 15, 2010) ...................................................................18

*G-I Holdings*, *Inc. v. Baron & Budd*, 238 F. Supp. 2d 521 (S.D.N.Y. 2002) )..............................48

*Grochowski v. Ajet Constr. Corp.*, No. CV 97-6269 (LAK), 1999 WL 688450
(S.D.N.Y. Sept. 2, 1999)...................................................................8

*Gustafson v. Bell Atl. Corp.*, 171 F. Supp. 2d 311 (S.D.N.Y. 2001) ...........................................38

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993).......................................................20

*Herman v. Blockbuster Entertainment Group*, 18 F. Supp. 2d 304 (S.D.N.Y. 1998) ....................4

*Herman v. RSR Sec. Servs., Ltd.*, 172 F.3d 132 (2d Cir. 1999) .................................3, 38

*Hernandez v. La Cazuela De Mari Rest., Inc.*, 538 F. Supp. 2d 528 (E.D.N.Y. 2007)..................4

*Hicks v. Baines*, 593 F.3d 159 (2d Cir. 2010)................................................35

*Hollingsworth v. City of N.Y.*, No. CV 95-3737, 1997 WL 91286
(S.D.N.Y. Mar. 4, 1997) ...................................................................46

*Hubbard v. No Parking Today, Inc.*, No. 08 Civ. 7228, 2010 WL 3835034
(S.D.N.Y. Sept. 22, 2010) ...................................................................18, 20

*In re Riverside Nursing Home*, 144 B.R. 951 (S.D.N.Y. 1992) ...............................43, 44

*Interscope Records v. Gilsa Barbosa*, No. CV 05-5864, 2006 U.S. Dist. LEXIS 94210
(E.D.N.Y. Dec. 29, 2006) ...................................................................46

*Int'l Bhd. of Elec. Workers, Local 532, v. Brink Constr. Co.*, 825 F.2d 207
(9th Cir. 1987)...................................................................41

*Jiao v. Shi Ya Chen*, No. CV 03-0165, 2007 WL 4944767 (S.D.N.Y. Mar. 30, 2007)...................3

*Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166 (2d Cir. 2005)................................35

*King v. Crossland Sav. Bank*, 111 F.3d 251 (2d. Cir. 1997)..........................................10

*Lee v. Bankers Trust Co.*, No. CV 96-8153 (DAB), 1998 WL 107119
    (S.D.N.Y. Mar. 11, 1998) .......................................................................................10

*LeGrand v. N.Y. Rest. Sch./Educ. Mgmt. Corp.*, No. CV 02-2249, 2004 WL 1555102
    (S.D.N.Y. July 12, 2004) .................................................................................24, 25

*Lin v. Great Rose Fashion, Inc.*, No. CV 08-4778 (NGG)(RLM), 2009 WL 1544749
    (E.D.N.Y. June 3, 2009) ..................................................................................30, 35

*Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976).........................48

*Liverpool v. Con-Way, Inc.*, No. CV 08-4076 (JG)(JO), 2009 WL 1362965
    (E.D.N.Y. May 15, 2009) .......................................................................................30

*Lopes v. Caffe Centrale LLC*, 548 F. Supp. 2d 47 (S.D.N.Y. 2008) .......................23, 25

*Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243 (2d Cir. 2002) ) ...............................44

*Mack v. Otis Elevator Co.*, 326 F.3d 116 (2d Cir. 2003)................................................20

*McDonald v. Head Criminal Court Officer*, 850 F.2d 121 (2d Cir. 1988)....................46

*Melendez v. Int'l Serv. Sys., Inc.*, No. CV 97-8051, 1999 WL 187071
    (S.D.N.Y. Apr. 6, 1999)...........................................................................................5

*Metrokane, Inc. v. The Wine Enthusiast*, 160 F. Supp. 2d 633 (S.D.N.Y. 2001) .........48

*Mitchell v. Washingtonville Ctr. Sch. Dist.*, 190 F.3d 1 (2d Cir. 1999).........................42

*Moran v. Fashion Inst. of Tech.*, No. CV 00-1275, 2002 WL 31288272
    (S.D.N.Y. Oct. 7, 2002) .........................................................................................22

*Morris v. Lindau*, 196 F.3d 102 (2d Cir. 1999) ......................................................30, 35

*NHL v. Metro Hockey Club*, 427 U.S. 639 (1976)........................................................46

*Nicholson v. Twelfth St. Corp.*, No. CV 09-1984, 2010 WL 1780957
    (S.D.N.Y. May 4, 2010)..........................................................................................27

*NLRB v. Thalbo Corp.*, 171 F.3d 102 (2d Cir. 1999) .......................................39, 40, 41

*Parker v. Columbia Pictures Indus.*, 204 F.3d 326 (2d Cir. 1999)................................43

*Perez v. Jasper Trading, Inc.*, No. CV 05-1725, 2007 WL 4441062
(E.D.N.Y. Dec. 17, 2007) ..................................................................37

*Petrosino v. Bell Atl.*, 385 F.3d 210 (2d Cir. 2004) .............................................18, 19

*Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79 (2d Cir. 2004) ..................................2

*Ragin v. NewBurgh Enlarged City Sch. Dist.*, No. CV 06-2797, 2009 WL 4906111
(S.D.N.Y. Dec. 17, 2009) .................................................................23

*Ragusa v. Malverne Union Free Sch. Dist.*, 381 F. App'x 85 (2d Cir. 2010) ..............................35

*Ramirez v. CSJ & Co., Inc.*, No. CV 06-13677, 2007 WL 1040363
(S.D.N.Y. Apr. 3, 2007)..................................................................50

*Reich v. Priba Corp.*, 890 F. Supp. 586 (N.D. Tex. 1995) ...........................................26

*Rivera v. Federlin*, No. CV 08-7293, 2009 WL 5062112 (S.D.N.Y. Dec. 17, 2009) ..................46

*Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10*, 605 F.2d 1228
(2d Cir. 1979)...........................................................................15

*Rule v. Brine, Inc.*, 85 F.3d 1002 (2d Cir. 1996) ..................................................2

*Sabol v. Cable & Wireless PLC*, 361 F. Supp. 2d 205 (S.D.N.Y. Mar. 7, 2005) ...........................5

*Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597 (2d Cir. 2006) .............................18

*Sease v. Doe*, No. CV 04-5569, 2006 WL 3210032 (S.D.N.Y. Nov. 6, 2006)......................46, 47

*Shannon v. Gen. Elec. Co.*, 186 F.3d 186 (2d Cir. 1999) .......................................46, 47

*Sumner v. U.S. Postal Serv.*, 899 F.2d 203 (2d Cir. 1990) .........................................31

*Taylor v. Sturgell*, 553 U.S. 880 (2008)...........................................................40

*Tepperwien v. Energy Nuclear Operations, Inc.*, 606 F. Supp. 2d 427 (S.D.N.Y. 2009) .......18, 22

*Terry v. Ashcroft*, 336 F.3d 128 (2d Cir. 2003) .............................................18, 24, 34

*Ting Yao Lin v. Hayashi Ya II, Inc.*, No. CV 08-6071, 2009 WL 289653
(S.D.N.Y. Jan. 30, 2009)...............................................................37

*Torres v. Pisano*, 116 F.3d 625 (2d Cir. 1997) .....................................................30

*Vaca v. Sipes*, 386 U.S. 171 (1967) ............................................................................40

*Valez v. U.S.*, 518 F.3d 173 (2d Cir. 2008) ...............................................................50

*Veerman v. Deep Blue Grp. L.L.C.*, No. CV 08-5042, 2010 WL 4449067
    (S.D.N.Y. Nov. 3, 2010) ......................................................................................31

*Vt. v. 1-800 Beargram Co.*, 373 F.3d 241 (2d Cir. 2004) .........................................2

*Wagner v. Burnham*, No. CV 03-1522, 2006 WL 266551 (N.D.N.Y. Feb. 1, 2006) ..................21

*Wanamaker v. Columbian Rope Co.*, 108 F.3d 462 (2d Cir. 1997) ...........................30

*Whalen v. Ansell Perry, Inc.*, No. CV 98-0188 (BSJ), 2004 WL 840286
    (S.D.N.Y. Apr. 16, 2004) .....................................................................................41

*Wickham Contracting Co. v. Bd. of Educ.*, 715 F.2d 21 (2d Cir. 1983) .................40, 42

*Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27 (1st Dep't 2009) ........................21, 22

*Wine Mkts. Int'l, Inc. v. Bass*, 177 F.R.D. 128 (E.D.N.Y. 1998) ............................48, 49

*Yang v. ACBL Corp.*, 427 F. Supp. 2d 327 (S.D.N.Y. 2005) ...................................28

*Yu G. Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240 (S.D.N.Y. 2008) ....................49, 50

*Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61 (2d Cir. 2003) ..............................3, 7, 9

*Zouarhi v. Colin Serv. Sys., Inc.*, 223 F.R.D. 315 (S.D.N.Y. 2004) ........................47

## STATUTES

Fed. R. Civ. P. 37 ....................................................................................................46

Fed. R. Civ. P. 56(c)(2) .............................................................................................2

N.Y. Comp. Codes R. & Regs. tit. 12, § 137 .......................................................26, 28, 29

N.Y. Comp. Codes R. & Regs. tit. 12, § 142 .........................................................28

NYLL § 215 .....................................................................................................29, 31, 36, 37

84 N.Y. Jur. 2d § 161 ...............................................................................................38

29 U.S.C. § 255 .........................................................................................................49

Plaintiffs Ricardo Copantitla, Diego Diaz de la Vega, Ignacio Garcia, Freddy Guachun, Julio Lantigua, Manuel Lizondro, Martin Lopez, Sebastian Lopez, Augustin Maldonado, Henry Matute, Joelito Melendez, Aussencio Ramirez, and Jose Luis Vargas (collectively, "Plaintiffs") respectfully submit this memorandum of law in opposition to the Motion for Partial Summary Judgment and to Dismiss Certain Plaintiffs filed by Defendants Fiskardo Estiatorio, Inc. d/b/a Thalassa Restaurant ("Thalasssa" or "the Restaurant"), George Makris, Julia Makris, Steve Makris, and Fantis Foods, Inc. (collectively, "Defendants").

## <u>PRELIMINARY STATEMENT</u>

Thalassa is an upscale Greek restaurant in New York City's Tribeca neighborhood. Despite its posh reputation, Thalassa has routinely violated numerous federal and state labor laws regarding the payment of wages and tips, and is liable for sexual harassment, false imprisonment, and other wrongs.

Plaintiffs – who are thirteen current and former employees of Thalassa – have moved for summary judgment on the wage- and tip-related claims and other issues. Defendants have cross-moved for summary judgment on thirteen issues that fall into four categories. Defendants' arguments all lack merit.

*First*, Defendants seek summary judgment on the issue of whether certain of the Defendants are the Plaintiffs' "employers" under the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"). Defendants' arguments on this issue have no merit because Thalassa is owned and jointly managed by the Defendants, who are members of the Makris family as well as certain companies the family controls. *Second,* multiple issues of material fact preclude summary judgment on certain Plaintiffs' claims of false imprisonment and sexual harassment. Defendants illegally confined Plaintiff Vargas in a basement office at Thalassa and

1

coercively interrogated him regarding a labor complaint letter that he and others brought to Thalassa.  Two off-duty police officers with personal ties to Defendant Steve Makris assisted Makris in confining and intimidating Mr. Vargas.  In addition, Kemal Kurt, a manager and maître d' at Thalassa, repeatedly engaged in harassing conduct directed at Plaintiffs Diaz de la Vega and Melendez.  A reasonable person would find Kurt's conduct severe, pervasive, and offensive.  *Third,* disputes of material fact also preclude summary judgment on certain employment law-related claims, including Plaintiffs' claims for uniform costs and illegal retaliation.  *Fourth,* aware of the inherent weakness of their case on the merits, Defendants invoke a litany of technical arguments, including arguments based on alleged conflicts of interest, collateral estoppel, judicial estoppel, election of remedies, statutes of limitations, and supposed discovery and pleading deficiencies.  None of these procedural attacks have merit.  Defendants' motion for partial summary judgment and to dismiss certain Plaintiffs should thus be denied in its entirety.

## STATEMENT OF FACTS

The material facts are set forth in Plaintiffs' Responses to Defendants' Rule 56.1 Statement of Uncontroverted Facts.

## LEGAL ARGUMENT

To prevail on a motion for summary judgment, the moving party has the burden to show that "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2); *see also Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 83 (2d Cir. 2004); *Vt. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  In assessing a motion for summary judgment a court must draw all factual inferences in favor of the party opposing summary judgment.  *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).

# I.      Julia Makris, George Makris, and Fantis Foods Are Plaintiffs' Joint Employers.

Defendants have moved for summary judgment on the issue of whether Defendants Julia Makris, George Makris, and Fantis Foods, Inc. are Plaintiffs' joint employers.  The FLSA's definition of "employ" is "necessarily a broad one, in accordance with the remedial purpose of the FLSA."  *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 66 (2d Cir. 2003); *Herman v. RSR Sec. Servs., Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) ("The Supreme Court has emphasized the 'expansiveness' of the FLSA's definition of employer.") (internal citation omitted).

The existence of a joint employer is determined based on a four-factor "economic reality" test that considers whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules and conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records.  *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984).  However, the Second Circuit has made clear that "[n]o one of the four factors [set forth in *Carter*] standing alone is dispositive" and "any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition."  *Herman*, 172 F.3d at 139; *see also Chao v. Vidtape, Inc.*, 196 F. Supp. 2d 281, 290 (E.D.N.Y. 2002) ("Since this is a 'totality of the circumstances test,' any relevant evidence can be examined, and not all factors are required to be present.").  Courts apply the same analysis in assessing joint employer status under the NYLL and FLSA.  *See Jiao v. Shi Ya Chen*, No. CV 03-0165, 2007 WL 4944767, at *9 n.12 (S.D.N.Y. Mar. 30, 2007).

## A.      Julia Makris, the Sole Shareholder of Thalassa Restaurant, Is an Employer.

Thalassa Restaurant is operated by the Makris family and, as argued below, two corporate entities the family controls.  The Makris family members who run the Restaurant are Julia and George, an older, married couple, and their adult son, Steve.  (*See, e.g.,* Goodman Declaration Ex. 5 [Ziotas] 19:18-21; Ex. 6 [S. Makris] 17:14-18:9; Ex. 17 [Zilo] 38:18-19;  Ex. 3

[Diaz de la Vega] 90:5-26; Ex. 4 [Dogan] 48:19-24.)[1]  Fiskardo Estiatorio, Inc., the corporate entity that directly operates and does business as "Thalassa Restaurant," is wholly owned by Julia Makris.  (Def. Rule 56.1 Statement ¶ 3; Ex. 34 [J. Makris] 10:16-25.)  Fantis Foods, Inc.— which is owned by George, Steve, and Steve's brother, Jerry—also jointly manages various aspects of the Restaurant's day-to-day operations. (*See, e.g.*, Ex. 5 [Ziotas] 21:14-16, 39:6-20; Ex. 6 [S. Makris] 108:14-20.)

