**UNTIED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- X

RICARDO COPANTITLA, DIEGO DIAZ DE :      Case No. 09 Civ. 1608 (RJH)
LA VEGA, IGNACIO GARCIA, JULIO :
LANTIGUA, MANUEL LIZANDRO, :      **AFFIDAVIT OF**
MARTIN LOPEZ, SEBASTIAN LOPEZ, :      **DAVID W. FIELD**
AUGUSTIN MALDONADO, HENRY :
MATUTE, JOELITO MELENDEZ, AND JOSE :
LUIS VARGAS, :

              Plaintiffs, :
                          :
             -against- :
                          :

FISKARDO ESTIATORIO, INC. d/b/a :
THALASSA RESTAURANT, GEORGE :
MAKRIS, JULIA MAKRIS, and STEVEN :
MAKRIS, :
                          :
             Defendants. :
                          :

------------------------------------------------------------- X

STATE OF NEW JERSEY    )
                      : ss
COUNTY OF ESSEX        )

       **DAVID W. FIELD**, having been first duly sworn, says:

       1.     I am a member of the law firm Lowenstein Sandler PC, attorneys for

Defendants Fiskardo Estiatorio, Inc. d/b/a Thalassa Restaurant, George Makris, Julia Makris,

Steve Makris (incorrectly sued as Steven Makris), and Fantis Foods, Inc. (collectively

"defendants") in the above-captioned action.  I make this affidavit to supplement the pending

summary judgment motion record.

       2.     In the parties' submissions in the pending cross-motions for summary

judgment, reference is made to a proceeding between many of these parties before the National

Labor Relations Board.  Attached as Exhibit A is a copy of the March 31, 2011 Decision and

Order from the NLRB in the matter of <u>Fiskardo Estiatorio, Inc. d/b/a Thalassa Restaurant, et al.</u>

<u>and Jose Luis Vargas, Diego Diaz de la Vega, Julio Lantigua, Manuel Lizandro and Sebastian</u>

<u>Lopez</u>, Cases 2-CA-38990, 2-CA-39002, 2-CA-39012, 2-CA-39017, and 2-CA-39157.

David W. Field

Subscribed and sworn to before
me, a notary public, this 4th day
of April, 2011.

Blanca R. Andujar
Notary Public

BLANCA R. ANDÚJAR
Notary Public Of New Jersey
My Commission Expires April 29, 2013

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**Fiskardo Estiatorio, Inc. d/b/a Thalassa Restaurant and Jose Luis Vargas and Diego Diaz De La Vega and Julio Lantigua and Manuel Lizondro and Sebastian Lopez. Cases 2–CA–38990, 2–CA–39002, 2–CA–39012, 2–CA–39017, and 2–CA–39157**

March 31, 2011

### DECISION AND ORDER

#### By Chairman Liebman and Members Pearce and Hayes

On June 9, 2010, Administrative Law Judge Eleanor MacDonald issued the attached decision. The Respondent and Charging Parties Manuel Lizondro and Julio Lantigua filed exceptions and supporting briefs. The Respondent, Charging Parties, and the Acting General Counsel filed answering briefs. The Respondent and Charging Parties filed reply briefs.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The National Labor Relations Board has considered the decision and the record in light of the exceptions[1] and briefs and has decided to affirm the judge's rulings, findings,[2] and conclusions[3] and to adopt the recommended Order as modified.[4]

_____

[1] There are no exceptions to the judge's finding that the Respondent engaged in unlawful surveillance or to her dismissal of allegations related to issuance of a new handbook, promulgation of a new rule requiring busboys to memorize the restaurant menu, interrogation of employee Manuel Segundo, and discharge of employee Diego Diaz de la Vega.

[2] The Respondent and Charging Parties except to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings.

[3] We agree with the judge's finding that Maitre d' Kemal Kurt is an agent of the Respondent. It is thus unnecessary to pass on her further finding regarding Kurt's supervisory status. We therefore deny the Charging Parties' request to remand the case to accept additional evidence related to Kurt's status. We note that the judge mistakenly found that General Manager Tasso Zapantis made threatening statements referring to cancer. The credited testimony shows that only Kurt made such statements. We also note that the judge inadvertently referred to Fausto as a captain, when the record indicates that he was a busboy. Finally, in adopting the judge's dismissal of the allegation that the Respondent discharged Captain Julio Lantigua for engaging in protected activity, we correct the judge's finding that Lantigua was fired because the Respondent needed a full-time captain. The record shows that Lantigua "just left" the restaurant and was not fired by the Respondent.

Inasmuch as the Board affirms the judge's findings of numerous other unlawful threats by Kurt in response to employees' protected concerted activities, Member Hayes finds no need to pass on whether

### ORDER

The National Labor Relations Board adopts the recommended Order of the administrative law judge and orders that the Respondent, Fiskardo Estiatorio, Inc. d/b/a Thalassa Restaurant, New York, New York, its officers, agents, successors, and assigns, shall take the action set forth in the Order, as modified.

Substitute the following for paragraph 2(a).

"(a) Within 14 days after service by the Region, post at its New York, New York restaurant copies of the attached notice marked "Appendix A." Copies of the notice, on forms provided by the Regional Director for Region 2, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous

_____

Kurt unlawfully threatened Lantigua with physical harm on one occasion.

We also agree with the judge, for the reasons she states, that the Respondent violated Sec. 8(a)(1) by interrogating, threatening, and attempting to arrest employee Jose Luis Vargas because he, along with a group of nonemployees, briefly entered the restaurant during evening dining hours to deliver a letter protesting the Respondent's alleged labor law violations. Cf. *Goya Foods of Florida*, 347 NLRB 1118, 1119, and 1134 (2006), enfd. 525 F.3d 1117 (11th Cir. 2008) (finding peaceful letter delivery by employees, accompanied by nonemployees, protected); *Saddle West Restaurant*, 269 NLRB 1027, 1041–1043 (1984) (restaurant employee did not lose the Act's protection by concerted activity near two or three customers where no evidence of disruption). *Restaurant Horikawa*, 260 NLRB 197 (1982), cited by our colleague, is distinguishable. There, the Board found that a group of 30 demonstrators "seriously disrupted" the employer's business by "invading the restaurant en masse and parading boisterously about during the dinner hour when patronage was at or near its peak." Id. at 198. By contrast, there is no evidence here that Vargas' group disturbed the handful of patrons present, blocked the ingress or egress of any individual, was violent or caused damage, or prevented any employee from performing his work. Thus, Vargas' activity was and remained protected at all times.

Member Hayes would not find that the Respondent violated Sec. 8(a)(1) by interrogating, threatening, and attempting to arrest employee Jose Luis Vargas with respect to an incident in which a large group of nonemployees who, with Vargas, entered the restaurant during evening dining hours for the purpose of delivering a protest letter. The conduct of the nonemployees, who sought access to the Respondent's restaurant for reasons other than dining there, was trespassory and unprotected under *Lechmere, Inc. v. NLRB*, 502 U.S. 527 (1992), as was Vargas' participation in this demonstration. See *Restaurant Horikawa*, 260 NLRB 197, 197–199 (1982). Unlike in the cases cited by his colleagues, the Respondent's subsequent interrogation of Vargas, its threat to arrest him, and its attempt to arrest him all focused on this unprotected activity rather than on any other prior protected activity by Vargas himself. Consequently, these actions did not violate Sec. 8(a)(1).

In affirming the judge's decision, we find it unnecessary to rely on *Saigon Grill Restaurant*, 353 NLRB 1063 (2009), or *National Steel Supply Co.*, 344 NLRB 973 (2005), enfd. 207 Fed.Appx. 9 (2d Cir. 2006). We also observe that the Board's decision in *Los Angeles Airport Hilton Hotel & Towers*, 354 NLRB No. 17 (2009), was recently reconsidered by the Board with the same result, see 355 NLRB No. 122 (2010).

[4] We shall modify the judge's recommended Order to provide for the posting of the notice in accord with *J. Picini Flooring*, 356 NLRB No. 9 (2010). For the reasons stated in his dissenting opinion in *J. Picini Flooring*, Member Hayes would not require electronic distribution of the notice.

places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed any of the stores involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the appropriate notice to all current employees and former employees employed by the Respondent at any time since April 2008."

Dated, Washington, D.C.  March 31, 2011

| | |
|---|---|
| Wilma B. Liebman, | Chairman |
| Mark Gaston Pearce, | Member |
| Brian E. Hayes, | Member |

(SEAL)   NATIONAL LABOR RELATIONS BOARD

*Robert Guerra, Esq., for the General Counsel.*
*David Field, Esq., Elizabeth Alcorn, Esq., and Stephanie Aranyos, Esq. (Lowenstein Sandler, PC), of Roseland, New Jersey and New York, New York, for the Respondent.*
*David Colodny, Esq. and Magdalena Barbosa, Esq. (Urban Justice Center), of New York, New York, for the Charging Parties.*

## DECISION

### STATEMENT OF THE CASE

ELEANOR MACDONALD, Administrative Law Judge. This case was tried in New York, New York, on six days from September 15, 2009 to January 15, 2010.[1] The Complaint alleges that Respondent, in violation of Section 8(a)(1) and (3) of the Act, interrogated employees, engaged in surveillance, threatened employees with termination and arrest and with physical harm, suspended employees, reduced employees' hours, caused the termination of Manuel Lizondro, discharged employees Diego Diaz de la Vega and Julio Lantigua and retaliated by issuing a new handbook and promulgating a new rule. At the close of the hearing the General Counsel amended the Complaint to allege that about September 2009 and/or the summer of 2009 Respondent interrogated Manuel Segundo Paguay about protected concerted activities. Respondent denies that it has engaged in any violations of the Act.

On the entire record, including my observation of the demeanor of the witness, and after considering the briefs filed by all the parties on November 18, 2009 and February 3, 2010, I make the following[2]

### FINDINGS OF FACT

#### I. JURISDICTION

Respondent is engaged in the operation of a restaurant at 179 Franklin Street, New York, New York. Annually, Respondent derives gross revenues in excess of $1,000,000 and purchases and receives goods valued in excess of $5,000 directly from points located outside the State of New York. I find that Respondent is an employer engaged in commerce with the meaning of Section 2(2), (6) and (7) of the Act.

#### II. ALLEGED UNFAIR LABOR PRACTICES

##### A. Background

The Thalassa Restaurant is a luxurious and expensive restaurant specializing in Greek food, especially Mediterranean fish. It is located in Tribeca, a trendy part of downtown New York City. The restaurant seats 181; if the banquet area is used, the seating capacity is about 280. The restaurant is constructed on three levels, a main floor on the street level, a mezzanine and a downstairs area in the basement containing the office and other rooms. On the main floor there is an open kitchen at the back of the restaurant. The main seating area is in front of the kitchen. Looking from the main seating area toward the front of the restaurant, one would see the bar at the left, including a lounge area with cocktail tables, and to the right the hostess station. The main entrance to the restaurant is beyond the hostess area in the front of the restaurant. The area between the front door and the hostess station holds 10 people comfortably. The restaurant has always had a security system including a video camera that is activated for 24 hours a day. The security system does not record sound.

The restaurant has a dress code. Patrons are not admitted wearing jeans or sweatshirts or backpacks.[3]

The Maitre d' and the hostess greet arriving patrons. The Maitre d' is responsible for assigning a table to each group of diners. Other aspects of duties carried out by the Maitre d' will be discussed in detail below.

Customers dining at Thalassa give their orders to the Captains who discuss the menu items and make wine suggestions. Food is brought to the table by the Runners. The tables are serviced by the Busboys who set up the tables, serve coffee and clear used tableware.

It appears that there is a Sommelier at the restaurant; however, the evidence suggests that he may not always be available to perform his service functions and that often the Captains have the sole duty of suggesting a wine and bringing it to the table.

The Thalassa Restaurant is owned by Julia Makris. Her son Steve Makris lives in an apartment above the restaurant with his family. Steve Makris, who has no official title at Thalassa

---

[1] As will be described in more detail below, the hearing closed on September 21, 2009 and was reopened on January 15, 2010 for the admission of further evidence.

[2] The Respondent's unopposed Motion to correct the transcript, received on November 18, 2009, is hereby granted. The transcript is further corrected so that at page 246, lines 14–15, the correct phrase is "labor laws violation."

[3] Julio Lantigua gave this testimony. Lantigua had been employed as a Captain at Thalassa.

and is not employed by the restaurant, eats dinner at the restaurant almost every night, often accompanied by his wife and children.[4]  He is viewed by Thalassa employees as the "boss" and the "eyes and ears" of Julia Makris.  Steve Makris is the CEO of Fantis Foods, located in Carlstadt, New Jersey, an importer of food products and a distributor of cheese, olives, and olive oils.  Fantis is owned by George Makris, the husband of Julia Makris, by Steve Makris and by Jerry Makris, a brother of Steve Makris.

Tommy Ziotas, the General Manager of Fantis Foods, is a Vice President of Thalassa Restaurant.  Ziotas supervises the payroll and financial operations of Thalassa.  He has no responsibilities for hiring, firing or scheduling at Thalassa.  Ziotas works at the Fantis office in New Jersey.  He goes to the restaurant once or twice a week after 5 pm to pick up cash for placard and to obtain invoices for payment.  On these occasions Ziotas discusses issues with the Thalassa General Manager and speaks to the Executive Chef about new items coming to the restaurant.  In addition, Ziotas speaks by telephone with the restaurant's General Manager about five times a day.  Ziotas does not discuss managerial issues with the Thalassa's Maitre d'.[5]

Steve Makris testified that the General Manager is responsible for managing the entire restaurant and for keeping him informed about the restaurant.  At the time some of the events relevant to the instant case occurred, Tasso Zapantis was in the process of taking over the duties of General Manager of Thalassa.[6]  Julia Zilo, who had been the restaurant's General Manager, was badly injured in an automobile accident in February 2008.  For a long time it was hoped that Zilo would return to work in the restaurant.  During this time Zapantis filled in for Zilo but did not assume all of her duties.  Zapantis' managerial duties were not well defined and Steve Makris also functioned as a manager of the employees.  By the end of 2008 it was clear that Zilo would not return to work and Zapantis was officially designated General Manager.

Ralpheal Abrahante is the Executive Chef of Thalassa.[7]  Abrahante is the supervisor of the kitchen; he has the power to hire employees and to suspend them.  He oversees the kitchen, the receiving of supplies and the preparation of food and he acts as the expediter sending food out of the kitchen for service to the tables.  There is also an expediter outside the kitchen in the front of the house.

Abrahante arrives at the restaurant daily at 3 pm and begins preparations for dinner.  The restaurant opens at 5:30 pm and the kitchen is ready for service at that time.  However, most customers dine much later; the restaurant is hardly busy until 7 pm.  Abrahante expects the bulk of the orders to come into the kitchen at 7 pm or later.

The staff is served a "family meal" from 3 to 4 pm.  All the employees present in the restaurant at that time sit down for a communal meal consisting of a vegetable, a starch and a protein.  After the meal, the General Manager conducts a pre-shift meeting with the wait staff who are working that evening.  The

General Manager informs the staff about various menu items, especially the fresh fish being featured that evening.  If VIP guests are expected the staff will be informed of that fact, and the staff will be given information relating to a private party that may be scheduled.  During the pre-shift meeting the Maitre d' gives the wait staff information or training relating to service.