Defendants assert that Julia Makris, the undisputed sole shareholder of Fiskardo Estiatorio, Inc. (Def. 56.1 Statement ¶ 3; Ex. 34 [J. Makris] 10:16-25), is not an "employer" under the FLSA and NYLL.  To the contrary, as explained in Plaintiffs' moving brief ("Pl. Br."), Julia Makris, as the sole legal owner of the Restaurant, has full authority and control over Plaintiffs' working conditions, and is therefore the Plaintiffs' "employer."  (*See* Pl. Br. 26-27.)

Defendants' argument that they are entitled to summary judgment on this issue because Julia Makris delegated her day-to-day authority over the Restaurant to others misstates the law reflected in their own authorities on this point.  (*See* Defendants' Memorandum of Law in Support of their Motion for Partial Summary Judgment and to Dismiss Certain Plaintiffs ("Def. Br.") at 5.)  For example, *Herman v. Blockbuster Entertainment Group*, a case that Defendants cite, does not establish that evidence of day-to-day control is required for a sole shareholder to be deemed an employer.  18 F. Supp. 2d 304, 313 (S.D.N.Y. 1998).  In fact, it suggests the opposite. In *Blockbuster*, the Court was considering whether a 49.9% shareholder was a joint employer.  In analyzing the issue, the Court specifically contrasted the case before it from one, as here, where the corporation was "*wholly owned* by" a party.  *Id*. (emphasis added).  Because Julia Makris does wholly own Thalassa, she is an employer under the FLSA and NYLL.  *See Hernandez v. La*

---

[1] Unless otherwise noted, all citations to exhibits refer to exhibits to the Declaration of Joshua M. Goodman, dated December 17, 2010.

*Cazuela De Mari Rest., Inc*., 538 F. Supp. 2d 528 (E.D.N.Y. 2007) (individuals, as sole owners and officers, were "employers" under both the FLSA and New York law even if owner did not personally employ plaintiffs).

The fact that Julia Makris "delegated duties to others" at Thalassa, (*see* Def. Br. 6), does not shield her from liability; to the contrary, her power of delegation is compelling evidence of her control over Plaintiffs' working conditions.  *See Herman*, 172 F.3d at 139-140 (chairman's hiring of the individuals in charge of the employees was "a strong indication of control").

Defendants' argument that they are entitled to summary judgment on this issue also fails because there are myriad facts showing Julia Makris's involvement in the operations of the Restaurant.  For example, Julia Makris received status reports about Thalassa's operations, received paychecks from Thalassa from 2002 to 2008, and made recommendations about such matters as hiring, food, music, and ambiance.  (*See* Pl. Br. 27.)  It is therefore not undisputed that Julia Makris "ceased being involved with Thalassa in February 2003."  (Def. Br. 6.) Accordingly, Defendants are not entitled to summary judgment on the issue of Julia Makris's status as an employer under the FLSA and NYLL and the Plaintiffs are.[2]  (*See* Pl. Br. 26-27.)

> **B.    Disputed Facts Regarding George Makris's Involvement in the Restaurant's Operations Preclude Summary Judgment on his Liability as an Employer**

Defendants assert that they are entitled to summary judgment as to George Makris's status as Plaintiffs' employer because he is not an owner, officer, or employee of Thalassa and

---

[2] For the same reasons, plaintiffs are also entitled to summary judgment as to Julia Makris's status as an employer under the New York State Human Rights Law and New York City Human Rights Law, under which Plaintiffs bring their sexual harassment claims.  The analysis to determine who is an employer under these laws is similar to the analysis under the FLSA and NYLL.  *See Sabol v. Cable & Wireless PLC*, 361 F. Supp. 2d 205, 210 (S.D.N.Y. Mar. 7, 2005); *Melendez v. Int'l Serv. Sys.*, *Inc.*, No. CV 97-8051, 1999 WL 187071, at *9-10 (S.D.N.Y. Apr. 6, 1999); (Def. Br. 6.).

supposedly did not have "any involvement in the operation or management of the Restaurant." (Def. Br. 5.)  In making this argument, Defendants rely on the district court's opinion in *Vidtape*, in which a father of two "employers" was found not to be an employer under the statute.

Unlike the father in *Vidtape*, George Makris's relationship to Thalassa was not simply a matter of family ties.  Indeed, there is record evidence that George Makris directed Thalassa employees regarding various aspects of the Restaurant's business.  (Ex. 1 [Lantigua] 230:10-13 (stating George Makris "g[ave] us ideas about the selling point, how we could be better sellers, how we could change things in the restaurant, why we should put this décor over here.  Things like that."); *see also* Ex. 2 [Zapantis] 36:5-12 (stating that on George Makris's visits to the Restaurant, he may instruct employees to do things such as "[f]ix the door" or correct a wobbly chair).)  There is also evidence that George Makris met with Thalassa's managers about the Restaurant's business, and on one occasion instructed Kemal Kurt to suspend Plaintiff Henry Matute from his employment at the Restaurant.  (*See* Ex. 1 [Lantigua] 260:3-261:20; *see also* Ex. 3 [Diaz de la Vega] 90:5-25 (stating he perceived that George Makris was an owner of Thalassa because Makris would meet with managerial staff in Thalassa's office and "go over things.").)  There is also evidence that George Makris played a role in setting employees' pay.  (Ex. 4 [Dogan] 48:19-24 (explaining that Sait Dogan recalled having a conversation with George Makris about his salary upon first being hired to work at Thalassa.).)  Finally, George Makris is the majority shareholder of Fantis Foods, Inc., which is also Plaintiffs' joint employer, as discussed below.  *See* Section I.C.  The "totality of the[se] circumstances" is sufficient to preclude summary judgment on the issue of George Makris's status as an employer under the

FLSA and NYLL.[3]  *Carter*, 735 F.2d 8 at 12.

**C.**    **Facts Showing Fantis Foods' "Interlocking" Relationship with Thalassa Preclude Summary Judgment as to its Joint Employer Status**

Summary judgment in Defendants' favor is also not warranted as to Fantis Foods, Inc.'s status as Plaintiffs' "joint employer."  In *Zheng v. Liberty Apparel Co.*, the Second Circuit set out a six-factor test to analyze whether an entity exercised "functional" control over employees sufficient to be considered a joint employer, including (1) whether the defendants' premises and equipment were used for plaintiffs' work and (2) the degree to which defendants and their agents supervised plaintiffs' work.  355 F.3d at 61.  This inquiry is not formalistic or contingent upon whether one set of particular factors is completely satisfied.  Rather, "different sets of relevant factors" apply "based on the factual challenges posed by particular cases."  *See Barfield v. N.Y.C. Health and Hosps. Corp.*, 537 F.3d 132, 142 (2d Cir. 2008); *see also Lin v. Great Rose Fashion, Inc.*, No. CV 08-4778 (NGG)(RLM), 2009 WL 1544749, at *12 (E.D.N.Y. June 3, 2009) ("The Second Circuit has declined to circumscribe [a court's] analysis to a precise set of factors, recognizing up to ten common factors while noting that a district court is free to consider any other factors it deems relevant to . . . the economic realities.") (internal citations omitted).

During discovery, the Court permitted Plaintiffs to amend their complaint to add Fantis Foods as a defendant because there was evidence of an interlocking relationship between Fantis and Thalassa that suggested Fantis Foods was a joint employer.  *See Copantitla v. Fiskardo Estiatorio, Inc.*, No. CV 09-1608 (RJH)(JCF), 2010 WL 1327921 (S.D.N.Y. Apr. 5, 2010) (Docket Entry # 29).  Now that discovery is complete, the record supporting the conclusion that Fantis Foods was Plaintiffs' joint employer has only become stronger under the fact-intensive,

---

[3] For the same reasons, summary judgment is precluded as to George Makris's status as an employer under the New York State Human Rights Law and New York City Human Rights Law, under which Plaintiffs bring their sexual harassment claims.

"totality of the circumstances" approach that courts use to determine joint employer status.

While Thalassa is a customer of Fantis Foods, the connection between the two entities is not, as Defendants assert, merely an "arms length" relationship between seller and buyer.  (Def. Rule 56.1 Statement ¶ 6.)  The three owners of Fantis Foods are all members of the nuclear Makris family.  (Ex. 6 [S. Makris] 78:10-25; Ex. 7 [Fantis Foods 30(b)(6)] 21:10-24.)  Steve Makris is the Chief Operating Officer of Fantis Foods and has worked for Fantis for over 20 years.  (Ex. 6 [S. Makris] 15:3-16.)  Most significantly, Fantis Foods was Steve Makris's sole employer for the entire time from when Thalassa first opened in 2002 until after this lawsuit was filed.  (*Id.* 15:17-25; 197:17-20.)  Yet during all those years, Steve Makris acted as the "eyes and ears" of Julia Makris at Thalassa and oversaw almost every aspect of the Restaurant's business. (Pl. Br. 28.)  Specifically, Steve Makris (i) had the authority to hire and fire employees; (ii) set work schedules for employees of the restaurant; (iii) represented himself as the owner of Thalassa; (iv) determined the management structure of Thalassa, placing himself at the top; and (v) determined employee compensation, together with another joint employee of both Fantis and Thalassa.  (*Id.*)  While fulfilling this "overseer" role at Thalassa, Steve Makris never received a paycheck from Thalassa – his only employer was Fantis Foods.  (*See* Ex. 6 [S. Makris] 197:17-20.)  Defendants contention that Steve Makris's involvement was "solely because of his mother's illness and his residence being located above Thalassa," (Def. Br. 8), is not a sufficient grounds for summary judgment because, even if true, the motivations behind Steve Makris's involvement have no bearing on the "economic reality" of Fantis's control over Thalassa's employees.  Given Steve Makris's involvement in the Restaurant while he was only an employee of Fantis Foods, there is more than enough evidence in the record to raise a legitimate dispute as to whether Fantis Foods was Plaintiffs' joint employer.  *See Grochowski v. Ajet Constr. Corp*., No. CV 97-

6269 (LAK), 1999 WL 688450, at *3 (S.D.N.Y. Sept. 2, 1999) (finding that questions of fact precluded summary judgment on whether two defendants were joint employers under the FLSA).

But there are more facts supporting the conclusion that Fantis Foods was Plaintiffs' joint employer.  Aside from Steve Makris, Fantis Foods shares two other senior employees with Thalassa:  Tommy Ziotas, who is the Vice President of Thalassa and the General Manager of Fantis Foods (Ex. 5 [Ziotas] 13:3-11, 27:18-20), and Kathy Zotos, who is in charge of the accounts payable for both companies.  (*Id.* 21:8-13.)  It is undisputed that Ziotas and Zotos are in charge of processing payroll records for both companies out of Fantis Foods' office in New Jersey.  (*Id.* 21:14-16, 30:15-22, 46:5-11.)  It is also undisputed that Thalassa's payroll records are sent to Fantis Foods' office for this purpose (*Id.* 21:14-16, 39:6-20), and forwarded to the same outside vendor for processing.  (*Id.* 46:12-47:5.)  Aside from payroll records, Fantis Foods also houses Thalassa's archived banquet records at the office in New Jersey.  (Ex. 6 [S. Makris] 108:14-20.)

The housing of Thalassa's employment records is not the only Thalassa business that is conducted from Fantis Foods' office.  Steve Makris interviewed and hired Sait Dogan, a former employee, at the Fantis office.  (Ex. 4 [Dogan] 79:5-16.)  Steve Makris also met on more than one occasion with members of Thalassa's management team in Fantis Foods' office to discuss Thalassa's business.  (Ex. 6 [S. Makris] 103:4-16.)  Finally, as noted above, George Makris, the majority owner of Fantis Foods, was also involved in various aspects of Thalassa's business, including tasks related to hiring and firing employees.  George Makris and Jerry Makris were listed on a phone number list posted on a wall at the Restaurant for use by Thalassa employees, alongside numbers for the rest of Thalassa's staff.  (Ex. 5 [Ziotas] 52:9-54:18, Ex. 8 [COP000460].)

9

In determining whether an entity was a joint employer, the court in *Lin v. Great Rose Fashion*, considered a factual situation similar to the one at issue here.  2009 WL 1327921.  In *Lin*, in addition to considering the *Zheng* factors, the court found the "interlocking relationships between the Defendant Corporations" significant and "pertinent to the joint employer inquiry." *Id.* at 16.  Specifically, because "nearly every aspect of these businesses was intertwined"— including the fact that the same family controlled both companies, that "significant funds flowed between these related companies on a regular basis," and that "[t]hese entities were functioning as complementary components of a single business enterprise"—the court denied the defendant's motion to dismiss based on lack of joint employer status.  *Id.*

At a minimum, these facts raise a triable issue as to Fantis Foods' status as an employer, and summary judgment on the issue should be denied.

## II. <u>Defendants Falsely Imprisoned Mr. Vargas, as Plaintiffs Will Show at Trial.</u>

Defendants are not entitled to summary judgment on Jose Luis Vargas's false imprisonment claim.  To establish a cause of action for false imprisonment, four elements are required: (1) that the defendant intended to confine the plaintiff, (2) that the plaintiff was aware of the confinement, (3) that the plaintiff did not consent to the confinement, and (4) that the confinement was not otherwise privileged.  *King v. Crossland Sav. Bank*, 111 F.3d 251, 255 (2d. Cir. 1997).  A plaintiff must also make a *prima facie* showing of actual confinement or threatening conduct.  *See Lee v. Bankers Trust Co.*, No. CV 96-8153 (DAB), 1998 WL 107119, at *4 (S.D.N.Y. Mar. 11, 1998).  The false imprisonment may be for any length of time. *Campoverde v. Sony Pictures Entmn't*, No. CV 01-7775 (LAP), 2002 WL 31163804, at *8 (S.D.N.Y. Sept. 30, 2002).  As discussed below, there are several disputed issues of material fact that preclude summary judgment on Vargas's false imprisonment claim.