A majority of the employees' earnings come from customer tips.  At the time of the events relevant to the instant proceeding, the restaurant distributed tips to employees using a pool system.  Every night the cash and credit card tips provided by customers would be added up to form the tip pool.  Employees were assigned a number of points based on their job duties.  Captains had 11 points, the Maitre d' had 10 points, the Sommelier and Bartenders had 8 points, the Food Runners had 7 points and the Busboys had 5 points.  The points assigned to the employees actually working each night would be added up and the tip pool would be divided by the total number of points, resulting in a dollar value equal to one point.  Each employee would then get a share of the tips calculated by multiplying the value of one point times the number of points assigned to the individual's job title.  Cash tips would be calculated each day and distributed in cash at the end of the evening.  Credit card tips would be calculated each day and added to the weekly paycheck.

### B. Status of Kemal Kurt

The Complaint alleges that Kemal Kurt is the Maitre d' of Respondent and a supervisor and/or agent of Respondent within the meaning of Section 2(11) of the Act.[8]  The Answer denies this allegation.

The evidence establishes that in 2007 the restaurant's Maitre d' was Sait Dogan.  Zapantis testified that Kemal Kurt became Maitre d' in 2008.  Kurt had been previously employed by Thalassa as a Captain from November 2006 to April 2007.  He returned to work in February 2008 as the Maitre d' and stayed until May 2009 when he left to work in the hotel industry.[9]  The restaurant provided Kurt with a business card that identified him as "Maitre d'."  Kurt testified that as a Maitre d' he was the "head waiter."  He wore a business suit when on duty, not a uniform.  His duties were to greet customers, seat customers, oversee the service on the floor and serve open wines.  When necessary, Kurt cleared the tables with the Busboys.  Kurt reported to General Manager Zapantis.  Kurt was paid by the day, not by the hour.  He received special pay for extra work.  In response to a subpoena served by Counsel for the General Counsel, Respondent provided Kurt's earnings information and stated that he did not receive health or life insurance and did not receive other benefits.[10]

During the dinner service Zapantis was usually in his office on the lowest level of the restaurant and Kurt was on the floor overseeing the service.  The Maitre d' is responsible for train-

---

[4] Respondent stipulated that Steve Makris is an agent of Respondent.

[5] The title Maitre d'hôtel, literally the master of the house in the original French term, is shortened in common usage to Maitre d'.  The issue relating to the actual duties and powers of the Maitre d' at Thalassa will be discussed below.

[6] Respondent stipulated that Zapantis is a supervisor.  Beginning in 2003, Zapantis had previously performed sales and marketing services for the restaurant.

[7] Abrahante began as a sous chef in 2001.

[8] The Complaint does not name Kurt as a "manager."

[9] In the event, Kurt was called home to Turkey for a family emergency and when he returned to the US he began work as the assistant manager of a restaurant.  He has not spoken to Steve Makris or Zapantis about returning to work at Thalassa.

[10] Later in the hearing Respondent offered information relating to health insurance provided to other employees.  This evidence was rejected because it had not been timely produced in response to Counsel for the General Counsel's subpoena.

ing employees on the floor and correcting service on the floor when he sees that an error is being made.

Kurt testified generally that he did not hire, fire or discipline employees.

Zapantis stated that the Maitre d' interviewed prospective employees for the floor, including Busboys, Runners and Captains. According to Zapantis, Steve Makris hired the employees after they were interviewed by the Maitre d'. Kurt testified that he interviewed candidates for the job of Captain to determine their level of experience and knowledge concerning wine and food. Kurt stated that he gave his opinion to Zapantis, but he denied that he recommended hiring. Ignacio Garcia was hired to work as a Busboy in May 2008. He was interviewed by Kurt who called two days later to offer him a job.[11]

Zapantis testified that only Steve Makris had the authority to terminate employees. He could not recall that any employers were fired from the end of 2008 and in 2009. Steve Makris testified that he terminated two Captains in April 2008, Dominick LaRuffa and Henry Matute.

Zapantis testified that the Maitre d' did not schedule employees. Kurt testified that Zapantis prepared the schedule showing the days and hours of work for each employee. Employees who wanted a change in their work schedules discussed the issue with Zapantis. However, Kurt assigned employees to their work stations, that is the particular tables they were to serve and, for Busboys, duty at a coffee station. Kurt testified that at the beginning of the evening if there were not many reservations on hand, Zapantis would send some employees home. Further, if the restaurant was slow the employees might ask to go home because they knew they would not make much money. On these occasions, the men agreed amongst themselves who should go home.

Busboy Jose Luis Vargas testified that both Kurt and Zapantis scheduled employees. If Vargas wanted to take time off he would ask Kurt. Kurt would approve the time off if the restaurant was not busy. Busboy Diego Diaz de la Vega also testified that if he needed a day off he spoke to Kurt about his schedule. Captain Julio Lantigua testified that the employees' work schedules were posted on Friday for the week beginning the following Monday. Before the schedule was posted, Kurt asked employees if they had scheduling problems.

Chef Abrahante testified that Kurt had authority over the front of the house. In 2008 when Abrahante suspended Busboy Jose Luis Vargas and a dishwasher for fighting in the kitchen, he informed Kurt because he did not want to bear all the responsibility himself. Kurt agreed that Vargas would be sent home. Vargas testified that Kurt suspended him when he had the argument with the dishwasher. Kurt did not testify concerning this incident.

Steve Makris testified that he occasionally directed Kurt to counsel employees about issues of work performance and that he discussed employee work performance with Kurt.

On direct examination by Counsel for the General Counsel, Julio Lantigua identified Kurt as the floor manager/ Maitre d'. On cross-examination Lantigua said Kurt was a manager; he

denied that Kurt was identified as the Maitre d'. Lantigua stated that in "high end" restaurants the Maitre d' is in charge of service; this is true in all restaurants but not at Thalassa. Lantigua testified that it is common restaurant practice for the Sommelier and the Maitre d' to participate in the tip pool. At Thalassa, Kurt participated in the tip pool. If he had not been so included, all the other front-of-the-house employees would have received more tip money. Busboy Manuel Lizondro echoed this complaint. Lizondro testified about Kurt, "he is the Maitre d' and he also received tips. We were in disagreement with that because the house is supposed to pay the Maitre d' and not our tips."

## C. The Tip Controversy

In February or March 2008 Thalassa's wait staff employees began to express concerns related to the amount of tips they were receiving. Some employees believed that they were not getting all the tips left by the customers. A particular concern was the 20% gratuity the restaurant charged for private parties. Employees believed that the private party gratuities were not properly being added to the tip pool.

Lantigua testified that in March 2008 he and employees Diego Diaz de la Vega, Manuel Lizondro, Joelito Menendez, John Perez and Fausto spoke to Kurt about their concerns that the tips were not being fairly distributed. Kurt said he would look into how the tip pool was being calculated. At a pre-shift meeting in March 2008 Zapantis and Kurt addressed the employees about the issue. Zapantis said that 20% was being charged to private parties. Then Kurt spoke and said there was no "monkey-business" with respect to the tip calculations. Some employees demanded transparency in the calculation of the tip pool. These included Lantigua, a Captain of Greek origin named Nick, Diaz de la Vega and Lizondro.[12] They asked for a tip book that would be open to inspection by the employees. Zapantis said this was not a feasible option. Lantigua said that after this meeting the restaurant fired Captains Henry Matute and Dominick LaRuffa.[13]

Lantigua testified that at the end of March 2008 the employees discussed their concerns with an organization called the Restaurant Opportunity Center, or ROC-NY. According to Lantigua, the employees were afraid that they would be fired in the same manner as Matute and LaRuffa. Lantigua testified that the same week the employees went to ROC-NY the restaurant began scheduling three, four and five pre-shift meetings per week. Lantigua maintained that prior to this time pre-shift meetings were held only once every six weeks or two months. At one of these meetings, according to Lantigua, Zapantis and Kurt said that if the employees wanted to avoid the fate of Matute and LaRuffa they should stay quiet and work. Zapantis and Kurt told the employees that they knew what the employees were doing. Zapantis and Kurt said that at Thalassa problems were solved by cutting out the cancer to avoid the spread. Lantigua stated that the Greek Captain spoke up and asked how much the restaurant was charging the private parties. There had been a wedding party at the restaurant and the employees had expected a big tip but the actual tips distributed had been disappointingly small. Kurt left the meeting and said he would call New Jersey to see if the office had forgotten to distribute the tips from the wedding. Kurt came back with a tip distribution

---

[11] Several witnesses testified that they were hired after being interviewed by Kurt's predecessor, Sait Dogan. I do not regard this testimony as persuasive on the issue of Kurt's role in hiring employees. It is possible that Dogan had different responsibilities than were given to Kurt. I note that Zapantis' job duties were in transition for most of 2008 while the possibility of Zilo's return to the restaurant was still open.

[12] No witness gave the last name for the Captain of Greek origin.

[13] In fact, Matute was fired on April 9, 2008, and La Ruffa was fired on April 5, 2008.

sheet and said there had been a mistake. All the Captains received an additional $100 and the Busboys received $50 extra.

Lantigua said that Diaz de la Vega was fired in April 2008 soon after this meeting.[14] After the discharge, Zapantis told Lantigua that he knew the employees were getting legal advice. He asked who else was involved with the effort and he told Lantigua to consider his position at the restaurant. Zapantis told Lantigua that the restaurant was accommodating his school schedule and that he was well-liked. Zapantis said Lantigua should appreciate how easy it was for him at Thalassa.

Lantigua testified that employees continued to attend meetings with ROC-NY. At these meetings, employees were urged to recruit new people and they were advised to arrive on time and keep working. According to Lantigua, Zapantis and Kurt held more meetings where they told employee to shut up and work and reminded them that the restaurant would solve its problems by cutting out the cancer. Zapantis and Kurt told the employees they should stop seeking legal advice. Lantigua said Zapantis and Kurt never mentioned ROC-NY.

Lantigua stated that eventually there was a change in the tip system. Busboys and Food Runners were given an extra point so that they earned more money but all the others lost. The employees continued to ask for a tip book and they complained to Kurt that tips from private parties were not being distributed properly.

Busboy Manuel Lizondro testified that in February 2008 all the front of the house employees went downstairs to the office where they met with Kurt.[15] They told him that their checks were smaller and they asked Kurt to investigate and take action. Kurt agreed, remarking that he was in the tip pool and he was concerned. But after two weeks the checks were again unsatisfactorily small and the employees repeated their concerns to Kurt. At one of the regular 5 pm meetings on the floor Kurt said he did not know what was happening. Kurt added, "You guys are making me tired." Kurt said, "If you guys want to continue working, then continue. But don't ask me anything else. I just want you to continue working and shut your mouth and stop asking ... everything here is going well." In February, Lizondro testified, he went to ROC with Ricky, Luis, and Lantigua. Following the meeting with ROC a waiter named Dominick was fired.[16] At some point the employees asked Kurt why their checks were lower; Kurt was upset and told them to stop asking. He said they should see what happened to Henry Matute and Dominick. He said when you get cancer your arm has to be cut off and this was happening in the restaurant. Kurt said he would cut off the hand and not permit the cancer to continue to the rest of the body. If they did what Matute and LaRuffa did he would cut the hand. If Lizondro did not like the work he should leave the restaurant. On one occasion, Lizondro testified, Kurt called him to the office and told him to stop what he was doing; Kurt said, "I know that you guys are dong something bad for Thalassa. . . . Don't do that. If you do that, you're going to lose this job and you're going to get job in another place." Kurt promised him another position where he would make more money if he stopped what he was doing. Lizondro testified that in June 2008 on his last day of work there was a meeting attended by all the employees. At this

meeting Lizondro asked Zapantis to tell him what happened with the tips. Zapantis replied that if he didn't like the tips he should not work there anymore and he should get out. Zapantis said he would never show a tip book and that Lizondro should "just work." Lizondro testified that he never went back to the restaurant after that day.[17] Lizondro's affidavit places this meeting on the last Saturday in April; at the hearing Lizondro affirmed that the meeting occurred in April and that was when he decided he would no longer work at the restaurant.

Busboy Diego Diaz de la Vega testified that on a Saturday in March 2008 the employees discussed their concern about the amount of their tips.[18] There had been a busy week at the restaurant but it was not reflected in their share of the tips. All the employees went to the office with Captain Henry Matute and spoke to Kurt. Kurt thought the problem might be in New Jersey and said he would call the office. The employees requested a tip book. Diaz de la Vega said that Matute never came back to work after that meeting. The employees did not get an answer to their inquiries about the tip problem and they asked again at the pre-shift meeting that occurred "every day at five o'clock." Kurt said he was still looking for an answer. The employees were angry and, at Lantigua's suggestion, they went to meet with ROC in April 2008. Twelve or thirteen employees attended the meeting. According to Diaz de la Vega, one week after the ROC meeting there were two pre-shift meetings in one day. At the first meeting, Kurt and Zapantis discussed the menu and the liquor and cheeses as they usually did. Then some employees spoke up, including Diaz de la Vega, Lantigua, Nick and Lizondro. They asked about a tip book and the money they were missing; they asked when the restaurant would fix the checks. After a while the front of the house people were called to a second meeting with Kurt and the kitchen employees. Kurt was angry; he said the economy was in recession and professional were losing their jobs. He advised the employees to think what they were doing. Speaking of the Makris family, Kurt stated that they were wealthy with businesses all over. Kurt said the restaurant was like a toy for them. He said that if a patient had a cancer the problem would be cut out. Kurt said, "I don't want anybody to have the same problem like Dominick or Henry. So think about what you are doing guys, or why are you talking, or what are you trying to do." According to Diaz de la Vega, the employees continued to ask about their tips at the pre-shift meetings but Kurt tried not to answer them. Then, Kurt announced a change in the point system that increased the tips for busboys and bartenders, but this did not solve the problem. On cross-examination, Diaz de la Vega testified that in April all the Busboys said they were not getting enough of the tip pool and they wanted a larger share. Kurt said he would correct the problem and then he reported back that the Busboys' points would be increased. Diaz de la Vega was not satisfied with the increase in his pay.

Busboy Sebastian Lopez testified about a pre-shift meeting where employees complained to Kurt that their paychecks were small even though the restaurant had been busy with private parties.[19] According to Lopez those who voiced complaints included Diaz de la Vega, Lizondro, Ricardo, Samuel and Luis.

---

[14] Diaz de la Vega's last day of work was April 25, 2008.

[15] Lizondro testified though an interpreter. He was employed by Respondent from January 5, 2007 to June 30, 2008.

[16] Presumably LaRuffa.

[17] The circumstances of Lizondro's departure from the restaurant will be discussed below.

[18] Diaz de la Vega was employed by Respondent from November 7, 2007 to April 25, 2008.

[19] Lopez is still employed by the restaurant. He testified using an interpreter.