## A.    The Evidence Shows That Defendants Falsely Imprisoned Mr. Vargas.

On October 1, 2008, a group of current and former Thalassa employees, as well as their friends and supporters, came to deliver a letter to Thalassa complaining about Thalassa's labor law violations (the "Labor Complaint Letter"). (Ex. 12 [Lantigua NLRB] 244:16-246:17.) The group's attempt to deliver the Labor Complaint Letter lasted no more than five minutes, from 6:06 pm to 6:11 pm, as recorded by Thalassa's video surveillance cameras.[4] (Ex. 13). Plaintiffs Julio Lantigua and Jose Luis Vargas were part of this group. (Ex. 12 [Lantigua NLRB] 247:11-18.) Upon arrival at Thalassa, Lantigua greeted Kemal Kurt, the floor manager and maître d', and explained to him that the group had come to deliver a letter regarding Thalassa's labor law violations. (*Id.* 246:10-17.) Lantigua stated that the group was represented by an attorney and that they were contemplating filing a lawsuit. (*Id.*) Kurt refused to accept the Labor Complaint Letter. (*Id.* 246:19-24.) Tasso Zapantis, Thalassa's General Manager, was also present for most of this encounter and witnessed Kurt's refusal to accept the letter. (Ex. 2 [Zapantis] 177:10-178:6.)

After the group departed, Zapantis called Steve Makris and told him what happened. (*Id.* 178:25-179:2.) Later that night, Makris came to the Restaurant and viewed the surveillance video. (Ex. 6 [S. Makris] 128:15-129:2.) Around midnight that same night, Steve Makris called his friend Nick Giakoumis. (Ex. 14 [Giak.] 42:5-10.) Giakoumis is a police officer in New York City's First Precinct. (*Id.* 19:11-12.) He and Steve Makris have been friendly for many years, since before Giakoumis became a police officer. (*Id.* 19:9-12; 27:11-29:5; 29:14-31:13.)

---

[4] A DVD copy of Thalassa's surveillance video of the delivery of the letter on October 1, 2008 is attached as Exhibit 13. This video plainly discredits Defendants' attempts to characterize the delivery of the Labor Complaint Letter as somehow hostile or aggressive. (*See* Def. Br. 11-12.) Defendants have failed to produce additional surveillance videos from October 2, 2008, which might further corroborate the details of the false imprisonment of Vargas.

Giakoumis has visited Thalassa restaurant over a dozen times, and Steve Makris always insists on providing Giakoumis with food free of charge.  (*Id.* 38:19-39:2; 39:12-40:9.)  After receiving Steve Makris's call, Giakoumis drove to Thalassa and met with Steve Makris, who played the surveillance video for him.  (*Id.* 45:14-22.)  During this meeting, Giakoumis and Makris agreed that Giakoumis would return on another day to "interview" Thalassa employees regarding the attempted delivery of the letter.  (*Id.* 55:12-24.)

The next day, October 2, Jose Luis Vargas reported to Thalassa for work around 3:30 p.m.  (Ex. 9 [Vargas] 112:23-113:4.)  Zapantis called Steve Makris to inform him of Vargas's arrival.  (Ex. 6 [S. Makris] 140:14-18.)  While on his way to Thalassa, Steve Makris called Giakoumis and asked him to come to Thalassa.  (*Id.* 141:10-14; Ex. 14 [Giak.] 56:8-57:9; 57:10-25.)  Giakoumis, who was then off-duty, asked another off-duty officer named Joseph Conway to accompany him to Thalassa for the interrogation.  (Ex. 14 [Giak.] 62:25-63:18.)

After Makris, Giakoumis, and Conway arrived at Thalassa, Kurt approached Vargas and ordered him to come with him to the basement office.  (Ex. 9 [Vargas] 120:4-16.)  When the two of them arrived at the basement office, the front door to the office was locked with a code lock.  (*Id.* 121:15-24.)  Kurt punched in the pass code and opened the door.  (*Id.*)

Inside the tiny basement office, five other people were waiting for Vargas:  Steve Makris, Zapantis, Ralphael Abrahante (the Restaurant's chef), and Officers Giakoumis and Conway.  (*Id.* 122:2-9.)  Giakoumis and Conway were not wearing police uniforms.  (*Id.* 121:25-122:9.)  After Vargas entered the basement office, the door was shut behind him.  (*Id.* 125:8-10.)  Once inside, Makris played the video of the attempt to deliver the Labor Complaint Letter and interrogated Vargas about the identities of the people in the video.  (*Id.* 127:20-128:15.)  Abrahante served as a Spanish interpreter.  (Ex. 15 [Vargas NLRB] 512:7-21.)  Giakoumis and Conway frightened

Vargas.  (Ex. 9 [Vargas] 132:3-20; Ex. 11 [Vargas Aff.] ¶ 5.)  Vargas did not know whether to

believe they were real police officers.  (Ex. 11 [Vargas Aff.] ¶ 6.)  Vargas told Steve Makris that

Makris should speak to his lawyer regarding any questions about the letter, but Makris persisted

in his questioning.  (Ex. 9 [Vargas] 131:3-11.)

 Vargas was "very scared" for his personal safety during this ordeal.  (*Id.* 133:8-14; Ex. 11

[Vargas Aff.] ¶¶ 5, 9.)  Vargas asked Steve Makris, as the person who was directing the

interrogation, if he could leave the basement office and go get his lawyer's card.  (Ex. 9 [Vargas]

134:6-15.)  Vargas testified that when he asked to leave the office to go get his lawyer's card,

Makris refused to let him leave.  (*Id.* 134:6-15.)  Eventually, after further questioning, Makris did

let Vargas leave to get his lawyer's card, but Makris had Kurt, Vargas's supervisor, accompany

him.  (Ex. 15 [Vargas NLRB] 497:2-17.)  Kurt prevented Vargas from calling his lawyer at that

time and instructed him that he had to return immediately to the office after obtaining the card.

(*Id.* 497:24-498:5; Ex. 9 [Vargas] 148:2-14.)

 At some point after Vargas returned with his lawyer's card, Makris briefly exited the

office, leaving Vargas in the room with Zapantis and Abrahante.  (Ex. 15 [Vargas NLRB]

498:11-14.)  Vargas remained in the office with the doors shut.  (Ex. 11 [Vargas Aff.] ¶¶ 10-13.)

Around this time, Giakoumis and Conway exited the office as well.  (Vargas 134:16-22.)

 Unbeknownst to Vargas at the time, while he was shut in the office, Makris and

Giakoumis briefly conferred privately and Makris decided to call 911 to request uniformed, on-

duty police officers to come to the Restaurant to pressure Vargas for more information.  (Ex. 6

[S. Makris] 152:15-153:3; Ex. 14 [Giak.] 97:13-99:17.)   According to Giakoumis, he and

Conway left the Restaurant shortly after Makris called 911.  (Ex. 14 [Giak.] 97:13-100:9.)

However, Vargas had no way of knowing if Giakoumis and Conway had departed or remained

outside the office.

After calling 911, Steve Makris returned to the office to try a new tack in interrogating Vargas.  He ordered everyone to leave the room except for Vargas, whom he ordered to stay. (Ex. 15 [Vargas NLRB] 499:10-16; Ex. 9 [Vargas] 134:24-135:10.)  Then Steve Makris told Vargas that now that they were alone, Vargas should tell him everything he knew.  (Ex. 9 [Vargas] 136:5-7.)  When Vargas responded that he would have to speak to his lawyer, Steve Makris became enraged and began yelling at Vargas and continued interrogating him.  (*Id.* 136:8-11.)  Steve Makris asked Vargas if he had been to jail before and told him "you need to talk with me now.  If you don't, you are going to be arrested because the police are coming." (Ex. 15 [Vargas NLRB] 499:20-501:8; Ex. 9 [Vargas] 136:17-137:8.)

When the uniformed officers arrived, Steve Makris asked them to arrest Vargas.  (Ex. 9 [Vargas] 139:2-7.)  Vargas explained to the uniformed officers that the situation involved a labor dispute.  (*Id.* 139:17-19.)  The officers declined to arrest Vargas.  (*Id.* 139:2-7.)  After the uniformed police departed, Vargas asked Steve Makris if he was fired.  Steve Makris told Vargas to go home.  (*Id.* 142:15-143:17.)  Vargas took his belongings from his locker and left the Restaurant immediately.  (*Id.* 143:18-25.)  He remained in a state of fear.  (*Id.*)  Later that evening, Makris invited Giakoumis and Conway to return to Thalassa for dinner on the house. (Ex. 14 [Giak.] 107:20-108:19; 110:25-111:7; 109:12-24; Ex. 48 [S. Makris NLRB] 173:13-174:4.)

## B.   Mr. Vargas Has Made a *Prima Facie* Showing of Actual Confinement and Threatening Conduct.

The record testimony outlined above establishes the elements of false imprisonment and makes the required *prima facie* showing of actual confinement or threatening conduct.  Behind closed doors, Steve Makris and five of his agents, including the two off-duty officers wearing

street clothes, surrounded and intimidated Vargas, while Steve Makris questioned him about protected labor activities.  (Ex. 9 [Vargas] 125:8-10; 127:20-129:23; 132:3-20; Ex. 10 [NLRB Op.] 35.)  Vargas reasonably feared for his personal safety.  (Ex. 9 [Vargas] 133:8-14; Ex. 11 [Vargas Aff.] ¶¶ 5, 9.)  Vargas asked to leave the office to get his lawyer's card, but Makris refused to let him leave.  (Ex. 9 [Vargas] 134:6-15.)  These facts alone establish the required *prima facie* showing of actual confinement or threatening conduct.

Defendants wrongly suggest that Vargas was not confined because he "never ran for the door nor screamed that he wanted help."  (Def. Rule 56.1 Statement ¶ 237.)  It is well settled, however, that a plaintiff "need not show that [he] physically attempted to leave," and is not "required to incur the risk of personal violence by resisting until it actually is used." *Campoverde*, 2002 WL 31163804, at *8 (internal quotation marks and citations omitted).  A defendant exercises confinement over a plaintiff "when the plaintiff submits to an apprehension of force reasonably understood from the defendant's conduct."  *Id.*  Steve Makris's premeditated seclusion, detention, and interrogation of Vargas with the assistance of his staff and the off-duty officers created a reasonable apprehension of force.

Moreover, there is no basis to infer that Vargas consented to the confinement.  "'Consent' to a confinement means not mere acquiescence but a voluntary assent," *Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10*, 605 F.2d 1228, 1248 (2d Cir. 1979), and a plaintiff need not show that he attempted to leave.  *Campoverde*, 2002 WL 31163804, at *8.  As a Thalassa employee, Vargas accompanied his supervisor, Kurt, to the office at Kurt's request.  (Ex. 9 [Vargas] 120:4-18.)  Once he arrived there, however, Vargas encountered a hostile, unexpected situation that unfolded rapidly.  The fact that Vargas did not run for the door hardly establishes his consent.  In fact, the record demonstrates that Vargas requested to exit the office

15

and was refused.  (*Id.* 134:6-15.)  At a minimum, his consent is a question of fact for trial.

The cases Defendants cited in their motion for summary judgment are easily distinguishable.  (*See* Def. Br. 13-15.)  None of those cases involved unfamiliar, plainclothes police officers acting to intimidate the employee on the employer's behalf.  None of those cases involved employees who specifically asked to leave and were refused.  And none of those cases involved an illegal "interview," which is what the National Labor Relations Board ("NLRB") found to be the case here.[5]  (Ex. 10 [NLRB Op.] 35.)  Moreover, unlike the cases cited by Defendants, the basement office in which Vargas was confined was not "familiar."  While the office is located on Thalassa's premises, its doors locked with a code Vargas did not know and the threatening, off-duty police rendered the setting unfamiliar and unsettling.[6]

### C.   Genuine Disputes of Material Fact Preclude Summary Judgment on False Imprisonment.

---

[5] An unfair labor practices proceeding against Thalassa Restaurant for violations of the National Labor Relations Act was tried before ALJ Eleanor MacDonald of the NLRB in September 2009 and January 2010.  (Ex. 10 [NLRB Op.] 1.)  As fully addressed in Section VI.B below, Defendants are incorrect in contending that the NLRB ALJ's findings have preclusive effect in this action.  However, while the findings of the ALJ are not binding here and do not preclude Plaintiffs from pursuing their claims of relief, this Court may, of course, examine the findings of the ALJ.  *See infra* Section VI.B.  In discussing the NLRB case, Defendants conveniently fail to acknowledge the ALJ's many findings that favor the Plaintiffs in this matter and which discredit the testimony of Thalassa's witnesses.  Indeed, in their submissions to this Court, Defendants have routinely asserted factual positions that contradict the ALJ's findings, despite their purported position that all such findings are preclusive.  (Def. Br. 42.)  For example, the ALJ found that Makris's interrogation of Vargas on October 2, 2008 indicated "an evident hostility to the employees' concerted activities" and that Makris "engaged in a coercive interrogation" in violation of the law.  (Ex. 10 [NLRB Op.] 35.)  Indeed, the ALJ generally discredited the testimony of Thalassa's witnesses about the facts of October 1 and 2, 2008.  (*See id.*)

[6] Defendants' argument that a "fear of being arrested or fired . . . does not constitute the detaining force necessary to establish the tort of false imprisonment" is irrelevant.  (*See* Def. Br. 13-16.)  Vargas's confinement did not result from fear of being arrested or fired, but rather from a reasonable fear for his safety.  Indeed, Vargas questioned whether Giakoumis and Conway were real police officers, and he had not broken any law.  (Ex. 9 [Vargas] 125:8-10; Ex. 11 [Vargas Aff.] ¶ 6.)

At a minimum, disputed issues of material fact preclude summary judgment on this

claim.  For example, Defendants claim that "[w]hile Vargas was in the office at least one door to

the office was open," but Vargas testified that the doors were closed after he entered.[7]  (Def. Br.

15-16; Ex. 9 [Vargas] 125:8-10; Ex. 11 [Vargas Aff.] ¶¶10-13.)  Defendants also claim that

"when Vargas did ask to leave the room to get his attorney's business card, he was able to

leave," but Vargas testified that Makris refused to let him leave and continued interrogating him

for some time.  (Def. Br. 16; Ex. 9 [Vargas] 134:13-15.)  Defendants further deny that Steve

Makris ever threatened Vargas with arrest, asked the uniformed officers to arrest him, or asked

Vargas if he had ever been to jail.  (Def. Br. 16; Ex. 6 [S. Makris] 158:11-159:13.)  These and

other disputed issues of fact set forth in Plaintiffs' Rule 56.1 Responses preclude summary

judgment.  (*See* Plaintiffs' Stmt. of Material Facts Which Preclude Summary Judgment ¶¶ 1-45.)