At another pre-shift meeting, Kurt and Zapantis told the employees that if they were not satisfied with their checks the doors were open and they could leave. Kurt also said he if he got a cancer in his hand or foot he would cut it and throw it away. Kurt did not explain what he meant but he was trying to make employees understand that he could fire any employees he did not like. Lopez did not offer any dates for these two meetings. Lopez testified that in late 2008 Kurt told him that he knew Lopez had meetings with Lantigua and the others about complaints. He told Lopez not to listen to Lantigua. Kurt said, "Stick with me and I'll teach you. Don't listen to Julio."

Kurt testified that one evening in the spring of 2008 all but two of the employees left the floor at 7:30 pm when there were about 70 customers in the restaurant.[20] The employees gathered in the office downstairs. Kurt went downstairs where he heard the employees asking about their tips. Captain Henry Matute acted as an interpreter for the group, many of whom were Spanish speakers. Kurt does not speak much Spanish. Kurt asked the employees to go back upstairs to the floor. Kurt suggested that "payroll" may have made a mistake and he promised to ask Zapantis about the tips. The employees stayed off the floor for about 20 minutes and then returned to the dinner service. Steve Makris asked Kurt about this incident and then he fired Henry Matute. After this event, Zapantis looked into the tip problem.

Steve Makris testified that he fired Matute because he was instrumental in getting the employees to walk off the floor on a Saturday night. The parties stipulated that Matute's last day of employment was April 9, 2008. Makris testified that he fired Dominick LaRuffa because he heard from Zapantis that La-Ruffa was always late. As shown above, LaRuffa was one of two employees who stayed on the floor to serve customers when the wait staff walked off on the Saturday night. The parties stipulated that LaRuffa's last day of employment was April 5, 2008.

Kurt testified that at one point he suggested to Zapantis and Steve Makris that the Busboys should get a larger share of the tip pool. Makris testified that he told Zapantis to increase the tips for the Busboys after a manager in New Jersey told him the Busboys were not earning enough money. As a result, the Busboys and Bartenders were allocated one more point. This action reduced the amount of tips distributed to the Captains, and to Kurt himself. Kurt stated that Captain Julio Lantigua complained to him more than once about the resulting reduction in his share of the tip pool. Kurt told Lantigua that he would get better service from the Busboys if they were given more money.

Kurt testified that he did not threaten employees that they would be fired. He never heard Zapantis threaten to fire employees. Zapantis testified that he did not warn or threaten employees with termination at pre-shift meetings. Zapantis did not hear Kurt threaten employees with termination. Zapantis denied that he interrogated employees about their activities.

David Jimenez worked as an organizer for Restaurant Opportunities Center of NY, often called ROC-NY. This organization advocates for New York City restaurant workers, files lawsuit on behalf of or with restaurant workers, organizes restaurant workers and engages in workplace justice campaigns.

Jimenez testified that beginning in the summer of 2008 he met with Thalassa employees twice a month and he coordinated meetings of Thalassa workers with the Urban Justice Center, an organization of lawyers who represent workers. Employees must sign a commitment with ROC-NY which signifies their agreement to attend meetings.

### D. Alleged Discharges of Employees

#### 1. Diego Diaz de la Vega

Diego Diaz de la Vega was hired as a Busboy in November 2007. He recalled that his last day of work was a Friday or a Saturday in April 2008. The parties stipulated that Diaz de la Vega was employed by Respondent until Friday April 25, 2008. Diaz de la Vega testified that on a day in April he asked Maitre d' Kurt, "Can I get the last day off because one of my cousins is coming from my country, and obviously he-didn't know the United States." According to Diaz de la Vega, Kurt replied, "You can take all your days off." He testified that he called Kurt on the following Monday because he was not sure he had been fired, and Kurt told him he was no longer needed. When Diaz de la Vega went to pick up his final check Kurt offered him some advice saying, "You have to be more professional in your job. . . . You cannot be an ungrateful person. We are the people who are giving you money to eat. So don't be like that in your career because you're not going to be successful." After Diaz de la Vega provided this testimony, Counsel for the General Counsel asked the following leading question, "Did he mention anything about complaints?" At that point Diaz de la Vega responded that Kurt also said, "Don't make complaints in the way that you did it."

On cross examination Diaz de la Vega could not recall whether he asked Kurt for the next day off on a Friday or a Saturday; he said both of these days are very busy days at the restaurant. Diaz de la Vega denied that he informed Kurt or Steve Makris that he was training for a new job. He denied that Kurt told him he had to make a choice if he was training for a new job. Kurt did not say that that he could not be at both places. Finally, Diaz de la Vega testified, "I found that job at [the Tribeca Grand Hotel] after Kemal fired me."

On redirect examination Counsel for the General Counsel asked Diaz de la Vega whether he asked for the day off to go train for a new job. Diaz de la Vega replied, "No. Never."

Kurt testified that one night he was standing next to Steve Makris when Diaz de la Vega quit. Kurt recalled that Diaz de la Vega said he had a new job at a hotel. Kurt remembered that the restaurant was going to be busy the next day. Kurt denied that he fired de la Vega. Makris testified that Diaz de la Vega said he had another job and could no longer work at the restaurant. Zapantis testified that he heard that Diaz de la Vega had resigned.

After Diaz de la Vega testified and other testimony was taken, the hearing closed. By order dated December 8, 2009 the hearing was reopened on January 15, 2010 to admit evidence concerning Diaz de la Vega's employment at the Tribeca Grand Hotel. Diaz de la Vega's time card report from the hotel shows that he was paid beginning on Monday April 21, 2008 through Thursday April 24 2008 for "training." On Monday he was paid $70 for the hours from 9 am to 4 pm and on Tuesday and Wednesday of that week he was paid $75 per day for the hours from 9 am to 4:30 pm. He was paid $82.50, for the hours from 10 am to 8:15 pm on Thursday, April 24. Beginning Saturday, April 26 he was paid for working Saturday, Sunday and

---

[20] Victor Chavez and Dominick LaRuffa stayed on the floor to tend to the diners.

Monday with a starting time of 4 or 4:15 pm, plus tips. During the following months he worked three or four consecutive days per week beginning either Friday or Saturday, and he received an hourly rate plus tips. He reported for work in the afternoon, anytime from 3:45 pm to 5:15 pm. His employment at the hotel ended on July 12, 2008.

At the reopened hearing Diaz de la Vega testified that he applied for a job at the Tribeca Grand Hotel because he was trying to make more money. He planned to work at both places. Others at the restaurant worked two jobs; they had one job during the day and Thalassa at night. Diaz de la Vega said he was interviewed at the hotel by three managers including the bar manager for a position as a "bar back", that is a bartender's helper. He stated that he was not hired but he would given training for some days after which he would take a test to see if he had worked out. He was not guaranteed a job. Diaz de la Vega testified that after he took the test on Thursday April 24 he was told that he had a job and he accepted the position. The bar manager gave him a schedule that called for him to work on Saturday, Sunday and Monday. Diaz de la Vega informed her that he had a conflict on Saturday and she agreed to get another bar back to cover that day. She informed him that he would start the next week with a regular schedule.

Diaz de la Vega further testified that on Friday April 25 he learned that his cousin was coming to the US the next day. Diaz de la Vega had to go to the airport because his cousin would be a little confused in America. At around midnight on the 25th he asked Kurt for the next day off and Kurt said, "I can take all my days off." The next day, according to Diaz de la Vega, he learned that his cousin would be landing at 11 or 12 at JFK. His cousin would stay at the airport for a few hours while waiting for a connecting flight to Boston where he was participating in a student exchange program. Diaz de la Vega stayed with his cousin at JFK for two hours. That day, assuming he had been fired from Thalassa, he called the bar manager at the hotel and said he could work. Diaz de la Vega assumed he had been fired because he did not get a call from the restaurant and, "When you are absent from your job you are supposed to get a call."

On cross-examination Diaz de la Vega acknowledged that when he went to work at Thalassa on Friday April 25 he had already accepted employment at the Tribeca Grand. He agreed that he found the job at the hotel before Friday April 25. Diaz de la Vega stated that he worked the same shift at the hotel that he had been working at Thalassa, but he said that sometimes he did not work at the restaurant on both Friday and Saturday. Further, according to Diaz de la Vega, he could have gotten a friend to cover his shifts at Thalassa on Sunday and Monday. Diaz de la Vega testified that other Thalassa employees have two jobs: they work one job during the day and at Thalassa at night. Diaz de la Vega did not testify that he had a day job at the Tribeca Grand Hotel.

Sara Legenhausen, formerly the bar manager at the Tribeca Grand Hotel, testified pursuant to subpoena. She had hired Diaz de la Vega but she could not recall her conversation with him. She testified that she always asks potential employees if they have other employment because most bar workers are usually students, actors or musicians. Since she did not recall her conversation with Diaz de la Vega she could not say whether he told her he had another job.

## 2. Julio Lantigua

Julio Lantigua began work as a Captain at Thalassa in July 2007 right after he received his Bachelor's degree in political science in June 2007. Lantigua attended some pre-law classes in the spring of 2008 and he took the LSAT and applied to law school, intending to be a full time student. Lantigua testified that he began his studies at the City University Law School in August 2008 as a "9 to 5" full time day student.

Lantigua testified about an occasion in the Spring of 2008 when he was sitting at a table with Maitre d' Kurt, a Captain named Fausto and a few Busboys. Fausto complained that the Sommelier was not dressed and ready for duty; as a result, the Captains had to perform the Sommelier's duties on the floor. Lantigua told Kurt to tell the Sommelier he should be on the floor at 5:30 because the Captains had other things to do. According to Lantigua, Kurt became upset and said he had been in the restaurant business since 1981 and that the Captains should not be telling him how to run a restaurant. Lantigua stated that Kurt said, "Because of his training with the Turkish army he'll take care of me in a second" or "he could take care of me." Later, Lantigua shook hands with Kurt and apologized, saying he had not meant to tell Kurt how to do his job. Kurt apologized to Lantigua saying he did an ugly thing in front of the co-workers.

Kurt testified that he never threatened an employee with physical harm. He explained that he had completed mandatory military service in Turkey, his native country. After basic training he was assigned as the personal assistant to a General. Kurt stated that he never threatened anyone with the use of physical defense training. Kurt did not address the particular incident related by Lantigua.

Lantigua testified that from January to April 2008 his schedule was arranged so that he could attend his pre-law classes. Beginning in April 2008 Kurt began to schedule him for work on days that conflicted with his school schedule. Lantigua had either to miss school or ask another Captain to exchange shifts.

On direct examination, Lantigua testified that before the employees began complaining about the tip pool he had been working six or seven shifts per week, including four or five dinners and one or two lunches. However, at the end of June or beginning of July he was reduced to two shifts per week and was given only two dinners. According to Lantigua, he would receive a call at home saying that he should not come to work because the restaurant was slow.

On cross-examination Lantigua testified that his regular schedule would include three, four or five dinners and two lunches, or maybe five dinners and one lunch. A full schedule would range from 30 to 40 or 45 hours per week. December is a busier month and would generate more work hours. February is a busy month. July is a slower month. Lantigua testified that Kurt began scheduling him for fewer hours in April 2008; that month he worked a 30 to 35 hour week. Then, Lantigua changed his testimony and said that in April he experienced conflicts with his school schedule and he had to find another Captain to take his scheduled hours; Lantigua would take the undesirable nights such as Sunday, Monday, and Tuesday when fewer tips would be expected. Lantigua maintained that the restaurant harassed him by switching his shifts to the nights he went to school. Lantigua's affidavit does not mention anything about undesirable shifts or having to switch with other Captains. Lantigua's affidavit states that in May and June the restaurant began scheduling him for fewer shifts; instead of five

8          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

shifts he would have only three or two, and the restaurant started calling him before his shift to tell him that he was not needed. Lantigua testified that he worked fewer hours in June that he had in April 2008.[21]

Zapantis denied that he had reduced Lantigua's hours.

A record of Lantigua's hours worked in 2007 and 2008 was received in evidence. For 2008 these are summarized as follows:

| | |
|---|---|
| 1/08 to 1/28/08 | 167.63 |
| 1/29/08 to 3/3/08 | 181.11 |
| 3/4/08 to 3/31/08 | 101.41 |
| 4/1/08 to 4/28/08 | 116.48 |
| 4/29/08 to 6/2/08 | 131.59 |
| 6/3/08 to 6/30/08 | 138.74 |
| 6/31/08 to 7/14/08 | 34.10 |

These figures show that Lantigua's hours increased in every month from March 2008 when the employees first complained about the tip pool.

Lantigua's earnings show the following weekly pay checks beginning in March 2008:[22]

| | | | | |
|---|---|---|---|---|
| 3/03 | 701.1 | 5/12 | 620.05 |
| 3/10 | 401.58 | 5/19 | 744.34 |
| 3/17 | 605.73 | 5/26 | 319.05 |
| 3/24 | 667.43 | 6/02 | 178.67 |
| 3/31 | 190.10 | 6/09 | 536.98 |
| 4/07 | 682.17 | 6/16 | 587.96 |
| 4/14 | 492.90 | 6/23 | 508.96 |
| 4/21 | 659.38 | 6/30 | 783.43 |
| 4/28 | 708.66 | 7/07 | 199.32[23] |
| 5/05 | 544.66 | 7/14 | 428.06 |

These figures do not bear out Lantigua's testimony that he was forced to take less lucrative shifts because of conflicts in his school schedule after he began complaining about the tip pool in March 2008. In March Lantigua took home $2565.64, or an average of $513 per week. Lantigua's average weekly take home was greater in April, May and June than it had been in March: In April he took home $2543.11 for an average weekly net of $635.77. In May Lantigua took home $2228.10 for an average weekly check of $557. In June Lantigua's net pay was $2606, averaging $521 per week. Lantigua's take home pay was greater than it had been in March even though the tip pool was reconfigured in April to provide a greater share of tips to the Busboys so that Lantigua and the other Captains received fewer points than they had previously, thereby decreasing their total tip earnings.

Lantigua testified that on July 25, 26 or 27, 2008 Kurt called to tell him that he was no longer needed because they were training some new Captains. When Lantigua went to pick up his check Kurt told him he was fired and that he had done it to himself by turning the Busboys against the employer. As shown above, Lantigua's last paycheck was dated July 14, 2008.

Zapantis testified that in July 2008 Lantigua did not come to work on several occasions when he was scheduled. The restaurant was closed on July 4 so that the floors could be redone. On July 5th a party of 80 to 100 was scheduled for a luncheon. All the staff was asked to come at 9 am that day to put the dining room back together. The other employees came early, but Lantigua did not come to work and he did not call. After the party was served Zapantis left a phone message for Lantigua but the latter did not return Zapantis' call. However, Lantigua appeared for his next scheduled day, possibly a Wednesday. Another large luncheon was scheduled that week and the staff was asked to come at 10 am. Lantigua appeared at 11:45 and in response to Zapantis' question about his lateness and his failure to call in, Lantigua replied that the trains were late. Zapantis sent Lantigua home that day. The next week, Lantigua was scheduled to work but he did not call and he did not come to work. Then, Kurt informed Zapantis that Lantigua had telephoned and said he would be available only two days per week because he was working elsewhere. Zapantis testified that he needed a full time person.