**III.        Plaintiffs Have Adequately Alleged Claims For Sexual Harassment Which Cannot
              be Decided on Summary Judgment.**

Sexual harassment is prohibited both by New York State and New York City laws,

known as the New York State Human Rights Law ("State HRL") and the New York City Human

Rights Law ("City HRL"), respectively.  Under each of these laws, a plaintiff may bring a sexual

harassment claim under one of three different theories:  (1) that defendants' harassment created a

hostile work environment; (2) *quid pro quo* harassment, *i.e.*, that the plaintiff's reaction to

defendants' harassment affected the conditions of the plaintiff's employment; and (3)

---

[7] There are two doors to the basement office at Thalassa, one of which opens out to the polishing
station and the other of which opens to a small hall that leads to a freight elevator.  (Ex. 11
[Vargas Aff.] ¶¶10-13.)  Both doors have key-code locks that lock from the outside.  (*Id.*)  Both
doors remained closed during the interrogation of Vargas, except when someone used the door to
enter or exit.  (*Id.*)  In trying to claim that "at least one door to the office was open" while Vargas
was interrogated, (*see* Def. Br. 15), Defendants rely on unreliable and conflicting accounts of
which of the two doors was supposedly open.  (*See* Ex. 6 [S. Makris] 150:23-151:8; *compare* Ex.
14 [Giak.] 77:2-24.)  In fact, both doors were closed.  (Ex. 9 [Vargas] 125:8-10; Ex. 11 [Vargas
Aff.] ¶¶10-13.)

constructive discharge, *i.e.*, that the defendants' harassment created an intolerable environment that forced the plaintiff to quit.  Plaintiff Diaz de la Vega alleges hostile work environment and *quid pro quo* harassment claims under both the State HRL and City HRL.  Plaintiff Melendez alleges hostile work environment and constructive discharge claims under both the State HRL and City HRL.  Plaintiffs have adequately alleged their claims and disputed issues of fact preclude summary judgment.[8]

### A. Disputed Issues of Material Fact Preclude Summary Judgment on Both Plaintiffs' State HRL Claims Based on a Hostile Work Environment.

To establish a State HRL claim based on a hostile work environment theory, a plaintiff must show "'(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the [defendant].'"  *Fenn v. Verizon Commc'ns, Inc.*, No. CV 08-2348, 2010 WL 908918, at *9 (S.D.N.Y. Mar. 15, 2010) (quoting *Petrosino v. Bell Atl.*, 385 F.3d 210, 221 (2d Cir. 2004)) (internal quotation marks omitted).  The first prong of the hostile work environment test assesses whether a reasonable person would have found the alleged misconduct to be severe or pervasive and whether the victim perceived an abusive environment.  *See id.* (citing *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)).[9]  On a motion for summary judgment, the court resolves "whether a reasonable factfinder *could* conclude, considering all the circumstances, that 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her

---

[8] Defendants purport to request summary judgment on each harassment claim, but Diaz de la Vega's hostile work environment claim is not mentioned once after the Defendants' Preliminary Statement.  (*See* Def. Br. 1.)

[9] As Defendants noted (Def. Br. 20 n.7), courts evaluate State HRL sexual harassment claims under the same standards as Title VII cases.  *Hubbard v. No Parking Today, Inc.*, No. 08 Civ. 7228, 2010 WL 3835034, at *10 (S.D.N.Y. Sept. 22, 2010).

employment *altered for the worse*.'" *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 600 (2d

Cir. 2006) (second emphasis in original).[10]

### 1.    The Facts Demonstrate a Hostile Work Environment

A reasonable factfinder *could* and would find that Kurt's sexual harassment "altered the

work conditions" of Diaz de la Vega and Melendez "for the worse."  Kurt asked Diaz de la Vega

several times what he was doing on his days off and whether he wanted to go out with him—to

Kurt's house, or the movies, or to eat.  (Ex. 3 [Diaz de la Vega] 69:19; 70:7-11.)  Asking one's

subordinates repeatedly to "go out" can be abusive if juxtaposed against repeated and unwanted

sexual touching.  *See Petrosino*, 385 F.3d at 224.  In this case, Kurt repeatedly touched Diaz de

la Vega in a harassing, sexual manner.  For example, Kurt approached Diaz de la Vega from

behind at the polishing station and massaged his shoulders.  (Ex. 3 [Diaz de la Vega] 69:25-

70:4.)  The polishing station is an area of the Restaurant that is surrounded by a thick curtain

concealing the polisher from public view.  (Ex. 25 [Lantigua Aff.] ¶ 4; Ex. 23 [Matute Aff.] ¶ 7;

Ex. 42 [Guachun Aff.] ¶ 4.)  Kurt assigned Diaz de la Vega to work at the polishing station.  (*See*

Ex. 19 [Kurt] 122:19-123:7.)  Another day, Kurt grabbed Diaz de la Vega's crotch.  (*See* Ex. 3

---

[10] In assessing all the relevant circumstances, unreported harassment or other sexual harassment may also be considered.  *See Tepperwien v. Energy Nuclear Operations, Inc.*, 606 F. Supp. 2d 427, 437 (S.D.N.Y. 2009) (citing *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 62 (2d Cir. 1998)); *see generally Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000).  There are many such instances of unreported sexual harassment.  Melendez testified to Kurt rubbing Plaintiff Ricky Copantitla's back on four occasions.  (Ex. 16 [Melendez] 86:21-92:20.)  Plaintiffs testified about harassment of female employees by Steve Makris and other managers.  (Ex. 3 [Diaz de la Vega] 133:23-134:3; 144:6-15.)  Sophia Zilo testified about multiple harassment complaints from female employees against Sait Dogan, a former manager and maître d'.  (Ex. 17 [Zilo] 137:6-10; Ex. 36 [D31609-D31617] (complaints against Dogan).)  Thalassa also lacked an official anti-sexual harassment policy and busboys were not informed about how to make complaints for sexual harassment.  (Ex. 17 [Zilo] 129:17-22.)  Steve Makris did not remember whether the Dogan complaints ever led to a sexual harassment policy.  (Ex. 6 [S. Makris] 176:10-24.)  Zilo failed to recognize the Employee Handbook or recall whether the Handbook had a anti-harassment policy, but did confirm that Thalassa provided no training regarding sexual harassment.  (Ex. 17 [Zilo] 129:17-132:20.)

[Diaz de la Vega] 70:4-6.)  On two other occasions, Kurt asked Diaz de la Vega "to show him [his] penis" while Diaz de la Vega was urinating in the Restaurant bathroom.  (*Id.* 69:22-24.)

Demonstrating similar harassing behavior toward Melendez, Kurt walked up from behind and rubbed Melendez's back about five times and always at the coffee station.  (Ex. 16 [Melendez] 82:8-14.)  The coffee station, like the polishing station, has a thick curtain concealing the area from public view.  (Ex. 25 [Lantigua Aff.] ¶ 4; Ex. 23 [Matute Aff.] ¶ 7; Ex. 42 [Guachun Aff.] ¶ 4.)  One particularly aggressive instance of Kurt's misconduct, which Defendants euphemistically characterize as "a single occurrence where Kurt grazed against Melendez's back," (Def. Br. 19), occurred when Melendez and Kurt were alone on the second floor of Thalassa cleaning up after a party.  (Ex. 16 [Melendez] 63:24-64:10; 73:13-16.)  Kurt began touching Melendez by rubbing his back and eventually closed in and grabbed Melendez's waist.  (*Id.* 71:15-18; 74:2-8.)  Kurt "started rubbing his – himself.  His private part, is the best word."  (*Id.* 74:11-16.)  After feeling Kurt's "private part" rubbing against him, Melendez pushed Kurt off of him and ran downstairs.  (*Id.* 74:24-75:7.)  Melendez never returned to work at Thalassa after that night, (*Id.* 121:3-10.), and suffered from depression:  "I was locked up in the house.  I didn't eat.  I stayed in bed."  (*Id.* 115:13-14); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) ("The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive.").

## 2. The Hostile Work Environment Can Be Imputed to Defendants

Employers are presumptively responsible for a hostile work environment where the harasser was a "supervisor."  *See Hubbard v. No Parking Today, Inc.*, No. CV 08-7228, 2010 WL 3835034, at *6 (S.D.N.Y. Sept. 22, 2010) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).  Contrary to Defendants' suggestion (Def. Br. 29), supervisors include not only persons with authority to hire, fire, or discipline, but also persons with the power to affect the

20

employee's day-to-day work activities.  *See Mack v. Otis Elevator Co.*, 326 F.3d 116, 126 (2d

Cir. 2003).  Record evidence clearly establishes that Kurt was a supervisor.[11]  As maître d', he

was charged with creating work schedules (*see* Ex. 18 [Matute] 16:13-17; Ex. 4 [Dogan] 49:18-

19; *cf.* Ex. 19 [Kurt] 122:8-18); conducting training (Ex. 19 [Kurt] 94:7-97:11; *see* Ex. 4 [Dogan]

49:20-22); running the floor (Ex. 19 [Kurt] 94:7-97:11; *see* Ex. 18 [Matute] 16:13-17);

interviewing job candidates (Ex. 19 [Kurt] 97:17-103:21; *see* Ex. 4 [Dogan] 49:23-25);

disciplining workers, including busboys (*see* Ex. 18 [Matute] 146:10-17; Ex. 4 [Dogan] 50:14-

23); and assigning people to work stations (*e.g.*, the coffee or polishing station) (Ex. 19 [Kurt]

122:19-123:7; *see* Ex. 18 [Matute] 16:13-17; Ex. 4 [Dogan] 49:14-15).  Kurt's subordinates

viewed and treated him as a boss.  (Ex. 3 [Diaz de la Vega] 38:13-15.)  Kurt received a salary

rather than an hourly wage, (Ex. 46 [Kurt NLRB] 530:10-20; 740:25-750:13), was listed as a

"manager" on documents created by Thalassa, (Ex. 19 [Kurt] 204:8-17), led "pre-shift meetings"

on behalf of management to instruct waitstaff on various issues, (Ex. 12 [Lantigua NLRB]

201:14-202:25), and threatened employees about their complaints on behalf of management, (Ex.

21 [Diaz de la Vega NLRB] 451:16-19).  Kurt himself admitted that he supervised the waitstaff

in explaining his role: "I oversee."  (Ex. 46 [Kurt NLRB] 744:2.)  Similarly, the chef, Ralphael

Abrahante, admitted that Kurt supervises the front-of-the-house staff.  (Ex. 44 [Abrahante

NLRB] 566:3-5.)  All of these facts preclude summary judgment.  *See Wagner v. Burnham*, No.

CV 03-1522, 2006 WL 266551, at *14 (N.D.N.Y. Feb. 1, 2006) (denying summary judgment

because of issues of material fact regarding supervisor status).

> **B.    Disputed Issues of Material Fact Preclude Summary Judgment on Plaintiffs'
> City HRL Claims Based on a Hostile Work Environment.**

Plaintiffs have also stated hostile work environment claims under the City HRL that

---

[11] In discussing Melendez's hostile work environment claims, Defendants never dispute the issue
of whether Kurt acted as Melendez's supervisor.

cannot be decided on summary judgment.  Unlike the State HRL, questions of severity and

pervasiveness are not relevant to liability for sexual harassment under the City HRL, although

they remain applicable in assessing damages.  *See Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d

27, 38 (1st Dep't 2009) (stating the City HRL is broader and more remedial than the State HRL).

Under the City HRL, "liability is normally determined simply by the existence of unwanted

gender-based conduct."  *Id*. at 38.  A plaintiff merely needs to show "by a preponderance of the

evidence that [he] has been treated less well than other employees because of [his] gender." *Id.* at

39.  To "prevail on a same-sex sexual discrimination claim," specifically, "plaintiffs must present

some evidence that the harasser was homosexual," *Moran v. Fashion Inst. of Tech.*, No. CV 00-

1275, 2002 WL 31288272, at *5 (S.D.N.Y. Oct. 7, 2002) (internal quotation omitted), such as

"(1) evidence suggesting that the harasser intended to have some kind of sexual contact with the

plaintiff, or (2) proof that the alleged harasser made same-sex sexual advances to others,

especially to other employees."  *Tepperwien*, 606 F. Supp. 2d at 438 (internal quotation omitted).

"At the summary judgment stage, judgment should normally be denied to a defendant if there

exist triable issues of fact as to whether such conduct occurred."  *Williams*, 872 N.Y.S. at 39.

The record evidence easily satisfies these requirements.  Diaz de la Vega testified that

Kurt is a homosexual.  (Ex. 3 [Diaz de la Vega] 70:17-20; 110:18-20.)  The record evidence

reveals repeated instances of Kurt rubbing the backs of multiple men.  (*Id.* 70:2-4; Ex. 16

[Melendez] 82:8-12; 86:21-92:20.)  Thus, there is evidence that Kurt was homosexual and that

he made same-sex sexual advances to other employees.  *See Tepperwien*, 606 F. Supp. 2d at 440-

41 (finding evidence raised a genuine issue as to whether defendant acted out of a sexual desire,

including evidence that defendant allegedly tried to grab his co-worker's crotch).  The record

evidence discussed above is more than sufficient to show that Kurt's harassment was not "'petty

slight[s]' or 'trivial inconvenience[s].'"  (Def. Br. 23.)

### C.    Disputed Issues of Material Fact Preclude Summary Judgment on the *Quid Pro Quo* Claims of Diaz de la Vega under the State and City HRLs.

Diaz de la Vega also has established a claim for *quid pro quo* harassment under the State HRL and City HRL.[12]  To establish a *prima facie* case of *quid pro quo* harassment, a plaintiff must "'present evidence that [he] was subject to unwelcome sexual conduct, and that [his] reaction to that conduct was then used as the basis of decisions affecting the compensation, terms, conditions, or privileges of [his] employment.'"  *Ragin v. NewBurgh Enlarged City Sch. Dist.*, No. CV 06-2797, 2009 WL 4906111, at *7 (S.D.N.Y. Dec. 17, 2009) (quoting *Karibian v. Columbia Univ.*, 14 F. 3d 773, 777 (2d Cir. 1994)).  A plaintiff may survive summary judgment on the causal connection question by providing circumstantial proof that a termination followed closely in time after the employee rejected the supervisor's sexual advances.  *Id*. at *9.

As explained above, Kurt was Diaz de la Vega's supervisor and Kurt sexually harassed Diaz de la Vega.[13]  *See supra* Section III.A.  Diaz de la Vega can also show at trial that his reaction to Kurt's unwelcome harassment had a tangible effect on his employment status because Kurt fired Diaz de la Vega.  Kurt was promoted to the supervisory position of maître d' at Thalassa in approximately early March 2008.  (Ex. 22 [Ziotas NLRB] 626:5-15.)  On April 25,

---

[12] With the goal of raising credibility issues, Defendants seek to distract the Court with an incomplete and distorted account of what happened before the NLRB.  Defendants ignore the substantial evidence suggesting that Kurt testified falsely when he claimed Diaz de la Vega quit.  (*See* Ex. 20 [Letter from the National Labor Relations Board to the Honorable Eleanor MacDonald, dated February 3, 2010].)  Second, credibility issues are properly reserved for a trier of fact.  *See Lopes v. Caffe Centrale LLC*, 548 F. Supp. 2d 47, 54 (S.D.N.Y. 2008) (finding credibility issues precluded summary judgment as to employee's sex discrimination claims).  Notably, Defendants also fail to mention that the NLRB found Kurt to be a supervisor.  (*See* Ex. 10 [NLRB Op.] 28.)