Kurt testified that Lantigua returned from a vacation just as the restaurant was going into peak season for an event in July known as Restaurant Week. Lantigua informed Kurt that he could only work one or two days per week, possibly Friday night and Saturday beginning at 6 pm. Kurt told Lantigua to speak to Zapantis and then Kurt informed Zapantis of Lantigua's reduced availability. Kurt testified that he did not recall seeing Lantigua when he came to pick up his check.

When asked about his termination on cross-examination, Lantigua acknowledged that the restaurant was closed over the July 4th weekend, but he did not recall that there were private parties scheduled right after the July 4th weekend. He did not recall being asked to report early after July 4th for a private party and he did not recall being told that if he did not work he would be fired. Lantigua denied that he failed to come to work when scheduled and he denied that Zapantis called him to say that he had failed to come to work early as requested.

Lantigua denied informing Zapantis that he wanted to decrease his hours and work only a shift on Friday or Saturday night. Lantigua stated that he has not worked since he began law school in August 2008.

### 3. Manuel Lizondro

As described above Busboy Manuel Lizondro was among those employees who questioned the tip pool arrangements in meetings with Kurt in February 2008 and on subsequent occasions which he did not date. Lizondro testified that Kurt told him and other employees that they should stop asking about the tips, that Kurt promised him another position if he stopped what he was doing and that Kurt threatened employees with discharge by referring to the employer cutting out a cancer. Lizondro stated that Kurt told him to leave the restaurant if he did not like the work.

Lizondro testified that he received pay and tips as a Busboy. He was assigned to polishing glasses and silverware and to a coffee station. He also served bread. On one occasion Kurt sent him to the floor to explain the menu and he was embarrassed because he did not speak English and he had not been trained. Asked about cleaning the bathrooms, Lizondro recalled that the restaurant "always sent a girl there at night so she could check the bathroom and clean them. She would check the ladies' room and the men's room." But, Lizondro testified, beginning in 2008 he was the person "always" as-

---

[21] At a certain point during cross-examination, Lantigua refused to answer the questions posed by Counsel for Respondent, and he insisted on answering questions that were not asked. It was clear that he had become an uncooperative witness who, despite an instruction from the ALJ, persisted in giving unresponsive answers.

[22] These figures represent net pay.

[23] The restaurant was closed over the July 4th weekend.

signed to clean the bathroom and the bathroom floor. Lizondro stated that sometimes Kurt, or Zapantis or Steve Makris sent him outside to sweep even though the dishwashers always did that.

Lizondro testified that from January 2007 when he was hired he had the same schedule with Monday and Tuesday off to avoid extra babysitting costs while his wife worked. Lizondro said he generally worked 40 hours per week. Kurt changed the schedule after he went to ROC-NY. Sometimes Kurt would send Lizondro home when he got to the restaurant saying that he was not needed. Before the tips became an issue Lizondro had not sent him home, but had called him before he left for work.

Lizondro testified that his hours were cut after he went to ROC-NY in February 2008. After he first complained about being given fewer hours he was given more work by the restaurant, but then these hours were reduced by Kurt. Lizondro said his checks were low and his tips were missing so he decided not to work at the restaurant. As has been described above, Lizondro testified that at a meeting in June 2008 on his last day of work Zapantis told him that if he did not like the tips he should get out and not work at Thalassa any longer. Zapantis told him he could leave. After the meeting, Lizondro told Kurt that he would not come back to work and Kurt replied, "Do whatever you want." Lizondro stated he never went back to the restaurant after that day. However, Lizondro's affidavit places this meeting with Zapantis in April 2008.[24] On cross examination Lizondro was given an opportunity to reread his affidavit. He affirmed that the meeting took place in April and that was when he decided to leave the restaurant. The affidavit places this meeting on the last Saturday in April 2008. Continuing his testimony, Lizondro stated that at that meeting Zapantis told him to stop working if he wanted to. When it was pointed out to Lizondro that he had worked at Thalassa in May and until June 2008, he said he was confused about the months because that was too long ago. He continued his testimony saying that after the meeting in April he decided that he would no longer work at Thalassa and he began to look for jobs elsewhere.

Summing up his reasons for quitting work, Lizondro said he was embarrassed, he was tired of his changing schedule and of being sent home, he was tired of being asked to clean the bathroom and being asked to sweep outside and he was offended. He told Kurt he would not come back to work because he was treated badly just for asking for his rights.

Respondent's records show that Lizondro worked the following hours each week beginning with the pay period end dates shown below:

| | 2007 | | |
|---|---|---|---|
| 7/02 | 36.87 | 10/15 | 37.76 |
| 7/09 | 23.64 | 10/22 | 38.64 |
| 7/16 | 39.41 | 10/29 | 39.39 |
| 7/23 | 31.36 | 11/06 | 38.91 |
| 8/13 | 36.90 | 11/12 | 38.75 |
| 8/20 | 36.73 | 11/19 | 32.47 |
| 8/27 | 21.46 | 11/26 | 35.06 |
| 9/03 | 23.54 | 12/03 | 52.50 |
| 9/10 | 23.09 | 12/10 | 41.59 |
| 9/17 | 34.14 | 12/17 | 52.19 |
| 9/24 | 37.82 | 12/24 | 50.40 |

| 10/03 | 31.20 | 12/31 | 31.16 |
|---|---|---|---|
| 10/08 | 38.19 | 10/15 | 37.76 |
| | | 2008 | |
| 1/07 | 23.86 | 3/31 | 33.24 |
| 1/14 | 24.36 | 4/07 | 45.79 |
| 1/21 | 16.39 | 4/14 | 22.48 |
| 1/28 | 39.14 | 4/21 | 37.00 |
| 2/04 | 40.21 | 4/28 | 42.44 |
| 2/11 | 47.89 | 5/05 | 40.00 |
| 2/18 | 40.00 | 5/12 | 53.59 |
| 2/25 | 22.83 | 5/19 | 40.77 |
| 3/03 | 31.00 | 6/09 | 8.15 |
| 3/10 | 24.43 | 6/16 | 7.64 |
| 3/17 | 38.04 | 6/23 | 7.64 |
| 3/24 | 43.35 | 6/30 | 7.00 |

These figures show that Lizondro was paid for 150.93 hours in February 2008, or an average of 37.73 hours per week. In March he was paid for 170.06 hours, or an average of 34.10 hours per week. In April 2008 he was paid for 147.71 hours, or an average of 36.92 per week. In May 2008 he was paid for 134.36 hours, or an average of 44.78 per week for the three weeks he worked that month.[25] These figures show an average fluctuation downward of no more than three hours per week in the amount of hours Lizondro worked from February through April 2008, at the height of the tip controversy. Further, Lizondro's hours increased in May. Thus, the record does not support Lizondro's testimony that his hours were cut after he began complaining about the tips. Indeed, Lizondro worked far fewer hours per week in January 2008 before the tip controversy arose than he did after the employees began complaining to management.

Kurt testified that two cleaners are employed by the restaurant to clean during the day. The bathrooms cannot be cleaned at night because the restaurant cannot operate if a restroom is closed. He said he has never asked any Busboy to clean the bathroom floor. Kurt said that he himself has emptied full trash cans from the bathroom and he has on occasion asked a Busboy to do that task. Zapantis testified that Busboys do not clean the bathrooms.

Kurt testified that Lizondro told him he wanted to quit his job to go to school. Kurt told Lizondro to speak to Zapantis about his schedule. Kurt suggested that Lizondro should go to school during the day and come to work at 5 or 6 to earn a little bit of money. Kurt testified that he tried to convince Lizondro to continue working. However, Kurt stated, Lizondro told him he had enough money saved up. Kurt testified that he did not fire Lizondro. Zapantis recalled that Lizondro was a very good worker. Zapantis testified that he did not reduce Lizondro's scheduled hours in May and June 2008. Zapantis denied firing Lizondro; he said that Lizondro gave his resignation orally to Kurt because his wife had recently given birth and he was going back to school. The figures above show that Lizondro seemed to have worked only one day a week in June. This is consistent with Kurt and Zapantis' testimony that Lizondro wanted to go back to school and that he reduced his hours due to a recent birth in his family. The figures are also consistent with Lizondro's testimony that he had begun looking for another job in April.

---

[24] The affidavit was given November 13, 2008. Lizondro testified herein on September 17, 2009.

[25] The record does not show why Lizondro took a week off in May.

*E. Events in October 2008*

### 1. October 1, 2008 visit to Thalassa

On Wednesday October 1, 2008, Julio Lantigua went to the restaurant with a group of 20 to 25 other people from ROC-NY among whom were one current employee, Jose Luis Vargas, and one former employee of the restaurant, Manuel Lizondro. Lantigua testified that the restaurant was not busy; only one or two tables were being served. Lantigua entered the restaurant first and saw Kurt and the hostess at the front of the room. According to Lantigua, Kurt greeted him and gave him a bear hug. Then, Lantigua told Kurt that he was not there for dinner and at that point Kurt saw the other ROC-NY supporters entering the restaurant behind Lantigua. Kurt looked surprised and asked, "What the fuck is this?" Lantigua said that they were members of the organization and they had a letter to deliver to Steve, to the company, to George and Julia. Lantigua said the people were represented by Attorney Colodny of Urban Justice. Lantigua said the letter was about labor law violations that Thalassa was engaging in.[26] He wanted the restaurant to take care of the issues in 10 or 15 days or he would file a formal complaint with a court. Lantigua testified that Kurt said he could not take the letter. The proper channel for the letter was from Lantigua's lawyer to the restaurant's lawyer. Lantigua denied shaking the letter in Kurt's face. Kurt said Lantigua was breaking the law by being there with so many people. Then Zapantis came to the front of the restaurant. At some point Kurt asked Vargas what he was doing there. He said Vargas should not listen to Lantigua.

Jose Luis Vargas testified that he went to the restaurant on October 1 to deliver the letter.[27] Vargas stated that he could not properly hear what Lantigua said to Kurt. However, he heard that the letter was about problems they were having and about a lawsuit. At one point Kurt asked Vargas, "Are you involved in this thing?" Vargas did not respond to Kurt's question.

Kurt testified about the October 1, 2008 incident. He recalled that Lantigua came in at about 5:30 or 6 pm with a group of people. The restaurant was open for dinner service and Kurt had been standing at the bar speaking to a regular customer. Kurt had his back to the door when he heard a noise and turned to greet Lantigua whom he saw entering the restaurant. Then he saw a group of people walking in. Lantigua tried to hand Kurt a letter, saying "take this, you are a manager too." Lantigua shook the letter in the air. Kurt replied that he was not a manager and that Lantigua should send the letter in the mail. He refused to take the letter. The group was gathered around the hostess station behind Lantigua and some were blocking the entrance to the restaurant. Kurt saw Vargas in the group and greeted him. A woman used profanity and told Kurt to take the letter. Kurt asked the people to leave. Zapantis came to the hostess station and asked the group to leave once or twice. Eventually, the group left. Kurt testified that during this incident Lantigua did not tell him what was in the envelope. Later that evening Steve Makris came to the restaurant and Kurt, Makris and Zapantis looked at the videotapes of the incident recorded by the restaurant's surveillance system. The three

men went to the local police precinct; Kurt left the station house before anything of significance occurred.

Zapantis recalled that on October 1 he was in his office when he was paged to come to the front of the restaurant. Zapantis went upstairs and stood next to Kurt. He saw a group of about 25 people including current employee Jose Vargas. The people were wearing casual street clothes, not the type of business attire worn by the restaurant's regular customers. Zapantis stood at the head of the group holding in the air a letter which he wanted Kurt to accept. Lantigua repeatedly told Kurt that he had a certified letter from the group's lawyer. Kurt told Lantigua that it was not his position to accept a letter and that Lantigua should take the proper path. If the group had legal counsel that person would know how this should be done. Kurt repeated that the lawyer knows the proper path and asked the group to leave. Zapantis testified that Lantigua did not mention "labor issues" when speaking to Kurt about the letter. Zapantis thought the group was in the restaurant for about 15, 20 or 30 minutes. After the group left the restaurant, Zapantis called Steve Makris who came to the restaurant and looked at the surveillance video. Zapantis and Makris went to the precinct to file a report but they were asked to come back another day.

Chef Abrahante testified that he went to the front of the house when he noticed a large group of people. Lantigua was there with about 20 others standing behind him. Lantigua showed Kurt a letter and said it was for Makris. Kurt refused the letter. According to Abrahante Kurt asked what was in the letter and Lantigua replied that everything was in the letter. Lantigua and Kurt went back and forth with Lantigua urging Kurt to take the letter and Kurt refusing to accept it. Abrahante asked Zapantis to come to the floor because there was a "situation." When Zapantis came up, Lantigua said they were there to give him a letter; Kurt and Zapantis continued to refuse the letter. Zapantis asked the group to leave because there were customers in the restaurant. After Zapantis repeated his request a few times the people left. Abrahante stated that during this confrontation there was no discussion of the content of the letter.

Steve Makris testified that on October 1, 2008 he was at the office in New Jersey when he was told that a large, rough looking gang type of group led by Julio Lantigua was in the restaurant. Makris heard that current employee Jose Luis Vargas was part of the group. Makris went to the restaurant and looked at the surveillance videotape. Then he went to the police station. He spoke to an officer who asked him whether the group had broken anything. The officer told Makris to call if the group returned. Later that night Makris described the event to New York City Police Officer Nick Giakoumis. Makris knew Giakoumis from the time the officer had responded to a theft at the restaurant.

A DVD of the surveillance video was played at the instant hearing and admitted into evidence.[28] The indoor portion of the video shows the bar area with the bartender handing a menu to the one customer seated at the bar. The outdoor portion of the video shows a group arriving at 6:06.41 pm. Members of the group are holding umbrellas and it appears to be raining. The people in the group are wearing casual clothes of all types, including jackets and hooded sweatshirts. The ALJ noted on the record that, "These people look just like the people I stood next to on the subway this morning coming to work." Indeed,

---

[26] Lantigua's testimony is garbled in the transcript at various points. However, Lantigua clearly testified that he told Kurt the letter concerned labor law violations.

[27] Vargas has worked at the restaurant as a Busboy since March 2007. Vargas testified through an interpreter.

[28] The DVD has no sound.

the group appeared to be typical New Yorkers who were not dressed for a business or expensive restaurant setting. The video does not provide any details of the events inside the restaurant and discloses only that a group of people were standing in the hostess and bar area of the restaurant. The surveillance video shows that the group left the restaurant at 6:11.22 pm.