[13] Defendants note that Kurt never "explicitly" asked Diaz de la Vega to have sex with him.  (Def. Br. 28.)  However, a reasonable person would interpret Kurt's requests to see Diaz de la Vega's penis, for example, as requests to engage in sexual acts.

2008, Diaz de la Vega asked Kurt for the next day off so that he could go to the airport to meet his cousin who was flying in from another country.  (Ex. 21 [Diaz de la Vega NLRB] 456:10-14.)  Kurt replied to Diaz de la Vega, "You can take all of your days off."  (*Id.* 456:15-16.)  Unsure whether he was fired, Diaz de la Vega called the Restaurant the following Monday and was told that he was no longer needed.  (*Id.* 457:1-6.)

At this stage, the only question is whether any triable issues of fact exist as to whether Defendants subjected  Diaz de la Vega to *quid pro quo* sexual harassment.  There are several triable issues here, including the specifics of Kurt's harassment, Kurt's status as a supervisor, and the circumstances of Thalassa's termination of Diaz de la Vega.  The causal link between the denial of Kurt's implicit requests for sex and Diaz de la Vega's termination is also a disputed fact question.  *See Ragin*, 2009 WL 4906111, at *9 (denying summary judgment on *quid pro quo* claim where a factual dispute existed regarding the causal link between plaintiff's rejection of defendant's sexual advances and plaintiff's termination).  Accordingly, summary judgment on Diaz de la Vega's *quid pro quo* claim should be denied.

### D.     Disputed Issues of Material Fact Preclude Summary Judgment on the Constructive Discharge Claims of Melendez under the State and City HRLs.

 Melendez has established a claim for constructive discharge under the State HRL and City HRL.  To establish a constructive discharge claim, a plaintiff must show that the employer "intentionally creates a work atmosphere so intolerable that [the employee] is forced to quit involuntarily."  *Terry*, 336 F.3d at 151-52.  "The same circumstances and facts that a court examines in reviewing a plaintiff's hostile work environment claim are examined on a plaintiff's constructive discharge claim."  *LeGrand v. N.Y. Rest. Sch./Educ. Mgmt. Corp.*, No. CV 02-2249, 2004 WL 1555102, at *8  (S.D.N.Y. July 12, 2004).  Regarding the meaning of "intolerable," "[t]he inquiry is objective:  Did [the] working conditions become so intolerable that a reasonable

person in the employee's position would have felt compelled to resign?" *Petrosino*, 385 F.3d at 230 (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004)); *see also Roberti v. Schroder Inv. Mgmt. N. Am.*, *Inc.,* No. CV 04-2404, 2006 WL 647718, at *7 (S.D.N.Y. Mar. 14, 2006). "The Second Circuit has 'not expressly insisted on proof of specific intent,' and has characterized the minimum required showing as one 'that the employer's actions were 'deliberate' and not merely 'negligent or ineffective[ ].'" *Roberti*, 2006 WL 647718, at *7 (quoting *Petrosino*, 385 F.3d at 230) (internal citation omitted).

Kurt's actions could not have been more intentional.  Kurt deliberately rubbed Melendez's back on about six occasions, five of which were at the concealed coffee station and the sixth of which was upstairs, secluded in the private banquet area.  (Ex. 16 [Melendez] 63:24-64:10; 74:9-75:7; 82:8-14.)  Kurt also intentionally groped Melendez's waist and rubbed himself against Melendez.  Melendez never returned to work at Thalassa after that night, (*See id.* 63:15-19; 67:17-68:5; 121:3-10.) This experience left Melendez depressed.  (*Id.* 74:9-75:7; 82:8-16; 115:10-15; 120:19-23.)  This severe harassment created an "intolerable" atmosphere and reasonable factfinders could conclude that, if in Melendez's shoes, they too would have felt compelled to resign, especially given the widespread problem of sexual harassment at the Restaurant.  *See supra* n.10 (discussing other sexual harassment at Thalassa); *see also Lopes*, 548 F. Supp. 2d at 49 (genuine issues of material fact precluded summary judgment as to the employee's constructive discharge claims); *LeGrand*, 2004 WL 1555102, at *8 (denying defendants summary judgment on constructive discharge claim).

**IV.**     **Defendants Unlawfully Required Plaintiffs to Pay for Uniform Purchase, Cleaning, and Maintenance.**

Defendants' motion for summary judgment on Plaintiffs' uniform claims should be denied.  Despite their assertions to the contrary, Defendants were legally obligated to pay for

employee uniform purchases, cleaning, and maintenance and material factual disputes preclude the entry of summary judgment on the issue of whether the clothing that Thalassa required its employees to wear was a "uniform" as defined under New York law.

**A.    Plaintiffs' Work Clothing Constituted "Required Uniforms" Under New York Law and Defendants Illegally Charged Plaintiffs for These Items.**

When an employee purchases a "required uniform," the employer must reimburse the employee for the cost.  N.Y. Comp. Codes R. & Regs. tit. 12, § 137-1.8.  A "required uniform" is "clothing worn by an employee, at the request of an employer, while performing job-related duties . . . .  [A required uniform] does not, however, include clothing that may be worn as part of an employee's ordinary wardrobe."[14]  *Id.* § 137-3.13.

Defendants required captains to purchase and wear a shiny, dark blue, two-piece suit with a long-sleeved, button-down shirt and dark blue necktie, all of which the restaurant ordered from a company in New Jersey, and which cost approximately 200 to 250 dollars a set. (Ex. 1 [Lantigua] 53:9-12; Ex. 23 [Matute Aff.] ¶ 5.)  Captains were not allowed to pick the design or color of these items.  (Ex. 18 [Matute] 30:16-31:10.)  It is undisputed that Defendants not only failed to reimburse captains and other front-of-the-house employees for the cost of this required clothing, but also affirmatively charged employees for these items.  (Ex. 16 [Melendez] 118:5-10; Ex. 25 [Lantigua Aff.] ¶ 2; Ex. 24 [Copantitla Aff.] ¶¶ 6-8; Ex. 23 [Matute Aff.] ¶ 5; Ex. 42 [Guachun Aff.] ¶ 2; Ex. 45 [D00485].)  The only issue Defendants quibble with is

_____

[14] In general, if an employer requires "a specific type of clothing such as a distinctive style, color or quality, such clothing is considered to be a 'uniform.'"  1 Wage and Hour Law § 8:23 (2010); *see also Donovan v. Captain Bill's, Inc.*, No. CV 82-06-4, 1982 WL 2103, at *4 (E.D.N.C. June 20, 1982) (finding that white dresses, white shoes, and aprons which waitresses were required to wear and purchase at their own expense constituted "uniforms" under the FLSA); *see also Reich v. Priba Corp.*, 890 F. Supp. 586, 596-97 (N.D. Tex. 1995) (finding that the black shoes, black bodysuit, tights, fishnet stockings, and a wide belt, which an employer required its waitresses to wear and purchase at waitresses' own expense, constituted a "uniform" under FLSA regulations).

whether the Plaintiffs' uniforms could be worn as part of their daily wardrobe.  (*See* Def. Br. 17, referring to these suits as merely "business suits, shirts, ties, and shoes.")

There is no way that the blue suits required could be characterized as something that would form a part of the employees' normal, daily wardrobe.  The suits were described during depositions as having a distinct "Liberace" style.  (Ex. 1 [Lantigua] 59:17-21.)  Plaintiffs would not have otherwise purchased or worn these suits but for the Restaurant's requirements.  (*See, e.g., id.* 59:17-61:7.)  Even the neckties the Restaurant required captains to wear were so distinctive that one captain threw away his tie upon completion of his employment at Thalassa. (Ex. 18 [Matute] 36:22-37:5.)  At a minimum, there is a factual dispute as to whether the captains' shiny blue suits would be worn as part of the employees' ordinary wardrobe, much less worn "socially," as Defendants claim (Def. Br. 17), and summary judgment should be denied.

The same is true with respect to the black aprons and black vests worn by the busboys, runners, expediters, and polishers.  The Restaurant dictated the particular brand and style of these vests and aprons, the costs of which – approximately ten to fifteen dollars per apron and approximately thirty-five dollars per vest – were deducted from employees' paychecks.  (Ex. 16 [Melendez] 118:5-10; Ex. 18 [Matute] 24:24-25:17; Ex. 42 [Guachun Aff.] ¶ 3; Ex. 24 [Copantitla Aff.] ¶ 7.)  Contrary to Defendants' claims (*see* Def. Br. 17), the non-captain, front-of-the-house employees – all minimum wage workers (at best) – would not wear these vests and aprons in their ordinary wardrobes.  (*See, e.g.*, Ex. 24 [Copantitla Aff.] ¶ 5.)

Defendants wrongly argue that the presence of the Restaurant's "logos or other unique marking" determines whether Plaintiffs' work clothing constituted a "required uniform."  (Def. Br. 17-18.)  The inclusion of a logo on clothing worn at the employer's request is not dispositive as to whether that clothing constitutes a "uniform."  *See Nicholson v. Twelfth St. Corp.*, No. CV

09-1984, 2010 WL 1780957, at *3-4 (S.D.N.Y. May 4, 2010) (denying summary judgment because a question of fact existed as to whether clothing bearing logo of restaurant employer was a "uniform").  Here, logos are not at issue; the issue is whether Thalassa's required clothing was sufficiently distinctive in other respects – shiny blue suits, and black aprons and vests – to be considered a required uniform.[15]

> **B.    Defendants Failed to Reimburse Plaintiffs for Uniform Cleaning and Maintenance.**

Plaintiffs are also entitled to uniform cleaning and maintenance costs.  Defendants argue that Plaintiffs must show that uniform cleaning costs reduced Plaintiffs' wages below minimum wage to recover these costs under New York law.  (Def. Br. 18.)  Defendants are wrong.

Under New York law, "[w]here the employer fails to launder or maintain required uniforms for any employee, he shall pay such employee *in addition to the minimum wage* . . . $9.00 per week on or after July 24, 2009, if the employee works more than 30 hours weekly . . . ."  N.Y. Comp. Codes R. & Regs. tit. 12, § 137-1.8 (emphasis added).  New York law further provides that "[n]o allowance for the supply, maintenance, or laundering of required uniforms shall be permitted as part of the minimum wage."  *Id.*  The proper interpretation of this language is that uniform maintenance and cleaning costs should be *in addition to* an employee's pay, regardless of whether these expenses reduce pay below minimum wage.  This interpretation is bolstered by case law that interprets the same regulatory language, in the context of spread of hours pay, as requiring employers to pay an additional hour's pay for any day in which "the spread of hours" – the time between the beginning and end of an employee's workday – exceeds

---

[15] Defendants cite a September 29, 1998 New York Department of Labor Opinion Letter to support their contention that presence of a logo renders a piece of required clothing a "required uniform" under New York law.  However, the presence or absence of a logo is not at issue here, and thus this opinion letter is irrelevant to the matter at hand.

10 hours.[16]  *See, e.g.*, *Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 339-40 (S.D.N.Y. 2005)

(rejecting argument that spread of hours pay is not required if the pay already provided is at least

as much as minimum wage, and awarding spread of hours compensation to plaintiffs); *Cuzco v.*

*Orion Builders, Inc.*, No. CV 06-2789 (KMW) (THK), 2010 WL 2143662, at *3 (S.D.N.Y. May

26, 2010) (granting summary judgment on plaintiffs' claims for unpaid spread of hours wages,

without regard to plaintiffs' rate of pay).[17]

Even if the Court were to interpret the New York regulations as requiring evidence that

uniform cleaning and maintenance costs reduced Plaintiffs' wages to below minimum wage,

Plaintiffs have provided ample evidence that Defendants did not pay them minimum wage at all,

let alone once the uniform-related expenses are factored in.  (*See* Pl. Br. 12-18.)

## V.        Defendants Illegally Retaliated Against Plaintiffs.

Defendants unlawfully retaliated against Plaintiffs Copantitla, Diaz de la Vega, Lantigua,

Lizondro, S. Lopez, Maldonado, and Vargas in violation of  NYLL § 215 in response to these

Plaintiffs' complaints about Defendants' labor law violations.  NYLL § 215 prohibits an

employer from taking any "adverse employment action" against an employee as a result of a

---

[16] N.Y. Comp.Codes R. & Regs. tit. 12, § 142-2.4 states, "An employee shall receive one hour's pay at the basic minimum hourly wage rate, *in addition to the minimum wage* . . . for any day in which:  (a) the spread of hours exceeds 10 hours; or (b) there is a split shift; or (c) both situations occur" (emphasis added).

[17] Defendants rely on two cases that provide only a conclusory interpretation of the New York regulation at issue, N.Y. Comp. Codes R. & Regs. tit. 12, § 137-1.8.  Defendants cite *Chan v. Triple 8 Palace*, No. CV 03-6048 (GEL), 2006 U.S. Dist. LEXIS 15780, at *78 n.39 (S.D.N.Y. March 31, 2006) for their assertion that the regulation only requires employers to cover uniform cleaning and maintenance costs "if the employees' expenditures for uniform-maintenance purposes would reduce their wages to below minimum wage."  *Id.* at *78.  *Chan*, in turn, cites only to one other case, *Ayres v. 127 Rest. Corp.*, 12 F. Supp. 2d 305, 310 (S.D.N.Y. 1998), to support its interpretation of the same regulation.  *Ayres* cites no authority for its assertion that "New York law . . . require[s] employers to compensate employees for the purchase and maintenance of required uniforms *if* the employees' expenditures for these purposes would reduce their wages to below minimum wage."  12 F. Supp. 2d at 310 (emphasis added).

complaint about the employer's violation of the NYLL.  Determining whether an employer's

action is "adverse" is a fact-based inquiry in which "courts must pore over each case to

determine whether the challenged employment action reaches the level of 'adverse.'"

*Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997) (in federal anti-

discrimination context) (internal citation omitted).[18]  Adverse employment actions need not rise

to the level of firing to be actionable.  *See, e.g., Morris v. Lindau*, 196 F.3d 102 (2d Cir. 1999);

*Lin v. Great Rose Fashion, Inc.*, No. CV 08-4778, 2009 WL 1544749, at *7-8 (E.D.N.Y. June 3,

2009) (recognizing a reduction in hours as "troubling evidence" of a retaliatory act).  Threats of

termination in response to protected complaints may also constitute an adverse employment

action.  *See Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997) ("repeated and forceful demands

accompanied even by veiled suggestions that failure to comply would lead to termination,

discipline, unpleasant assignments or the like, might in some circumstances affect an employee's

working conditions") (in Title VII context).  Plaintiffs Copantitla, Diaz de la Vega, Lantigua,

Lizondro, S. Lopez, Maldonado, and Vargas have adequately alleged retaliation claims against

Defendants and disputed issues of fact preclude summary judgment on these claims.[19]

A. **Defendants' Attacks on Plaintiffs' Retaliation Claims Fail, and, At Best, Raise Disputed Issues of Fact That Preclude Summary Judgment.**

In March 2008, Plaintiffs Copantitla, Diaz de la Vega, Lantigua, Lizondro, Maldonado,

S. Lopez and Vargas complained to Thalassa's management about potential violations of the

applicable labor laws, including the Restaurant's illegal retention of the employees' tips.  (Ex. 26

---

[18] Courts apply analogous standards in analyzing retaliation claims under the NYLL and federal anti-discrimination laws.  *See, e.g., Liverpool v. Con-Way, Inc.*, No. CV 08-4076 (JG)(JO), 2009 WL 1362965 (E.D.N.Y. May 15, 2009) (applying Title VII precedent to interpret NYLL § 215).

[19] As discussed below in Section VI.B.1, the NLRB's findings do not preclude Plaintiffs' retaliation claims and Plaintiffs are not otherwise collaterally estopped from bringing these claims.

[Lizondro] 122:13-123:11; Ex. 27 [Lizondro NLRB] 399:22-400:19; Ex. 9 [Vargas] 95:12-98:11; Ex. 15 [Vargas NLRB] 527:20-528:7; Ex. 3 [Diaz de la Vega] 111:2-112:12; Ex. 21 [Diaz de la Vega NLRB] 443:16-444:15.)  This complaint was a protected labor complaint within the anti-retaliation provisions of the NYLL.[20]  NYLL § 215(1)(a)(i).

On October 1, 2008, Lantigua, Lizondro, Melendez, and Vargas then attempted to deliver a letter to Thalassa on behalf of themselves and Copantitla, Diaz de la Vega, Garcia, S. Lopez, and Maldonado to inform the Restaurant of its many violations of federal and state labor laws. (Ex. 12 [Lantigua NLRB] 244:18-247:10; Ex. 9 [Vargas] 104:24-109:9; Ex. 15 [Vargas NLRB] 488:18-490:24; Ex. 3 [Diaz de la Vega] 108:17-110:17.; Ex. 51 [October 3 fax from Shearman & Sterling LLP, attaching October 1 letter].)  The October 2008 complaint was also a protected labor complaint within the anti-retaliation provisions of the NYLL.

Defendants reacted harshly, in particular to the March 2008 complaint.  They threatened to fire employees who complained.  (Ex. 48 [S. Makris NLRB] 164:24-165:22; Ex. 12 [Lantigua NLRB] 302:8-11.)  They compared Plaintiffs' labor law complaints to "cancer" and "gangrene" and threatened that "before the cancer is spread, they [would] cut off the limbs."  (Ex. 1 [Lantigua] 187:15-16, 273:4-14; Ex. 12 [Lantigua NLRB] 221:13-19; Ex. 3 [Diaz de la Vega] 101:15-20; Ex. 47 [S. Lopez NLRB] 347:21-348:5.)  And they soon made good on their threats and retaliated against Plaintiffs.  For example, Steve Makris freely admits to firing Henry Matute because he thought Matute was "instrumental" in organizing the employees' March 2008

---

[20] Defendants wrongly argue that complaints must reference the specific NYLL provision violated.  (Def. Br. 32.)  It is well settled that an employee's informal protests, such as general complaints to management, qualify as protected activity.  *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).  A plaintiff's complaint need not be communicated in any particular fashion and need not cite the law.  *Veerman v. Deep Blue Grp. L.L.C.*, No. CV 08-5042, 2010 WL 4449067, at *3 (S.D.N.Y. Nov. 3, 2010).

complaint.[21]  (Ex. 48 [S. Makris NLRB] 164:24-166:18.)

Defendants' retaliatory acts against each Plaintiff asserting retaliation claims is discussed below.

### 1.   Julio Lantigua

After reducing Lantigua's hours in July 2008 in response to the March 2008 complaint (Ex. 12 [Lantigua NLRB] 239:12-18), Thalassa then called Lantigua in late July 2008 to fire him, telling him that they "didn't need [him] anymore." (*Id.* 241:2-7.)  When picking up his last paycheck, Kurt acknowledged to Lantigua that he was fired and told him that he "did it to himself" by "getting all the busboys and the front of the house against the company." (*Id.* 242:13-23.)  Unsurprisingly, Defendants deny firing Lantigua and contend Lantigua voluntarily left his job at Thalassa because he was planning to attend law school, and that Lantigua's reduced hours in July 2008 is attributable to his failure to appear for shifts.  (Def. Br. 34-35.)  Defendants' also contend that Lantigua's current unemployed status indicates that there is no causal link between his complaint and the termination of his employment.

However, record evidence contradicts Defendants' claims.  (Ex. 12 [Lantigua NLRB] 241:2-7; 242:4-23.)  Lantigua only attended law school classes two days per week and has continued looking for work.  (Ex. 1 [Lantigua] 150:14-25; 205:25.)  Because Thalassa caused Lantigua's unemployment by firing him and because Lantigua has continued to seek work, his unemployment only amplifies the impact of his firing.  Further, Lantigua did not miss scheduled shifts in July 2008.  (Ex. 12 [Lantigua NLRB] 316:21-25.)  Given Kurt's admission that Lantigua "fired" himself by his organizing activities, there is a triable issue of fact regarding whether his reduced hours and termination were retaliatory.  (*Id.* 239:12-18; 241:2-7; 242:13-23.)

---

[21] Matute is not pursuing a retaliation claim.

2.     **Diego Diaz de la Vega**

In April 2008, a month after his March 2008 labor complaint, Defendants fired Diego Diaz de la Vega.[22]  (Ex. 3 [Diaz de la Vega] 111:2-112:12; Ex. 21 [Diaz de la Vega NLRB] 443:16-444:15; 456:15-16; 457:1-6.)  On April 25, 2008, Diaz de la Vega asked his supervisor Kurt for the next day off so that he could go to the airport to meet his cousin, who was flying in from another country.  (Ex. 21 [Diaz de la Vega NLRB] 456:10-14.)  Kurt replied, "You can take all of your days off."  (*Id.* 456:15-16.)  Unsure whether he was fired, Diaz de la Vega called Thalassa the following Monday and was told that he was no longer needed.  (*Id.* 457:1-6.)  Kurt also told Diaz de la Vega that he should not "make complaints in the way that [he] did."  (Ex. 10 [NLRB Op.] 10:7-8 (conveying testimony).)  When Diaz de la Vega picked up his last paycheck, Zapantis told him that he "shouldn't continue attacking the bosses" and that he would not be paid for his last day of work as punishment for doing so.  (Ex. 3 [Diaz de la Vega] 59:23-60:4.)

Defendants' summary judgment papers do nothing more than highlight the various issues of material fact in dispute regarding Diaz de la Vega's claim.  Defendants assert that Diaz de la Vega voluntarily left his job at Thalassa to work at the Tribeca Grand Hotel.  (Def. Br. 34.)  But Diaz de la Vega testified that he intended to continue working at both jobs and that the job at the Tribeca Grand was only part-time.  (Ex. 3 [Diaz de la Vega] 131:9-15; Ex. 21 [Diaz de la Vega NLRB] 773:15-24.)  Defendants also contend that Diaz de la Vega's last day of work on April 25, 2008 is too distant from his March 2008 complaint to demonstrate a causal link between the

---

[22] Diaz de la Vega brings both unlawful retaliation and *quid pro quo* sexual harassment claims (*see supra* Section III.C) arising out of his termination.  Kurt, who sexually harassed Diaz de la Vega, fired him on April 25, 2008, as discussed further below.  Based on the available evidence, Plaintiffs submit that Diaz de la Vega's termination involved both labor retaliation and *quid pro quo* harassment motivations.  In any event, Diaz de la Vega is permitted to pursue both claims, despite Defendants' assertions to the contrary.  *See discussion infra*, Section VI.B.

complaint and the retaliation.  However, as a matter of law, a termination occurring *the month after* an employee's complaint cannot be so far removed as to negate a causal link between the complaint and retaliation.  To the contrary, as a matter of law, the timing is close enough to support an inference that the two were related.  *See DeCintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 111 (2d Cir. 1987) (finding that genuine issues of material fact existed in plaintiff's Title VII retaliation claim where the plaintiff showed he was fired *within one year* of filing of his action).

### 3.   Manuel Lizondro

Following the March 2008 complaint, Lizondro received unfavorable work schedules, was repeatedly sent home, was reprimanded for asking to see the tip book, and was assigned additional cleaning duties as a result of his complaining about tips.  (Ex. 27 [Lizondro NLRB] 411:12-17, 409:11-411:5, 412:16-413:7.)  Moreover, Lizondro has small children and informed the Restaurant about his childcare schedule.  (Ex. 26 [Lizondro] 141:15-142:7.)  Following his labor complaints, Defendants assigned Lizondro shifts that conflicted with his childcare responsibilities, such that he was unable to make his assigned shifts.  (*Id.* 142:5-25.)  Because of these actions, Lizondro contends he was constructively discharged in June 2008.  *See Terry*, 336 F.3d at 151-52 (stating that an employee is constructively discharged when his employer creates a work atmosphere "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.") (in Title VII context) (citation omitted).

Defendants argue that Thalassa's actions against Lizondro, even if taken as true, do not amount to an adverse employment action as a matter of law.  However, courts recognize that retaliation claims are not limited only to acts of retaliation that take the form of discharge, transfer or demotion, but can take a variety of lesser forms, such as those suffered by Lizondro.  *See Morris*, 196 F.3d at 110 (recognizing that "lesser actions may be considered adverse

employment actions").

### 4.       Ricardo Copantitla, Sebastian Lopez, and Augustin Maldonado

Defendants retaliated against Plaintiffs Copantitla, Maldonado, and S. Lopez for their October 2008 complaint by cutting their hours and shifts.  (Ex. 49 [S. Lopez] 124:2-16; Ex. 28 [Maldonado] 31:20-25.)  Copantitla's hours declined following the October 2008 complaint, as Defendants admit.  (Def. Br. 40.)  S. Lopez's hours were also reduced for four or five months around the beginning of 2009.  (Ex. 49 [S. Lopez] 124:2-16.)  Similarly, Maldonado's shifts were reduced in the first half of 2009, leading him to ultimately leave his employment at the Restaurant in June 2009.  (Ex. 28 [Maldonado] 31:20-25.)

Defendants argue that a schedule reduction does not constitute an adverse employment action.  (Def. Br. 38-40.)  Defendants are wrong.  Courts routinely recognize schedule reductions and a variety of other less severe employer actions as adverse employment actions.  *See, e.g.*, *Morris*, 196 F.3d at 110; *Lin*, 2009 WL 1544749, at *7-8 (recognizing reduction in hours as a form of retaliation under the NYLL).

As to Defendants' claim that a depressed economic climate caused these Plaintiffs' reductions in hours, (Def. Br. 38-40.), there is sufficient record evidence to conclude that this proffered reason is merely "pretextual."  Evidence that an employer's proffered reason is "pretext" is established where there is a strong temporal relationship between the protected activity and the adverse action and where plaintiffs demonstrate there was a retaliatory motive behind the action.  *See Jute v. Hamilton Sundstrand Corp*., 420 F.3d 166, 180 (2d Cir. 2005); *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010).  Here, the temporal proximity of Plaintiffs' complaints to their subsequent reduction in hours – plus the prior explicit threats of retaliation made by Thalassa's management – strongly suggests that Defendants' proffered reason of a depressed economic climate is pretextual.  Because there are genuine disputes of material fact

about the reason for the reduction in Plaintiffs' hours, summary judgment on the retaliation claim is inappropriate.  *See, e.g.*, *Ragusa v. Malverne Union Free Sch. Dist.*, 381 F. App'x 85 (2d Cir. 2010) (holding summary judgment is inappropriate when a genuine issue of material fact exists as to whether the employer's proffered legitimate reasons for its actions were pretextual).

### 5.    Jose Luis Vargas

As described above in Section II, on October 2, 2008, the day following the attempted delivery of the October 1 Labor Complaint Letter to Thalassa, Defendants coercively interrogated and falsely imprisoned Vargas in direct response to his protected activity.  This retaliatory conduct violated NYLL § 215.

Defendants claim that this detention and interrogation could not have been retaliation because Steve Makris had no knowledge of the Labor Complaint Letter's content when he interrogated Vargas on October 2.  But, in fact, Steve Makris was well aware that the letter concerned complaints about Thalassa's labor law violations because Lantigua had explained the letter's purpose to Kemal Kurt on October 1.  (Ex. 12 [Lantigua NLRB] 246:9-17.)  Tasso Zapantis was also present during this encounter between Lantigua and Kurt, (Ex. 2 [Zapantis] 176:13-177:2), and he informed Makris about what happened.  (*Id.*)  The NLRB credited the testimony establishing Defendants' knowledge of the purpose of the letter:  "I credit Lantigua that he told Kurt that the group was represented by an attorney from Urban Justice and that the letter concerned labor law violations."  (Ex. 10 [NLRB Op.] 34.)  Zapantis admitted that Lantigua informed Kurt multiple times on October 1 that the letter came from counsel for the current and former employees.  (Ex. 2 [Zapantis] 178:7-17.)  Vargas also specifically told Makris that he was represented by counsel.  (*See, e.g.*, Ex. 9 [Vargas] 131:3-11; 134:6-15.)  Defendants' suggestion that Makris detained and interrogated Vargas out of supposed safety concerns is bogus and discredited by facts in the record.  The parties' disputes as to the facts surrounding

36

Vargas's detention therefore preclude summary judgment on Vargas's retaliation claim.

### B.   Punitive Damages Are Available for Retaliation.

Contrary to Defendants' arguments (Def. Br. 41), Plaintiffs are entitled to punitive damages.  The NYLL anti-retaliation provision affords courts broad discretion in determining damages.  The statute reads, in relevant part, that the court may "order *all appropriate relief*, including . . . damages, and reasonable attorneys' fees."  NYLL § 215(2) (emphasis added). Courts have interpreted this language to permit the application of punitive damages in retaliation cases.  *See, e.g.*, *Perez v. Jasper Trading, Inc.*, No. CV 05-1725, 2007 WL 4441062 (E.D.N.Y. Dec. 17, 2007) (awarding plaintiffs punitive damages, given the wanton nature of defendants' conduct in retaliating against plaintiffs); *Ting Yao Lin v. Hayashi Ya II, Inc.*, No. CV 08-6071, 2009 WL 289653 (S.D.N.Y. Jan. 30, 2009) (awarding plaintiffs punitive damages on their retaliation claims) *aff'd*, 2009 WL 513371 (S.D.N.Y. Feb. 27, 2009).