### 2.  October 2, 2008 Questioning of Jose Luis Vargas

Vargas testified that on Thursday October 2, 2008 he got to work at 3:30 pm and Kurt told him to change and go back to work. At 5:30 Zapantis took him outside and said, "You are fucking stupid guy. . . . Why are you doing all this? . . . You don't know what you are doing." Vargas asked whether he should go to work or whether he was being fired. Zapantis told him to go to work. Later Kurt took Vargas to the office where he met with Steve Makris. Abrahante and Zapantis were there as well as two men with police badges who were not in uniform. Vargas testified that Abrahante translated for Makris. Makris asked Vargas, "What do you want? . . . Do you need some money?" Makris played the surveillance video and asked Vargas who the people were and who else was involved. Vargas replied that if Makris wanted to know he should speak to his lawyer. Makris insisted that Vargas answer his questions. Vargas told Makris that the people in the video were ex-workers and friends. Vargas repeated that he did not know what the people wanted and that Makris should speak to his lawyer. Vargas had the attorney's card in his locker but Makris did not let him get the card. Vargas testified that Abrahante stayed in the office for 25 to 30 minutes and then left. After about an hour, according to Vargas, Makris told him to get his attorney's card and then the officers left. Vargas said he was in the office alone with Makris who played the video again and asked about the people in the video. When Vargas told Makris to call his lawyer Makris asked whether Vargas had been in jail and told him to talk to him saying, "If you don't you are going to be arrested because the police are coming." Then two uniformed officers came to the office and Makris told them that Vargas should be arrested because he had come to the restaurant with a group of people who looked like gangsters. The officers looked at the video. The officers asked Makris whether the group had broken the glass or pushed the doors open to force their way in. Makris said no. The officers asked whether Vargas worked at the restaurant. Eventually, Vargas told the officers it was a labor dispute and they said there was no reason to arrest him. After the officers left Abrahante and Zapantis returned to the office and Vargas asked whether he had been fired. Makris told Vargas to go home and said he would be called if he were to return. Vargas said he was in the office for a total of 2 to 3 hours before he went home. On Friday October 3 Kurt telephoned Vargas and told him to come to work on Saturday. Vargas was not sure if he was paid for October 2 and 3.

Abrahante testified that on October 2 he saw Vargas at the family meal. At the end of the meal Vargas asked Kurt if he was working and Kurt said yes and told him to go and change and come to work on the floor. At about 6:30 pm Steve Makris called Abrahante to the office to translate for the Spanish-speaking Vargas. Abrahante met in the office with Makris, Zapantis, Kurt and Vargas. Makris played about two minutes of the surveillance video. Makris asked Vargas who the people were. Then two plainclothes officers came in and showed their badges to Vargas. They asked Vargas why he was with the group and what was in the letter. They asked "what is this all about" and "do you know any of these people." Vargas said he

did not know what was in the letter and told them to talk to his lawyer. Kurt and Zapantis left and Vargas went to retrieve the lawyer's business card from his locker. At some point the plainclothes officers left and two uniformed officers appeared and gave their names. They asked Vargas whether he knew anyone in the video and they asked what it was all about and what was in the letter. Vargas replied that he was in the video but he did not know the others. He said, "This is all about money." The officers left after about 20 minutes. Abrahante testified that Zapantis asked him to translate for Vargas that he should take a couple of days off and then Zapantis would call him with a schedule to return to work. Zapantis did not tell Abrahante to tell Vargas that he was suspended. Abrahante testified that he was in the office for about 1/2 hour; this was the entire time that Vargas was in the office.

Steve Makris testified that on October 2, 2008 Zapantis telephoned him at the office in New Jersey to say that Vargas had appeared for his scheduled shift. After work Makris drove to the restaurant. At Makris' request, Police Officer Giakoumis came to the restaurant accompanied by another plain clothes officer. Makris told Giakoumas that he wanted to know about the group that had been in the restaurant the night before and why the people had come to the restaurant. Makris thought the video showed "shady" people and he thought it was strange that all those people would come to deliver a letter. Makris lives above the restaurant with his wife and children; the building has no doorman and the neighborhood is quiet at night. Makris explained that he had experienced "situations" on the roof on previous occasions.

Makris summoned Vargas to the downstairs office. Zapantis and Kurt were also present with the two plainclothes officers. The officers showed Vargas their badges. Makris testified that he asked Vargas who had come to the restaurant with him the day before. Vargas responded that they were "friends and family" and then he said, "I don't know." Makris played the surveillance video a number of times and asked Vargas about the people. Vargas did not want to tell Makris who they were. Makris testified that because Vargas did not believe the plainclothes officers were real members of the police force he called for uniformed officers. After the uniformed officers arrived Vargas told Makris to "speak to my lawyer." Eventually, Vargas gave Makris a card from Urban Justice. Vargas told the officers that the group was there to deliver a letter and the issue concerned money. The uniformed officers concluded that the incident was a civil matter and they left the restaurant at 7:30 or 8 pm.

The business card given to Makris bears the title "Urban Justice" and identifies David Colodny as a Senior Staff Attorney, Community Development Project. The card contains the address and telephone information for the Urban Justice Center and at the bottom there is a legend reading, "individual rights—social change."

Zapantis testified that on October 2 at about 8 pm he was present in the office with Steve Makris, two plainclothes officers, Maitre d' Kurt and Chef Abrahante.[29] Vargas was asked to come to the office. At Makris' request Abrahante translated for Vargas. Makris played the surveillance video for the group. Makris asked Vargas who was in the group and what was in the letter. Vargas said he did not know and that Makris should speak to his lawyer. Makris asked who these people were and

---

[29] Zapantis was in and out of the office to attend to service upstairs.

what their intentions were. Vargas only replied "you have to speak to my lawyer." Zapantis did not recall that Vargas said anything about suing the restaurant. Vargas had questions about the plainclothes officers with badges and eventually two uniformed officers came to the office. Later, Vargas gave Makris his attorney's business card. After the police left, Zapantis asked Vargas if he wanted to continue working that evening or if he wanted to go home. He did this because Vargas seemed nervous and distressed. Vargas asked to go home and Zapantis told him to come back on his next scheduled day. Zapantis testified that Vargas was paid for the evening, including tips.

Kurt testified that he saw Vargas in the office with Makris, Zapantis, Abrahante and two men wearing badges on their belts. Kurt recalled that he was in and out of the office that night; he did not testify about what was said by anyone in the office.

On or about October 3, 2008 Makris received a fax from the Urban Justice Center containing a notice that certain workers intended to pursue legal claims against the restaurant for violations of City, State and Federal labor laws. The individuals named included Julio Lantigua, Manuel Lizondro, Jose Luis Vargas, Diego Diaz de la Vega, Sebastian Lopez and others.

### F. The Employee Manual and the Menu Tests

Zapantis testified that Thalassa has an Employee Manual that is given to every employee hired by the restaurant. The Manual was reissued to employees about October 10, 2008. The restaurant menu is attached to the Manual; the menu may change over time but the rest of the Manual has not been revised. The Manual was introduced into evidence. It contains rules and information applicable to a wide variety of employees beginning with the hostess who greets entering diners and continuing to details of set up and service, instructions for answering the phone, details of opening and closing the restaurant, and general rules of hygiene and deportment such as "NO BIRTHDAY SINGING under any circumstances." I note that the Manual states, "All servers and runners **MUST KNOW** menu descriptions."

A number of documents titled "Thalassa Menu Test" were introduced into evidence. The one page tests were signed at the top by employees of the restaurant. The test consisted of seven questions such as "what is an avgolemono sauce?" or "what is a petit four?" or "which bones cannot be removed when deboning a fish?" Some of the tests had been left blank by the individual employees, some had been partially answered and some tests showed a wide knowledge of fish species and sauce preparation.

Busboy Sebastian Lopez testified that at a pre-shift meeting Zapantis and Kurt told the employees that they had to have a detailed knowledge of the menu. Lopez said this occurred "at the end of the year" in 2008. According to Lopez the employees were told that they had to know everything on the menu including the food and condiments otherwise they would be fired. Lopez did not learn all the menu items and he was not disciplined for this failure. He still works for Thalassa. Lopez did not testify that he was given a menu test.

Busboy Jose Vargas testified that when he was first hired in March 2007 he was not told to memorize the menu. Before 2008 Vargas had not been trained on the menu items and had not been tested on his knowledge of the menu. Vargas stated that in the first week of October 2008 Kurt gave the employees a manual and asked them to sign for it. The employees were

told to learn what was in the manual so that they would know how to do their jobs.

Lizondro and Diaz de la Vega testified that they had never seen the employee manual. Vargas testified that he had not been given an employee manual before the first week of October.

Victor Lagos was hired as a Food Runner in May 2003. After approximately 9 months or a year he was promoted to Captain. He testified that the restaurant usually promotes from within. The managers know whom to promote because "they see your performance and they test you." Lagos stated that everyone gets a test. Captains are tested on knowledge they must have, Food Runners get a different test and Busboys are asked simple questions. As a Runner Lagos had to know and explain the dishes he brought to the table, for instance the type of fish and the description of the sauce. As a Captain he has to describe 10 to 15 different species of fish and their countries of origin. Lagos said the tests are either oral or in writing. If an employee does not know the answer to a question, "We try to teach them so they will learn." Lagos said he has not heard that any Thalassa employee was discharged for failing a test.

Zapantis testified that menu item tests are given annually or several times a year.[30] The menu test is a way to ascertain the staff's knowledge about the restaurant and the menu and to see which employees need more help. The restaurant prefers to promote from within; the more knowledge an employee has the faster he will move up the ladder. A menu item test was given to all employees in October 2008 including the busboys. Zapantis stated that a few tests were returned blank. Some employees could not read and they were given a verbal test. No employees were disciplined as a result of the test. Zapantis testified that the test was given in October 2008 to prepare for the holiday season starting at the end of November so that management could train the employees for the busy season.

### G. ROC-NY Activities in January 23, 2009

David Jimenez worked for ROC-NY. Beginning in the summer of 2008 he coordinated meetings involving Thalassa workers and the Urban Justice Center.[31] Jimenez also conducted street outreach in an attempt to recruit employees. On January 23, 2009 beginning at 10 pm Jimenez conducted outreach near Thalassa in order to meet employees with whom he had not yet spoken. He was later joined by ROC-NY employees Jeff Mansfield and Cecilia Crudo and Crudo's niece. The group stood on the corner of Franklin and Hudson Streets 1/2 block from Thalassa. At around 11 pm Jimenez approached an employee who had just left the restaurant.[32] Jimenez introduced himself as a ROC-NY employee and asked what was going on in the restaurant. The employee seemed startled and afraid. He said, "No, no, no, there's no problems" and he walked away. Jimenez later learned from a Thalassa employee that he had spoken to Manuel Segundo. Jimenez testified that he was doing initial footwork by introducing himself to employees and that he was not trying to get people to sign anything. Jimenez did not follow Segundo to the subway station.

Jimenez testified that a few minutes after Segundo walked away Steve Makris and a tall person with a beard emerged from

---

[30] The General Counsel subpoenaed the menu item tests. Respondent was only able to locate tests from the years 2002, 2004 and 2008.

[31] Jimenez had been with the group that visited the restaurant on October 1, 2008. He did not testify about that incident.

[32] Jimenez spoke Spanish to the employees.

the restaurant. The two men stood on the corner while Makris spoke on a cell phone. Jimenez heard Makris ask, "Where are they. I don't see them." Makris and the other man stood on the corner for a while and then returned to the restaurant. Jimenez testified that his ROC-NY companions were there when Makris appeared.

Close to midnight, more employees left the restaurant. Jimenez spoke to three people who appeared to be kitchen employees; he introduced himself and asked what was going on in the restaurant. The group spoke for a while. Then Jimenez saw Steve Makris on a corner about 1 ½ blocks from the restaurant. Jimenez walked up to Makris and told him that what he was doing was illegal.[33]

Busboy Manuel Paguay testified that he is also called Manuel Segundo.[34] Segundo stated that on January 23 he left the restaurant for home at about 11:30 pm or midnight. Segundo had received his paycheck that day. As he headed for the subway he saw two groups of two people on two different corners. Two people approached him and told him to sign something so that he could win a lot of money.[35] Segundo replied that he did not know what they were talking about. After being asked whether his name was Manuel, Segundo told the people his name was Antonio and he had been working at the restaurant less than a month. Segundo testified that he was frightened because he was carrying his pay. The people followed Segundo so he went into a market and waited 15 or 20 minutes. When Segundo left the market and proceeded to the subway he was followed by three or four women who told him to sign so that he could win a lot of money from a lawsuit. Segundo walked down the stairs to the train and the women followed him to the platform and got on the train with him. They continued to ask him to sign the papers. After a few stops, Segundo left the train and called the restaurant. He told employee Victor Lagos that some people had followed him and that there were a lot of people on the corner stopping employees as they left the restaurant. Segundo told Lagos to have Steve Makris do something because there were a lot of people stopping the employees.

Victor Lagos testified that Manuel Segundo called him at work between 10:30 and 11 pm one night just as the restaurant was about to close. He asked to speak to Kurt or Steve Makris. Segundo told Lagos that there were some people asking him if his name was Manuel and if he worked at Thalassa. Segundo said he was on the corner near Thalassa. Lagos told Segundo to stay where he was and that he would inform Makris and Kurt. Lagos informed Makris that Segundo had called to say there were people on the corner asking his name and if he worked at Thalassa. Makris left the restaurant at that point. Then, Makris called Lagos and said he was there but he could not see Segundo. Lagos called Segundo on his cell phone but Lagos did not answer. Finally, Makris returned to the restaurant and resumed eating his dinner.

Kurt testified that the night of January 23, 2009 Lagos informed him that Segundo had called him at the restaurant. Segundo said he had been approached by some people who wanted him to sign some papers for a claim and he was afraid. Kurt informed Steve Makris who was then dining at the restau-

rant. Kurt recalled that after receiving the information Makris left the restaurant alone. Kurt did not know what kind of claim the papers referred to.

Steve Makris testified that Kurt informed him that Segundo was at the train station and he was nervous and concerned because someone was making him sign something. Makris recalled that he and Kurt walked to the train station and then returned to the restaurant. Then, Makris went out alone and saw three people but he did not speak to them. Later that evening Makris followed behind the kitchen staff as they went home. Makris explained that the employees were nervous so he walked behind them a little way. Makris saw a man approach the kitchen employees; he did not hear anything about signing a paper. The next day a chef informed Makris that the employees told the man to leave them alone.

Segundo said that after the incident on January 23 he told Zapantis and Steve Makris about what had happened that night. In response to questions posed by Counsel for the General Counsel, Segundo testified that he had spoken to Zapantis about coming to court to testify in the instant hearing but that Zapantis had not asked him about the events of January 23. At first Segundo insisted that he had not spoken to Respondent's attorneys or any attorneys prior to testifying herein. Then Segundo recalled that he did speak to the restaurant's attorneys in their office.[36] Segundo said Zapantis directed him to meet with the attorneys so that he could explain what happened on the night of January 23rd. Zapantis told Segundo that the restaurant had a lawyer, but Segundo testified that he did not know the purpose of speaking to the lawyers about January 23rd. Segundo testified that Zapantis told him it was his choice to make whether he would speak to the attorneys. But Segundo also testified that Zapantis did not say, "If you don't want to go you don't have to." Finally, Segundo stated, "I went to talk to her to tell her what happened that night so that it wouldn't happen again." Segundo testified, "I wanted to tell them what happened to me that night."

### H. The District Court Action

On February 20, 2009 eleven of Thalassa's employees commenced an action in the Southern District of New York pursuant to the Fair Labor Standards Act, encompassing violations of Federal and State Labor Law.[37] Diego Diaz de la Vega, Julio Lantigua, Manuel Lizondro, Sebastian Lopez and Jose Luis Vargas are among the named plaintiffs. Among other violations, the plaintiffs allege that Respondent violated Federal and State laws relating to illegal retention of employee gratuities and charges purported to be gratuities. The plaintiffs allege that managers are not tipped employees within the meaning of the Fair Labor Standards Act and New York Labor Law, and that Thalassa unlawfully required wait-staff employees to share tips with managers.