## VI.   Defendants' Myriad Procedural Attacks Are All Meritless.

In a desperate attempt to secure summary judgment, Defendants launch a cavalcade of baseless procedural arguments.  None of these arguments have any merit.

### A.   There is No Conflict of Interest Among Plaintiffs and Defendants' Counterclaims for "Setoff" Fail as a Matter of Law.

As discussed in Plaintiffs' moving brief, Defendants diluted the tips paid to the Plaintiffs who were busboys and captains by including the Restaurant's managers, as well as polishers, in the Restaurant's tip pool.  (Pl. Br. 4.)  Defendants asserted counterclaims for "set off" to recover tips allegedly overpaid to eight polisher and so-called manager Plaintiffs.  (Second Amended Answer ¶¶ 272-316.)  Based on these counterclaims, Defendants argue that there is conflict of interest between the busboy and captain Plaintiffs, on the one hand, and the polishers and so-called manager Plaintiffs, on the other.  According to Defendants, this is because, if the busboys

and captains prevail on their claims that Thalassa diluted their tips by including polishers and

managers in the tip pool, the polishers and managers will then be liable under Defendants'

counterclaim to repay the share of the tip pool that Thalassa originally paid to them.  (Def. Br. 3.)

There is no conflict here because there is no cause of action that would permit Thalassa

(or anyone else) to recover wages and tips that Thalassa paid to the polisher and so-called

manager Plaintiffs in compensation for their work.  "Setoff" is not a cause of action, but an

equitable remedy that allows debts between parties to be set off against each other, and it only

applies when those debts arise from the same underlying legal right.  *Burns v. Lopez*, 256 N.Y.

123, 128 (1931); *see also* 84 N.Y. Jur. 2d § 161, "Equitable Setoffs."

Defendants have no claim for setoff because they do not have any legal right that is the

same as the legal right underlying the Plaintiffs' tip pool claims.  Plaintiffs' claims are under the

FLSA and NYLL, but those laws do not provide any right for employers to recover from

employees.  In analogous circumstances, the Second Circuit has held that employers have no

right to contribution or indemnification under the FLSA or the New York labor laws.  *See*

*Herman v. RSR Sec. Servs.*, 172 F.3d 132, 144 (2d Cir. 1999); *Gustafson v. Bell Atl. Corp.*, 171

F. Supp. 2d 311, 328 n.8 (S.D.N.Y. 2001); *Ansoumana v. Gristedes Operating Corp.*, No. CV

00-253(AKH), 2003 WL 30411, at *1 (S.D.N.Y. Jan. 3, 2003).  While Thalassa's tip pool was

invalid under the labor laws, that fact does not create any liability for employees who merely

accepted their pay, especially since Thalassa decided what to pay their workers, who would be in

the tip pool, and how much they would receive.  (Ex. 19 [Kurt] 221:23-223:25; Ex. 28

[Maldonado] 59:17-24; Ex. 3 [Diaz de la Vega] 101:2-24.)  Because there is no counterclaim,

there can be no conflict.

Finally, even if Defendants' counterclaims had merit (which they do not), harsh

remedies like disqualification of counsel or dismissal would still be unwarranted.  The Second

Circuit has long held that motions for disqualification of counsel are disfavored because, as here,

they are usually raised for tactical reasons and because they cause delay and harmfully deprive

parties of their chosen counsel.  *See Bd. of Educ. of the City of N.Y. v. Nyquist*, 590 F.2d 1241,

1246 (2d Cir. 1979).  Accordingly, if the Court were to conclude there was an actual conflict, the

appropriate next step would be for counsel to apprise the Plaintiffs and solicit their informed

opinion on whether to continue the joint representation.  *See Como v. Commerce Oil Co., Inc.*,

607 F. Supp. 335, 342-43 (S.D.N.Y. 1985); *see also* N.Y. Rules of Professional Conduct 1.7(b)

(regarding waiver of concurrent conflicts of interest by informed written consent of the client).

### B.    Collateral Estoppel, Judicial Estoppel, and the Doctrine of Election of Remedies do not Apply to Plaintiffs' Claims.

#### 1.    Collateral Estoppel Does Not Apply to Plaintiffs' Claims.

Defendants wrongly assert that collateral estoppel precludes certain issues from being

litigated in this action because similar issues were litigated in the NLRB proceeding against

Thalassa.  Collateral estoppel, or issue preclusion, bars a party and its privies from re-litigating

an issue decided in a prior proceeding if and "only if" (1) the issues in both proceedings are

identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3)

there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously

litigated was necessary to support a valid and final judgment on the merits.  *NLRB v. Thalbo

Corp.*, 171 F.3d 102, 109 (2d Cir. 1999).  Under this standard, collateral estoppel is not

warranted against any of Plaintiffs' claims in this action.

First, collateral estoppel cannot apply to Plaintiffs' claims in this action because none of

the Plaintiffs were parties to the NLRB proceeding, nor are Plaintiffs in privity with those

parties.  *See id.* at 109-10 (explaining privity requirements).  The only true parties in the NLRB

proceeding were the NLRB itself, represented by its General Counsel, and Thalassa.  Plaintiffs

Vargas, Diaz de la Vega, Lizondro, Lantigua, and S. Lopez merely served as "charging

parties."[23]   In limited circumstances, a non-party may be bound by a prior judicial determination

if the non-party was "adequately represented by someone *with the same interests*" in the prior

proceeding.  *Taylor v. Sturgell*, 553 U.S. 880, 881 (2008) (emphasis added) (internal citation and

quotation marks omitted).  However, the Second Circuit has explained that the interests of

individuals in vindicating private rights are different from the interests of the NLRB in an unfair

labor practices proceeding, where the NLRB's primary concern is ensuring employer practices

comply with federal labor policies.  *See Thalbo*, 171 F.3d at 110 (declining to apply collateral

estoppel); *see also Vaca v. Sipes*, 386 U.S. 171, 182-83 n.8 (1967) ("The public interest in

effectuating the policies of the federal labor laws, not the wrong done the individual employee, is

always the [NLRB's] principal concern in fashioning unfair labor practice remedies.").

Defendants' reliance on *Wickham Contracting* is misplaced.  In that case, collateral

estoppel applied to certain findings from a prior NLRB proceeding against a labor union, but,

unlike Plaintiffs here, the labor union was a party in the prior NLRB proceeding.  *See Wickham

Contracting Co. v. Bd. of Educ.*, 715 F.2d 21, 22-23 (2d Cir. 1983).  Significantly, Defendants do

not point to any case in which an individual was estopped from pursuing his or her rights in

---

[23]  In an NLRB unfair labor practices case, "charging parties" file the charges against the
respondent by filling out a one-page form setting forth possible violations of the National Labor
Relations Act.  After a charge is filed, the Office of the General Counsel investigates the charge
and decides whether or not to issue a complaint against the employer.  *See* National Labor
Relations Board, "Unfair Labor Practice Cases," *available at* http://www.nlrb.gov/about_us/
public_notices/customer_service_standards/unfair_labor_practice_cases.aspx.  If the General
Counsel decides to issue a complaint, an NLRB "attorney will prepare and present the case to an
NLRB Administrative Law Judge (ALJ)."  *Id.*  The charging parties' further involvement is
optional.  *Id.*  They may examine witnesses and present evidence at the hearing, but their role is
significantly limited compared to that of a plaintiff in a federal action.  For example, charging
parties cannot obtain any pre-hearing discovery and do not control the presentation of the case.

federal court based on a prior NLRB unfair labor practices proceeding.

Second, even if certain Plaintiffs were parties in the NLRB proceeding (which they were not), collateral estoppel cannot bar their claims on a generalized basis. Rather, collateral estoppel is only available on an issue-by-issue basis where all four elements of collateral estoppel must be satisfied for each issue. *Thalbo*, 171 F.3d at 109. Thus, Defendants' sweeping assertions that collateral estoppel applies to all factual findings made in the NLRB proceeding or to all findings regarding Plaintiffs Vargas, Diaz de la Vega, and S. Lopez do not properly invoke collateral estoppel and must be rejected.[24] (*See* Def. Br. 42); *see also Whalen v. Ansell Perry, Inc.*, No. CV 98-0188 (BSJ), 2004 WL 840286, at *4 (S.D.N.Y. Apr. 16, 2004) (declining to apply collateral estoppel where the party seeking to invoke the doctrine failed to prove that the issue in the prior proceeding was identical).

Third, collateral estoppel is also inappropriate because the ALJ's decision is not final, as both parties have filed appeals to the Board. *See Int'l Bhd. of Elec. Workers, Local 532, v. Brink Constr. Co.*, 825 F.2d 207, 213 (9th Cir. 1987) (declining to apply collateral estoppel because ALJ decisions pending NLRB review "have no preclusive effect.").

Finally, collateral estoppel does not apply to the only specific issue that Defendants identify for preclusion—the ALJ's finding that Diaz de la Vega quit his job at Thalassa. This finding cannot preclude Diaz de la Vega's retaliation and sexual harassment claims in this action for several reasons. Among other things, Defendants' misconduct towards Diaz de la Vega violated different statutes leading to different injuries, and the ALJ noted that her own decision would not be influenced by the claims made in a separate lawsuit under a separate statute – *i.e.*,

---

[24] Defendants compound this defect in their argument by conveniently failing to acknowledge the ALJ's many factual findings that favor the Plaintiffs in this matter and which discredit the testimony of Thalassa's witnesses.

this action.  (Ex. 21 [Diaz de la Vega NLRB] 479:11-15); *see also Thalbo*, 171 F.3d at 111

(declining to apply collateral estoppel where the two proceedings in question, a sexual

harassment suit in federal court and an NLRB proceeding, dealt with different harms).  Indeed,

the ALJ explicitly declined to hear any testimony about Diaz de la Vega's sexual harassment

claim during the NLRB proceeding.  (Ex. 21 [Diaz de la Vega NLRB] 477:14-478:5; 479:8-10.)

Moreover, since Diaz de la Vega was not a party to the NLRB proceeding, this action is his only

opportunity for a full and fair hearing on both of his claims.  As a mere charging party, Diaz de

la Vega had limited discovery in the NLRB case, and discovery here has provided further

support for his claims.  (*See, e.g.*, Ex. 1 [Lantigua] 250:8-24); *see also Wickham*, 2004 WL

840286 at 27 ("[T]he unavailability of pre-hearing discovery in NLRB proceedings might allow

relitigation of a factual issue where relevant evidence is later discovered").

### 2. Judicial Estoppel Does Not Bar Diego Diaz de la Vega's Sexual Harassment Claim.

Judicial estoppel precludes a party from asserting a position that is directly contrary or

inconsistent with a position successfully asserted in a prior legal proceeding.  *Mitchell v.*

*Washingtonville Ctr. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999).  Defendants argue that judicial

estoppels bars Diaz de la Vega from bringing his *quid pro quo* sexual harassment claim because

Diaz de la Vega claimed that Thalassa retaliated against him for labor activities in the NLRB

proceeding.  Judicial estoppel only applies to directly conflicting statements about purely factual

matters, however.  *Id*. at 7.  Here, judicial estoppel is unwarranted because Diaz de la Vega, who

was not a party to the NLRB proceeding, has not taken contradictory positions, nor did the

NLRB adopt any position that he asserted.  *See id.* at 5-6.

First, Diaz de la Vega's claims that Thalassa retaliated against him for labor activities in

the NLRB proceeding and for sexual harassment reasons in this action are not contradictory.

Diaz de la Vega has never claimed that his discharge from Thalassa was a result of one issue, at the exclusion of others.  (Ex. 3 [Diaz de la Vega] 12:15-13:13; 78:2-79:18.)  It is entirely plausible that Diaz de la Vega's termination was motivated both by a desire to retaliate against him for his labor law complaints and because he refused to engage in a sexual relationship with Kurt.  *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 335 n.3 (2d Cir. 1999) (declining to apply judicial estoppel where plaintiff adequately explained any apparent inconsistencies).

Second, it is well settled in the Second Circuit that judicial estoppel is only available against a party whose claim prevailed in the prior proceeding.  *See Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1038 n.4 (2d Cir. 1993).  Here, the NLRB did not find in Diaz de la Vega's favor on the specific issue of his termination, and the NLRB did not adopt his supposedly contradictory position.  (Ex. 10 [NLRB Op.] 31.)  Defendants freely concede this point.  (Def. Br. 43.)  Therefore, Defendants' judicial estoppel argument fails.  *See Parker*, 204 F.3d at 335 n.3 (declining to apply judicial estoppel where plaintiff did not receive any "benefit" from his prior statements).

### 3.   Election of Remedies Does Not Apply to Diego Diaz de la Vega's Retaliation and Sexual Harassment Claims.

The disfavored doctrine of election of remedies is irrelevant to Diaz de la Vega's retaliation and sexual harassment claims.  (Def. Br. 44-45.)  Election of remedies requires a party to elect among two or more inconsistent remedies for a single claim.  *See Cayuga Indian Nation of N.Y., et al., v. Cuomo*, 667 F. Supp. 938, 946 (N.D.N.Y. 1987).  The doctrine "is given little, if any, validity in federal practice . . . and under any circumstances is considered a harsh doctrine that is not favored."  *Id.*; *see also In re Riverside Nursing Home*, 144 B.R. 951, 958 (S.D.N.Y. 1992) (declining to apply election of remedies as "it is harsh and generally disfavored").

Election of remedies does not apply here because it requires the existence of two or more

43

inconsistent remedies for the same claim, not two separate and distinguishable claims, such as Diaz de la Vega's sexual harassment and retaliation claims. *See Riverside*, 144 B.R. at 957 ("The doctrine of election of remedies prevents duplicative recovery for the same wrong by requiring parties to elect between legally coexistent and inconsistent remedies . . . .  However, where two causes of action that are not inconsistent arise from a single course of events, the doctrine of election of remedies does not preclude a plaintiff from asserting both claims.").

Defendants' own authority neatly illustrates the proper application of election of remedies.  In *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243 (2d Cir. 2002), election of remedies barred the plaintiff from treating a contract as valid and binding for the purpose of one remedy, while claiming the same contract had been prematurely breached for the purpose of another remedy.  *Id.* at 258.  Unlike in *Lucente*, Diaz de la Vega's sexual harassment and retaliation claims are distinct causes of action for which he seeks distinct remedies.  Moreover, because Diaz de la Vega does not know if he was fired in retaliation for his labor complaints, or because he refused Kurt's sexual advances, or both, those are issues of fact for trial.

### C.    Ricardo Copantitla Did Not Fail to Comply With His Discovery Obligations and His Claims Should Not Be Dismissed.