### III. DISCUSSION AND CONCLUSIONS

#### A. Credibility of the Witnesses

Julio Lantigua, one of the Plaintiffs in the Federal action, testified on direct examination in response to the first few questions by Counsel for the General Counsel that Kurt was the

---

[33] Neither Mansfield nor Crudo nor Crudo's niece testified herein.

[34] I shall refer to him as Segundo. He has worked at the restaurant since November 14, 2001. Segundo testified through an interpreter.

[35] The individuals who spoke to Segundo addressed him in Spanish.

[36] Apparently Segundo met with Respondent's counsel in the summer and in September of 2009.

[37] The plaintiffs are represented by David Colodny, Esq. of the Urban Justice Center and by Shearman & Sterling LLP.

Floor Manager/ Maitre d' of the restaurant.[38]   On cross-examination Lantigua denied that Kurt was ever referred to as a Maitre d'.[39] Lantigua acknowledged that in luxurious restaurants the Maitre d' is in charge of service but he insisted that Kurt was not a Maitre d'. Lantigua thus maintained, contrary to many other witnesses, that Thalassa had no Maitre d'.[40] Lantigua described the pre-shift meetings as taking place from 4:30 to 5:30 after the family meal; at these meetings Kurt assigned the evening's stations to the Captains and Busboys. Lantigua maintained that before the employees had begun complaining about their tips these meetings had taken place only once every six weeks or two months, but after March 2008 they occurred as often as three times per week. I note that three of General Counsel's witnesses testified that the pre-shift meetings took place every day.[41] Respondent's witnesses also stated that the pre-shift meetings took place every day after the family meal. I find that Lantigua shaded his testimony to favor the General Counsel's position in the instant case and also to gain an advantage in the District Court action brought on his behalf. Further, Lantigua's testimony was contradicted by the documentary evidence. He testified that his hours and earnings were reduced after he participated in complaints about the tip pool. However, the figures belie this assertion. When asked about this discrepancy on cross-examination Lantigua became uncooperative and persisted in giving non-responsive answers despite an instruction from the ALJ. Lantigua was also unable to recall certain central facts relating to his claim that he was fired for his concerted activities. Lantigua claimed that he was fired by Kurt on July 25, 26 or 27.  However, Lantigua's last paycheck was dated July 14. Zapantis admitted that he was the one who fired Lantigua because the restaurant needed a full time person. Finally, Lantigua did not recall anything about the incidents after the July 4th holiday; this was the time close to his purported discharge and he should have been able to testify about events around this time. I have grave doubts about Lantigua's forthrightness in this proceeding.  As a college graduate and law school student, who will be an officer of the court if he is admitted to practice, Lantigua may reasonably be expected to testify with precision.  Further, Lantigua's uncooperative and evasive answers on cross-examination are significant in one who is being trained in the law. I shall not credit Lantigua's testimony where it is contradicted by more reliable evidence.

Diego Diaz de la Vega, also a Plaintiff in the Federal action, testified on direct about the titles and duties of Sait and Kurt. On cross-examination, however, Diaz de la Vega became nota-

bly uncooperative in this area. He refused to answer questions, he refused to confine his answers to the questions asked even after being directed to do so by the ALJ and, although he stated that he did not need a translator, he maintained that he could not understand certain common words. For example, right after Diaz de la Vega testified that the Chef was in charge of the kitchen, he was asked whether the Maitre d' was in charge of the front of the house staff and he replied, "I don't know what is 'in charge of.'" The ALJ then went off the record and directed Counsel for the General Counsel to take his witness outside and caution him that if he refused to answer questions on cross-examination his testimony on direct would be stricken from the record. When the hearing resumed Diaz de la Vega did in fact provide answers to the questions that were posed to him in further cross-examination. As described above, Diaz de la Vega claimed to have been fired after asking for a night off, and he testified in response to a leading question that when he went to pick up his check Kurt told him not to make complaints. I am hesitant to credit an answer given to a leading question when the subject matter goes to the very heart of the case before me; a witness can be expected to remember without prompting if an unlawful threat has been made to him in connection with an unlawful discharge. Finally, Diaz de la Vega was not forthright and hid the truth in connection with his new employment at the Tribeca Grand Hotel. At first he testified that he found the job at the hotel "after Kemal fired me." He further testified that he asked for time off not in connection with a new job but because his cousin was flying to New York and had never been in this country before. After the hearing reopened, and after being confronted with evidence that he found a new job before the purported discharge, Diaz de la Vega acknowledged that he had accepted new employment before he asked Kurt for time off on a Saturday, the busiest night at Thalassa. He also acknowledged that his cousin was only laying over briefly at JFK and he acknowledged working at the hotel that Saturday night. My close observation of Diaz de la Vega at the reopened hearing convinced me that Diaz de la Vega's testimony consisted of a series of inventions crafted to meet the problems with the story he had initially told at the hearing. Based on his obvious refusal to answer questions on cross-examination, on his failure to recall an alleged unlawful statement without being prompted by counsel, and on his failure to testify truthfully and fully about his job at the hotel and his cousin's needs, I find that Diaz de la Vega was not a truthful and reliable witness. I shall not credit his testimony where it is contradicted by more reliable evidence.

Manuel Lizondro's testimony was at odds with the documentary evidence. Although he stated that his hours were cut after he joined other employees in complaining about the tip pool, the records show that this was not so. Further, Lizondro's testimony given in September 2009 was inconsistent with his affidavit given just months after the events it described. The affidavit states, and Lizondro confirmed on cross-examination, that he had decided to leave the restaurant in April 2008 when Zapantis told him that he should get out if he did not like the tips. However, on direct examination Lizondro testified that this meeting occurred in June 2008 and that he never returned to the restaurant after that day.  Lizondro admitted that he was confused about the time sequence of events to which he testified. On cross examination he reiterated that the affidavit describing the April 2008 meeting was the correct version of the events. I

---

[38] He also stated that he had been interviewed by Kurt's predecessor, Sait Dogan, whom he identified as a Manager and Maitre d'.

[39] Lantigua stated that in the restaurant industry, a manager does not participate in the tip pool but a Maitre d' does share in the tip pool. If Kurt did not participate in the tip pool the other employees would get a larger share of the pool for the night.

[40] Some of General Counsel's witnesses acknowledged that Kurt was the restaurant's Maitre d'.  Sebastian Lopez testified on cross-examination that Kurt was a Maitre d' at the restaurant.  Manuel Lizondro testified on direct that Sait Dogan had been the Maitre d' and Kurt took his position.  In fact, Counsel for the General Counsel referred to Kurt as the Maitre d' when questioning Lizondro. Of course, the Complaint alleges that Kurt was a Maitre d'.

[41] Sebastian Lopez testified on cross-examination that there is a pre-shift meeting every day at the restaurant. Manuel Lizondro testified that there were regular meetings on the floor at around 5 pm.  Diego Diaz de la Vega testified on direct that the pre-shift meetings took place "every day."

shall not credit Lizondro's testimony where it is contradicted by more reliable evidence.

Manuel Segundo had difficulty testifying to the events he described. His statements were often contradictory. On several occasions, Segundo testified to one fact only to testify to the opposite version when his recollection changed. I believe that Segundo was nervous about testifying and that he gave his answers without adequate reflection. A close reading of his entire testimony leads me to conclude that his testimony must be taken with a grain of salt. It is clear that Segundo was disturbed by the events when he was followed to the subway station late at night and when he was asked to sign a document for a claim. I believe that his recollection of the central facts relating to that night is vivid but that he had trouble relating the exact details of the events. Further, I would not rely on his testimony for any exact repetition of statements made to him by others.

Kemal Kurt was employed by Thalassa as a Captain from November 2006 to April 2007. He returned to work at the restaurant as the Maitre d' in February 2008 and left in May 2009 to work in the hotel industry. At the time he gave his testimony in the fall of 2009 Kurt was employed in another restaurant and he had not engaged in discussions about returning to work at Thalassa. I find that Kurt had no motive to shade his testimony to favor any party in the instant case. My observation of Kurt led me to conclude that he was cooperative with all counsel who questioned him and that he consulted his memory and answered to the best of his recollection. Kurt denied generally some of the allegations of the Complaint which are based on his conduct, and I shall not credit the denials where other witnesses gave detailed and credible testimony to support the allegations. Where Kurt's testimony was specific I formed the impression that it was based on a truthful recollection of the incident about which he was testifying. I do not believe that Kurt would fabricate a narrative. Therefore, in those instances where Kurt gave detailed testimony about an incident in which he was involved I shall credit his testimony.

Tasso Zapantis gave testimony that was limited in certain key areas. Although Zapantis testified in detail about the workings of the restaurant, about specific events relating to certain employees and about events such as the October 1, 2008 visit by ROC-NY, he did not fully address other issues in the case. For example, Zapantis testified generally that he did not warn or threaten employees with termination at pre-shift meetings, but Zapantis did not deny the specific statements that were attributed to him by the various employee witnesses. I shall evaluate Zapantis' testimony in relation to the testimony of other witnesses in my discussion of the separate incidents discussed below. However, where Zapantis' testimony related to certain specific incidents and where he gave a detailed factual narrative, I shall credit his testimony. I do not believe that Zapantis would invent a story and deliver it under oath.

Steve Makris gave limited testimony herein. Makris freely admitted firing Matute because he led most of the wait staff off the floor while diners were seated in the restaurant. I shall credit his testimony.

I credit Ralpheal Abrahante. Abrahante testified forthrightly and was cooperative on cross-examination. He did not seek to shade his testimony to favor Respondent's position.

Sara Legenhausen testified that she hired Diaz de la Vega but she stated that she did not remember the exact conversation

with him. She answered questions based on her general practice. I shall evaluate her testimony accordingly.

The testimony of the other witnesses is credited to the extent discussed below.

### B. Status of Kemal Kurt

The Complaint alleges that Kemal Kurt was the Maitre d' of Thalassa and a supervisor and/or agent of Respondent. Most of the witnesses herein identified Kurt as the Maitre d'. The evidence establishes that Kurt assigned Waiters and Busboys to their stations every day. At the daily pre-shift meetings, Kurt gave the wait staff training about service at the restaurant. Kurt testified that his duties included overseeing service on the floor and he corrected wait staff when they committed errors during service. Kurt interviewed candidates for Captain and Busboy positions to determine their level of knowledge and suitability for the job and he gave his opinion to management; he informed employees that they were hired. I credit Vargas and Diaz de la Vega and I find that members of the wait staff spoke to Kurt when they needed time off, and I find that he had the authority to approve their requests. Although Kurt testified that Zapantis prepared the work schedule for the wait staff he did not deny that he had the authority to approve requests for time off. I credit Abrahante and Vargas that Kurt had the authority to suspend an employee and send him home. Kurt did not deny that he possessed this authority. I credit Makris that Kurt counseled employees about their work performance. The record shows that in contrast to the wait staff, Kurt was not paid hourly; he received pay for each day worked and special pay for extra work. Based on Kurt's authority to assign Waiters and Busboys to their stations, authority to grant time off and authority to suspend employees, I find that Kurt was a supervisor of Respondent.

Unlike the facts in *Victor's Café 52*, 321 NLRB 504 (1996), cited by Respondent, the Maitre d' in the instant case determined the wait staff assignments without direction from any manager, he had the power to discipline employees and he exercised the authority to approve requests for time off. Even if I did not find that Kurt was a supervisor, it is clear that he was an agent of Respondent because he was in a position where employees could reasonably believe that he spoke on behalf of management. He told employees they were hired after he had interviewed them, he counseled employees about their work performance at Steve Makris' request, and he trained employees and corrected their performance on the floor during service. As a result he was vested with apparent authority to act as the Respondent's agent and his actions are attributable to Thalassa. *Victor's Café 52*, supra at 513.

I find that Kurt was a supervisor and agent of Respondent within the meaning of Section 2(11) and (13) of the Act.

### C. The Tip Controversy

#### 1. Timing of the events

The witnesses were not in agreement about the month in which they first concertedly expressed to management their dissatisfaction with the amount of the tip pool. Lantigua testified that in March 2008 he and others raised concerns about the tip distribution with Kurt. Lantigua testified about a pre-shift meeting in March 2008 where Kurt and Zapantis responded to the wait staff's questions about their share of tips for private parties. According to Lantigua this was before Matute was fired, an event which took place on April 9. Diaz de la Vega

also described a meeting where the employees discussed their tips with Kurt in March 2008 right before Matute was fired. However, Diaz de la Vega's testimony indicates that this was the occasion when all but two of the employees walked off the floor; because Matute was fired on April 9 for leading this action, the meeting probably would have taken place not in March but in early April. Lizondro, whose recall of dates was admittedly confused, testified that the employees asked Kurt to investigate the small size of their tips in February 2008.

I find the most plausible sequence of events is that employees began to be concerned about their tips in late February or early March. Lantigua and others including Diaz de la Vega, Lizondro, Menendez, Perez and Fausto raised the issue of tip distribution with Kurt. At a later meeting sometime in March 2008 Kurt and Zapantis reported that the tips were being calculated correctly. At this meeting employees including Lantigua, a Captain of Greek origin named Nick, Diaz de la Vega and Lizondro asked for a tip book that would be open to inspections by the employees. Zapantis refused this request. On a Saturday night in early April the employees walked off the floor and met in the downstairs office to emphasize their dismay that their tips had been much lower than expected even though the restaurant was busy. Only LaRuffa and another employee remained to serve the many diners in the restaurant. Matute was fired on Wednesday April 9.

The employees continued to complain to Kurt and Zapantis about their tips following the Saturday night incident. After a wedding was held at the restaurant and the employees again complained that they did not receive a fair share of the tips Kurt called the New Jersey office and distributed more tip money to the employees. This occurred before Diaz de la Vega's last day, that is, before April 25, 2008. It appears that employees continued to raise the tip distribution issue and to demand a tip book that would be open to inspection by the wait staff.

It is difficult to establish precisely the month in which employees first met with ROC-NY. Lantigua testified that the employees went to ROC-NY because they were afraid they would be fired in the same manner as Matute and LaRuffa.[42] Since both of these employees were fired in April 2008, that would place the first contact with ROC-NY after April 9. Diaz de la Vega also testified that the employees met with ROC-NY in April 2008 at Lantigua's instance. However, Lizondro testified that he and others met with ROC-NY in February and it was after this meeting that LaRuffa was fired. As found above, Lizondro did not have a good recollection of dates. ROC-NY organizer Jimenez, who would be expected to have access to the records that would establish when the employees first went to ROC-NY, did not state when the first contact occurred. He merely testified that he met with Thalassa employees beginning in the summer of 2008. I find that the employees first met with ROC-NY after the second week of April 2008.

### 2. Alleged unlawful statements

No extended discussion is required to find that when the employees discussed their dissatisfaction with the tip distribution

system with managers, supervisors and agents of Thalassa and when they pressed their demands for a tip book, the employees were engaged in protected concerted activities. Similarly, when employees attended meetings with ROC-NY and sought the help of Urban Justice and its attorneys with respect to their earnings, the employees were engaged in protected concerted activities. *Le Madri Restaurant*, 331 NLRB 269, 275–276 (2000); *Saigon Gourmet Restaurant*, 353 NLRB No. 110 (2009).