Defendants' assertions that Plaintiff Ricardo Copantitla failed "to comply with discovery obligations," (Def. Br. 48-49), by refusing to answer questions at a deposition or to produce any documents are false and baseless.

First, Plaintiffs did not "deliberately obstruct[]" Defendants' attempts to depose Copantitla.  (*Id.*)  Copantitla appeared for his deposition at the offices of Defendants' counsel on February 18, 2010.  (Ex. 29 [Copantitla] 3:4.)  Defendants' counsel began deposing him.  (*Id.* 3:16.)  At one point, Copantitla's counsel instructed him not to answer a particular question.  (*Id.* 6:7-8.)  Rather than continuing with further lines of questioning or calling the Court, counsel for

Defendants halted Copantitla's deposition after mere minutes, despite repeated assurance that Copantitla was prepared to answer other questions:

> MR. FIELD:  The question is, what is the basis for [Mr. Copantitla] using two names?

> MS. MULHALL:  . . . [W]e are instructing the witness not to answer that question.  We have the witness here.  He's able to testify as to documents he provided to the restaurant and to testify to the name he provided to the restaurant.  We see no reason to halt any questioning of this witness.

(*Id.* 10:20-11:6.)

> * * *

> MR. FIELD:  You don't get to tell me how to take my deposition.  You don't get to tell me cause you brought the body here and you're refusing to answer questions, that's the way we are going to do things. . . .  We're done.  We'll go to the court.

> MS. MULHALL:  Okay. . . we are offering to reserve this issue with the court for a later point.  We have the witness here.  We're all here.  We'd be happy to have you ask him any other lines of questioning that we mutually deem appropriate.

(*Id.* 11:17-12:10.)

Defendants never asked Copantitla any other questions, never contacted the Court, never moved to compel or sought sanctions, never requested that Copantitla's deposition be reopened, and never made any other attempt to depose Copantitla.

Second, contrary to Defendants' claim that "Plaintiffs produced no records pertaining to any one [sic] with the name Ricardo Copantitla" (Def. Br. 49), Plaintiffs have produced all relevant documents in the possession of Copantitla.  As Defendants well know, Copantitla also uses the name Eduardo Garcia, a fact established in Copantitla's deposition and acknowledged by Defendants.  (Ex. 29 [Copantitla] 5:19-23; Second Amended Answer ¶¶ 7, 276.)  Because Defendants know that Copantitla sometimes uses the name Eduardo Garcia, as referenced in Thalassa payroll documents Defendants themselves produced (*see, e.g.*, Ex. 30 [D 14317] and

45

Ex. 31 [D 14372]), their attempt to feign ignorance of Copantitla's identity appears to be disingenuous, at best.  (*See*, *e.g.*, Def. Rule 56.1 Statement ¶ 120; Ex. 29 [Copantitla] 6:17-7:8.)

Last, dismissal of Copantitla's claims is wholly unwarranted.  This motion represents Defendants' first and only attempt to raise the issue of Copantitla's supposed discovery deficiencies in the ten months since Copantitla's deposition on February 18, 2010.  Defendants have not pursued any available remedies under Rule 37 or otherwise, such as filing a motion to compel or contacting the Court.  They never raised any concerns with Magistrate Judge Francis, whom this Court appointed to handle discovery disputes between the parties.[25]

### D.   Martin Lopez's Claims Are Established by Documentary Evidence and Should Not Be Dismissed.

Defendants argue that Martin Lopez's claims should be dismissed with prejudice because he has not yet been deposed.  (Def. Br. 47.)  In assessing whether to dismiss a plaintiff's claims for alleged delay in a deposition, courts consider whether "(1) the plaintiff's failure to prosecute caused a delay of significant duration; (2) plaintiff was given notice that further delay would result in dismissal; (3) defendant was likely to be prejudiced by further delay; (4) the need to alleviate court calendar congestion was carefully balanced against plaintiff's right to an opportunity for a day in court; and (5) the trial court adequately assessed the efficacy of lesser sanctions."  *Rivera v. Federlin*, No. CV 08-7293, 2009 WL 5062112, at *4 (S.D.N.Y. Dec. 17, 2009).  "No single factor is dispositive when deciding whether to dismiss on this basis." *Sease v.*

---

[25] The cases Defendants cite regarding Copantitla's claims are inapposite.  (*See* Def. Br. 48-49.) *NHL v. Metro Hockey Club* involved defiance of warnings from the court after the court granted multiple "eleventh hour" extensions. 427 U.S. 639, 640 (1976).  *Interscope Records v. Gilsa Barbosa*, No. CV 05-5864, 2006 U.S. Dist. LEXIS 94210 (E.D.N.Y. Dec. 29, 2006) involved a motion to compel pursuant to Fed. R. Civ. P. 37.  *Altschuler v. Samsonite Corp.*, 109 F.R.D. 353 (E.D.N.Y. 1986), *Hollingsworth v. City of N.Y.*, No. CV 95-3737, 1997 WL 91286 (S.D.N.Y. Mar. 4, 1997) and *McDonald v. Head Criminal Court Officer*, 850 F.2d 121, 124 (2d Cir. 1988) all involved a party's defiance of court orders.  No orders were sought or entered in this case.

*Doe*, No. CV 04-5569, 2006 WL 3210032, at *4 (S.D.N.Y. Nov. 6, 2006).

Under these factors, dismissal of Lopez's claims is unwarranted. Lopez has asserted only wage and uniform claims against Defendants. Documentary evidence – *i.e.*, his pay stubs and the Restaurant's records concerning unlawfully confiscated tips – will determine whether Defendants violated the law.[26]

Lopez has been out of the country during the discovery process, and while his testimony will add little, he is available to sit for a deposition in February 2011. (Ex. 50 [Letter, dated November 9, 2010, from Shearman & Sterling LLP to Lowenstein Sandler PC].) This date is well in advance of trial and would not cause delay to the ultimate resolution of the case. Moreover, dismissal is rarely an appropriate sanction without prior warnings, and there have been no prior warnings here because Defendants have not previously brought their concern to the Court's attention. *See Zouarhi v. Colin Serv. Sys., Inc.*, 223 F.R.D. 315, 316 (S.D.N.Y. 2004); *see also Sease*, 2006 WL 3210032, at *3. Dismissal is a "harsh remedy," appropriate only "when a court finds 'willfulness, bad faith, or any fault' on the part of the prospective deponent." *Zouarhi*, 223 F.R.D. at 315-16 (citing *Bobal v. Rensselaer Polytechnic Inst.*, 916 F.2d 759, 766 (2d Cir. 1990)). Defendants can point to no such bad faith on the part of Lopez.

### E.     There Is No Legal Basis for Striking Ignacio Garcia's Allegations.

Defendants' motion to strike Ignacio Garcia's retaliation allegations is unwarranted under the relevant legal standards. Defendants argue that because Garcia voluntarily withdrew his retaliation claim, his underlying factual allegations about Thalassa's retaliation against him must be stricken from Plaintiffs' pleadings. (Def. Br. 45-46.) Rule 12(f) permits a court to strike from

---

[26] As to Lopez's uniform claims, there little reason to suspect his testimony will differ in any appreciable manner from the testimony already gathered from multiple Plaintiffs about Thalassa's uniform practices, but, in any event, he can still be deposed before trial.

a pleading any "redundant, immaterial, impertinent or scandalous matter," but "motions to strike are disfavored and usually granted only for scandalous material." *Metrokane, Inc. v. The Wine Enthusiast*, 160 F. Supp. 2d 633, 641-42 (S.D.N.Y. 2001). *See also Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) ("[I]t is settled that the motion will be denied, unless it can be shown that no evidence in support of the allegation would be admissible. . . . [T]he courts should not tamper with the pleadings unless there is a strong reason for so doing.").

Defendants' own cited cases confirm that courts usually only strike scandalous allegations. *Wine Mkts. Int'l, Inc. v. Bass*, 177 F.R.D. 128, 133 (E.D.N.Y. 1998); *G-I Holdings, Inc. v. Baron & Budd*, 238 F. Supp. 2d 521, 554 (S.D.N.Y. 2002) (motion to strike granted for scandalous, irrelevant allegations including that defendant plied expert witnesses with sex). Garcia's retaliation allegations are not scandalous and are relevant to active claims in this litigation, including other Plaintiffs' retaliation allegations that Defendants must concede are relevant. *See Metrokane*, 160 F. Supp. 2d at 642 (denying motion to strike where the allegations "bear on the overall issues of the case" and provide "general background information" that is "neither scandalous nor redundant"). It is immaterial that Garcia withdrew his own retaliation claim. He did so for personal reasons and certainly did not "recogniz[e] that his retaliation claim was meritless," as Defendants wrongly assert.[27] (Def. Br. 45.)

Defendants' assertions about the substance of Garcia's deposition testimony, as matters outside the pleadings, should be disregarded in considering whether to strike his allegations. *See*

---

[27] Defendants' motion abuses Garcia's voluntary, mutually negotiated consent by attempting to use it as a predicate to dismiss further relevant allegations. As Defendants openly concede, in negotiating the voluntary dismissal of his retaliation claim, Garcia only agreed to withdraw the claim for relief and declined to withdraw the underlying factual allegations. (*See* Def. Br. 45 n.19.) Garcia declined to withdraw these allegations because they remain relevant to other Plaintiffs' claims and provide background on the illegal labor practices at Thalassa.

*Wine Mkts. Int'l*, 177 F.R.D. at 134 ("[I]t is generally improper to consider matters outside the pleadings in ruling upon a motion to strike").  Further, Garcia's deposition took place through a translator, and while Garcia clearly became confused by the questioning at times, he maintained that he was fired by Manuel Segundo, acting on behalf of Kemal Kurt, and that his dismissal related to complaints about not receiving the appropriate tips.  (Ex. 32 [Garcia] 68:25-70:1, 29:4-7, 45:13-17, 64:19-66:11.)  This testimony supports rather than negates his allegations.

F.      **Statutes of Limitations Do Not Significantly Affect Plaintiffs' Claims.**

Defendants argue that a limitation of damages is appropriate for Plaintiffs Copantitla, Guachun, and Matute.  As explained below, none of Copantitla's or Matute's claims are time-barred.  All of Plaintiffs' FLSA claims are subject to the three-year FLSA statute of limitations, plus equitable tolling where appropriate.  There is no dispute that Plaintiffs' claims under the NYLL are subject to the six-year NYLL statute of limitations.

The FLSA statute of limitations is either two or three years, depending on whether the defendant's conduct amounts to a "willful violation."  29 U.S.C. § 255(a).  Here, the three-year statute of limitations should apply because Defendants' violations were willful and Defendants do not attempt to argue otherwise.  (*See* Def. Br. 49-50.)  Defendants' violations were "willful," *inter alia*, because of Defendants' failure to comply with the FLSA's notice requirements.  *See Yu G. Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240, 258 (S.D.N.Y. 2008) (noting that the willfulness requirement may be met if the employer either acted knowingly or "showed a reckless disregard for the matter of whether its conduct was prohibited by the statute.") (internal quotation omitted).  As in *Saigon Grill*, it is undisputed that Defendants neither displayed the required FLSA minimum wage and overtime notices at Thalassa, nor did they inform Plaintiffs of the tip credit provisions under the FLSA during the period in which Plaintiffs' claims arose.  (Ex. 4 [Dogan] 102:14-19; Ex. 33 [Abrahante] 32:23-33:17; Ex. 9 [Vargas] 60:19-63:2; Ex. 32

[Garcia] 96:20-97-11; Ex. 24 [Copantitla Aff.] ¶¶ 2-3; Ex. 23 [Matute Aff.] ¶ 2.)  Thus, Defendants' willful violations should extend the FLSA limitations period to three years.

Equitable tolling also applies to all FLSA claims asserted by Plaintiffs Copantitla and Matute.  Equitable tolling applies where the plaintiff is "unaware of his cause of action," and especially where, as here, the defendant "concealed from the plaintiff the existence of a cause of action."  *Saigon Grill*, 595 F. Supp. 2d at 259 (internal quotation marks and citation omitted).  Equitable tolling "at root involves questions of fairness."  *Ramirez v. CSJ & Co., Inc.*, No. CV 06-13677, 2007 WL 1040363, at *2 (S.D.N.Y. Apr. 3, 2007).  Courts in this district have noted the importance of equitable tolling by explaining that "[e]mployers that fail to post the required [labor law] notices take advantage of the defenseless in a very real way . . . [and] frustrate [the] legislative objective of protecting those most in need of protection."  *Id.* at *3.  Like the plaintiffs in *Saigon Grill*, Copantitla and Matute were unaware of their rights under the FLSA during the period in which their claims arose, and Defendants made no effort to provide them with notice. (Ex. 24 [Copantitla Aff.] ¶¶ 2-3; Ex. 23 [Matute Aff.] ¶ 2.)  *See Saigon Grill*, 595 F. Supp. 2d at 259 (holding equitable tolling is especially appropriate where defendant concealed existence of claims).[28]  Copantitla's claims should be tolled until he became aware of his rights under the FLSA in approximately May 2008.  (Ex. 24 [Copantitla Aff.] ¶ 4.)  Similarly, Matute's FLSA claims should be tolled until he became aware of his rights under the FLSA in approximately October 2008.  (Ex. 23 [Matute Aff.] ¶ 3.)

---

[28] Fraud is not required for equitable tolling to apply. *Saigon Grill*, 595 F. Supp. 2d at 259 (citing *Valez v. U.S.*, 518 F.3d 173, 182-83 (2d Cir. 2008)); *see also Ramirez*, 2007 WL 1040363, at *3 (denying defendant's motion to dismiss where plaintiffs were unaware of their rights under the FLSA and alleged that defendants failed to post the required labor notice); *Baba v. Grand Cent. P'ship*, No. CV 99-5818, 2000 WL 1808971, at *2 (S.D.N.Y. Dec. 8, 2000) (noting that an employer's failure to comply with the FLSA notice requirements may "equitably [toll] the statute of limitations unless and until an employee has actual notice of his rights.").

## CONCLUSION

For all the foregoing reasons, the Court should deny Defendants' Motion for Partial Summary Judgment and to Dismiss Certain Plaintiffs.

Respectfully submitted,

SHEARMAN & STERLING LLP

By:   /s/ Joshua M. Goodman
      Alan S. Goudiss
      Daniel C. Lewis
      Joshua M. Goodman
      Marjorie A. Mulhall
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (212) 848-7179

CHADBOURNE & PARKE LLP
Marc D. Ashley
mashley@chadbourne.com
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 408-5100
Facsimile: (212) 541-5369

URBAN JUSTICE CENTER
David Colodny
Dcolodny@urbanjustice.org
123 William Street, 16th Floor
New York, New York 10038
Telephone: (646) 602-5600
Facsimile: (212) 533-4598

*Attorneys for Plaintiffs*