Lantigua testified that at preshift meetings in April and Zapantis told the employees that if they wanted to avoid the fate of Matute and LaRuffa they should stay quiet and work. Lizondro testified to the same effect: Kurt said if the employees wished to continue working they should stop asking about the tips and they should look to what happened to Matute and LaRuffa. Kurt testified generally that he did not threaten employees with termination. However, Kurt did not deny the very specific phrases attributed to him where he raised the specter of Matute's and LaRuffa's termination as an example to the employees. Zapantis likewise stated that he did not warn or threaten employees with termination. Zapantis is still employed at the restaurant and would be expected to have a vivid recollection of the events. His general denial is not convincing. I credit Lantigua and Lizondro that in April 2008 Kurt and Zapantis warned employees to stop asking about their tips and threatened that they might be fired in the same manner as Matute and LaRuffa. Respondent thus violated Section 8(a)(1) of the Act April 2008 by threatening employees with termination for engaging in protected concerted activities. *National Steel Supply*, 344 NLRB 973, 982 (2005), enfd. 207 Fed. Appx. 9 (2d Cir. 2006).

According to Lantigua, at meetings in April and May, Kurt and Zapantis said they knew what the employees were doing. Kurt and Zapantis likened the unrest over the tips to a cancer and they told the employees that at Thalassa a cancer would be cut out to avoid the spread. Kurt and Zapantis said the employees should cease obtaining legal advice. Lizondro also testified that Kurt told him that when one had cancer it had to be cut off and this was happening at the restaurant. Diaz de la Vega testified that Kurt held a meeting where he mentioned that the economy was in recession and professionals were losing their jobs. He advised the employees to think and said that the restaurant was a toy for the Makris family. Kurt used the analogy to cancer and said he did not want the employees to have the same problems as LaRuffa and Matute. Lopez testified that Kurt told the employees to leave if they did not like their checks; Kurt also spoke about cancer in order to let the employees know that he could fire any employees he did not like.[43] The employees' testimony about the analogy to cancer rings true. The phrases about cancer and cutting it out are startling by their explicit nature. Kurt and Zapantis did not deny speaking about cutting out a cancer at the restaurant. I credit Lantigua, Lizondro, Diaz de la Vega and Lopez that Kurt and Zapantis instructed the employees to stop obtaining legal advice about their tips and threatened employees with termination if they did not cease their efforts. Respondent violated Section 8(a)(1) of the Act in April and May 2008 by threatening employees with termination for engaging in protected concerted

---

[42] Although several of the General Counsel's witnesses testified that LaRuffa was fired for concerted activity, the evidence is to the contrary. LaRuffa was one of only two wait staff who continued to work while all the others walked off the floor during dinner service; Matute was fired because he led this action. I credit Steve Makris that LaRuffa was terminated on April 5, 2008 for chronic lateness. The Complaint does not allege that LaRuffa was unlawfully terminated.

[43] I credit Lopez. He is still employed at the restaurant and has no reason to shade his testimony about these events.

activities by likening the activist employees to a cancer that would be cut out.

Lantigua testified that sometime after April 25, 2008 Zapantis remarked that he knew the employees were getting legal advice. He asked Lantigua who else was involved in this effort and he told Lantigua to consider his position at the restaurant, saying that Lantigua was well-liked and his school schedule was being accommodated. Zapantis generally denied interrogating employees about their activities but he did not deny this conversation with Lantigua. Lantigua's recollection is specific and detailed and the entire exchange has the ring of truth. Zapantis' statement referring to Lantigua's schedule amounted to a threat directed at Lantigua's favorable working conditions. This threat was coupled with a question about who else might be involved in the activities. Zapantis is the General Manager of the Restaurant, the highest level manager who is present at the restaurant at all times. He was asking for the names of other employees who were involved in protected concerted activities. I find that Respondent violated Section 8(a)(1) of the Act by coercively interrogating Lantigua about the employees' concerted activities. *Bourne v. NLRB*, 332 F.2d 47 (2d Cir. 1964).

Lizordo testified that on his last day of work in June 2008 Zapantis told him that if he did not like his tips he should get out and leave the restaurant. However, I find that this conversation did not take place on Lizordo's last day of work but that it took place in April, as stated in Lizordo's affidavit. Indeed, after reading his affidavit, Lizordo testified that the statements were made in April and that was when he decided to look for another job so he could leave the restaurant. The Complaint alleges that on July 3, 2008 Respondent "implicitly threatened employees with termination in order to discourage employees from engaging in the protected concerted activity." The evidence in the record does not support this allegation.[44]

Lantigua testified about an occasion when he and Captain Fausto complained to Kurt about the Sommelier and the fact that they and other Captains had to perform the Sommelier's duties because he was not on the floor when service began. Lantigua and Fausto wanted Kurt to tell the Sommelier to be ready for duty at 5:30 so that they could perform their own duties. According to Lantigua, Kurt said that the Captains should not tell him how to run a restaurant. Kurt referred to his training in the Turkish Army and said he could take care of Lantigua. Later, Lantigua and Kurt shook hands and each apologized to the other for the incident. Kurt did not deny Lantigua's specific testimony about the incident or the apology, he merely denied threatening anyone with the use of physical defense training. I credit Lantigua's detailed version of the conversation and its aftermath. When Captains Fausto and Lantigua were discussing their working conditions with Kurt, they were engaged in protected concerted activity. Kurt's statement that he could "take care of" Lantigua amounted to a physical threat directed at Lantigua. Respondent violated Section 8(a)(1) of the Act by threatening employees with physical harm because they engaged in protected concerted activities. *Workroom for Designers* 274 NLRB 840, 854 (1985); *Los Angeles Airport Hilton*, 354 NLRB No. 17 (2009).

---

[44] Counsel for the General Counsel's Brief also urges that I should find a threat of termination made after June 16, 2008 based on testimony by Lantigua. The Complaint did not allege this violation and no amendment relating to any such violation was offered at the hearing.

## D. Alleged Discharges of Employees

### 1. Diaz de la Vega

The Complaint alleges that Diaz de la Vega was fired on April 25, 2008 because he engaged in protected concerted activities. As discussed in detail above, I have found that Diaz de la Vega was not a truthful and reliable witness and I have determined not to credit his testimony where it is contradicted by more reliable evidence. As set forth above, in addition to being an uncooperative witness who had to be warned to answer questions on cross-examination, Diaz de la Vega was not truthful in testifying about the circumstances of finding and accepting a new job at the Tribeca Grand Hotel. I find that Diaz de la Vega began his paid training for a new job at the hotel on Monday April 21 and completed his training on Thursday April 24. Diaz de la Vega was formally offered a job at the hotel on Thursday April 24 and he accepted the job offer on that very day. He began work at the Tribeca Grand Hotel on Saturday April 26, working three or four days a week, beginning work anywhere from 3:45 pm to 5 pm, until July 12, 2008. These times correspond to the reporting time at Thalassa. Despite his testimony to the contrary, it is clear that by Friday April 25 Diaz de la Vega had already accepted a new job that would necessarily conflict with his schedule at Thalassa. Further, I do not credit his testimony that on Friday April 25 he asked for Saturday night off because his cousin was flying in and did not know the United States. In truth, the cousin was laying over in the airport during the day and Diaz de la Vega was free to work that night as shown by the fact that he worked Saturday night at the Tribeca Grand Hotel. I do not credit Diaz de la Vega's testimony that on Friday April 25 when he asked Kurt for a day off, Kurt responded by firing him. Instead, I credit Kurt that he was standing next to Steve Makris and Diaz de la Vega when he heard Diaz de la Vega tell Makris that he had a new job at a hotel. I credit Makris that Diaz de la Vega could no longer work at the restaurant because he had another job.[45]

Finally, I do not credit Diaz de la Vega that when he went to pick up his final check Kurt told him not to make complaints. In describing his last conversation with Kurt, Diaz de la Vega did not at first mention this admonition by Kurt. After Diaz de la Vega described the conversation, Counsel for the General Counsel elicited this further testimony by a leading question. If Diaz de la Vega had been fired and then had actually been warned not to make complaints in the future he could not have failed to remember the warning while recounting the incident. If this statement had actually been made to Diaz de la Vega he would not have required a leading question to recall it. The other statements that Diaz de la Vega attributed to Kurt on the day that he picked up his last check are not unlawful when placed in context. Kurt told him to be more professional and said he should not be ungrateful to those who were paying his wages. This was sage advice to Diaz de la Vega who had quit his job at Thalassa before the busiest day of the week without giving the restaurant the courtesy of any notice.

### 2. Julio Lantigua

The Complaint alleges that Julio Lantigua was fired in late July 2008 because he engaged in protected concerted activities. As discussed above, I found that Lantigua shaded his testimony

---

[45] Counsel for the General Counsel's Brief incorrectly states that Makris failed to corroborate Kurt's testimony about Diaz de la Vega's reason for leaving the hotel.

and was not a reliable witness and I determined not to credit him where his testimony is contradicted by more credible and reliable evidence. As set forth above, the documentary evidence does not support Lantigua's testimony that his hours were decreased following the March 2008 inception of his complaints about the tip pool. Further, as shown above, the documentary evidence does not support Lantigua's testimony, which was not mentioned in his affidavit, that he was harassed by being forced to take less desirable shifts when fewer tips would be expected. I do not credit Lantigua that Kurt called him on July 25, 26 or 27 and fired him. The record shows that Lantigua's last paycheck was received on July 14. I do not credit Lantigua that Kurt said he was fired because he turned the Busboys against the restaurant.

I credit Zapantis, who convincingly testified in great detail about the events of July 5, 2008, that Lantigua did not come in early with the other employees to put the restaurant back together after the floors had been redone. I credit Zapantis that Lantigua did not appear to work for the private party that was scheduled on July 5th. I credit Zapantis that Lantigua did not come in at 10 am to prepare for a private luncheon party on his next scheduled day of work, but that he came in late at 11:45 and was sent home that day. I credit Zapantis that Lantigua did not come to work the next week. I credit Kurt that Lantigua then informed him that he would be available only at 6 pm and only for one or two days per week. I credit Zapantis that he fired Lantigua because he needed a full time Captain. I note that these events took place immediately before Lantigua became a full time "9 to 5" law student in August 2008. Lantigua testified that he has not worked since he began law school and I note that he was not working at Thalassa while he was earning his Bachelor's degree.

### 3. Manuel Lizondro

As discussed above, I found that Lizondro was confused about dates and that his testimony was at odds with the documentary evidence and with his affidavit. In fact, Lizondro admitted to confusion about dates and testified that he was confused by dates in 2008 because events in 2008 took place long before the instant hearing where he gave his testimony. I found that Lizondro's testimony should not be credited where it is contradicted by more reliable evidence.

The documentary evidence set forth in detail above does not support Lizondro's assertion that his hours were cut after he began attending ROC-NY meetings, a practice which Lizondro placed in February 2008.

It appears from Lizondro's description of his job duties that he was assigned to a number of jobs: he polished glasses and silverware, he manned the coffee station and he served bread. Lizondro testified that the restaurant "always" employed a person to clean the bathrooms but that beginning in 2008 he was "always" assigned to clean the bathroom floors. Of course, the tip controversy did not arise until the end of February or the beginning of March. If Lizondro's testimony about being assigned to clean the bathrooms on a regular basis is to be believed, then that assignment began before employees complained to management about the amount of their tips. Based on Lizondro's testimony alone there is no evidence that being asked to clean the bathroom was connected to his concerted activities. Further, Kurt testified in detail that two people were employed during the day to clean the restaurant, including the bathrooms. Kurt recalled that on occasion he emptied a trashcan from a bathroom and that on occasion he would ask a Bus-

boy to do the same task. Kurt denied that a Busboy had ever been asked to clean the bathroom floors. Kurt pointed out that bathrooms cannot be cleaned while the restaurant is in operation because the bathrooms cannot be closed while diners are on the premises. Zapantis also testified that cleaning bathrooms is not a Busboy job. I credit Kurt and Zapantis and I find that there is no evidence that Respondent retaliated against Lizondro by assigning him to clean the bathrooms and the bathroom floors.

Lizondro offered few specifics about being asked to sweep outside aside from stating that it was a job for the dishwashers. Lizondro said he was sent outside to sweep, but he offered no details connecting these assignments with the onset of his concerted activities. I cannot find a violation of the Act based on Lizondro's vague testimony that he was asked to sweep outside.

Finally, there is the matter of when and why Lizondro decided to end his employment at Thalassa. Although at first Lizondro testified that he left the restaurant after a meeting in June 2008 at which Zapantis told him to get out if he was dissatisfied with his tips, Lizondro then changed his testimony. After being shown his affidavit which placed this meeting in April, Lizondro affirmed that the meeting took place in April. He continued his testimony by stating that after the meeting in April he decided that he would no longer work at Thalassa and he began to look for jobs elsewhere. Lizondro worked at Thalassa full time though May and he worked a day a week in June 2008. It is clear, based on his testimony, that he did not like his job assignments, he did not like the size of his paycheck and he did not like the fact that sometimes Kurt changed his job schedule. I note that Lizondro testified that his schedule was changed so that it no longer accommodated his wife's work schedule, and Lizondro connected this change to his concerted activities. However, based on Lizondro's general lack of reliability I do not credit this testimony.

Kurt testified that he tried to convince Lizondro to keep working a few hours a day when Lizondro told him he was quitting in order to attend school. Kurt recalled advising Lizondro to speak to Zapantis to arrange his schedule, but Lizondro replied that he had enough money saved up. Zapantis praised Lizondro as a good worker and he also recalled that Lizondro said he was quitting in order to attend school. Both Kurt and Zapantis denied that they discharged Lizondro. I credit Kurt and Zapantis. I do not find that Respondent constructively discharged Lizondro.

### E. Questioning of Vargas on October 2, 2008

The videotape from Thalassa's security system shows that on October 1, 2008 the ROC-NY group was present in the restaurant from 6:06 pm to 6:11 pm, or about five minutes. Aside from Lantigua, the members of the group were not dressed for dinner at Thalassa; they wore informal clothing and some had hooded garments, perhaps attributable to the fact that it was raining outside. The restaurant was not yet busy; the videotape shows one customer at the bar and Lantigua testified that only one or two tables were occupied. Kurt greeted Lantigua with a bear hug, but then Kurt became alarmed when he saw that Lantigua was followed by a group of 20 or 25 people.

Lantigua was the spokesman for the group as he attempted to hand a letter to Kurt. The testimony about what Lantigua said to Kurt varies according to the witness. Vargas, who was still employed by the restaurant, was a part of the group but he testi-

fied that he could not properly hear what Lantigua said to Kurt. For that reason I shall not rely on what he said he heard.

Lantigua testified that he told Kurt that the people with him were members of an organization and they had a letter to deliver to the Makris family and the restaurant. Lantigua said the group was represented by an attorney from Urban Justice. Lantigua told Kurt the letter was about labor laws being violated by Thalassa; if the restaurant did not take care of the issues in 10 or 15 days he would file a formal complaint in court. Kurt refused to take the letter, saying that the proper method of delivery was from the group's lawyer to the restaurant lawyer. Kurt told Lantigua he was breaking the law by bringing such a large group into the restaurant.

Kurt testified that Lantigua did not tell him what was in the envelope. Kurt recalled that he refused to take the letter and he repeatedly asked the group to leave.

Zapantis was called upstairs from his office and he stood next to Kurt for the latter part of the time that the ROC-NY group was in the restaurant. Zapantis heard Lantigua tell Kurt that he had a certified letter from the group's lawyer. Zapantis said that Lantigua did not use the phrase "labor issues." Zapantis heard Kurt refuse the letter and he heard Kurt tell Lantigua that if the group had a lawyer he would know how to send the letter. Abrahante was present during a part of the incident. He stated that there was no discussion of the contents of the letter while he was present. However, Abrahante heard Kurt ask what was in the letter; Lantigua replied that everything was in the letter.

I do not agree with Respondent's contention that the five minute visit by members of ROC-NY constituted unprotected activity. The group entered the restaurant at a time when there was one customer at the bar and perhaps one or two tables occupied by diners. There is no evidence that the members of the group made unnecessary noise or disturbed the patrons. There is no evidence that the group blocked the ingress or egress of any individual. The group did not damage any property. Although not dressed for dinner at Thalassa, the members of the group were attired as ordinary New Yorkers. There is absolutely no evidence in the record to support the contention that the group was a mob, was violent, unruly or frightening or had any of the attributes of a gang. There is no testimony that any employee was prevented from performing his or her work during the five minutes the ROC-NY group was on the premises. Kurt did not testify that he was prevented from greeting and seating any potential diners during the incident. Further, the group left the restaurant in an orderly fashion after being asked to do so by Zapantis.

The testimony summarized above shows that Kurt and Zapantis were aware that a former employee and a current employee were in a group of 20 to 25 people who came to the restaurant to deliver a letter. I credit Lantigua's testimony about what he said to Kurt. I find it reasonable and likely that Lantigua explained why he was there to deliver a letter and that he gave a brief description of the purpose of the letter. I do not credit Respondent's witnesses that Lantigua either refused to answer Kurt's question about what was in the letter or made no mention of its contents. It is not plausible that a large and organized group of people would assemble to deliver a letter but would refuse or fail to state the purpose of the letter. I credit Lantigua that he told Kurt that the group was represented by an attorney from Urban Justice and that the letter concerned labor law violations. I credit Lantigua that he told Kurt that a suit

would be filed if the violations were not corrected in 10 or 15 days. Steve Makris was told about the group's visit, including the presence of Vargas, and later that night Makris went to the restaurant to look at the video tape. Respondent was thus on notice that a current employee and a former employee were part of a group seeking a remedy for alleged labor law violations at Thalassa and that the group's lawyer was prepared to file a suit. I conclude that Respondent was aware that Vargas was engaged in protected concerted activities when he joined the group that entered the restaurant on October 1, 2008. *Saigon Grill Restaurant*, 353 NLRB No 110 (2009).

All the witnesses agree that Vargas was called to a meeting during the evening of October 2. Vargas testified that he was called to the office after work began, that is sometime after 5:30 pm. Abrahante testified that he was called to meet Vargas and Steve Makris at about 6:30 pm; Zapantis and Kurt were present. Makris did not say when the meeting began but he placed the end of the meeting at about 7:30 or 8 pm. Kurt was in and out of the office and did not testify about the timing. Zapantis stated that the meeting began about 8 pm, but this seems unlikely as that would have been the busiest time in the restaurant. Zapantis was also in and out of the office. I find that the meeting began at around 6:30 pm and ended between 7:30 and 8 pm. At one point two plainclothes New York City Police Officers were present and after they left two uniformed Police Officers came to the restaurant. Abrahante was present to interpret for Vargas.

Abrahante testified that he remained in the office the entire time that Makris met with Vargas, and that the entire meeting lasted about 30 minutes. In contrast, Vargas testified that Abrahante was only in the office for 25 to 30 minutes and then left and did not return. However, Abrahante testified that he was present when the uniformed officers arrived and that he was there at the end of the meeting. I have found that Abrahante is a credible and reliable witness. I find that Abrahante joined the meeting when it began but he probably left the office for a period of time. It is clear that Abrahante was in the office to translate when the uniformed officers arrived and when the incident ended.

I find, based on the testimony of Vargas, Abrahante, Zapantis and Makris, that Makris asked Vargas why the group had appeared at the restaurant and what Vargas wanted. In the presence of the plainclothes Police Officers Makris played portions of the videotape and repeatedly asked Vargas who the people were and who else was involved. The officers asked Vargas why he was with the group and what was in the letter. Vargas told Makris that if he wanted answers he should speak to Vargas' lawyer. Vargas said that the people in the video were ex-workers and friends. He repeated that Makris should speak to his lawyer. Eventually, because Vargas expressed doubts about the identity of the plainclothes officers, they left.

Vargas testified that at some point he was alone in the office with Makris when the latter asked whether he had been in jail and threatened Vargas with arrest if he did not answer the questions being posed to him. When the uniformed officers appeared Makris told them Vargas should be arrested for coming to the restaurant with a group of people who looked like gangsters. Makris did not deny these statements. I credit Vargas.

Based on the testimony of Vargas, Abrahante, Zapantis and Makris I find that the uniformed Police Officers looked at the video and asked Vargas if he knew the people in the video; they asked what the incident was all about and they asked what was

in the letter. Vargas said he was in the video but that he did not know all the others. Vargas told the officer the group had come to deliver a letter and he said, "This is all about money." Eventually, Vargas told the officers it was a labor dispute. Finally, the officers remarked that the group had done no damage to the restaurant and that no force had been used, and the officers left the restaurant.

On October 2, 2008 Steve Makris was aware that Vargas had entered the restaurant the day before with a group in order to deal with alleged labor law violations by Respondent; Makris was aware that the employees were taking action to institute a law suit. As found above, it was clear to Makris that Vargas was engaged in protected concerted activities in coming to the restaurant and standing with Lantigua as he attempted to deliver the letter. Makris is regarded by Thalassa employees as their boss; he was questioning Vargas in the restaurant office to which Vargas had been directed at a time when he would normally be working. The unfair labor practices found above indicate an evident hostility to the employees' concerted activities. Makris was seeking information about the identity of employees who joined with Vargas, in other words, quite specific information. When Makris asked Vargas who else was involved, what the people wanted and threatened Vargas with arrest if he did not answer, he was engaged in a coercive interrogation of Vargas. Respondent thus violated Section 8(a)(1) of the Act. *Bourne v. NLRB*, 332 F.2d 47 (2d Cir. 1964). Makris' threat to Vargas that he would have him arrested for failing to answer questions about his concerted activities was a further violation of Section 8(a)(1) of the Act.

Makris' attempt to have the uniformed New York City Police Officers arrest Vargas for coming to the restaurant with the ROC-NY group amounted to a further violation of Section 8(a)(1) of the Act. *Corporate Interiors, Inc.* 340 NLRB 732, 746 (2003).

I credit Abrahante that he translated for Zapantis at the end of the meeting. Abrahante told Vargas to take a couple of days off and said that Zapantis would call Vargas to schedule a return to work. Vargas was not suspended. I credit Zapantis that Vargas was paid for October 2 and 3, including tips, and that he then returned to work.

### F. The Employee Manual and the Menu Tests

I credit Zapantis that the Employee Manual is given to every employee hired by the restaurant. I credit him that the Manual was reissued to the employees about October 10, 2008 and that they were told to learn it so that they could perform their duties. I credit Zapantis that menu item tests are given annually or even more frequently. As found above, Zapantis was a reliable and credible witness when asked to testify about the operation of the restaurant.

Zapantis testified that every employee was given a menu test either in writing or orally in October 2008. The record shows that no employees were disciplined for their lack of knowledge about the menu. The Employee Manual states that Servers and Runners are required to know the menu descriptions but the Manual does not require Busboys to know the menu items. This comports with Zapantis' testimony that the menu tests were given as a training aid and to determine which employees might be promoted. Victor Lagos also testified to the same effect. I do not credit Lopez that the Busboys were told they had to know everything on the menu or they would be fired. Lopez testified through an interpreter; his incomplete knowl-

edge of English may have led to a misunderstanding on his part. Lopez and the other Busboys attended the same pre-shift meetings as Runners and Captains. Zapantis may have repeated the admonition in the handbook that Runners and Captains should know the menu. The Busboys would doubtless have heard Zapantis' request and that may account for Lopez' confusion. Finally, Busboy Vargas did not testify that he was told to memorize the menu; he stated that employees were told to learn what was in the Manual.

The record does not support a finding that Respondent issued a new handbook and promulgated a new rule requiring Busboys to memorize the restaurant menu.

### G. Alleged Surveillance on January 23, 2009

Based on the testimony of Segundo, Lagos, Kurt and Steve Makris, I find that Segundo telephoned Lagos at the restaurant between 10:30 and 11 pm to say that there were people on the corner near the restaurant who asked his name and whether he worked at Thalassa. I credit Segundo that the people asked him to sign something so that he would win a lot of money. Segundo was carrying his pay and he was afraid; he became alarmed when a few women followed him into the subway and spoke to him about signing papers. I credit Segundo that he told Lagos to ask Steve Makris to take some action.

Even though Jimenez testified that he was not trying to obtain signatures on the night in question, the ROC-NY adherents who were with him did not testify about what they may have said to Lagos. Further, although Jimenez stated that these other ROC-NY people were on the corner when Steve Makris walked to the corner, this testimony does not directly contradict Segundo's very vivid testimony that at some point that night he was followed to the subway by women who asked him to sign papers and win a lot of money.

After Segundo's call, Makris walked to the subway and to the corner. It appears from Jimenez' testimony that Makris did not see Jimenez or his ROC-NY companions at this time.

By January 23, 2009 Makris was aware that employees represented by Urban Justice were preparing to file suit regarding various alleged labor law violations. Thus, Makris was aware that employees were engaged in protected concerted activity. Segundo's call alerted Makris that individuals who were positioned outside the restaurant were asking Segundo to join the concerted activity. When Makris followed the kitchen staff later that night he could reasonably expect that the individuals who had spoken to Segundo would still be near the restaurant and that they would speak to the kitchen employees with the aim of gaining their support for the lawsuit. By following the employees when he knew that they would likely be approached by individuals who would ask them to join the lawsuit, Makris was engaging in surveillance of his employees' protected concerted activities. Makris testified that he followed the employees because they were nervous. Makris did not explain how his presence a few paces behind the employees would have lessened any anxiety they may have had. If the employees needed protection Makris could have called the police. There is no evidence that Makris ordinarily followed his employees as they left the restaurant. *Aladdin Gaming, LLC* 345 NLRB 585, 586 (2005). I find that Respondent violated Section 8(a)(1) of the Act when Makris watched and followed employees who were being approached by ROC-NY adherents. *Dayton Hudson Corp.* 316 NLRB 477, fn. 1 (1995).

### H. Alleged Unlawful Interrogation of Segundo

The Complaint was amended at the hearing to allege that Respondent, by its agents, interrogated Segundo in the summer and in September of 2009 in violation of Section 8(a)(1) of the Act. Counsel for the General Counsel's Brief contends that the safeguards required by *Johnnie's Poultry*, 146 NLRB 770 (1964), were not adhered to when Segundo met with the restaurant's attorneys because, "The Employer's agents failed to communicate to [Segundo] the purpose of the questioning and thus the interrogation was coercive. . . ."

As set forth above, I found that Segundo was a confused witness who had trouble remembering and testifying about the various events. With respect to the alleged interrogation, Segundo testified both that he did not know the purpose of speaking to the attorneys for Thalassa and that he spoke to them because, "I went to talk to her to tell her what happened that night so that it wouldn't happen again" and "I wanted to tell them what happened to me that night." Segundo also testified both that it was his choice to make whether he would speak to the attorneys and that he was directed to meet with them by Zapantis. Manifestly, Segundo's testimony is inconsistent and unclear. Further, I do not believe that Segundo remembered very much about his meeting with Respondent's attorneys. The General Counsel has the burden of proof to show that Respondent engaged in a violation of the Act. Based on Segundo's contradictory and vague testimony and his imperfect recollection I find that the burden of proof has not been met.

### CONCLUSIONS OF LAW

1. By threatening employees with termination for engaging in protected concerted activities, Respondent violated Section 8(a)(1) of the Act.

2. By coercively interrogating employees about their protected concerted activities, Respondent violated Section 8(a)(1) of the Act.

3. By threatening employees with physical harm because they engaged in protected concerted activities, Respondent violated Section 8(a)(1) of the Act.

4. By coercively interrogating employees about their protected concerted activities and threatening them with arrest if they did not answer the questions posed to them, Respondent violated Section 8(a)(1) of the Act.

5. By attempting to cause the arrest of employees for engaging in protected concerted activities, Respondent violated Section 8(a)(1) of the Act.

6. By engaging in surveillance of its employees protected concerted activities, Respondent violated Section 8(a)(1) of the Act.

7. The General Counsel has not shown that Respondent engaged in any other violations of the Act.

### REMEDY

Having found that the Respondent has engaged in certain unfair labor practices, I find that it must be ordered to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act.

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[46]

### ORDER

The Respondent, Fiskardo Estiatoria Inc. d/b/a Thalassa Restaurant, New York, New York, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Threatening employees with termination because they engage in protected concerted activities.

(b) Coercively interrogating employees about their protected concerted activities.

(c) Threatening employees with physical harm because they engage in protected concerted activities.

(d) Coercively interrogating employees about their protected concerted activities and threatening them with arrest if they do not answer the questions posed to them.

(e) Attempting to cause the arrest of employees for engaging in protected concerted activities.

(f) Engaging in surveillance of employees' protected concerted activities.

(g) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Within 14 days after service by the Region, post at its restaurant in New York, New York, copies of the attached notice marked "Appendix"[47] in both English and Spanish. Copies of the notice, on forms provided by the Regional Director for Region 2, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since April 2008.

(b) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

IT IS FURTHER ORDERED that the complaint is dismissed insofar as it alleges violations of the Act not specifically found.

Dated, Washington, D.C.   June 9, 2010

APPENDIX

NOTICE TO EMPLOYEES

POSTED BY ORDER OF THE

NATIONAL LABOR RELATIONS BOARD

An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this Notice.

---

[46] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

[47] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

FEDERAL LAW GIVES YOU THE RIGHT TO

  Form, join, or assist a union

  Choose representatives to bargain with us on your behalf

  Act together with other employees for your benefit and protection

  Choose not to engage in any of these protected activities

WE WILL NOT threaten you with termination because you engage in protected concerted activities.

WE WILL NOT coercively question you about your protected concerted activities.

WE WILL NOT threaten you with physical harm because you engage in protected concerted activities.

WE WILL NOT threaten you with arrest for refusing to answer questions about your protected concerted activities.

WE WILL NOT attempt to have you arrested for engaging in protected concerted activities.

WE WILL NOT engage in surveillance of your protected concerted activities.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights guaranteed you by Section 7 of the Act.

FISKARDO ESTIATORIA INC., D/B/A THALASSA RESTAURANT