UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RICARDO COPANTITLA, DIEGO DIAZ DE LA
VEGA, IGNACIO GARCIA, FREDDY
GUACHUN, JULIO LANTIGUA, MANUEL
LIZANDRO, MARTIN LOPEZ, SEBASTIAN
LOPEZ, AUGUSTIN MALDONADO, HENRY
MATUTE, JOELITO MELENDEZ, AUSSENCIO
RAMIREZ, and JOSE LUIS VARGAS,

                              Plaintiffs,

                -against-                                    09 Civ. 1608 (RJH)

                                                   **MEMORANDUM OPINION
                                                        AND ORDER**

FISKARDO ESTIATORIO, INC. d/b/a
THALASSA RESTAURANT, GEORGE
MAKRIS, JULIA MAKRIS, STEVE MAKRIS,
and FANTIS FOODS, INC.,

                              Defendants.

Richard J. Holwell, District Judge:

       Plaintiffs Ricardo Copantitla, Diego Diaz de la Vega, Ignacio Garcia, Freddy Guachun,

Julio Lantigua, Manuel Lizondro, [1] Martin Lopez ("M. Lopez"), Sebastian Lopez ("S. Lopez"),

Augustin Maldonado, Henry Matute, Joelito Melendez, Aussencio Ramirez, and Jose Luis

Vargas bring this action against defendants Fiskardo Estiatorio, Inc. d/b/a Thalassa Restaurant,

George Makris, Julia Makris, Steve Makris, and Fantis Foods, Inc.  Plaintiffs, who are current

and former employees of Thalassa Restaurant, bring claims under the Fair Labor Standards Act

("FLSA"), New York Labor Law ("NYLL"), New York statutory and common law, and New

York City law for alleged violations arising out of their employment.  Now before the court are

---

[1] Apparently, Lizondro is incorrectly identified in the complaint as "Manuel Lizandro," and "Lizondro" is the correct spelling of his last name.  (Pls.' Mem. at 1 n.1.)

plaintiffs' motion for partial summary judgment and defendants' motion for partial summary judgment and to dismiss certain plaintiffs. For the reasons that follow, plaintiffs' motion for summary judgment is GRANTED in part and DENIED in part and defendants' motion is also GRANTED in part and DENIED in part.

## BACKGROUND

### I.  The Parties

#### A.  Defendants

Fiskardo Estiatorio, Inc. ("Fiskardo"), a New York corporation, has operated and done business as Thalassa Restaurant ("Thalassa") at all times relevant to this action. (Pls.' Rule 56.1 Stmt. ¶ 15.) Thalassa opened in November 2002 in the Tribeca neighborhood of New York City. (*Id.*; Defs.' Rule 56.1 Stmt. ¶ 1.) The parties agree that Fiskardo is engaged in interstate commerce and is or was plaintiffs' employer within the meaning of the FLSA. (Defs.' Opp'n at 1; *see also* Pls.' Rule 56.1 Stmt. ¶ 15.)

Fantis Foods, Inc. ("Fantis Foods"), a New York corporation with its principal executive office in New Jersey, is a wholesale food importer and distributor that generally imports European foods. (Pls.' Rule 56.1 Stmt. ¶ 16; *see also* Defs.' Rule 56.1 Stmt. ¶¶ 29, 32.) Fantis Foods sells food and beverages to hundreds of customers, including small businesses, grocery stores, and restaurants. (Defs.' Rule 56.1 Stmt. ¶ 31.) Among Fantis Foods's customers is Thalassa, who represents less than 1% of Fantis Foods's gross annual sales. (*See id.* ¶¶ 41, 44.) About 15-20% of Thalassa's food is purchased from Fantis Foods. (*Id.* ¶ 41.)

Julia Makris ("J. Makris" or "Julia") has been the sole owner, shareholder, and President of Fiskardo since its formation in 2001. (Pls.' Rule 56.1 Stmt. ¶ 17.) Julia Makris originally conceived of the idea to open Thalassa and envisioned the type of food it would serve. (*Id.*)

Julia's husband, George Makris ("G. Makris" or "George"), has been President of Fantis Foods since 2002.  (Defs.' Rule 56.1 Stmt. ¶ 17; G. Makris Decl. ¶ 3.)  George Makris has no ownership interest in Fiskardo or Thalassa, and does not receive a paycheck from Fiskardo. (Defs.' Rule 56.1 Stmt. ¶ 18; Pls.' Rule 56.1 Stmt. ¶ 21.)  George owns 60% of Fantis Foods. (Defs.' Rule 56.1 Stmt. ¶ 33.)

Julia became ill in February 2003, and her son Steve Makris ("S. Makris" or "Steve"), who lives with his family in an apartment above Thalassa, became her "eyes and ears" at the restaurant.  (First Aranyos Decl. Ex. Y [Fiskardo 30(b)(6)] at 22:6-20; *see also* J. Makris Decl. ¶¶ 2, 5; Pls.' Rule 56.1 Stmt. ¶ 12.)[2]  Steve Makris served in that role "from day one" at Thalassa on behalf of his mother.  (Pls.' Rule 56.1 Stmt. ¶ 20.)  More recently, Steve became the General Manager at Thalassa.  (Ashley Decl. Ex. 20 [S. Makris] at 15:17-25.)  Steve Makris represents to customers and to the public that he is the owner of Thalassa, and has been responsible for determinations regarding the management and supervisory structure of the Restaurant and the payment of its employees.  (Pls.' Rule 56.1 Stmt. ¶ 20.)  Steve has the authority to hire and fire Thalassa employees, to set work schedules for those employees, and has invoked his authority on occasion to fire employees.  (*Id.* ¶ 21.)  Prior to Steve's tenure as General Manager of Thalassa, the previous general managers, the Special Events Coordinator, maitre d's, and chefs reported to Steve regarding decisions on employment, food, service, and customer satisfaction.  (*Id.*)  In addition, Steve is the Chief Operating Officer of Fantis Foods and has held that position for "[a] few years."  (Ashley Decl. Ex. 20 [S. Makris] at 14:25-15:8.)  Steve is also the Treasurer of Fantis Foods and owns 20% of that company.  (Defs.' Rule 56.1 Stmt. ¶¶ 33, 34.)

---

[2] Deposition testimony is cited as [Witness name] page:line.  For example,  "First Aranyos Decl. Ex. Y [Fiskardo 30(b)(6)] at 22:6-20" is a citation to the deposition of Fiskardo's Rule 30(b)(6) representative, page 22, lines 6 through 20, found in Exhibit Y of the First Aranyos Declaration.

**B. Positions at Thalassa**

To understand the plaintiffs' roles at Thalassa, it is helpful first to review the different positions that exist at the restaurant. Among the "front-of-the-house" positions that exist at Thalassa are General Manager, Maitre d', Sommelier, Captain, Runner, Expediter, Busboy, Bartender, Barback and Host/Hostess. (Defs.' Rule 56.1 Stmt. ¶ 74.) These positions had different responsibilities, some of which are outlined below.

Thalassa has always had a position titled "maitre d'" since its founding in 2002. (Defs.' Rule 56.1 Stmt. ¶ 79.) In 2002, the maitre d' was Nickos Farmakas; after Farmakas's departure, Sait Dogan became the maitre d', followed by George Theodosio, Henry Matute, and Kemal Kurt. (*Id.*) Kurt's tenure as maitre d' began sometime in the first half of 2008 and ended in May 2009. (*See* Defs.' Rule 56.1 Stmt. ¶ 82; Aranyos Decl. Ex. JJ [Kurt] 51:10-23.)[3] The maitre d's responsibilities included seating and greeting customers, serving customers, and taking orders from customers. (*See* First Aranyos Decl. Ex. EE [Ziotas] at 55:8-24.) With respect to customers' service needs, a maitre d' would do "[w]hatever needs to be done." (First Aranyos Decl. Ex. CC [S. Makris] at 71:7-13.) The maitre d' also had certain supervisory and management functions, which could include supervising the front of the house staff, assigning work stations, creating the work schedule, supervising the training of new front-of-the-house employees, and interviewing prospective employees. (*See* Goodman Decl. Ex. 4 [Dogan] at 49:4-50:23, Ex. 18 [Matute] at 16:10-17:2, Ex. 19 [Kurt] at 94:7-103:21, 122:23-123:7. *But see* Goodman Decl. Ex 18 [Matute] at 146:10-17 (noting that Sait Dogan was the only maitre d' who

---

[3] There is some confusion about the start of Kurt's tenure as maitre d' in the record. Paragraph 82 of Defendants' Local Rule 56.1 Statement asserts that Kurt became the maitre d' approximately two weeks after he became a captain in late February 2008. That paragraph is undisputed. But paragraph 83, reflecting Kurt's testimony, asserts that he held the position from April 2008 through May 2009. (*Compare* Defs.' Rule 56.1 Stmt. ¶ 82 to *id.* ¶ 83.)

made hiring and firing decisions), Ex. 19 [Kurt] at 122:8-18 (noting that Kemal Kurt, as maitre d', did not set work schedules).)

Captains, also known as waiters, are assigned to tables in the dining room and responsible for the physical arrangement of the room and for taking food and wine orders.  (Defs.' Rule 56.1 Stmt. ¶¶ 85, 86.)

Busboys are responsible for preparing the restaurant for service by, among other things, setting up the coffee stations and tables, plates, glasses, and silverware, polishing glasses, and clearing dirty dishes.  (*Id.* ¶ 87.)  Busboys also worked on the floor folding napkins and clearing tables.  (*Id.* ¶ 88.)  One busboy at a time would be assigned to the polishing station and would be responsible for polishing glass and silverware.  (Goodman Decl. Ex. 16 [Diaz de la Vega] at 62:2-9.)   That polishing station is located in Thalassa's basement and is surrounded by a thick curtain.  (Goodman Decl. Ex. 23 ¶ 7, Ex. 25 ¶ 4.)

Runners were responsible for bringing food to the table.  (Defs.' Rule 56.1 Stmt. ¶ 90.)

## C.  Plaintiffs

Plaintiffs are current and former employees of Thalassa.  (Pls.' Rule 56.1 Stmt. ¶ 1.) Details regarding each plaintiff follow.

Ricardo Copantitla has been employed by Thalassa since September 23, 2003, under the name Eduardo Garcia.  (Pls.' Rule 56.1 Stmt. ¶ 2.)[4]

---

[4] Defendants' Counter Statement of Material Uncontroverted Facts disputes or denies the factual contentions in Plaintiffs' Rule 56.1 Statement ¶¶ 2-14, except to the extent that those paragraphs indicate that the plaintiffs worked at Thalassa.  Defendants, however, fail to provide any citation to admissible evidence in support of their denials. (*See, e.g.*, Defs.' Rule 56.1 Counter Statement ¶ 4 ("Admitted, that Mr. I Garcia was employed from approximately May 30, 2008 to September 21, 2008 for the purposes of this motion only, but denied that those were his start and end dates.  (Second Amended Answer ¶ 9.)  All remaining allegations are disputed.")  Defendants are not entitled to rely solely on their Answer at this stage of the litigation.  *See Parks Real Estate Purchasing Group v. St. Paul Marine and Fire Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) ("[W]ith respect to a properly supported summary judgment motion, the party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."). Instead, under Local Rule 56.1(d), "[e]ach statement *by the movant or opponent pursuant to Rule 56.1(a) and (b),*

Diego Diaz de la Vega was employed as a busboy by Thalassa from at least November 7, 2007.  (*Id.* ¶ 3.)  His last day at Thalassa was April 25, 2008.  (Defs.' Rule 56.1 Stmt. ¶ 122.)  As a busboy, Diaz de la Vega cleared and re-set tables with linens, dishes and silverware, and prepared olives, oils, bread, and coffee for service.  (Pls.' Rule 56.1 Stmt. ¶ 3.)  Near the end of his employment, Diaz de la Vega worked at the polishing station.  (*Id.*)

Ignacio Garcia was employed from approximately May 30, 2008 to September 21, 2008 by Thalassa as a busboy working in Thalassa's main dining room.  (*Id.* ¶ 4; Defs.' Rule 56.1 Stmt. ¶ 124.)

Freddy Guachun was employed by Thalassa from approximately 2003 through December 9, 2008.  (Pls.' Rule 56.1 Stmt. ¶ 5.)  He worked as a busboy for about three years, as a runner for approximately one year, and occasionally served as an expediter in 2004.  (*Id.*; Ashley Decl. Ex. 6 [Guachun] at 31:4-9.)  When Thalassa hosted banquets, Guachun also worked as a waiter, bartender, busboy, or runner depending on Thalassa's needs.  (Pls.' Rule 56.1 Stmt. ¶ 5.)

Julio Lantigua was employed from approximately July 12, 2007 to July 18, 2008 as a captain at Thalassa.  (*Id.* ¶ 6; Defs.' Rule 56.1 Stmt. ¶¶ 130, 131.)

Manuel Lizondro was employed by Thalassa from approximately January 5, 2007 through June 30, 2008, and his responsibilities primarily involved polishing.  (*See* Pls.' Rule 56.1 Stmt. ¶ 7; *see also* Defs.' Rule 56.1 Stmt. ¶¶ 141, 143.)

Martin Lopez worked at Thalassa from approximately June 23, 2008 to December 23, 2008.  (*Id.* ¶ 8.)

---

*including each statement controverting any statement of material fact,* must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)."  Courts have "broad discretion" in dealing with a party's failure to comply with local court rules.  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 72 (2d Cir. 2001).  Accordingly, where plaintiffs' assertions in their Rule 56.1 Statement are properly supported in the record, the Court admits them for purposes of this motion.

Sebastian Lopez worked at Thalassa as a busboy from approximately July 12, 2006 through December 30, 2008, except for a period from July to November 2007 when he was not employed by Thalassa.  (*Id.* ¶ 9.)

Augustin Maldonado worked at Thalassa from January 2007 to January 2008 under the name Samuel Merino and from approximately January 10, 2008 to June 30, 2009 under the name Augustin Maldonado.  (*Id.* ¶ 10; *see also* Second Amended Answer ¶ 15.)  At the beginning of his employment, Maldonado worked as a busboy on the restaurant's main floor and at banquets. (Pls.' Rule 56.1 Stmt. ¶ 10.)  After about ten months, he became a runner on the main floor, but remained a busboy at banquets.  (*Id.*)

Henry Matute worked at Thalassa from approximately November 20, 2002 to April 9, 2008.  (*Id.* ¶ 11; Defs.' Rule 56.1 Stmt. ¶ 144.)  He first worked as a busboy for four months, then as a runner and expediter for six months; by early 2004, was working as a waiter and was also responsible for overseeing banquets.  (Pls.' Rule 56.1 Stmt. ¶ 11; *see also* Defs.' Rule 56.1 Stmt. ¶¶ 145-147.)  Matute also assumed the duties of the maitre d' for a short period.  (Pls.' Rule 56.1 Stmt. ¶ 11.)

Joelito Melendez worked at Thalassa from approximately December 1, 2006 to March 14, 2008, working as a busboy.  (*Id.* ¶ 12; Defs.' Rule 56.1 Stmt. ¶¶ 148-149.)

Aussencio Ramirez worked at Thalassa from approximately March 30, 2007 to September 17, 2008 as a dishwasher.  (Pls.' Rule 56.1 Stmt. ¶ 13.)

Jose Luis Vargas has worked at Thalassa since approximately March 29, 2007 as a busboy.  (*Id.* ¶ 14; Defs.' Rule 56.1 Stmt. ¶¶ 150-151.)  His responsibilities include providing water to customers, providing proper silverware, and clearing tables.  (Defs.' Rule 56.1 Stmt. ¶ 152.)

## II. The Structure of Thalassa and Fantis Foods

### A. Involvement of the Makris Family in Thalassa

As mentioned above, Julia Makris is the sole shareholder of Fiskardo, doing business as Thalassa Restaurant. Her son, Steve, is her "eyes and ears" at the restaurant, and more recently, Thalassa's General Manager.

Steve Makris was not the restaurant's first General Manager. In 2002, when Thalassa opened, its management consisted of Gregory Zapantis, Executive Chef, and Mina Newman, General Manager. (Defs.' Rule 56.1 Stmt. ¶ 68.) Upon Newman's departure, Sophia Zilo took over as General Manager in or around May 2004. (*Id.* ¶ 69; *see* Pls.' Rule 56.1 Stmt. ¶ 25.) Zilo continued in that capacity until February 2008, when she was injured in an automobile accident and was unable to return to work. (Defs.' Rule 56.1 Stmt. ¶ 70.)

Tasso Zapantis ("Zapantis") took over as General Manager later that year when it became evident that Zilo would not be able to return. (*Id.*) Prior to that, Zapantis had worked in other capacities at Thalassa. (Pls.' Rule 56.1 Stmt. ¶ 24.) Zapantis began in 2003 or 2004 at Thalassa, and at that time was responsible for taking reservations. (*Id.*) After a year and a half of working in reservations, Steve Makris promoted him to be Special Events Manager, in charge of sales and marketing of banquets at Thalassa. (*See id.*; Defs.' Rule 56.1 Stmt. ¶ 71.) Zapantis, notwithstanding his stint as General Manager, continues in his role as Special Events Manager to the present. (Pls.' Rule 56.1 Stmt. ¶ 24.)

Steve Makris assumed the role of General Manager in November 2009. (Defs.' Rule 56.1 Stmt. ¶¶ 16, 72.)

Also part of the management is Tommy Ziotas, the Vice President of Thalassa. (Pls.' Rule 56.1 Stmt. ¶ 18; Defs.' Rule 56.1 Stmt. ¶ 61.) Ziotas oversees the financials of Thalassa,

including corporate filings, accounts receivable, and transmission of payroll information from Thalassa to its outside payroll company. (Defs.' Rule 56.1 Stmt. ¶ 61; *see also* Pls.' Rule 56.1 Stmt. ¶ 22.)

Julia Makris worked at Thalassa briefly when it opened in November 2002, but shortly thereafter, because of an illness in February 2003, delegated her responsibilities at the restaurant to Ziotas and her son Steve. (Goodman Decl. Ex. 34 [J. Makris] at 18:3-9, 20:14-17.) Since that time, Julia has had only limited involvement in Thalassa's business. In her capacity as sole shareholder of Fiskardo, Julia signed Consents to Action in Lieu of Formal Annual Meetings of Shareholders from 2001 to 2007 and in 2009 electing herself and Ziotas as directors for one-year terms. (Pls.' Rule 56.1 Stmt. ¶ 19.) In 2008, she signed a similar Consent electing herself only as a director. (*Id.*) During those years, Ziotas, as Secretary of Fiskardo, signed Consents in Lieu of Formal Annual Meetings of Directors of Fiskardo electing Julia as President/Treasurer and himself as Vice President and Secretary for one-year terms. (*Id.*)

Regarding the everyday operation of Thalassa, Ziotas has occasionally discussed with Julia how to improve the restaurant generally. (Goodman Decl. Ex. 5 [Ziotas] at 19:18-21, Ex. 34 [J. Makris] at 35:11-36:10.) Julia has also made recommendations about food and ambiance to Steve, which he sometimes followed. (*Id.* Ex. 6 [S. Makris] at 18:5-19:3.) She may also have made recommendations as to hiring. (*Compare* Goodman Decl. Ex. 6 [S. Makris] at 17:14-20 ("Q: Does she ever make recommendations to you as to whether to hire anyone, has she ever? A: She makes recommendations about a lot of things. Q: Is that one of them? A: Yeah, I guess so.") *with* Aranyos Decl. Ex. AA [J. Makris] at 23:23-25 ("Q: Did Tommy [Ziotas] and Steve ever consult with you about whether to hire an employee? A: No.") *and* J. Makris Decl. ¶ 8 ("I do not consult or confer with any employee or manager of the Restaurant regarding employment

related matters at the Restaurant.").)  Otherwise, Julia's role is primarily one of patron; she does not, for example, set employment compensation, determine Thalassa's tip policy, or address employee complaints.  (*See* Aranyos Decl. Ex. AA [J. Makris] at 29:20-32:19; J. Makris Decl. ¶ 11.)

George Makris, Julia's husband and Steve's father, has never been a shareholder, director, officer, or employee of Fiskardo, and does not receive a paycheck from it.  (Defs.' Rule 56.1 Stmt. ¶ 21.)

### B. Overlap Between Fantis Foods and Thalassa

Fantis Foods is a privately held corporation; George Makris owns 60% of the company, Steve owns 20%, and Steve's brother, Jerry Makris, owns the remaining 20%.  (Defs.' Rule 56.1 Stmt. ¶ 33.)  The three Makris men serve as corporate officers (President, Treasurer, and Vice President, respectively), and Steve Makris serves as Fantis Foods's Chief Operating Officer.  (*Id.* ¶¶ 34, Goodman Decl. Ex. 6 [S. Makris] at 14:25-15:5.)

About 15-20% of Thalassa's food is purchased from Fantis Foods, representing less than 1% of Fantis Foods's annual sales.  (Defs.' Rule 56.1 Stmt. ¶¶ 41, 44.)  Other than selling food products to the restaurant, Fantis Foods does not derive any revenue from Thalassa, and other Fantis Foods customers have received equally preferential discounts to Thalassa.  (*Id.* ¶ 45.)

Two other people outside of the Makris family have responsibilities at Fantis Foods and Thalassa.  First, Tommy Ziotas, Vice President of Thalassa, also serves as Fantis Foods's General Manager.  (Defs.' Rule 56.1 Stmt. ¶ 37.)  In that capacity, his responsibilities include purchasing products, accounts payable, and accounts receivable.  (*Id.*)  Ziotas began working for Fantis Foods in 1978, and for Thalassa in 2002.  (*Id.* ¶¶ 59, 60.)  70% of Ziotas's income comes from Fantis Foods, and 30% comes from Thalassa; he receives separate checks from each

company.  (*Id.* ¶ 62.)  Second, Kathy Zotos receives approximately 80% of her income from Fantis Foods and 20% from Thalassa in two separate checks.  (*Id.* ¶¶ 63, 64.)  At Thalassa, Zotos is primarily responsible for gathering payroll information and submitting it to the outside payroll company.  (*Id.* ¶ 65.)  Approximately once a week, either Thalassa's General Manager or office assistant would fax the payroll data to Ziotas or Zotos, who were based in Fantis Foods's office in New Jersey.  (*Id.* ¶ 66; *see also* Goodman Decl. Ex. 5 [Ziotas] at 21:14-16, 3015-22, 39:6-20, 46:5-11.)  Zotos or Ziotas would organize that information and send it to the outside payroll company that both Thalassa and Fantis Foods used, which in turn would issue paychecks for Thalassa employees.  (Defs.' Rule 56.1 Stmt. ¶ 67; Goodman Decl. Ex. 5 [Ziotas] at 46:12-47:2.)

### III. Front-of-the-House Dress Code

The front-of-the-house employees at Thalassa have a dress code.  (Defs.' Rule 56.1 Stmt. ¶ 91.)  When the restaurant opened, captains were wore black slacks and a black vest.  (*Id.* ¶ 94.)  When Henry Matute became a captain in January 2004, the captains' clothing also included a blue shirt, a tie, an apron and black shoes.[5]  (Goodman Decl. Ex. 18 [Matute] at 28:22-29:2.)  Subsequently, Thalassa made the decision to require captains to wear suits and ties, and currently, the maitre d' and captains wear dark suits, a white or light blue button down shirt, and dark shoes.  (Defs.' Rule 56.1 Stmt. ¶¶ 95-97.)  There appears to have been an informal requirement that full-time captains at Thalassa wear the same style of suit, shirt, and tie, which were navy blue suits (that did not have the name or logo of Thalassa on them) purchased at a cost of $200 to $250 and at the captains' expense from Sarar, a New Jersey clothing company.  (*See* Goodman Decl. Ex. 1 [Lantigua] at 49:6-50:15, 52:25-53:12; *id.* Ex. 23 ("Matute Aff.") ¶ 5; *id.* Ex. 18 [Matute] at 29:12-30:20, 35:21-36:2; *see also* Ziotas Decl. ¶¶ 35, 41-43.)  For example,

---

[5] Although plaintiffs, citing to Matute's testimony, indicate in paragraph 94 of their Response to Defendants' Rule 56.1 Statement that "Thalassa also originally required captains to wear a blue shirt, a tie, an apron, and black shoes," Matute testified only to what he wore as a captain in January 2004.

Lantigua wore his own black suit when he started as a captain, but after "a few weeks," Sait

Dogan, then the maitre d', "show[ed] up with three shirts, couple of ties, and two suits" from

Sarar, which Lantigua then paid for and wore when on duty.  (*See* Goodman Decl. Ex. 1

[Lantigua] at 45:3-46:14, 47:15-47:24, 51:20-52:17, 53:15-53:24, 55:18-56:9.)  Matute bought

two suits for work from Century 21, a department store, but was only "allowed" to wear these

suits when he served as "head server," as the head server could wear a variety of suit styles while

on duty.  (*See id.* Ex. 18 [Matute] at 35:24-36:8; Matute Aff. ¶ 6.)  When employees left

Thalassa, they kept the suits and shirts.  (Defs.' Rule 56.1 Stmt. ¶ 105.)

When Thalassa opened, busboys, runners, and expediters wore black slacks, a black vest,

and aprons.  (*See* Defs.' Rule 56.1 Stmt. ¶ 107; Goodman Decl. Ex. 18 [Matute] at 25:2-10.)

Matute, for example, wore a light blue shirt, a vest, an apron, black pants, and black shoes as a

busboy; the pants and shoes were his.  (Defs.' Rule 56.1 Stmt. ¶ 108.)  Currently, the busboys,

runners, and expediters wear a black shirt, black pants, black shoes, a black apron, and a black

vest.  (Ziotas Decl. ¶ 45; *see* Goodman Decl. Ex. 16 [Melendez] 118:5-7; Defs.' Rule 56.1 Stmt.

¶ 114.)  These employees purchased their own shirts, pants, and shoes, which were theirs to

keep.  (*Id.*; *see also* Defs.' Rule 56.1 Stmt. ¶¶ 111, 117, 118, 119; Goodman Decl. Ex. 28

[Maldonado] at 28:24-29:5.)  Thalassa provided the aprons and vests to these employees, the

costs of which were deducted from the employees' paychecks.  (Goodman Decl. Ex. 16

[Melendez], Ex. 18 [Matute] 24:24-25:17, Ex. 24 ("Copentitla Aff.") ¶ 7, Ex. 42 ("Guachun

Aff.") ¶ 3.)[6]  None of this clothing had the name of the restaurant on it.  (Ziotas Decl. ¶ 45; *see*

*also* Defs.' Rule 56.1 Stmt. ¶¶ 112, 116.)

---

[6] The record is unclear as to whether the employees kept the aprons and vests.

## IV. Compensation

### A.  Tip Pool

Thalassa is a "pooled house" in which all front-of-the-house employees participate in and receive a portion of the tip pool except for the General Manager and hosts/hostesses.  (Defs.' Rule 56.1 Stmt. ¶ 75, 77.)  The tip pool operates on a point system whereby each participant's share of the daily tips is based on the number of points assigned to that job title.  (*See* Goodman Decl. Ex. 28 [Maldonado] at 58:15-59:16; *see also id.* Ex. 6 [S. Makris] at 111:24-112:4.)

### B.  Pay Rate Before Tips

From late 2002 when Thalassa opened until approximately March 2007, Thalassa generally paid its wait staff $3.75 per hour, although it paid Guachun $5.25 per hour in 2007.  (*See* Pls.' Rule 56.1 Stmt. ¶ 27(a), (d), (f), (h); *see also* Second Ziotas Decl. ¶ 16, Ex. D.)  From approximately March 2007 to July 2009, the general rate was $4.60 per hour, and after July 2009, the general rate was $4.65 per hour.  (Pls.' Rule 56.1 Stmt. ¶ 27(ii), (iii).)  The specific pay rate for some of the plaintiffs in this case is outlined in tabular format below.

| Name | Rate (per hour) | Time Period | Citation |
|---|---|---|---|
| Copantitla | $3.75 | 2003-04 | (Pls.' Rule 56.1 Stmt. |
|  | $4.60 | 2007-08 | ¶ 27(a).) |
| Diaz de la Vega | $4.60 | Nov. 2007 to Apr. 2008 | (*Id.* ¶ 27(b).) |
| Garcia | $4.60 | May 2008 to Sept. 2008 | (*Id.* ¶ 27(c).) |
| Guachun | $3.25 | Start Rate | (*Id.* ¶ 27(d).) |
|  | $3.75 | 2003-04 |  |
|  | $5.25 | 2007 |  |
|  | $4.60 | 2008 |  |
| Lantigua | $4.60 | July 2007 to July 2008 | (*Id.* ¶ 27(e).) |
| Lizondro | $3.75 | January 2007 | (*Id.* ¶ 27(f).) |
|  | $4.60 | 2007 to June 2008 |  |
| M. Lopez | $4.60 | June 2008 to Dec. 2008 | (*Id.* ¶ 27(g).) |
| S. Lopez | $3.75 | Start Rate in July 2006 | (*Id.* ¶ 27(h).) |
|  | $4.60 | Late 2007 to Dec. 2008 |  |
| Maldonado | $4.60 | 2007-08 | (*Id.* ¶ 27(i).) |
| Melendez | $4.60 | 2007 to Mar. 2008 | (*Id.* ¶ 27(k).) |
| Vargas | $4.60 | Mar. 2007 to 2009 | (*Id.* ¶ 27(l).) |

| | $4.65 | Beginning Aug. 2009 | |
|---|---|---|---|

Matute was paid a base rate of as low as $2.00-$2.15 per hour in 2003, although he could earn extra money for lunch shifts he worked; Thalassa paid an extra $25 to captains for each lunch shift worked between between 2002 and 2006.  (*See* Ashley Decl. Ex. 52; Second Ziotas Decl. ¶ 17.)  For the week ending November 9, 2003, for example, Matute worked 28.88 hours, and earned a base pay of $57.79, plus "special" pay of $50 for two lunch shifts worked.  (Ashley Decl. Ex. 52.)  With the same caveat regarding special pay for lunch shifts, Matute was paid as low as $2.15 per hour from 2004 to 2007.  (*Id.* Exs. 53, 54, 55, 56.)  Beginning in March 2007, Matute was paid as low as $4.60 per hour until the end of his employment in approximately April 2008.  (*See id.* Exs. 57, 58.)

## C.  Overtime

All plaintiffs occasionally worked more than 40 hours per week, and when they did, they were paid overtime compensation at 1.5 times their standard hourly rate before tips.[7]  (Pls.' Rule 56.1 Stmt. ¶ 28.)  For example, when Guachun was paid $5.25 per hour, his overtime rate was $7.875 per hour, and when Matute was paid $4.60 per hour, his overtime rate was $6.90.  (*Id.* ¶ 29.)  Thalassa used this formula until January 2009, when it began paying overtime compensation at a rate of $8.18 per hour.  (*Id.* ¶ 30.)

## D.  Spread of Hours

Certain plaintiffs occasionally worked shifts spanning over ten hours.  (Pls.' Rule 56.1 Stmt. ¶ 31.)  Until approximately December 2008, Thalassa did not pay any plaintiffs one hour of extra pay at the minimum-wage rate to compensate the time they worked beyond the span of ten hours.  (*Id.*)

---

[7] There is some dispute over whether any overtime compensation was paid to all plaintiffs prior to 2007, but this is not relevant to this motion.  (*Compare* Pls.' Rule 56.1 Stmt. ¶ 28 n.10 *with* Defs.' Response to Pls.' Rule 56.1 Stmt. ¶ 28.)

## V. Banquet Service Charges

### A. Terms Used To Refer to the Banquet Service Charges

Thalassa has offered "Banquet Services," pre-planned events in which customers negotiate the menu, number of guests, and price in advance of the event, since at least December 2002. (Pls.' Rule 56.1 Stmt. ¶ 32.) Thalassa's banquet rooms can accommodate large groups; it has advertised, for example, that its "Gallery Loft" can accommodate 120 seated guests and 200 for cocktails. (*Id.* ¶ 33.) Throughout the period that Thalassa has offered Banquet Services, it has routinely imposed and collected service charges of approximately 20% of the total food and wine bill (the "Banquet Service Charge"). (*Id.* ¶ 34.) The current Banquet Service Charge for Banquet Services is 15%. (*Id.*)

In several marketing documents, Thalassa vacillated between using the words "gratuity" and "service charge" to describe the Banquet Service Charge. On a page about private dining on Thalassa's website, for example, under the heading "Gratuity," a paragraph informed website visitors that "[a] 20% service charge will be added to your final bill to accommodate the service staff." (*Id.* ¶ 37.) Thalassa also distributed marketing materials explaining "Private Dining at Thalassa," which included menu options for banquets; some of these menu options used the "gratuity" to describe the Banquet Service Charge, while others used the term "service charge." (*Id.* ¶ 38.) Certain e-mails Thalassa sent to customers also referred to the Banquet Service Charge as a "gratuity." (*See* Ashley Decl. Exs. 114, 115.) Other documents created by Thalassa to account for the collection and distribution of the Banquet Service Charge referred to it as a "Banquet Tip" or a "tip." (Pls.' Rule 56.1 Stmt. ¶¶ 53, 55.)

The interchangeable use of "gratuity" and "service charge" existed in Thalassa's banquet contracts as well. Prior to approximately September 2005, certain menu and contract proposals

explaining the terms of banquets described the Banquet Service Charge using the terms "service" or "service charge." (*Id.* ¶ 40.) Starting in approximately September 2005, Thalassa's menu and contract proposals included a document called "Thalassa Restaurant Contract Details," which contained standard contract terms. (*Id.* ¶ 41.) The menu and contract proposals from September 2005 through December 2008, in explaining the details of the banquet contract, explained the Banquet Service Charge using both "gratuity" and "service charge" in the explanation. (*Id.* ¶¶ 42, 45.) Sometimes the terms would be used interchangeably when preparing documents for the same event. (*Id.* ¶ 46.) Documents labeled "INVOICE – Final Bill," which Thalassa provided to customers, also used both terms at times to describe the Banquet Service Charge. (*Id.* ¶ 49.)

Thalassa requested at times that banquet customers sign and return the proposed menu and contract in advance of the banquet, which they sometimes did. (*Id.* ¶ 43.) The banquet contracts generally required customers to pay a portion of the cost of the banquet in advance, and it was "rare" that a patron would tip the wait staff directly on the night of a banquet, or at any other time. (*Id.* ¶ 44; *see* Second Ziotas Decl. ¶ 8.) The banquet contracts did not contain any information stating that the Banquet Service Charge would not be paid entirely to the service staff, nor did they indicate that Thalassa would keep some of it to compensate ownership or management, to pay part-time workers, or to give bonuses to banquet managers. (Pls.' Rule 56.1 Stmt. ¶ 47.) The documents labeled "INVOICE – Final Bill" lacked that same information. (*Id.* ¶ 50.)

### B. Thalassa's Retention of Portions of the Banquet Service Charges

Thalassa retained approximately 25% of the Banquet Service Charges it collected and used that money for marketing and promotion purposes, which was recorded either as a

"House"-kept portion or as a "Room Rental Fee." (*Id.* ¶¶ 57, 58.) Steve Makris made the decision to retain a portion of the Banquet Service Charge for the restaurant. (*Id.* ¶ 59.)

Thalassa also occasionally hired part-time or temporary workers to assist at banquets, who were paid at a flat rate per shift without tips. (*Id.* ¶ 60.) These workers were sometimes paid out of the Banquet Service Charge. (*Id.*) In addition, Thalassa sometimes deducted approximately 2.5% of the Banquet Service Charge to provide additional compensation to the banquet manager. (*Id.* ¶ 62.)

## VI. Defendants' Consultation of Labor Laws

Julia Makris is unfamiliar with minimum wage laws, overtime laws, and the FLSA; she has never consulted with a lawyer regarding labor laws relating to Thalassa. (Pls.' Rule 56.1 Stmt. ¶ 66.) Steve Makris made the decision to retain a portion of the Banquet Service Charge for the house, but never consulted or otherwise informed himself as to the law relating to tip retention, is not familiar with overtime laws, does not know whether Thalassa ever consulted with counsel regarding any labor issue except that he indicated in his deposition that Ziotas may have done so, and never spoke to Ziotas about any labor law issue. (*Id.* ¶ 67.) The extent to which Ziotas informed himself of the FLSA and New York Labor Law's requirements is that he called an accountant and requested "information on things that he was not aware of, such as minimum wage, if it increased during the year." (*Id.* ¶ 68.)

## VII.   Spring 2008 Incident

In addition to Thalassa's general practices, two labor-dispute incidents form the factual core of this case. The first of these incidents occurred on a Saturday night in the Spring of 2008, when nearly all of the front-of-the-house employees stopped working and left the floor during service (the "Spring 2008 Incident"). (*See* Aranyos Decl. Ex. SS [Lizondro] at 122:13-123:2,

124:19-21; *id.* Ex. KK [Kurt NLRB][8] at 712:10-13; *id.* Ex. TT [Lizondro NLRB] at 400:5-11;

Goodman Decl. Ex. 3 [Diaz de la Vega] at 111:2-21.)  They went to the restaurant's office,

located in its lower level.  (Defs.' Rule 56.1 Stmt. ¶ 154.)  Matute acted as an Spanish interpreter

during this meeting.  (*Id.* ¶ 155.)  At the meeting, the employees complained to Kemal Kurt, the

maitre d' at the time, about low paychecks, although it is disputed whether they informed Kurt

that they believed that the paychecks should have been higher given the number of large private

parties that had happened recently.  (*Compare* Aranyos Decl. Ex. JJ [Kurt] at 189:10-190:15 *and*

*id.* Ex. KK [Kurt NLRB] at 714:9-16 *with* Goodman Decl. Ex. 1 [Lantigua] at 171:9-21 *and id.*

Ex. 3 [Diaz de la Vega] at 112:7-12.)  Kurt responded that he would look into it, although there

is some dispute about exactly what was said.  (*Compare* Aranyos Decl. Ex. KK [Kurt] at 714:10-

19 ("And I said 'I don't do it. I don't know what happened with the pay, but we can ask.  We

have a duty to do now. Please let's go back up and continue our duties, and then we will ask Mr.

Tasso and then we will take it from there.'") *with* Goodman Decl. Ex. 3 [Diaz de la Vega] at

113:2-19 ("Q: Did he tell you he was nervous because there were customers upstairs that were

not being attended to?  A: No, he wasn't all of a sudden nervous because of that.  He was

nervous because he didn't know how to answer—how to answer our accusations. . . .  Q: And at

the end of the meeting he said he would look into it, correct? . . . A: He agreed to two things:

That he was going to make a book for tips, and number two, that he was going to find the

problem to resolve it, in reference to why our checks were coming in very short.").  Kurt, like all

employees at the meeting, was a member of the tip pool.  (Defs.' Rule 56.1 Stmt. ¶ 157.)  After

15 or 20 minutes, the employees returned to work.  (*Compare* Aranyos Decl. Ex. KK [Kurt

NLRB] at 713:21-23, 714:22-24 *with* Goodman Decl. Ex. 3 [Diaz de la Vega] at 112:2-3.)  In

---

[8] [Name NLRB] refers to testimony given at the NLRB hearing described below that covered some of the events at issue in this litigation.

April 2008, the tip apportionment system changed to give a greater share of tips to busboys and other employees, which resulted in a lesser share of tips to captains, maitre d's, and sommeliers. (Defs.' Rule 56.1 Stmt. ¶ 164.)

After the Spring 2008 Incident, Steve Makris fired Matute, who was "instrumental" in the incident in his opinion.  (Goodman Decl. Ex. 48 [S. Makris NLRB] 164:24-165:17.)  Steve Makris also fired another employee, Dominick LaRuffa, although additional factors may have been involved there.  (*Id.* at 163:10-164:23.)  Later, Kurt and Tasso Zapantis compared the Spring 2008 Incident to "gangrene" and "cancer" and intimated that "[b]efore the cancer is spread, they [would] cut off the limbs."  (Goodman Decl. Ex. 12 [Lantigua NLRB] at 221:8-19; *see also id.* Ex. 1 [Lantigua] at 186:23-187:16; *id.* Ex. 3 [Diaz de la Vega] at 101:6-101:20; *id.* Ex. 47 [S. Lopez NLRB] 347:8-348:5.)

## VIII.   Employees Whose Employment Ended Following the Spring 2008 Incident

After the Spring 2008 Incident, the employment of several employees at Thalassa ended. The circumstances of those departures from Thalassa are detailed below.

### A.  Diego Diaz de la Vega

Diaz de la Vega's last day of work at Thalassa was April 25, 2008.  (Defs.' Rule 56.1 Stmt. ¶ 165.)  From April 21, 2008 to April 24, 2008, Diaz de la Vega underwent paid training at the Tribeca Grand Hotel.  (*See* Goodman Decl. Ex. 21 [Diaz de la Vega NLRB] at 770:4-771:5; Aranyos Decl. Ex. B.)  Immediately after his employment at Thalassa ended, Diaz de la Vega worked at the Tribeca Grand Hotel; he worked there on April 26, 2008, from 4:15 p.m. to 3:30 a.m.  (Defs.' Rule 56.1 Stmt. ¶¶ 170, 171.)  Beyond that, however, the circumstances of Diaz de la Vega's departure are disputed.

19

According to defendants, on April 25, 2008, a Friday, Diaz de la Vega told Kurt and Steve Makris that he could not work the following day because he needed to train at another job. (*See* S. Makris Decl. ¶ 19; Aranyos Decl. Ex. JJ [Kurt] at 303:10-20; *id.* Ex. KK [Kurt NLRB] at 718:9-19.)  Diaz de la Vega denies that this conversation happened.  (Goodman Decl. Ex. 3 [Diaz de la Vega] at 107:14-108:16.)  Instead, according to him, he asked Kurt if he could take the next day off because one of his cousins was coming from outside the United States, and Kurt told him that he could "take all [his] days off."  (*Id.* Ex. 21 [Diaz de la Vega NLRB] at 456:9-16.)

Diaz de la Vega continued to work at the Tribeca Grand three or four days a week through mid-July 2008, which was his only job during that time.  (Defs.' Rule 56.1 Stmt. ¶ 178.)

## B.  Manuel Lizondro

The circumstances of Lizondro's departure from Thalassa are in dispute as well.  It is undisputed that Lizondro is the father of two children; that at some point, he told Kurt that he saved up and had no need to work; that Lizondro quit his employment sometime in the summer of 2008 perhaps in or around June; and that Kurt told Lizondro to speak with Zapantis about his decision.  (*See* Defs.' Rule 56.1 Stmt. ¶¶ 180, 184, 185; Goodman Decl. Ex. 27 [Lizondro NLRB] at 411:18-21.)  Beyond that, the two sides tell different stories.

According to defendants, Lizondro told Kurt that he could not work as many hours as he had done previously because he was going to school and because of family obligations. (Aranyos Decl. Ex. KK [Kurt NLRB] at 719:10-720:17.)  Kurt then attempted to persuade Lizondro to keep working and suggested that Lizondro pursue accommodations to meet his scheduling needs, but Lizondro nevertheless quit.  (*Id.*)

According to Lizondro, prior to the Spring 2008 Incident, he had a schedule that allowed him to take Mondays and Tuesdays off.  (Goodman Decl. Ex. 27 [Lizondro NLRB] at 409:9-15.) That schedule allowed him to pay a babysitter for only three days per week, as he could take care of the children on Mondays and Tuesdays, and his wife could do so on Wednesdays and Thursdays.  (*Id.* at 409:16-19.)  After the Spring 2008 Incident, Kurt gave Lizondro Wednesdays and Thursdays off, upsetting this schedule, and would sometimes send Lizondro home after he showed up for work.  (*Id.* at 409:22-410:16.)  Because Kurt did this instead of calling him at home to cancel his shift, this further inconvenienced Lizondro because his commute from Brooklyn to Thalassa was an hour and forty-five minutes.  (*Id.* at 410:17-24.)  According to Lizondro, these efforts "were trying to tire me out so I would leave."  (*Id.* at 410:15.)

### C.  Julio Lantigua

Lantigua's employment with Thalassa ended in July 2008.  (Defs.' Rule 56.1 Stmt. ¶ 130.)  Prior to that, in late 2007, Lantigua began the process of seeking entrance to law schools by taking the LSAT in December 2007 and February 2008.  (*Id.* ¶ 132.)  As of February 2008, Lantigua was preparing applications for law school, including letters of recommendation, one of which he asked Sophia Zilo, the former General Manager of Thalassa, to write.  (*Id.* ¶¶ 133, 134.)  After Zilo's accident, Zapantis prepared and signed the letter in Zilo's name and gave it to Lantigua in April 2008.  (*Id.* ¶ 134.)  On April 2, 2008, Lantigua was accepted into CUNY School of Law for the Fall 2008 semester, and he accepted admission, completed his paperwork, and was approved for his loans in Spring 2008.  (*Id.* ¶¶ 136, 137, 138.)

Over the 4th of July weekend in 2008, Thalassa re-polished its floors and had to remove all tables, chairs, and other objects from the floor.  (*Id.* ¶ 188.)  From that point, the two sides' stories diverge.  Defendants assert that Lantigua showed up late or did not show up at all on

several occasions in July 2008.  (*See id.* ¶¶ 187, 189-191.)  Subsequently, according to

defendants, Lantigua informed Kurt that he could only work one or two nights per week on

weekends only, and Thalassa declined the offer.  (*See id.* ¶¶ 193-194.)

In contrast, according to Lantigua, in response to the Spring 2008 Incident, his hours

were reduced in 2008, and Thalassa called Lantigua in late July 2008 to fire him.  (Goodman

Decl. Ex. 12 [Lantigua NLRB] at 239:8-240:25.)  When Lantigua asked Kurt why he was being

fired, Kurt told him that he "did it to [him]self" because he "was getting all the busboys and the

front of the house against the company."  (*Id.* at 242:17-23.)

## IX. The October 2008 Incident

The second labor-dispute incident occurred on October 1, 2008, at 6:06 p.m., when a

group of approximately twenty-five people, including plaintiffs Lantigua and Vargas, entered

Thalassa and attempted to deliver a letter detailing alleged labor law violations by Thalassa to

Kurt (the "October 2008 Incident").  (*See* Aranyos Decl. Ex. GG [Zapantis NLRB] at 41:23-

42:20; *id.* Ex. KK [Kurt NLRB] at 722:22-724:15; Goodman Decl. Ex. 12 [Lantigua NLRB] at

244:16-246:1; Goodman Decl. Ex. 13; *see also* Defs.' Rule 56.1 Stmt. ¶ 205.)  A few customers

were in the restaurant at the time.  (*See* Aranyos Decl. Ex. KK [Kurt NLRB] at 723:9-16;

Goodman Decl. Ex. 12 [Lantigua NLRB] at 322:16-24.)  Initially, Kurt was happy to see

Lantigua, but that changed when he saw the rest of the group walk in.  (Aranyos Decl. Ex. KK

[Kurt NLRB] at 724:2-12; Goodman Decl. Ex. 12 [Lantigua NLRB] at 245:13-246:1.)  Shortly

after the group entered, Tasso Zapantis joined Kurt.  (Aranyos Decl. Ex. GG [Zapantis NLRB] at

82:15-20; Goodman Decl. Ex. 12 [Lantigua NLRB] at 246:25-247:3.)

Zapantis and Kurt assert that they were never informed of the contents of the letter that

the group attempted to deliver.  (Aranyos Decl. Ex. GG [Zapantis NLRB] at 85:4-16; *id.* Ex. KK

[Kurt NLRB] at 727:13-25.)  Lantigua, on the other hand, asserts that he informed Zapantis and Kurt that the group was there to deliver a letter to Steve, George, and Julia Makris, that they were represented by counsel, and that the letter detailed certain alleged labor law violations on Thalassa's part.  (Goodman Decl. Ex. 12 [Lantigua NLRB] at 246:9-17.)  Kurt ultimately refused to accept the letter, telling Lantigua that he was not following the proper channels.  (*See* Aranyos Decl. Ex. GG [Zapantis NLRB] at 42:21-24; Goodman Decl. Ex. 12 [Lantigua NLRB] at 246:18-24.)  The group was asked to leave and did.  (*See* Aranyos Decl. Ex. KK [Kurt NLRB] at 727:5-9; Goodman Decl. Ex. 12 [Lantigua NLRB] at 247:4-10.)  While leaving, the group started cheering and clapping in front of the restaurant.  (Defs.' Rule 56.1 Stmt. ¶ 204.)

The letter that the group attempted to deliver on October 1, 2008 was ultimately delivered on October 3, 2008.  (*See* S. Makris Decl. ¶ 13.)

## X.  Interrogation of Vargas

Steve Makris was in New Jersey on October 1, 2008, and someone at Thalassa informed him of the October 2008 Incident that night.  (Defs.' Rule 56.1 Stmt. ¶ 209.)  Concerned by what he heard, Steve went to the restaurant and viewed a surveillance video of the October 2008 Incident.  (*Id.*; Goodman Decl. Ex. 6 [S. Makris] at 128:22-129:9.)  Around midnight, Steve called Nick Giakoumis, a friend of his and a New York City police officer.  (*See* Goodman Decl. Ex. 14 [Giakoumis] at 29:2-5, 42:9-24.)

The next day, Vargas, who had been part of the October 2008 Incident group, reported to work.  (Defs.' Rule 56.1 Stmt. ¶ 211.)  Steve Makris was in New Jersey at the time, and Zapantis called him to say that Vargas had arrived at work.  (*Id.* ¶ 212.)  Steve then went to Thalassa, and Vargas was asked to go to the General Manager's office, where he was questioned.  (*Id.* ¶ 214.)  That office was the same office where the employees met in the Spring 2008 Incident.  (*Id.*

¶ 216.)  Thalassa's Executive Chef, Ralpheal Abrahante was present and served as a translator during the meeting.  (*Id.* ¶ 219.)  Steve asked Giakoumis, who was then off duty, to be present when he questioned Vargas, (*see* Aranyos Decl. Ex. DD [S. Makris] at 132:9-22), and Giakoumis showed up with another officer, Joseph Conway, at the restaurant in plain clothes; they accompanied Steve, Abrahante, and Zapantis for the questioning.  (Aranyos Decl. Ex. DD [S. Makris] at 132:23-134:11.)  There, the officers identified themselves as police officers to Vargas with their badges.  (Goodman Decl. Ex. 9 [Vargas] at 121:25-122:19.)

At the meeting, Steve showed a security system videotape of the October 2008 Incident to everyone in the room.[9]  (Defs.' Rule 56.1 Stmt. ¶ 227.)  Steve then questioned Vargas about the identity of the people in the video, what Vargas wanted, and about the content of the letter.  (*See* Aranyos Decl. Ex. CC [S. Makris] at 146:11-147:2, 149:25-150:4; Goodman Decl. Ex. 9 [Vargas] at 127:23-129:9, 129:20-23, 131:15-17.)  Vargas told Steve that the people in the video were ex-workers and friends supporting them.  (*See* Goodman Decl. Ex. 9 [Vargas] at 128:16-18; *see also* Aranyos Decl. Ex. CC [S. Makris] at 146:14-16.)  Vargas also told Steve that he had a lawyer, referred some questions to his lawyer, and asked to retrieve his attorney's card.  (*See* Goodman Decl. Ex. 9 [Vargas] at 131:18-22, 134:9-19; *see also* Aranyos Decl. Ex. CC [S. Makris] at 150:7-14; Defs.' Rule 56.1 Stmt. ¶ 244.)

Eventually, Vargas did leave the office for a short time to retrieve his lawyer's card and returned.  (*See* Goodman Decl. Ex. 9 [Vargas] at 134:13-19; *see also* Aranyos Decl. Ex. CC [S. Makris] at 150:11-18.)  Vargas gave Steve the card, and Steve, along with the two officers, left

---

[9] There is some dispute about whether one of the doors to the office was open or closed during the questioning.  The office has two doors: the front door, through which Vargas initially entered, is near the polishing station, and the back door opens to a small hall leading to Thalassa's freight elevator.  (Goodman Decl. Ex. 12 ("Vargas Decl.") ¶¶ 10, 11, 13.)  Kurt, who entered the office at some point during the meeting, and Giakoumis both remember the front door being open.  (Aranyos Decl. Ex. JJ [Kurt] at 336:5-11; Goodman Decl. Ex. 14 [Giakoumis] at 76:21-77:13.)  Steve Makris recalls the back door, but not the front door, being open.  (Aranyos Decl. Ex. CC [S. Makris] at 150:23-151:8.)  Vargas remembers the doors being closed, except when someone used them to enter or exit the office.  (Goodman Decl. Ex. 9 [Vargas] at 125:7-10; Vargas Decl. ¶¶ 12, 13.)

24

the office.  (Goodman Decl. Ex. 15 [Vargas NLRB] at 498:11-17.)  Giakoumis told Steve to call

911, which he did.  (Defs.' Rule 56.1 Stmt. ¶ 240; Aranyos Decl. Ex. CC [S. Makris] at 152:17-

153:3.)  According to Vargas, Steve then spoke to him alone in the office, telling him that he

needed to talk now, asking him whether he had been in jail before, and threatening him with

arrest if he did not speak at that moment; Vargas also asserts that Steve asked the uniformed

officers who arrived in response to the 911 call to arrest him.  (Goodman Decl. Ex. 15 [Vargas

NLRB] at 499:25-501:20.)  Steve denies making these statements.  (*See* Aranyos Decl. Ex. CC

[S. Makris] at 158:11-16; S. Makris Decl. ¶ 10.)

Vargas told the two uniformed officers who arrived in response to the 911 call that the

dispute was a labor dispute.  (Goodman Decl. Ex. 15 [Vargas NLRB] at 501:11-15, 501:21-25.)

After some time, the uniformed officers left.  (*See* Aranyos Decl. Ex. CC [S. Makris] at 154:24-

155:5; Goodman Decl. Ex. 15 [Vargas NLRB] at 502:3-14.)  Steve Makris ended the questioning

and told Vargas to go home.  (*See* Aranyos Decl. Ex. CC [S. Makris] at 152:6-11; Goodman

Decl. Ex. 9 [Vargas] at 142:23-25.)  Vargas gathered his belongings from his locker and left.

(Goodman Decl. Ex. 9 [Vargas] at 143:18-25.)

### XI. NLRB Hearing

Many of the facts to be adjudicated in this litigation have already been through litigation

in front of the National Labor Relations Board ("NLRB").  Administrative Law Judge Eleanor

MacDonald issued a decision in that litigation on June 9, 2010, which was adopted by the NLRB

on March 31, 2011, subject to modifications not relevant here.  (Field Aff. Ex. A ("NLRB

Decision") at 1.)  In that action, the NLRB's Complaint alleged that Thalassa had,

> in violation of Section 8(a)(1) and (3) of the [National Labor Relations] Act[, 29
> U.S.C. § 158(a)(1), (3) (the "Act")], interrogated employees, engaged in
> surveillance, threatened employees with termination and arrest and with physical
> harm, suspended employees, reduced employees' hours, caused the termination of

> Manuel Lizondro, discharged employees Diego Diaz de la Vega and Julio
> Lantigua and retaliated by issuing a new handbook and promulgating a new rule.

(NLRB Decision at 2.)  Plaintiffs Vargas, Diaz de la Vega, Lantigua, Lizondro, and S. Lopez

were Charging Parties in the action, while defendant Fiskardo was the respondent.  (*Id.*)

Relevant to this action, the NLRB found that Thalassa violated Section 8(a)(1) of the Act

"by threatening employees with termination for engaging in protected concerted activities" when

"Kurt and Zapantis warned employees to stop asking about their tips and threatened that they

might be fired in the same manner as Matute and LaRuffa."  (NLRB Decision at 16.)

With respect to Diaz de la Vega's alleged termination, the NLRB credited Kurt and Steve

Makris in finding that "Diaz de la Vega could no longer work at the restaurant because he had

another job," that Diaz de la Vega's job at the Tribeca Grand would "necessarily conflict with

his job at Thalassa" and that therefore, Diaz de la Vega was not fired for asking for a day off.

(*Id.* at 17.)

The NLRB also credited defendants' version of the events with respect to Lantigua's

employment, finding that Lantigua did not appear or appeared late for work on several occasions

and finding that Zapantis "fired Lantigua because he needed a full time Captain."  (*Id.* at 18.)

The NLRB also "d[id] not find that [Thalassa] constructively discharged Lizondro,"

finding that instead Lizondro had quit to attend school.  (*Id.*)

With respect to the questioning of Vargas, the NLRB found that the October 2008

Incident constituted protected activity under the Act and that Thalassa was on notice "that a

current employee and a former employee were part of a group seeking a remedy for alleged labor

law violations at Thalassa and that the group's lawyer was prepared to file a suit" because of the

October 2008 Incident.  (*Id.* at 19.)  The NLRB further found, crediting Vargas's testimony, that

Steve Makris threatened Vargas with arrest and told the uniformed officers that Vargas should be

26

arrested.  (*Id.*)  Therefore, the NLRB found that Steve "engaged in a coercive interrogation of Vargas . . . [and] thus violated Section 8(a)(1) of the Act."  (*Id.* at 20.)

## XII.   Claims in This Action

The Second Amended Complaint ("SAC") asserts thirteen causes of action as follows:

Count One alleges that defendants failed to pay plaintiffs the minimum wage required under the FLSA.  (SAC ¶¶ 147-153.)  Count Two alleges minimum wage violations under NYLL § 652.  (*Id.* ¶¶ 154-158.)

Count Three alleges a violation of the FLSA's overtime provisions, and Count Four does the same under the NYLL.  (*Id.* ¶¶ 159-169.)

Count Five alleges a failure to pay "spread of hours wages of an additional hour of pay at the minimum wage for each day Plaintiffs had a spread of hours in excess of ten hours per day, in violation of the New York Labor Law."  (*Id.* ¶¶ 170-174.)

Count Six alleges that defendants made unauthorized deductions from plaintiffs' wages in violation of the NYLL.  (*Id.* ¶¶ 175-179.)

Count Seven alleges that defendants unlawfully retained gratuities and "charges purported to be gratuities" under the NYLL.  (*Id.* ¶¶ 180-184.)

Count Eight alleges that defendants failed to reimburse plaintiffs for the cost of purchasing, cleaning, and maintaining uniforms, in violation of the NYLL.  (*Id.* ¶¶ 185-190.)

Count Nine alleges a failure to pay "call-in pay" under the NYLL, because certain plaintiffs were sent home without pay when they reported for work at Thalassa.  (*Id.* ¶¶ 191-194.)

Count Ten alleges that defendants retaliated against plaintiffs Copantitla, Diaz de la Vega, Garcia, Lantigua, Lizondro, S. Lopez, Maldonado, Melendez, and Vargas for their complaints about violations of the NYLL.  (*Id.* ¶¶ 195-198).

Count Eleven alleges that the interrogation of Vargas was false imprisonment under New York common law.  (*Id.* ¶¶ 199-202.)

Finally, Counts Twelve and Thirteen allege sexual harassment by Kemal Kurt against plaintiffs Diaz de la Vega and Melendez in violation of the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL").  (*Id.* ¶¶ 203-216.)

## XIII.   The Motions

The parties have filed cross-motions for partial summary judgment.

Plaintiffs seek summary judgment on whether: (1) defendants illegally retained gratuities or charges purported to be gratuities; (2) defendants violated minimum wage laws; (3) defendants violated overtime laws; (4) defendants violated New York State spread of hours law; (5) Fiskardo, Julia Makris, and Steve Makris are "employers" under the FLSA and the NYLL; and (6) plaintiffs are entitled to liquidated damages.

Defendants seek summary judgment that: (1) plaintiffs' counsel has a conflict of interest requiring disqualification; (2) George and Julia Makris are not "employers" under the FLSA, the NYLL, or the New York State and City Human Rights Laws; (3) Fantis Foods is not an "employer" of plaintiffs; (4) Vargas's false imprisonment claim must be dismissed; (5) plaintiffs were not required to wear "uniforms" under New York law; (6) Melendez's claim for hostile work environment cannot survive; (7) Diaz de la Vega's claim for quid pro quo sexual harassment cannot survive; (8) defendants did not retaliate in violation of New York Labor Law; (9) procedural issues bar certain claims in this action; (10) Garcia's allegations regarding his

retaliation claim should be stricken; (11) a failure to meet certain discovery obligations implies

that M. Lopez and Copantitla's claims should be dismissed; and (12) certain plaintiffs are not

entitled to equitable tolling.

## DISCUSSION

### I.   Standard for a Motion for Summary Judgment

Summary judgment is proper if the moving party shows that "there is no genuine issue as

to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ.

Proc. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In deciding whether there

is a genuine issue of material fact as to an element essential to a party's case, the court must

examine the evidence in the light most favorable to the party opposing the motion, and resolve

ambiguities and draw reasonable inferences against the moving party." *Abramson v. Pataki*, 278

F.3d 93, 101 (2d Cir. 2002) (internal quotation marks omitted); *see also Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The moving party must demonstrate that no genuine

issue exists as to any material fact.  *Celotex*, 477 U.S. at 323–25.  As to an issue on which the

non-moving party bears the burden of proof, "the burden on the moving party may be discharged

by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to

support the nonmoving party's case." *Id.* at 325 (rejecting a construction of Rule 56(c) that

would require the party moving for summary judgment to produce evidence affirmatively

establishing the absence of a genuine issue of material fact with respect to an issue on which the

nonmoving party bears the burden of proof).

If the moving party makes such a showing, the "non-movant may defeat summary

judgment only by producing specific facts showing that there is a genuine issue of material fact

for trial." *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996); *Celotex*, 477 U.S. at 322–23.  In

seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial. *See Anderson*, 477 U.S. at 256–57; *Gross v. Nat'l Broad. Co.*, 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002).

## II. Conflict of Interest

The Court begins its analysis by examining defendants' claim that plaintiffs' counsel has a conflict of interest in pursuing the illegal retention of tips claim. According to defendants, "plaintiffs' counsel presented a claim on behalf of certain plaintiffs—busboys and waiters (*i.e.*, 'correctly tipped employees')—where, if they prevail, will expose other plaintiffs—'polishers' and 'managers' (*i.e.*, 'incorrectly tipped employees')—to liability." (Defs.' Mem. at 2.) This is because some plaintiffs accused others of improperly participating in the tip pool during depositions, and defendants have now asserted a counterclaim for a "'set-off' from the 'incorrectly tipped employees' who are named as plaintiffs for any amounts they were improperly paid." (*Id.* at 2-3.) Thus, "[i]f the 'correctly tipped employees' ultimately prevail on their claim that fellow plaintiffs improperly received tips, defendants' counterclaim seeks to recover the tips paid to polishers and managers (as a set-off to damages awarded, if any)." (*Id.* at 3.) Defendants contend that plaintiffs' counsel must therefore be disqualified or, in the alternative, that plaintiffs' illegal retention of tips claim must be dismissed to alleviate the conflict.

Generally, disqualification motions are disfavored, as they "are often interposed for tactical reasons, and . . . even when made in the best of faith, such motions inevitably cause delay." *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791-92 (2d Cir. 1983) (internal quotation marks omitted). Accordingly, such motions are "subjected to a high standard of proof." *Merck Eprova*

*AG v. ProThera, Inc.*, 670 F. Supp. 2d 201, 207 (S.D.N.Y. 2009).  Nevertheless, the Second

Circuit has stated that "[i]n cases of concurrent representation, we have ruled it is 'prima facie

improper' for an attorney to simultaneously represent a client and another party with interests

directly adverse to that client."  *Hempstead Video, Inc. v. Incorporated Village of Valley Stream*,

409 F.3d 127, 133 (2d Cir. 2005).  And the Second Circuit has also stated that "in the

disqualification situation, any doubt is to be resolved in favor of disqualification."  *Hull v.

Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975).

   In deciding disqualification motions, a court "balance[s] 'a client's right freely to choose

his counsel' against 'the need to maintain the highest standards of the profession.'"  *Hempstead*,

409 F.3d at 132 (quoting *Gov't of India v. Cook Indus., Inc.*, 569 F.2d 737, 739 (2d Cir. 1978)).

Although "decisions on disqualification motions often benefit from guidance offered by the

American Bar Association (ABA) and state disciplinary rules, such rules merely provide general

guidance and not every violation of a disciplinary rule will necessarily lead to disqualification."

*Id.* (internal citations omitted).

   In this case, plaintiffs' counsel are not representing clients with directly adverse interests.

Certainly, if defendants have stated a viable counterclaim, then pursuing the improper tip

distribution claim could be said to put plaintiffs' counsel in a position where they are advocating

for the "correctly tipped employees" to the detriment of the "incorrectly tipped employees."

   But defendants' counterclaim has no basis in law.  Defendants' counterclaims are styled

"set-offs" and assert that if it is determined that gratuity from the tip pool was improperly paid to

certain plaintiffs, that any amount of improper payment should be used to set off any monetary

judgment awarded to that plaintiff.  (*See* Second Amended Answer ¶¶ 272-316.)  These

counterclaims do not specify any provision of law on which defendants rely for the legal

existence of such counterclaims, and although "setoff can be claimed . . . a party must have a legally subsisting cause of action upon which it could maintain an independent claim" to do so. *Bendat v. Premier Broadcast Group, Inc.*, 572 N.Y.S.2d 796, 798-99 (N.Y. App. Div. 1991).

The one case that defendants cite, *Hoyle v. Dimond*, 612 F. Supp. 2d 225, 231 (W.D.N.Y. 2009), does not support the proposition that an employer can recover from its employees money that the employees received as a result of an improper tip distribution.  First, that case is not factually on point, as it involved a plaintiff suing a monastery falsely holding itself out as Benedictine to recover money he had given the monastery based on that representation.  *See Hoyle*, 612 F. Supp. 2d at 228-29, 231.  Second, neither of the causes of action on the page cited by defendants, namely unjust enrichment and money had and received, apply to this action. [10]

"A cause of action for money had and received is established where (1) the defendant received money belonging to [the] plaintiff, (2) the defendant benefited from receipt of the money, and (3) under principles of equity and good conscience, the defendant should not be permitted to keep the money."  *State v. Int'l Asset Recovery Corp.*, 866 N.Y.S.2d 823, 826 (N.Y. App. Div. 2008) (internal quotation marks omitted).  Defendants' counterclaim fails on the first element: if an employee improperly received money from a tip pool, then it is not money belonging to Thalassa, but money belonging to another employee.  It also fails on the third: it hardly seems in keeping with "principles of equity and good conscience" to disgorge tips from an employee who did nothing but receive the money his employer paid him.

---

[10] Defendants do not explain why their cite to *Hoyle* proves that their set-off counterclaim is cognizable.  Instead, they assert only that they "simply seek to apply the overpayment of tips allegedly improperly paid to certain plaintiffs (if plaintiffs prevail on their claim that Thalassa improperly diluted the tip pool) to any damages owed to those individuals and/or the properly tipped employees." (Defs.' Reply at 1 n.2.)  "This is a cognizable claim." (*Id.* (citing *Hoyle*, 612 F. Supp. 2d at 231).)  Thus the Court is left to guess whether defendants are arguing that their claim is supported by the doctrine of unjust enrichment or the money had and received cause of action.

"The theory of unjust enrichment lies as a quasi-contract claim," *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009), and is "based on the equitable principles that a person shall not be allowed to enrich himself unjustly at the expense of another." *Banco Popular North America v. Lieberman*, 905 N.Y.S.2d 82, 85 (N.Y. App. Div. 2010). That doctrine's applicability to this action is also problematic, as again, to the extent the "improperly tipped employees" were improperly tipped, it was at the expense of the other employees, not Thalassa.[11]

Because defendants' counterclaims are legally insufficient, plaintiffs' counsel are not in a position where advocating for the retention of tips claim would be detrimental to other clients, and there is no conflict of interest. The Court now turns to plaintiffs' motion for summary judgment on the substantive wage claims.

### III. Tip Deductions

Plaintiffs first argue for summary judgment on whether defendants unlawfully retained gratuities or charges purported to be gratuities in violation of the NYLL.

### A. Applicable Law

The relevant statutory provision, N.Y. Lab. Law § 196-d, provides in relevant part that "[n]o employer or his agent or an officer or agent of any corporation, or any other person shall demand or accept, directly or indirectly, any part of the gratuities, received by an employee, or retain any part of a gratuity or of any charge purported to be a gratuity for an employee." In 2008, the New York Court of Appeals held that "the statutory language of Labor Law § 196-d can include mandatory charges when it is shown that employers represented or allowed their customers to believe that the charges were in fact gratuities for their employees." *Samiento v.*

---

[11] One might read the "setoff" counterclaim as one for contribution or indemnity, but defendants disclaim any connection between their "setoff" counterclaims and actions for contribution or indemnity. (*See* Defs.' Reply at 1 n.2.)

*World Yacht Inc.*, 883 N.E.2d 990, 996 (N.Y. 2008). The Court of Appeals reasoned that "[b]oth the plain meaning of Labor Law § 196-d and its legislative history establish that the service charges at issue in this appeal are contemplated within Labor Law § 196-d." *Id.* at 994. "[T]he standard under which a mandatory charge or fee is purported to be a gratuity should be weighed against the expectation of the reasonable customer as this standard is consistent with the purpose of Labor Law § 196-d." *Id.* at 994-95. Banquet charges are not exempted from this provision. *Id.* at 995.

### B. Retroactivity of *World Yacht*

Defendants contend, however, that *World Yacht* ought not to be applied retroactively, and that therefore all plaintiffs' claims for service charges accruing prior to 2008 should be dismissed under pre-*World Yacht* case law. (Defs.' Opp'n at 13-21.)

"Retroactivity is a question of New York state law." *Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 329 (S.D.N.Y. 2010) (citing *Am. Trucking Ass'ns, Inc. v. Smith*, 496 U.S. 167, 177 (1990)). Although the New York Court of Appeals has not yet ruled on whether *World Yacht* ought to be applied retroactively, the Appellate Division has. In *Ramirez v. Mansions Catering, Inc.*, 905 N.Y.S.2d 148 (N.Y. App. Div. 2010), the First Department held that "no 'new rule' was pronounced in *World Yacht*," and therefore "there is no basis here for disturbing the presumption that its holding be accorded retroactive effect." 905 N.Y.S.2d at 150. The court reasoned that "[t]he Court of Appeals' holding in *World Yacht* is 'a judicial decision construing the words of a statute,' and, as such, 'does not constitute the creation of a new legal principle.'" *Id.* (quoting *Gurnee v. Aetna Life & Cas. Co.*, 433 N.E.2d 128, 130 (N.Y. 1982)). The First Department also held that "the only pre-*World Yacht* appellate decision construing Section 196-d's 'gratuity' provisions was our decision in *Bynog v. Cipriani Group*, [784 N.Y.S.2d 9 (N.Y. App. Div.

2002), *aff'd as modified*, 802 N.E.2d 1090 (N.Y. 2003)]."  *Id.*  There, the First Department "held

that a 'contractual 22% "service charge"' was not a 'voluntary gratuity' within the meaning of

Section 196-d," but in modifying the First Department's order, "the Court of Appeals expressly

reserve[d] judgment" on that question.  *Id.* (quoting *Bynog*, 748 N.Y.S.2d at 11).  Therefore,

"prior to the Court of Appeals' decision in *World Yacht*, the issue of whether mandatory service

charges could constitute 'gratuities' under Section 196-d had not been authoritatively resolved

. . . [and] *World Yacht* was not a departure from existing law and thus not a 'new rule' subject to

retroactivity analysis."  *Id.*

     Although a federal court is not "strictly bound by state intermediate appellate courts,

rulings from such courts are a basis for ascertaining state law which is not to be disregarded by a

federal court unless it is convinced by other persuasive data that the highest court of the state

would decide otherwise."  *City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115,

126 (2d Cir. 2010).  Indeed, Judge Sand in *Spicer v. Pier Sixty LLC*, 269 F.R.D. 321 (S.D.N.Y.

2010), has already examined *Ramirez* and come to the same conclusion.  Defendants

nevertheless contend that *Ramirez* "erred in its findings and it is likely the New York Court of

Appeals would reverse its holding."  (Defs.' Opp'n at 13.)  The Court disagrees.

     Defendants contend that *Spicer* and *Ramirez* "erred in finding that the *World Yacht*

decision did not create a new rule."  (Defs.' Opp'n at 14.)  First, defendants attempt to

distinguish *Gurnee*, cited in both cases for the proposition that a judicial construction of a statute

cannot be a new rule, on the grounds that in *Gurnee*, "there were no prior judicial decisions on

the issue in question."  (*Id.*)  Defendants point to the First Department's holding in *Bynog*, and a

federal case, *Lu v. Jing Fong Restaurant, Inc.*, 503 F. Supp. 2d 706 (S.D.N.Y. 2007), as

establishing a "body of authority and case law in New York [that] clearly established that a

mandatory non-negotiable service charge was not a gratuity under [N.Y. Lab. Law] § 196-d, regardless of the customers' expectation."[12]  (Defs.' Opp'n at 15.)  Defendants also cite a 1995 memorandum from the New York Department of Labor ("NYDOL"), and give various examples that purport to show the NYDOL's continued adherence to that memorandum even after a 1999 NYDOL Opinion Letter that effectively superseded the 1995 memorandum.

All of these arguments were ably addressed by Judge Sand in *Spicer*, and defendants give no persuasive reason why this Court should disagree with the reasoning therein.  First, regarding the 1995 NYDOL memorandum, Judge Sand found that "the *Gurnee* court also faced prior conflicting administrative decisions from the Insurance Department, which 'had promulgated regulations based on a construction of [the statute] contrary to that subsequently articulated by this court.'"  *Spicer*, 269 F.R.D. at 330 (quoting *Gurnee*, 433 N.E.2d at 130).  That authority "did not prevent the *Gurnee* court from stating in the very next sentence that 'a judicial decision construing the words of a statute, however, does not constitute the creation of a new legal principle.'"  *Id.* (quoting *Gurnee*, 433 N.E.2d at 130).  "Accordingly, as in *Gurnee*, prior administrative constructions of a statute contrary to that subsequently adopted by the New York Court of Appeals do not transform a judicial statutory construction into a 'new legal principle.'" *Id.*

Second, regarding this District's decision in *Lu*, Judge Sand noted that "'federal precedents are not binding on a state court in interpreting a state statute.'"  *Id.* (quoting *Hartnett v. New York City Transit Auth.*, 657 N.E.2d 773, 778 (N.Y. 1995)).  Therefore, "*Lu* did not contribute to any 'existing body of established precedent' binding on New York courts prior to *World Yacht*."  *Id.*

---

[12] Defendants also cite a second federal case, *Chan v. Sung Yue Tung Corp.*, No. 03 Civ. 6048 (GEL), 2007 WL 313483 (S.D.N.Y. Feb. 1, 2007), but that case did not hold that mandatory charges are not charges purporting to be gratuities, and ultimately held the defendants liable for violating New York's Tip Appropriation Law.  *Id.* at *20.

Finally, regarding the First Department's decision in *Bynog*, "the continued validity of the Appellate Division's construction in *Bynog* was put into doubt by the Court of Appeals' explicit hesitance to endorse it, and *Bynog* could not be called an 'existing body of established precedent.'" *Id.* (quoting *Ramirez*, 905 N.Y.S.2d at 150) (internal citation omitted). Defendants give little reason to deviate from Judge Sand's reasoning that *World Yacht* is to be applied retroactively; instead, they advance the same arguments rejected in *Spicer*. The Court therefore follows *Ramirez* and *Spicer* to apply *World Yacht* retroactively.

### C.  Merits of the Summary Judgment Motion on N.Y. Lab. Law § 196-d

Plaintiffs argue for summary judgment on whether defendants violated N.Y. Lab. Law § 196-d.  Under *World Yacht*, a mandatory service charge is covered under N.Y. Lab. Law § 196-d when it "has been represented to the consumer as compensation to defendants' waitstaff in lieu of the gratuity"; that representation is "weighed against the expectations of the reasonable consumer."  883 N.E.2d at 994.

The argument has several parts.  First, plaintiffs argue that "under the reasonable-patron standard set forth in *Samiento*, Thalassa customers would have believed that the Banquet [Service Charges] were for the benefit of the wait-staff" and therefore they were "either gratuities or charges purported to be gratuities within the meaning of [N.Y. Lab. Law] § 196-d." (Pls.' Mem. at 6.)  Second, it is undisputed that Thalassa retained 25% of the Banquet Service Charge.  And third, it is undisputed that Thalassa used a portion of the Banquet Service Charge to pay the wages of part-time employees hired to work at banquets and to pay additional compensation to the Banquet Manager.

Defendants do not argue that plaintiffs' second and third factual contentions are wrong. Nor do they argue that if the Banquet Service Charges fall under the purview of N.Y. Lab. Law

37

§ 196-d that such practices would not constitute a violation of that section.  Rather, defendants

focus on demonstrating that the Banquet Service Charges do not come under the ambit of § 196-

d.  First, defendants argue that *World Yacht* should be interpreted to require defendants to have

represented "that the entire service charge payment was intended to be provided to the wait staff

as a 'gratuity.'"  (Defs.' Opp'n at 10 (emphasis in original).)  Defendants then argue that a

conclusion as a matter of law that the Banquet Service Charges are "charges purporting to be

gratuities" under § 196-d is unwarranted because (1) plaintiffs have failed to obtain testimony

from any actual customers that they believed that the Banquet Service Charge was intended

solely as a gratuity; (2) although rare, Thalassa customers have provided an additional gratuity

on top of the Banquet Service Charge, "demonstrating the customers' knowledge that the service

charge was not intended just as a gratuity for the wait staff"; (3) Thalassa's customers did not

express interest as to what portion of the service charge went to the wait staff; (4) Thalassa

understood the service charge to have a tip component and also a house component, which it felt

was justified under pre-*World Yacht* law; and (5) Thalassa's post-*World Yacht* contracts detail

the distribution of the Banquet Service Charge.  (Defs.' Opp'n at 11-12.)

    Because *World Yacht* is a relatively recent decision, there is little case law interpreting it

to illuminate when summary judgment ought to be granted, save for the general advice

reiterating the summary judgment standard.  *See Spicer*, 269 F.R.D. at 331.  However, the

NYDOL issued an Opinion Letter on March 11, 2010, opining that "a banquet operator would

not be permitted to retain but would be required to distribute an 18% or 20% service charge to

the service staff if the banquet operator added the service charge to the banquet contract and said

nothing about its purpose because a 'reasonable patron' would believe an 18% or 20% service

charge is for the service staff."  (Ashley Decl. Ex. 134 ("NYDOL Opinion Letter") at 2.)  The

Opinion Letter listed a number of factors that would bear on the sufficiency of a notice similar to that quoted above, including: (1) the font size and prominence of the notice; (2) the label used (*e.g.*, "administrative fee" is clearer than "service charge") for the mandatory charge; (3) whether the purpose and method of calculating the charge are described; (4) whether the notice discloses that no portion is being distributed to the service staff and that patrons should leave an additional payment as a tip; and (5) whether a separate line labeled gratuity or tip on the banquet contract existed.  (*Id.* at 3.)  *Spicer* relied upon the Opinion Letter, finding it "both reasonable and derived from an understanding of the 'underlying operational practices' of the New York banquet industry."  *Spicer*, 269 F.R.D. at 331 (quoting *Toys "R" Us v. Silva*, 676 N.E.2d 862, 866 (N.Y. 1996)).

Recently promulgated regulations also interpret the statute at issue.  Under the relevant regulations, effective January 1, 2011, "[t]here shall be a rebuttable presumption that any charge in addition to charges for food, beverage, lodging, and other specified materials or services, including but not limited to any charge for 'service' or 'food service,' is a charge purported to be a gratuity."  N.Y. Comp. Codes R. & Regs. tit. 12, § 146-2.18(b).  Furthermore, "[a] charge for the administration of a banquet, special function, or package deal shall be clearly identified as such and customers shall be notified that the charge is not a gratuity or tip," *id.* § 146-2.19(a), and "[t]he employer has the burden of demonstrating, by clear and convincing evidence, that the notification was sufficient to ensure that a reasonable customer would understand that such charge was not purported to be a gratuity."  *Id.* § 146-2.19(b).  And under New York law, an agency's "interpretation of the statutes it administers, if not unreasonable or irrational, is entitled to deference."  *Salvati v. Eimicke*, 533 N.E.2d 1045, 1047 (N.Y. 1988).

These authorities suggest that plaintiffs' argument is correct.  The undisputed evidence in this case indicates that defendants used the words "gratuity," "service charge," and "tip" at various times to describe the Banquet Service Charges.  The banquet contracts contained no information indicating that the Banquet Service Charge would not be paid entirely to the service staff.  And banquet customers rarely left an additional gratuity.  Under these circumstances, a reasonable customer would interpret the Banquet Service Charge under such circumstances to be a gratuity.[13]

Defendants' arguments do not compel a different conclusion.  The lack of actual customer testimony and lack of customer interest in the distribution of the Banquet Service Charge do not speak to the objective "reasonable customer" standard.  *World Yacht*, 883 N.E.2d at 994.  Neither does the restaurant's own understanding of its service charge speak to that standard.  And the "rare" additional gratuity on top of the Banquet Service Charge is consistent with a general customer expectation that the Banquet Service Charge is a gratuity, but that additional amounts can be given in appreciation of extraordinary service.

Accordingly, the Court finds defendants liable for violations of N.Y. Lab. Law § 196-d.

## IV. Minimum Wage Claims

### A. Federal Law

Generally, under the FLSA, the minimum wage plaintiffs were required to receive was $5.15 per hour prior to July 24, 2007; $5.85 per hour between July 24, 2007 and July 23, 2008; $6.55 per hour between July 24, 2008 and July 23, 2009; and $7.25 thereafter.  *See* 29 U.S.C. § 206(a)(1).  Plaintiffs' base salary was less than that amount at all times of their employment.

---

[13] Plaintiffs do not advance an argument as to why Thalassa's post-*World Yacht* contracts merit summary judgment as to N.Y. Lab. Law § 196-d, and the Court does not consider that issue here.

Defendants contend, however, that they are entitled to take a "tip credit" for plaintiffs' employment.  29 U.S.C. § 203(m) provides that:

> In determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to—
>
> > (1) the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on August 20, 1996; and
> >
> > (2) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the wage in effect under section 206(a)(1) of this title.
>
> The additional amount on account of tips may not exceed the value of the tips actually received by an employee.

That section further provides that "[t]he preceding 2 sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee."  29 U.S.C. § 203(m).  Courts have interpreted that provision to require that an employer "satisfy two conditions: (1) inform the employee of the 'tip credit' provision of the FLSA, and (2) permit the employee to retain all of the tips the employee receives" to qualify for the tip credit.  *Jin v. Pacific Buffet House*, No. CV-06-579 (VVP), 2009 WL 2601995, at *4 (E.D.N.Y. Aug. 24, 2009); *Chung v. New Silver Palace Rest.*, 246 F. Supp. 2d 220, 228-29 (S.D.N.Y. 2002) ("[I]n order to [take the tip credit], management also must have satisfied the two stated conditions as to all employees against whom they claimed the tip credit: (1) they must have informed the employee of the provisions of section 203(m), and (2) 'all of the tips received by such employee [must] have been retained by the employee.'" (quoting 29 U.S.C. § 203(m))).  These "two prerequisites that the employer must fulfill to be eligible for the tip credit are strictly construed,

and must be satisfied even if the employee received tips at least equivalent to the minimum wage." *Chung*, 246 F. Supp. 2d at 229.

### i.  Notice

Courts have noted that "[t]he notice requirement is a firm one." *Reich v. Chez Robert, Inc.*, 28 F.3d 401, 404 (3d Cir. 1994). Congress "expressly required notice as a condition of the tip credit," and the Courts of Appeals have interpreted the notice provision to require "at the very least notice to employees of the employer's intention to treat tips as satisfying part of the employer's minimum wage obligations." *Martin v. Tango's Rest., Inc.*, 969 F.2d 1319, 1322-23 (1st Cir. 1992); *see also Kilgore v. Outback Steakhouse of Florida, Inc.*, 160 F.3d 294, 298 (6th Cir. 1998) ("[A]n employer must inform the employee that it intends to treat tips as satisfying part of the employer's minimum wage obligation."); *Chez Robert*, 28 F.3d at 403 ("Section 3(m) therefore allows an employer to reduce a tipped employee's wage below the statutory minimum by an amount to be made up in tips, but only if the employer informs the tipped employee that her wage is being decreased under section 3(m)'s tip-credit provision."). Without notice, an employer is not entitled to take the tip credit, and "[i]f the penalty for omitting notice appears harsh, it is also true that notice is not difficult for the employer to provide." *Tango's Rest.*, 969 F.2d at 1323. "Employers bear the burden of showing that they have satisfied this requirement by, for example, providing employees with a copy of § 203(m) and informing them that their tips will be used as a credit against the minimum wage as permitted by law." *Chan*, 2007 WL 313483, at *18 (Lynch, J.); *see also Chez Robert*, 28 F.3d at 403 ("If the employer cannot show that it has informed employees that tips are being credited against their wages, then no tip credit can be taken . . . .").

Defendants contend that they have satisfied the notice requirement by: (1) informing employees that they would receive an hourly rate plus tips; and (2) posting notices about the minimum wage laws.  But defendants' arguments fall short.  For example, Sophia Zilo testified that employees' "payment structure was explained" to them, but nowhere asserts Thalassa told its employees that it intended to use tips to satisfy its minimum wage obligations.  (Second Aranyos Decl. Ex. G [Zilo] at 32:7-16; 105:14-18.)  Tasso Zapantis testified that he "would just simply state . . . that pay will be . . . part hourly wage, part tips."  (Second Aranyos Decl. Ex. D [Zapantis] at 211:20-212:7.)  Zapantis did not tell them their hourly rate and "would not define it," but instead "would just state" that the pay would be part hourly wages, part tips.  (*Id.* at 212:3-7.)  Sait Dogan testified that he was told that that he would be paid "hourly . . . plus take the tip share" and that those who were interviewed were told that they would be paid an hourly wage plus tips, but specifically denied telling interviewees about any wage laws.  (Second Aranyos Decl. Ex. F [Dogan] at 24:19-21, 64:12-65:8, 65:15-24.)  None of this deposition testimony shows that Thalassa informed plaintiffs that it intended to take a tip credit with respect to their salary, and therefore fails to satisfy the notice requirement.  *See Solis v. Yang*, 345 F. App'x 35, 38 (6th Cir. 2009) ("Although in this case Tasty Buffet informed its employees that their pay would consist almost exclusively of tips, it did not discuss its minimum-wage obligation or explain that it was applying a tip credit against that obligation.  As a result, Tasty Buffet failed to meet the statutory notice requirement for receiving tip credit, and the district court did not err in disallowing an offset on this basis."); *see also Kilgore*, 160 F.3d at 298; *Chez Robert*, 28 F.3d at 403; *Tango's Rest.*, 969 F.2d at 1322; 1 Wage and Hour Law § 8:27 ("It is insufficient that the employees know that they receive tips and one-half of the applicable minimum wage.").  *But see Rudy v. Consol. Rest. Cos.*, No. 3:08-CV-0904-L (BF), 2010 WL

43

3565418, at *9 (N.D. Tex. Aug. 18, 2010) ("Explaining that an employee would make $2.15/hour plus tips and that they would participate in a tip pool has been determined to be sufficient notice under Section 203(m).").[14]

As for defendants' second argument, Steve Makris and Ziotas testified that a poster about minimum wage was posted somewhere in the restaurant, although neither testified as to the poster's content or knew its source.  (Second Aranyos Decl. Ex. A [Fiskardo 30(b)(6)] at 129:13-130:11; *id.* Ex. C [S. Makris] at 182:19-183:16.)  The Executive Chef at Thalassa, Ralpheal Abrahante, testified that the poster was a "government poster that . . . talks about minimum wage, the dates of the minimum wage, also states about jury duty, things of that nature," that the poster was in English and Spanish, and that it was located across from the employee locker room.  (Second Aranyos Decl. Ex. E at 32:23-33:25.)

Some courts have held or suggested that a poster can constitutes sufficient notice.  *See Pellon v. Business Representation Int'l, Inc.*, 528 F. Supp. 2d 1306, 1310 (S.D. Fla. 2007) ("Because it would defy logic to require the display of inadequate information regarding the minimum wage and employer tip credit, a prominently displayed poster using language approved by the Department of Labor to explain 29 U.S.C. § 203(m) is sufficient notice."); *see also Davis v. B & S, Inc.*, 38 F. Supp. 2d 707, 719 (N.D. Ind. 1998) ("The *Kilgore* decision demonstrates that an employer may meet the notice requirement simply by providing conforming written materials to its employees.  This holding is supported by *dicta* from other decisions indicating that an employer can satisfactorily convey notice of the tip credit by way of a poster, if the content of the poster is otherwise sufficient and it is prominently displayed.").  But, as

---

[14] *Rudy* appears to rely on *Kilgore* for this proposition.  But in *Kilgore*, the Sixth Circuit held that a file folder including the "Outback Tip Policy," which explained that employees would participate in a tip pool and that tips would be used as a credit against the minimum wage, was sufficient to inform a plaintiff in that case; it did not hold that explaining that an employee would make $2.15/hour plus tips and that the employee would participate in a tip pool was sufficient notice.  *See Kilgore*, 160 F.3d at 298-300.

defendants acknowledge, a poster constitutes sufficient notice only "if the content of the poster is otherwise sufficient and it is prominently displayed."  (Defs.' Opp'n at 22.)  And in this respect, defendants' efforts fall short of the standard for the notice obligation articulated by the Courts of Appeals, which have uniformly "require[d] at the very least notice to employees of the employer's intention to treat tips as satisfying part of the employer's minimum wage obligations."  *Tango's Rest.*, 969 F.2d at 1322; *Kilgore*, 160 F.3d at 298; *Chez Robert*, 28 F.3d at 403.  A generic government poster could inform employees that minimum wage obligations exist, but could not possibly inform employees that their employers intend to take the tip credit with respect to their salary.[15]  Given the "strictly construed" nature of the notice requirement, defendants' evidence is insufficient to create a triable issue of fact as to whether the notice requirement has been satisfied, as it compels only the conclusion that the tipped employees knew they were tipped and that minimum wage obligations exist.  *Chung*, 246 F. Supp. 2d at 229; *see also Richard v. Marriott Corp.*, 549 F.2d 303, 305 (4th Cir. 1977) ("What the Congress has said, in effect, to restaurant employers is that, if you precisely follow the language of 3(m) *and fully inform* your employees of it, you may obtain a 50 percent credit from the receipt of tips toward your obligation to pay the minimum wage." (emphasis added)).

Because the notice requirement is unsatisfied, defendants are not entitled to a tip credit. In turn, because it is undisputed that plaintiffs' base pay rate was below the applicable minimum wage, summary judgment as to plaintiffs' federal-law minimum-wage claim is also appropriate.

---

[15] To the extent this conflicts with that of *Pellon*, the Court is not persuaded by the reasoning therein.  It does not "defy logic" that the Department of Labor would required posted notice about the minimum wage laws generally, but also require specific notice to a tipped employee that tips would be used in his case to meet the employer's minimum wage obligation.  The regulation requiring the posted notice, 29 C.F.R. § 516.4, addresses a broader responsibility of the employer to inform employees of the minimum wage provisions more generally, as opposed to the tip-credit notice requirement, which deals more specifically with the provisions of 29 U.S.C. § 203(m). *Compare* 29 C.F.R. § 516.4 ("Every employer employing any employees subject to the Act's minimum wage provisions shall post and keep posted a notice explaining the Act . . . .") *with* 29 U.S.C. § 203(m) ("The preceding 2 sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection . . . .").

**B. State Law**

Under New York state law, the minimum hourly wage was $5.15 on and after March 31, 2000; $6.00 on and after January 1, 2005; $6.75 on and after January 1, 2006; and $7.15 on and after January 1, 2007.  N.Y. Lab. Law § 652(1).  New York regulations set the current minimum wage at $7.25 per hour or the applicable federal minimum wage, whichever is greater.  N.Y. Comp. Codes R. & Regs. tit. 12, § 146-1.2.  It is undisputed that Thalassa paid its employees a base rate that was less than these amounts during the applicable periods.

As with plaintiffs' federal-law claims, however, defendants argue that they are entitled to a tip allowance under New York state law. "New York state law allows employers to credit a portion of an employee's tips and the costs of meals as allowances against the minimum wage requirement when certain preconditions are met."  *Padilla v. Manlapaz*, 643 F. Supp. 2d 302, 309 (E.D.N.Y. 2009).  Under the regulations in force during the events of this lawsuit, "[f]irst, the employer [was] required to 'furnish to each employee a statement with every payment of wages listing . . . allowances . . . claimed as part of the minimum wage . . . .'"  *Id.* at 309-10 (quoting N.Y. Comp. Codes R. & Regs. tit. 12, § 137-2.2).[16] "Second, the employer must 'maintain and preserve for not less than six years weekly payroll records which shall show for each employee . . . allowances . . . claimed as part of the minimum wage . . . .'"  *Id.* at 310 (quoting N.Y. Comp. Codes R. & Regs. tit. 12, § 137-2.1).

Here, although defendants provided plaintiffs with a pay statement listing hourly pay, deductions, and tip income, the pay statements do not show "allowances . . . claimed as part of the minimum wage."  (*See* Second Aranyos Decl. Ex. X); N.Y. Comp. Codes R. & Regs. tit. 12, § 137-2.2.   Neither do defendants' payroll records show "allowances . . . claimed as part of the

---

[16] These wage regulations have since been repealed and superseded by new regulations.  *See generally* N.Y. Comp. Codes R. & Regs. tit. 12, §§ 146-1.1-9.

minimum wage."  (*See* Second Aranyos Decl. Ex. Y); N.Y. Comp. Codes R. & Regs. tit. 12, § 137-2.1.  Both the pay statements and the payroll records show only that plaintiffs earned tip-related income; they do not record that any of the tip income was claimed as part of the minimum wage.  Accordingly, defendants have failed to meet this requirement of claiming a "tip allowance" under New York law.

Additionally, defendants' violation of N.Y. Lab. Law § 196-d itself constitutes an independent and sufficient reason to find that defendants are not entitled to a tip credit.  *See Lu*, 503 F. Supp. 2d at 711 (noting that "this separate violation of § 196-d would render Jing Fong ineligible to receive a tip credit under New York law").

Accordingly, summary judgment is granted to plaintiffs on the issue of defendants' violation of the minimum wage laws.

**V.  Overtime**

It is undisputed that in this case, all plaintiffs occasionally worked over forty hours in a week and that plaintiffs are entitled to overtime pay for those hours at a rate 1.5 times their regular wage.  Here, the parties' dispute is over how overtime pay should be calculated under applicable federal and state laws.  Defendants argue that the base hourly rate (before the tip credit is applied) is the appropriate wage by which it should calculate overtime pay; plaintiffs argue that the statutory minimum wage is the floor from which the overtime wage should be calculated.

**A.  Federal Law**

The FLSA provides that an employee shall receive overtime pay "at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207.  Federal regulations provide that "a tipped employee's regular rate of pay includes the amount of tip

credit taken by the employer."  29 C.F.R. § 531.60.  In addition, "[w]here a higher minimum

wage than that set in the [FLSA] is applicable to an employee by virtue of . . . other legislation,

the regular rate of the employee . . . cannot be lower than such applicable minimum, for the

words 'regular rate at which he is employed' . . . must be construed to mean the regular rate at

which he is lawfully employed."  29 C.F.R. § 778.5.  Based on these regulations, paying an

overtime wage one and one-half times the base hourly wage rate, as defendants have done, is

improper.  Even if defendants were entitled to take a tip credit, that credit should have been

included in the "regular rate" under 29 C.F.R. § 531.60.  If defendants were not so entitled (as

the Court has held here), it is inconsistent with the purposes of the FLSA and 29 C.F.R. § 778.5

to allow defendants to use an illegal "regular rate of pay" to calculate overtime pay.

In either case, defendants' calculation would be unduly low.  The proper method for

calculating overtime wages for tipped employees was illustrate by way of example in an opinion

from the District Court for the District of Columbia:[17]

> For example, a tipped employee working forty-five hours in a week is entitled to
> $344.40 (($7.25 x 40) + ($10.88 x 5)). For the first forty hours, the employer only
> needs to pay $2.13 per hour. It would be incorrect, however, to multiply $2.13 by
> 1.5 to get the rate the employer must pay for the overtime hours.  That would
> result in the employer paying only $3.20 for each overtime hour, which would
> mean the employer takes a tip credit of $7.68 ($10.88–$3.20).  This amount is
> higher than the tip credit permitted by 29 U.S.C.A. § 203(m), which, even for
> overtime hours, is still the minimum wage less $2.13, or $5.12.  Thus, for each
> hour worked over forty hours, the employer must pay $5.76 ($10.88–$5.12).
> Adding regular and overtime wages, the employer must pay a total of $114
> (($2.13 x 40) + ($5.76 x 5)).

*Ventura v. Bebo Foods, Inc.*, 738 F. Supp. 2d 8, 16 n.1 (D.D.C. 2010).

In their opposition, defendants rely on *Jin v. Pacific Buffet House*, No. CV-06-579

(VVP), 2009 WL 2601995, at *7 (E.D.N.Y. Aug. 24, 2009), where the court noted that "[f]or the

three weeks in February 2001 when the plaintiff was paid at the rate of $3.00 per hour, she

---

[17] In the example, the minimum wage is $7.25.

should have been paid at least $3.30 per hour for the first forty hours and $4.95 per hour (1.5 x $3.30) for overtime hours."  According to defendants, because the court in *Jin* used a base hourly rate lower than minimum wage to calculate overtime wages, the Court should do so as well.  But as *Ventura* points out, allowing an employer to use the hourly base wage would allow an employer to take a tip credit higher than that permitted by 29 U.S.C. § 203(m).  In short, the tip credit provides a way for employers of tipped employees to apply some tips to the wages, but does not provide a way to subvert the minimum wage through creative arithmetic.  Defendants' method of calculating overtime is incorrect under the law and they therefore violated the overtime provisions of the FLSA.  *See Ventura*, 738 F. Supp. 2d at 16 n.1; *Holder v. MJDE Venture, LLC*, No. 1:08-CV-2218-TWT, 2009 WL 4641757, at *2 (N.D. Ga. Dec. 1, 2009) (using the same method of calculating overtime pay).

## B.  State Law

New York law has a requirement similar to the FLSA's overtime provision.  *See* N.Y. Comp. Codes R. & Regs. tit. 12, § 137-1.3 ("An employer shall pay an employee for overtime at a wage rate of 1 1/2 times the employee's regular rate for hours worked in excess of 40 hours in one workweek.").  A 2009 Opinion Letter from the NYDOL uses the same formula to calculate overtime pay as does *Ventura* and *Holder*.  (*See* Ashley Decl. Ex. 137.)

Defendants appear on one hand to concede that their method is improper in their opposition brief.  (*See* Defs.' Opp'n at 28 ("[T]he Restaurant will pay the difference between the reduced hourly overtime rate they were paid based on the tip allowance and the New York minimum wage times 1.5 minus the tip allowance.").)  At the same time, defendants argue that the Court "should not give any weight to the 2009 NYDOL Opinion Letter."  (*Id.*)  Even absent that letter, though, the Court would still come to the same conclusion regarding the application of

N.Y. Comp. Codes R. & Regs. tit. 12, § 137-1.3 as the letter did.  To the extent defendants argue that their method of calculating overtime is correct, the Court disagrees, and grants summary judgment on plaintiffs' state-law overtime claim.

## VI. Spread of Hours Pay

Under New York law, an employee is entitled to an additional hour's pay "at the basic minimum hourly wage rate before allowances, in addition to the minimum wages otherwise required" for each day in which the spread of hours exceeds ten hours.  N.Y. Comp. Codes R. & Regs. tit. 12, § 137-1.7.  Defendants do not dispute plaintiffs' motion for summary judgment on this issue, and the record reflects undisputedly that defendants did not compensate employees with spread-of-hours pay.  (Defs.' Opp'n at 4.)  Accordingly, summary judgment is granted on this count.

## VII.   Uniforms

Defendants have moved for summary judgment on plaintiffs' claim that defendants failed to reimburse them for the costs of purchasing, cleaning, and maintaining uniforms.  "Where an employee purchases a required uniform he shall be reimbursed by the employer for the cost thereof not later than the time of the next payment of wages."[18]  N.Y. Comp. Codes R. & Regs. tit. 12, § 137-1.8.

A "required uniform" is "clothing worn by an employee, at the request of an employer, while performing job-related duties" but not "clothing that may be worn as part of an employee's ordinary wardrobe."  N.Y. Comp. Codes R. & Regs. tit. 12, § 137-3.13.  Plaintiffs argue that the captains' clothing was a "required uniform" because Lantigua testified that the suits were a

---

[18] "The provision only applies 'if the employees' expenditures for [uniform-maintenance] purposes would reduce their wages to below minimum wage.'"  *Chan*, 2007 WL 313483, at *22 (quoting *Ayres*, 12 F. Supp. 2d at 310).  In this case, since the Court has already determined that defendants are ineligible to take a tip credit under the FLSA, plaintiffs' wages are already below minimum wage, and if plaintiffs' work clothes were indeed uniforms, defendants will have violated this provision.

shiny, Liberace style that he disliked and because Matute threw away his tie after his

employment with Thalassa ended.  Plaintiffs argue that the busboys were required to wear black

aprons and vests, the "particular brand and style" of which were "dictated" by Thalassa, that the

busboys would not wear these items in their ordinary wardrobes, and that therefore the aprons

and vests were "required uniforms."  (Pls.' Opp'n at 26-27.)  Defendants argue that because

"[n]one of the clothing worn by any plaintiff had the name or logo of the Restaurant" and

because "all of that clothing was the property of each plaintiff, who could wear it socially and

kept it when their employment ended," that there are no "required uniforms" in this case.  (Defs.'

Mem. at 17-18.)

        The question of whether plaintiffs' work clothing constituted a required uniform under

New York law is better decided by a trier of fact in this case than as a matter of law.  *See, e.g.*,

*Ramirez v. CSJ & Co.*, No. 06 Civ. 13677 (LAK), 2007 WL 700831, at *2 (S.D.N.Y. Mar. 6,

2007) ("Although I am sorely tempted, given current dress norms, to hold that a blue T-shirt

bearing a deli's name and logo is 'clothing that may be worn as part of an employee's ordinary

wardrobe,' the question probably is better decided by a trier of fact than as a matter of law."

(quoting N.Y. Comp. Codes R. & Regs. tit. 12, § 137-3.13)).  Several courts have found that

requiring a specific color of clothing might reasonably be considered to make work clothing a

uniform under New York law.  *See, e.g.*, *Chan*, 2007 WL 313483, at *22 ("The uniforms that

plaintiffs and other employees wear at 88 Palace, consisting of either suits or jackets, and pants,

shirts, and ties of specific colors, constitute 'required' uniforms."); *Ayres*, 12 F. Supp. 2d at 310

("On this record, a reasonable juror could conclude that Le Madri's required outfit constituted a

uniform.  Although most of the articles of clothing at issue arguably 'may be worn as part of an

employee's ordinary wardrobe' and no specific brands are mandated, specific colors are required

(black shoes and socks and white shirts) . . . .").  Here, where a reasonable factfinder could find that captains wore suits, ordered from a single retailer, that were of a color that they disliked, and busboys were required to wear aprons and vests of a particular color and style chosen by defendants, summary judgment is inappropriate.

## VIII.    False Imprisonment of Vargas

Next, defendants move for summary judgment on Vargas's false imprisonment claim, which is based on the interrogation of Vargas in Thalassa's office by Steve Makris.  Under New York law, a claim for false imprisonment requires that a plaintiff show "the defendant intended to confine the plaintiff, that the plaintiff was conscious of the confinement and did not consent to the confinement, and that the confinement was not otherwise privileged."  *Burgio v. Ince*, 913 N.Y.S.2d 864, 865 (N.Y. App. Div. 2010).  Defendants argue that the interrogation was not false imprisonment because "Vargas was not confined, Steve Makris did not intend to confine Vargas, and Vargas consented to the meeting."  (Defs.' Mem. at 15.)  Because Vargas has failed to show actual confinement, the Court grants defendants' summary judgment motion on this issue.

"A false imprisonment claim requires a prima facie showing of actual confinement or threatening conduct."  *Lee v. Bankers Trust Co.*, No. 96 Civ. 8153 (DAB), 1998 WL 107119, at *4 (S.D.N.Y. Mar. 11, 1998), *aff'd*, 166 F.3d 540 (2d Cir. 1999).  Vargas argues that "Steve Makris's premeditated seclusion, detention, and interrogation of Vargas with the assistance of his staff and the off-duty officers created a reasonable apprehension of force."  (Pls.' Mem. at 15.) However, Vargas cannot rely on Steve's interrogation alone to support his claim for false imprisonment, as "[a] lengthy interview of an employee by an employer, without more, does not support a claim for false imprisonment."  *Lee*, 1998 WL 107119, at *4.  Vargas also argues that his testimony that Steve Makris threatened him with arrest precludes summary judgment.  But a

fear of being arrested also does not suffice to support a false imprisonment claim. *Arrington v. Liz Claiborne, Inc.*, 688 N.Y.S.2d 544, 546 (N.Y. App. Div. 1999) ("Plaintiffs' fears that they would be arrested or fired did not constitute detaining force necessary to establish the tort of false imprisonment."); *Malanga v. Sears, Roebuck and Co.*, 487 N.Y.S.2d 194, 196 (N.Y. App. Div. 1985) ("Plaintiff's fear that she would be arrested or fired if she left does not constitute the detaining force necessary to establish the tort of false imprisonment."); *see also Blumenfeld v. Harris*, 159 N.Y.S.2d 561, 563 (N.Y. App. Div. 1957) ("Threats to invoke peacefully the processes of the law, standing alone and unaccompanied by force or any other form of restraint, cannot result in such a detention as would constitute false imprisonment . . . ."). Vargas also argues that a factual dispute exists about whether the door to the office was open, but this also does not preclude summary judgment. *See Arrington*, 688 N.Y.S. 2d at 546 (holding that trial court erred in denying summary judgment on false imprisonment claim despite plaintiffs' assertion that they "believed" that the door to the office was locked). Finally, Vargas argues that the presence of plainclothes police officers and his testimony that Steve Makris was initially reluctant to allow him to retrieve his attorney's business card also require trial. But Steve Makris eventually did acquiesce to Vargas's request and allowed him to retrieve his attorney's card, and in any case, these issues do not suffice to create the reasonable apprehension of force necessary for a claim of false imprisonment. *See, e.g.*, Prosser & Keaton on The Law of Torts § 11, at 51 (5th ed. 1984) ("The presence of a policeman who questions the plaintiff . . . is not imprisonment, so long as no present restraint of liberty is implied."). Accordingly, summary judgment is appropriate on this claim.

### IX. Sexual Harassment

Defendants also move for summary judgment on Melendez's claims of hostile work environment and constructive discharge, as well as Diaz de la Vega's quid pro quo sexual harassment claim under both state and city laws.

### A.  State Law Standards

Courts "review discrimination claims brought under the NYSHRL according to the same standards that we apply to Title VII discrimination claims." *Pucino v. Verizon Wireless Commc'ns*, 618 F.3d 112, 117 n.2 (2d Cir. 2010).  The protections of Title VII, and by implication, the NYSHRL, extend to same-sex harassment claims, such as the ones alleged here, where the plaintiffs and alleged harasser, Kurt, are all male.  *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 79 (1998).

"Courts have traditionally recognized two forms of sexual harassment: '*quid pro quo*' harassment and 'hostile work environment' harassment."  *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 57 (2d Cir. 2004).  A plaintiff states a claim for quid pro quo harassment when he "proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands."  *Id.*  "A tangible employment action usually 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  *Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Mormol*, 364 F.3d at 57).  "If, however, a 'claim involves only unfulfilled threats, it should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct.'"  *Id.*

To survive a summary judgment motion on a hostile work environment claim under the NYSHRL, a plaintiff must "proffer sufficient evidence to allow a trier of fact to find disparate

treatment based on gender, resulting in a hostile working environment that was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . .'"  *Pucino*, 618 F.3d at 117 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  "The relevant inquiry focuses on both objective and subjective hostility: 'A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it.'"  *Id.* at 119 (quoting *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999)).  "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'"  *Oncale*, 523 U.S. at 81 (quoting *Harris*, 510 U.S. at 23).  Considerations include "(1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's work performance."  *Mormol*, 364 F.3d at 58.  "In establishing this element, a plaintiff need not show that her hostile working environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions."  *Pucino*, 618 F.3d at 119 (emphasis in original).

"[A]n employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily."  *Petrosino v. Bell Atlantic*, 385 F.3d 210, 229 (2d Cir. 2004).  "Case law generally focuses on two parts of this standard: the employer's intentional conduct and the intolerable level of the work conditions."  *Id.*  The latter issue is "assessed objectively by reference to a reasonable person in the employee's position."  *Id.* (citing *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004)).

**B. City Law Standards**

"[C]laims under the City HRL must be given 'an independent liberal construction' . . . . "
*Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (quoting *Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 31 (N.Y. App. Div. 2009)).  Under the NYCHRL, "the primary issue for a trier of fact . . . is whether the plaintiff has proven by a preponderance of the evidence that she has been treated less well than other employees because of her gender."
*Williams*, 872 N.Y.S.2d at 39.  Even so, "the broader purposes of the City HRL do not connote an intention that the law operate as a 'general civility code.'"  *Id.* at 40.  Accordingly, defendants in NYCHRL suits have an affirmative defense "if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'"  *Id.* at 41.  This defense "target[s] concerns about truly insubstantial cases, while at the same time avoiding improperly giving license to the broad range of conduct that falls between 'severe or pervasive' on the one hand and a 'petty slight or trivial inconvenience' on the other."  *Id.*

**C. Diaz de la Vega's Claims**

Diaz de la Vega asserts hostile work environment and quid pro quo harassment claims.
As the factual basis for his claims, Diaz de la Vega testified that Kurt began "showing [him] his homosexual tendencies" when Kurt was a waiter.  (Goodman Decl. Ex. 3 [Diaz de la Vega] at 70:15-22.)  Although Kurt never "explicitly ask[ed] [Diaz de la Vega] to engage in a sexual act, or to have sex," Diaz de la Vega testified that he "asked me on different occasions to go out together," "touched me inappropriately," "asked me to show him my penis" when they were in the bathroom together, "touch[ed] my shoulders as if he was massaging me," and "grab[bed] my penis."  (*Id.* at 69:16-70:14.)  Diaz de la Vega also testified that Kurt would ask him "personal

questions" such as whether he "had a boyfriend or girlfriend, and if it's true that Latinos are

horny or excitable."  (*Id.* at 71:23-72:4.)  Kurt denies that any of the allegedly harassing conduct

happened.  (Aranyos Decl. Ex. JJ [Kurt] at 329:22-331:3.)

Defendants argue that Diaz de la Vega's claims are barred by the doctrines of collateral

estoppel, judicial estoppel, and election of remedies, and also that his claims fail on the merits.

### i.   Collateral Estoppel

Collateral estoppel, or issue preclusion, bars a party and its privies from relitigating an

issue if there is a judgment in a prior proceeding and "(1) the issues in both proceedings are

identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3)

there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously

litigated was necessary to support a valid and final judgment on the merits."  *NLRB v. Thalbo*

*Corp.*, 171 F.3d 102, 109 (2d Cir. 1999).  "The doctrine of collateral estoppel may, of course,

apply to the relitigation in a court of prior findings by the Board."  *Truck Drivers Local Union*

*No. 807, I.B.T. v. Regional Import & Export Trucking Co.*, 944 F.2d 1037, 1043 (2d Cir. 1991).

Because the NLRB concluded that Diaz de la Vega quit his job and was not fired, defendants

assert that Diaz de la Vega cannot re-litigate those facts in this Court.[19]

Plaintiffs argue, however, that the NLRB was the party in the administrative proceeding,

and that Diaz de la Vega was only a "charging party."  Accordingly, in plaintiffs' estimation,

Diaz de la Vega has not had a "full and fair opportunity" to litigate in the prior NLRB action.

The case law favors plaintiffs' position.  In *Altemose Construction Co. v. Building &*

*Construction Trades Council of Philadelphia and Vicinity*, 751 F.2d 653 (3d Cir. 1985), the

Third Circuit noted that "the charging party[] had no control over the factual or legal issues tried

---

[19] Defendants also argue briefly that other unspecified claims of plaintiffs Vargas and S. Lopez are barred by
collateral estoppel.  (Defs.' Mem. at 42.)

before the Board because the General Counsel controlled the litigation."  751 F.2d at 661-62.

Accordingly, it was "clear that no plaintiff had a full and fair opportunity to litigate the issue of

organizational purpose before the Board, and all are free to attempt to do so in this proceeding."

*Id.* at 662.  The Second Circuit also found the NLRB's interests to be sufficiently different than a

private litigant's such that the application of issue preclusion was not warranted from one

proceeding to the other, although in *Thalbo*, it was urged that issue preclusion be applied against

the NLRB by virtue of the private litigant's former suit.  *Thalbo*, 171 F.3d at 110 ("The interests

of a private litigant in a Title VII action are not usually the same as the interests of the NLRB in

an unfair-labor-practice proceeding.").  Nor do the cases that defendants cite hold differently.  In

*Wickham Contracting Co. v. Board of Educ. of City of New York*, 715 F.2d 21 (2d Cir. 1983), the

Second Circuit applied collateral estoppel against a party who was a defendant in a prior NLRB

proceeding, a distinction that *Altemose* found important.  *See Wickham Contracting*, 715 F.2d at

22-23, 26-28; *see also Altemose*, 751 F.2d at 661 ("We have held that a Board decision may be

given preclusive effect in a subsequent antitrust case.  In that case, however, the party against

which collateral estoppel was asserted was a respondent, which controlled its side of the

litigation before the Board.  Altemose, as the charging party, had no control over the factual or

legal issues tried before the Board because the General Counsel controlled the litigation."

(internal citation omitted)).  Accordingly, collateral estoppel does not apply to plaintiffs' claims

in this action, including Diaz de la Vega's.

   **ii.  Judicial Estoppel**

        The doctrine of judicial estoppel "prevents a party from asserting a factual position

clearly inconsistent with a position previously advanced by that party and adopted by the court in

some manner."  *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 2011 WL 905118, at *9

(2d Cir. 2011) (internal quotation marks and alterations omitted).  Its purpose is "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment."  *Id.*  Thus "relief is granted only when 'the risk of inconsistent results with its impact on judicial integrity is certain.'"  *Id.* (quoting *Simon v. Safelite Glass Corp.*, 12 F.3d 68, 71-72 (2d Cir. 1997)).  Defendants claim that because Diaz de la Vega, in the NLRB action, "claimed that he was terminated from Thalassa for engaging in protected activities," whereas "in this action, he asserts that he was terminated for refusing to engage in sexual acts," and because "the ALJ concluded that Diaz de la Vega . . . voluntarily left Thalassa," judicial estoppel should apply.

Here, there is no ground for applying judicial estoppel.  Quite simply, the NLRB did not adopt Diaz de la Vega's position, but instead rejected his position with respect to the reason for his termination.  Defendants fail therefore on the second element of the doctrine, namely, that the inconsistent position be "adopted by the court in some manner."  *Republic of Ecuador*, 2011 WL 905118, at *9.  Defendants assert that "[j]udicial estoppel should not be as narrow as plaintiff suggests (i.e. only to circumstances were [sic] the tribunal renders favorable judgment)."  But the law is clear that "the prior inconsistent position must have been adopted by the court in some manner."  *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1038 & n.4 (2d Cir. 1993).

### iii. Election of Remedies

Under the election-of-remedies doctrine, "an election will be found only if a party has chosen to pursue one position that is inconsistent with another possible position, with full knowledge of the circumstances that make both theories available and inconsistent."  18B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4476.  The doctrine, however, "is harsh and generally disfavored by courts."  *In re Riverside Nursing*

*Home*, 144 B.R. 951, 958 (S.D.N.Y. 1992); *accord Voutsis v. Union Carbide Corp.*, 452 F.2d 889, 894 (2d Cir. 1971) ("The 'harsh' and 'technical' procedural rule of election of remedies is not applicable to a Title VII civil rights plaintiff . . . ." (internal citation omitted)).

Nevertheless, defendants assert that the doctrine applies here because Diaz de la Vega asserts both that he was terminated as part of quid pro quo sexual harassment and in retaliation for labor law violations.  (Defs.' Mem. at 44.)  But "the doctrine of election of remedies only applies where the second remedy is clearly inconsistent with the first."  *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 130 (2d Cir. 2009).  "[W]here two causes of action that are not inconsistent arise from a single course of events, the doctrine of election of remedies does not preclude a plaintiff from asserting both claims."  *Riverside*, 144 B.R. at 957.  Here, the causes of action Diaz de la Vega has asserted are not clearly inconsistent; he could have been terminated for in retaliation or for refusing Kurt's alleged sexual advances, or both.  The Court therefore declines to apply the doctrine in this case.

### iv.  Merits

On the merits of Diaz de la Vega's quid pro quo claim under state law, defendants argue that (1) there was no sexual demand; (2) Diaz de la Vega chose to leave the Restaurant and was not fired, so there was no tangible employment action; and (3) no causal connection exists between the alleged sexual advances and the tangible employment action.  In response, Diaz de la Vega argues that (1) Kurt's requests to see his penis were requests to engage in sexual acts; (2) Kurt fired him, constituting a tangible employment action; and (3) the causal connection between the denial of the "implicit requests for sex and Diaz de la Vega's termination is also a disputed fact question."  (Pls.' Opp'n at 23-24.)

Diaz de la Vega's third argument is merely conclusory, though.  Even assuming that Diaz de la Vega's first two arguments are correct, "without 'some evidence of a causal connection between the alleged sexual harassment and [plaintiff's] termination, the plaintiff's *quid pro quo* sexual harassment claim must be dismissed.'"  *Clarke v. Mount Sinai Hosp.*, No. 05-CV-566 (CBA)(LB), 2007 WL 2816198, at *8 (E.D.N.Y. July 13, 2007) (quoting *Tabachnik v. Jewish Theological Seminary of America*, No. 03 Civ. 2759 (HB), 2004 WL 414826, at *2 (S.D.N.Y. Mar. 4, 2004)); *Messer v. Fahnestock & Co.*, No. 1:03-cv-04989-ENV-JMA, 2008 WL 4934608, at *15 (E.D.N.Y. Nov. 18, 2008).  Here, Diaz de la Vega has pointed to no evidence that purports to show such a causal connection.  In some cases, "where direct evidence is lacking, a plaintiff still may survive summary judgment by providing circumstantial proof that 'an adverse employment action followed closely in time after the employee rejected or complained about the supervisor's sexual advance.'"  *Messer*, 2008 WL 4934608, at *15.  But here, Diaz de la Vega's testimony does not ground any of Kurt's allegedly harassing behavior in a specific time period, so the Court can draw no reasonable inference as to the temporal proximity of that behavior to Diaz de la Vega's alleged firing.  Because Diaz de la Vega has failed to show a causal connection between the allegedly harassing conduct and the tangible employment action, summary judgment is appropriate on the state-law quid pro quo claim.

The case is less clear with Diaz de la Vega's NYCHRL sexual harassment claim. Defendants assert that the same arguments advanced with respect to the state-law claim also entitle them to summary judgment on the NYCHRL claim.  (Defs.' Mem. at 30.)  Defendants also add the argument that "[i]n order to prevail on a same-sex sexual discrimination claim, plaintiffs must present some evidence that the harasser was homosexual" and that "Melendez and Diaz de la Vega have presented no evidence of Kurt's homosexuality and therefore, no inference

can be made to support their contention that Kurt's actions were done out of sexual desire."
(Defs.' Reply at 19 (citing *Oncale*, 523 U.S. at 80).)

"The *Oncale* court described three possible ways . . . in which a plaintiff may prove that
same-sex harassment occurred 'because of sex.'" *Redd v. New York State Div. of Parole*, No.
07-CV-120 (NGG)(LB), 2010 WL 1177453, at *4 (E.D.N.Y. Mar. 24, 2010). "A plaintiff can
(1) provide 'credible evidence that the harasser was homosexual;' (2) demonstrate that the
harasser was 'motivated by general hostility to the presence of women in the workplace,' or (3)
'offer direct, comparative evidence about how the alleged harasser treated members of both
sexes [differently] in a mixed-sex workplace.'" *Id.* (quoting *Oncale*, 523 U.S. at 80). To prove a
harasser is homosexual, a plaintiff "must either present (1) evidence suggesting that the harasser
intended to have some kind of sexual contact with the plaintiff, or (2) proof that the alleged
harasser made same-sex sexual advances to others, especially to other employees." *Tepperwein
v. Entergy Nuclear Operations*, 606 F. Supp. 2d 427, 438 (S.D.N.Y. 2009) (internal quotation
marks omitted).

Here, Diaz de la Vega testified that Kurt is homosexual. (Goodman Decl. Ex. 3 [Diaz de
la Vega] at 110:18-20.) Kurt's alleged requests to see Diaz de la Vega's penis, questions about
whether Latinos were "horny," and attempts to touch Diaz de la Vega's crotch may also
reasonably be viewed as suggesting that Kurt intended to have some kind of sexual contact with
Diaz de la Vega. Although defendants would have the Court disbelieve Diaz de la Vega and
credit their contention that "the record clearly shows that Kurt is a heterosexual male" because
he "freely discussed his wife and their 1998 marriage" at deposition and because he "vehemently
denied ever hoping to have sexual or romantic relationship with either Mr. Diaz de la Vega or
Mr. Melendez," that would require the Court to engage in the sort of credibility determinations

inappropriate on a motion for summary judgment.  (Defs.' Reply at 19); *see Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010) ("Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." (quoting Fed. R. Civ. P. 56(e) advisory committee's note (1963))).

As for the arguments that defendants made on Diaz de la Vega's state-law claim, they do not suffice to defeat Diaz de la Vega's city-law claim under the more liberal standard.  It is not difficult for the Court to conclude that based on Diaz de la Vega's deposition testimony about Kurt's conduct, a reasonable jury could find that "plaintiff has proven by a preponderance of the evidence that []he has been treated less well than other employees because of [his] gender." *Williams*, 872 N.Y.S.2d at 39.  Defendants offer little argument to the contrary, and therefore Diaz de la Vega's city-law claim survives.

### D.  Melendez

Defendants have moved for summary judgment on Melendez's state-law hostile work environment and constructive discharge claims as well as his NYCHRL sexual harassment claim.  The factual basis for Melendez's claims begin with his testimony that Kurt rubbed his back several times starting in March 2008, sometimes at the coffee station, which was isolated and secluded from view.  (Goodman Decl. Ex. 16 [Melendez] at 82:8-84:22; *see also id.* Ex. 25 ("Lantigua Decl.") ¶ 4.)  On one occasion, as Melendez was putting away liquor bottles at the bar, Kurt rubbed his back for about ten minutes.  (Goodman Decl. Ex. 16 [Melendez] at 70:21-71:18.)  Kurt then grabbed Melendez by the waist and rubbed his genitals against Melendez.  (*Id.* at 73:5-75:3.)  That lasted "some seconds" until Melendez pushed him off and ran downstairs.

(*Id.* at 74:24-75:7.)  Melendez testified that he felt depressed afterwards and did not return to work.  (*Id.* at 63:15-19, 115:5-116:16.)

### i.   **Hostile Work Environment**

"To withstand summary judgment, a 'plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.'"  *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)).  Defendants argue that because Kurt allegedly rubbed his genitals against Melendez "for mere seconds," the conduct was not sufficiently severe or persuasive as to alter the conditions of Melendez's working environment.  (Defs.' Mem. at 21.)

This case, however, is distinguishable from the cases defendants cite.  For example, in *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998), the alleged harasser "told [plaintiff] she had been voted the 'sleekest ass' in the office" and "on another occasion, . . . deliberately touched [plaintiff's] breasts with some papers that he was holding in his hand."  In that case, "the single incident of physical contact was incidental and fleeting."  *Guzman v. Macy's Retail Holdings, Inc.*, No. 09 Civ. 4472 (PGG), 2010 WL 1222044, at *5 (S.D.N.Y. Mar. 29, 2010).  Here, the physical contact, as related by Melendez, was not incidental, but, with all inferences drawn in his favor, was the culmination of a ten-minute sequence in which Kurt was closing in on Melendez while rubbing his back.  (Goodman Decl. Ex. 16 [Melendez] at 73:5-11.)  Furthermore, according to Melendez, the reason that the rubbing stopped was not because Kurt voluntarily ceased, but because Melendez pushed him off, which detracts from the probative value of the length of the physical contact.  (*Id.* at 74:9-75:3.)  *Osorio v. Source Enterprises*, 05 Civ. 10029 (JSR), 2006 WL 2548425, at *5 (S.D.N.Y. Sept. 5, 2006), did not involve physical

contact, but instead involved "pictures," an "offensive screen saver," and "one isolated incident of men in a mailroom watching a pornographic movie."  In *Feliciano v. Alpha Sector, Inc.*, No. 00 Civ. 9309 (AGS), 2002 WL 1492139, at *8-9 (S.D.N.Y. July 11, 2002), the alleged harasser "complimented [the plaintiff], said he wanted to date her, attempted to hug her, stated on one occasion that he wanted to 'lay with' [the plaintiff], and, after having given her a ride home, kissed her."  In short, none of these cases specifically address the situation here, in which an alleged harasser grabbed the plaintiff by the waist and rubbed his genitals against the plaintiff. While such isolated incidents of offensive physical contact constituted close questions, *see, e.g.*, *Guzman*, 2010 WL 1222044, at *4-5, given the Second Circuit's "repeated[] caution[s]"  against setting the bar too high," *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003), a reasonable jury could consider Kurt's conduct sufficiently severe so as to alter the conditions of employment, and therefore summary judgment is denied on this count.

Because Melendez's hostile work environment claim survives, his claim under the more liberal NYCHRL also survives.

### ii.  Constructive Discharge

The standard for establishing a constructive discharge claim is "higher than the standard for establishing a hostile work environment."  *Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010).  Constructive discharge cases "present[] a 'worse case' harassment scenario, harassment ratcheted up to the breaking point."  *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147-48 (2004).  "[T]he plus-factor attendant to a hostile work environment-based constructive discharge claim . . . is the requirement of evidence that shows that the working conditions were such that a reasonable person would be compelled to resign rather than work in the altered conditions of his employment."  *EEOC v. Grief Brothers Corp.*,

No. 02-CV-468S, 2004 WL 2202641, at *15 (W.D.N.Y. Sept. 30, 2004).  Defendants argue that Melendez's claim fails to meet this higher standard.

Defendants' argument, however, falls short.  Defendants argue again that because Melendez was "exposed to this supposedly 'intolerable' atmosphere for only a few seconds," that "there is no evidence that the employer deliberately created working conditions which were so difficult or unpleasant that a reasonable person in the [sic] Melendez's shoes would feel compelled to resign."  (Defs.' Mem. at 24.)   But with all inferences drawn in Melendez's favor, the Court cannot say that no reasonable jury would find that being rubbed with a supervisor's genitals, even if for ten seconds, would cause Melendez's working conditions to be such that he would feel compelled to resign.  Accordingly, summary judgment is denied on the constructive discharge claim as well.

## X.  Retaliation

Defendants also move for summary judgment on the claims of Copantitla, Diaz de la Vega, Lantigua, Lizondro, S. Lopez, A. Maldonado, Melendez, and Vargas, that defendants retaliated against them in violation of N.Y. Lab. Law § 215 following their complaints about tips.  The statute provides in relevant part:

> No employer or his or her agent . . . shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee . . . because such employee has made a complaint to his or her employer . . . that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter . . . .

N.Y. Lab. Law § 215.  To establish a prima facie case under this section, "the plaintiff must adequately plead that while employed by the defendant, she made a complaint about the employer's violation of the law and, as a result, was terminated or otherwise penalized, discriminated against, or subjected to an adverse employment action."  *Higueros v. New York*

*State Catholic Health Plan, Inc.*, 630 F. Supp. 2d 265, 269 (E.D.N.Y. 2009).  "Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action."  *Id.* at 271 (quoting *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001)).  The plaintiff can counter that legitimate, nondiscriminatory reason with evidence that the explanation is pretextual.  *Id.* at 272.

Defendants argue that none of the above-named plaintiffs can establish a prima facie case for retaliation, and in some cases, offer legitimate, nondiscriminatory reasons for its actions.  The Court addresses defendants' arguments as to each plaintiff in turn.

## A. Lantigua

Defendants argue that Lantigua, who alleges retaliatory termination and reduction in hours, fails to show retaliation because (1) the evidence shows that he was not terminated but instead left to attend law school; (2) Lantigua's hours and monthly pay increased immediately following the Spring 2008 Incident; (3) any reduction in hours in July was due to Lantigua's absence and tardiness, not because of any retaliatory motive.  Lantigua's counter-argument focuses on the alleged retaliatory termination.  (*See* Pls.' Opp'n at 32.)

In support of his argument, Lantigua cites his testimony before the NLRB in which he testified that Kurt, when asked by Lantigua why he was being fired, told Lantigua that he "did it to [him]self."  (Goodman Decl. Ex. 12 [Lantigua] at 269:17-23.)  Lantigua further testified that Kurt told him that he "was getting all the busboys and the front of the house against the company; turned these guys against the company.  And that I did it to myself."  (*Id.*)  In reply, defendants argue that "he tries to sustain his retaliation claim by basing it not on the March [2008 Incident], but on his [Restaurant Opportunities Center of New York] organizing activities."  (Defs.' Reply at 21.)  Defendants further argue that "this issue has been adjudicated

before the NLRB and plaintiffs' retaliation claims are limited to two complaints [the March 2008 and October 2008 Incidents] about tips and wages—and are not premised on purported union activities." (*Id.*) The Court has dealt with the issue of prior adjudication before the NLRB above. As for defendants' second argument, a plaintiff's activities "in organizing to file a lawsuit are certainly protected activities." *Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240, 263 (S.D.N.Y. 2008). Lantigua's testimony therefore could be read as direct evidence of a retaliatory motive against protected activity, and summary judgment on his retaliation claim is therefore denied.

### B. Diaz de la Vega

Defendants argue for summary judgment on Diaz de la Vega's retaliation claim because "the uncontroverted record as well as the factual findings made by the [NLRB] demonstrates that Diaz de la Vega left Thalassa so he could work at another restaurant . . . ." (Defs.' Mem. at 36.) To the extent defendants rely on collateral estoppel, that has been addressed above. To the extent defendants rely on the record for the conclusion that Diaz de la Vega left Thalassa voluntarily to work at another restaurant, evidence in the record renders that issue disputed. Diaz de la Vega testified that he asked Kurt if he could take a day off "because one of my cousins is coming from [out of the] country, . . . and he told me 'You can take all of your days off,' like get out of here." (Goodman Decl. Ex. 21 [Diaz de la Vega NLRB] at 456:9-16.) Diaz de la Vega further testified that he called in to the restaurant later to see whether he had been fired, and his suspicion that he had been was confirmed. (*Id.* at 456:25-457:6.) In his deposition, Diaz de la Vega also testified that Zapantis withheld wages from him as a "punishment" for "attacking the bosses." (Goodman Decl. Ex. 3 [Diaz de la Vega] at 59:13-60:4.) Accordingly, triable issues of fact exist with respect to whether Diaz de la Vega endured a retaliatory termination.

### C.  Lizondro

Lizondro's retaliation claim is based on: (1) unfavorable work schedules; (2) repeatedly being sent home; (3) reprimands for asking to see the tip book; (4) cleaning duties; and (5) a constructive discharge because of the unfavorable work schedules.  Defendants argue that summary judgment should be granted on Lizondro's claim because: (1) the schedule change happened in February 2008, before the Spring 2008 Incident; (2) unfavorable work schedules are not adverse employment actions and cannot give rise to a constructive discharge; (3) embarrassment from being reprimanded and being assigned additional cleaning duties sporadically cannot constitute adverse employment actions; and (4) Lizondro voluntarily resigned to take care of his newborn child and go back to school.

In support of their argument that unfavorable work schedules, reprimands, and the assignment of unfavorable duties cannot constitute adverse employment actions, defendants cite an unreported New York Supreme Court decision noting that "an adverse employment action is not established by proof of excessive work, denials of requests for leave with pay and a supervisor's general negative treatment or by evidence of being yelled at, receiving unfair criticism, or receiving unfavorable schedules or work assignments."  *Dubois v. Brookdale Univ. Hosp.*, No. 6062/04, 2004 WL 3196952, at *6 (N.Y. Sup. Ct. Dec. 1, 2004).

But *Dubois* was interpreting federal and state anti-discrimination provisions, not N.Y. Lab. Law. § 215.  The Second Circuit has distinguished the standard for an "adverse employment action" in a discrimination case from that used in a retaliation case.  *See Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 720 n.6 (2d Cir. 2010).  As for § 215, "[a]lthough termination of employment clearly constitutes prohibited retaliation under this provision, state courts have not developed jurisprudence concerning the breadth of conduct prohibited by the

statute." *Perez v. Jasper Trading, Inc.*, No. 05 CV 1725(ILG)(VVP), 2007 WL 4441062, at *3 (E.D.N.Y. Dec. 17, 2007).[20]  Under the analogous FLSA provision, however, the standard for an adverse employment action is whether it "well might have dissuaded a reasonable worker from making or supporting similar charges." *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  The FLSA and NYLL use similar language to describe what conduct is prohibited in their anti-retaliation provisions.  *Compare* 29 U.S.C. § 215(a)(3) (making it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint") *with* N.Y. Lab. Law § 215 ("No employer . . . shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee (i) because such employee has made a complaint to his or her employer . . . .").  Accordingly, use of similar standards for what constitutes an adverse employment action also seems appropriate.

Under this standard, receiving unfavorable work schedules that impact child-care arrangements, being assigned less favorable duties, or repeatedly being sent home are not prohibited retaliatory actions as a matter of law could dissuade a reasonable worker from making complaints about NYLL violations.  Defendants cite no case law to the contrary.

Defendants also contend that the unfavorable schedule changes should be disregarded because Lizondro testified that those changes occurred in February 2008, which would be before the Spring 2008 Incident.  (*See* Goodman Decl. Ex. 26 [Lizondro] at 142:8-17.)  But this may merely reflect a confusion in chronology on Lizondro's part, as Lizondro also testified before the NLRB that the Spring 2008 Incident happened in February.  (*See* Goodman Decl. Ex. 27 [Lizondro NLRB] at 400:2-4.)  With all inferences drawn in Lizondro's favor, his testimony may

---

[20] The Court's search of state court cases since 2007 has similarly failed to find cases illuminating this question.

simply reflect a confusion about when the Spring 2008 Incident happened.  Under that reading, there is no causal connection problem, and summary judgment is therefore denied.

Because a genuine issue of material fact exists with respect to Lizondro's retaliation claim based on the schedule changes, unfavorable assignments, and being sent home, it is unnecessary to address the parties' arguments about his retaliatory "constructive discharge."

### D.  Melendez

Defendants argue that Melendez has failed to present a prima facie case of retaliation because (1) there is no evidence that Melendez participated in the Spring 2008 Incident or suffered any other retaliatory acts as a result of the complaint; (2) his last day of work was before the Spring 2008 Incident; and (3) Melendez testified that he made complaints only to his co-workers, not to Thalassa.  (*See* Aranyos Decl. Ex. BBB [Melendez] at 16:15-17, 114:6-24.) Plaintiffs make no argument to resist defendants' motion on Melendez's retaliation claim. Defendants' arguments are supported by the record evidence, and they compel a conclusion that Melendez has failed to present a prima facie case, as no evidence indicates that he complained to his employer or that any retaliatory action was taken.  Accordingly, summary judgment is granted on this claim.

### E.  Maldonado, S. Lopez, Copantitla

Defendants argue that summary judgment on the retaliation claims of Maldonado, S. Lopez, and Copantitla is warranted because (1) the schedule reductions on which they base their retaliation claims do not constitute adverse employment actions; (2) Maldonado suffered no schedule reduction; (3) S. Lopez's schedule reductions are too far removed in time to infer a causal connection between them and the Labor Law complaints; and (4) any schedule reduction alleged is attributable to the depressed economic climate at the end of 2008.

As for the first of these arguments, defendants again rely on *DuBois*.  For the reasons discussed above, the Court finds that reliance on that case is unwarranted.  (*See supra* Section X.C.)

Defendants also argue that Maldonado has not adduced evidence that his hours were reduced and that the documentary evidence demonstrates that his net weekly pay did not decline after either the Spring 2008 Incident or the October 2008 Incident, or that any claimed scheduling issues were a consequence of any of his complaints of wage and hours laws. Maldonado cites his deposition testimony, in which he listed as his reason for leaving Thalassa that he "wasn't working enough days and . . . needed to earn more money to pay my rent and my bills."  (Goodman Decl. Ex. 28 [Maldonado] at 31:20-25.)  However, Maldonado's deposition testimony does not show that his hours were reduced in response to either the Spring 2008 Incident or the October 2008 Incident; it shows only that his overall pay at Thalassa did not meet his needs.  Because Maldonado has failed to offer any evidence of retaliatory conduct or a causal connection between any conduct and a complaint about the Labor Laws, summary judgment is granted on his retaliation claim.

As for the third argument, defendants argue that S. Lopez's reduction in hours in early 2009 is too far removed from the October 2008 Incident to be causally linked to his reduction in hours.  (*See* Defs.' Mem. at 39; Aranyos Decl. Ex. UU [S. Lopez] at 111:14-21.)  "[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action."  *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001) (internal quotation marks omitted).  But no "bright line" exists "to define the outer

limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Id.*

Here, about three months elapsed between the October 2008 Incident and the alleged scheduling reduction for S. Lopez, given his testimony that his hours were reduced in "the beginning of 2009." (Aranyos Decl. Ex. UU [S. Lopez] at 111:20-21.)  In this case, that time period is too attenuated to draw an inference of retaliatory motive on the defendants' part.  A new schedule was posted every week to advise employees of their work schedules.  (Defs.' Rule 56.1 Stmt. ¶ 78.)  In order to draw the inference of retaliation in S. Lopez's case, one would have to believe that eight or more intervening work schedules hid defendants' retaliatory motive until it began to be evinced in early 2009 schedules.  This inference, without more, is too attenuated to survive  motion for summary judgment, and accordingly summary judgment is granted on S. Lopez's retaliation claim.

With respect to Copantitla's retaliation claim, although defendants acknowledge that Copantitla's hours declined after the October 2008 Incident, they attribute that reduction in hours to the global recession in the fourth quarter of 2008.  But "the coincidence of this lawsuit with the toxic economic climate does not provide a blanket excuse for the actions of these Defendants." *Lin v. Great Rose Fashion, Inc.*, No. 08-cv-4778 (NGG) (RLM), 2009 WL 1544749, at *18 (E.D.N.Y. June 3, 2009).  Here, however, the temporal connection between Copantitla's hours reduction and the October 2008 Incident raises the possibility of pretext in that stated reason and prevents summary judgment in defendants' favor, especially with all inferences drawn in favor of Copantitla.  *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 180 (2d Cir. 2005) (denying summary judgment on retaliation claim where there was a "strong

temporal connection between her involvement in protected activity on the one hand, and instances . . . of retaliation on the other").

### F. Vargas

Defendants' final argument on the retaliation claims relates to Vargas's claim.  They contend that the October 2, 2008 interrogation of Vargas cannot be retaliation under the New York Labor Law because Steve Makris had no knowledge of the letter that was presented at the October 2008 Incident (which occurred the day before) and therefore no causal connection between the October 2 interrogation and any protected activity can be shown.  But Steve Makris's knowledge of the contents of the letter is a disputed issue of material fact.  Lantigua testified before the NLRB that he told Kemal Kurt that the letter complained of labor law violations by Thalassa.  (Goodman Decl. Ex. 12 [Lantigua NLRB] at 246:9-17.)  Indeed, the NLRB credited Lantigua's testimony and found that "[o]n October 2, 2008 Steve Makris was aware that Vargas had entered the restaurant the day before with a group in order to deal with alleged labor law violations by Respondent; Makris was aware that the employees were taking action to institute a law suit."  (NLRB Decision at 20.)  Given the record in this case, a reasonable jury could come to the same conclusion.  Accordingly, summary judgment is denied on Vargas's claim.

### XI. Punitive Damages

Defendants also move to strike plaintiffs' demand for punitive damages under N.Y. Lab. Law § 215, arguing that as a matter of law, punitive damages are not authorized by the statute. When the New York Court of Appeals has considered the question of whether punitive damages are available under a statute, it has engaged in a detailed analysis of statutory language and legislative history.  *See, e.g.*, *Thoreson v. Penthouse Int'l, Ltd.*, 606 N.E.2d 1369, 1371-73 (N.Y.

1992) (analyzing whether punitive damages are available under N.Y. Exec. Law § 297).  The

parties have each offered only a page of briefing on this subject and offer little analysis of the

variety employed by the Court of Appeals.  Defendants cite cases dealing with other statutes.

*See, e.g.*, *Gruenewald v. 132 West 31st Street Realty Corp.*, 613 N.Y.S.2d 39 (N.Y. App. Div.

1994).  Plaintiffs cite cases from this District that awarded punitive damages on default

judgments.  *See, e.g.*, *Lin v. Hayashi Ya II, Inc.*, No. 08 Civ. 6071(SAS)(AJP), 2009 WL 289653,

at *8 (S.D.N.Y. Jan. 30, 2009).  Rather than decide this issue on such scant briefing when the

resolution is unclear, the Court denies this motion without prejudice to renewal at a later time

with additional briefing.

## XII.    Procedural Issues

Defendants also raise three procedural attacks.  First, they argue that Copantitla failed to

comply with his discovery obligations and that his claims should be dismissed.  Second, they

argue that M. Lopez's claims should be dismissed for failure to sit for a deposition.  And third,

they argue Garcia's factual allegations regarding his retaliation claim should be stricken because

he has abandoned that claim.

### A.  Copantitla's Discovery Obligations

The dispute about Copantitla's discovery obligations centers around a question posed at

Copantitla's deposition.  Defendants' counsel asked at deposition why Copantitla used "Eduardo

Garcia" as another name; plaintiffs' counsel objected, protesting that defendants' counsel was

using the question as a "back door to his immigration status," and instructed Copantitla not to

answer the question, at which point defendants' counsel stopped the deposition.  (*See* Goodman

Decl. Ex. 29 ("Copantitla Dep.") at 6-13.)  Defendants now rely on Fed. R. Civ. P. 37 and this

Court's inherent authority to manage its proceedings to argue that this constitutes a discovery violation and warrants dismissal of Copantitla's claims.

The Court declines to do so. Defendants never pursued any remedies for Copantitla's conduct and now belatedly seek to use the discovery incident as a tool to dismiss Copantitla's claims. Given that the question defense counsel asked, to the extent it was relevant, would be relevant to credibility issues and not necessarily to the substance of Copantitla's claims, it seems unlikely that Copantitla's failure to answer crippled the ability of defense counsel to further conduct the deposition. In short, as "[d]ismissal of a party's claims under Fed. R. Civ. Proc. 37 is a drastic remedy, warranted 'where a party fails to comply with the court's discovery orders willfully, in bad faith, or through fault,'" *Brickey v. Dolgencorp, Inc.*, 272 F.R.D. 344, 2011 WL 643256, at *6 (W.D.N.Y. Feb. 23, 2011) (quoting *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 845 F.2d 1172, 1176 (2d Cir. 1988)), and because defendants made no previous attempts to ensure compliance with the discovery rules, the Court declines to employ the "drastic remedy" in this case.

### B. M. Lopez's Failure To Appear for Deposition

Likewise, the Court declines to dismiss M. Lopez's claims based on his failure to appear for deposition. At oral argument, plaintiffs' counsel indicated that M. Lopez was out of the country until February and has been available for deposition since then, but that defendants have elected not to take advantage of his availability. Although failure to appear for a scheduled deposition can be grounds for dismissal of a plaintiff's claims, defendants' argument for dismissal rings a bit hollow where M. Lopez was out of the country during the discovery period and defendants have not attempted to avail themselves of the opportunity to depose him since his return.

### C.  Garcia's Factual Allegations

Defendants also contend that paragraph 110 and the part of paragraph 115 relating to plaintiff Garcia should be stricken on the grounds that Garcia voluntarily withdrew his retaliation claim.  These paragraphs allege that Garcia complained to Thalassa management in June or July 2008 and that he was terminated in retaliation for his complaints.  Federal Rule of Civil Procedure 12(f) allows the Court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  But "[m]otions to strike are not generally favored, except in relation to scandalous matters."  *Wine Markets Int'l, Inc. v. Bass*, 177 F.R.D. 128, 133 (E.D.N.Y. 1998).  "Because striking a portion of a pleading is often sought by the movant as a dilatory tactic, motions under Rule 12(f) are viewed with disfavor."  *Id.*; *see also G-I Holdings, Inc. v. Baron & Budd*, 238 F. Supp. 2d 521, 555 (S.D.N.Y. 2002) ("The Court of Appeals has cautioned district courts to approach such motions with caution: '[I]t is settled that the motion will be denied, unless it can be shown that no evidence in support of the allegation would be admissible . . . .  Thus the courts should not tamper with the pleadings unless there is a strong reason for doing so.'" (quoting *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976)).

Defendants assert in conclusory fashion that these allegations relate only to Garcia's withdrawn retaliation claim and therefore have no real bearing on the case; plaintiffs assert in equally conclusory fashion that they are relevant to active claims. In this case, given the high standard for striking factual allegations from the complaint, the Court declines to do so. Defendants' arguments as to prejudice are merely conclusory, and given the disfavor with which federal courts view motions to strike, such arguments fail to suffice on such motions.

## XIII.   "Employer" Status

Turning to the question of who may be held liable for the violations alleged in the SAC, the parties all acknowledge that Fiskardo is an "employer" under the FLSA.  Defendants have moved for summary judgment, however, on the issue of whether Julia Makris, George Makris, and Fantis Foods are "employers" under the FLSA.  Plaintiffs have moved for summary judgment on the issue of whether Julia Makris and Steve Makris are "employers."  Their arguments are addressed below.

### A.  Legal Standards

"In identifying the persons or entities who qualify as 'employers' . . . statutory definitions sweep broadly."  *Barfield v. New York City Health and Hosps. Corp.*, 537 F.3d 132, 140 (2d Cir. 2008).  Subject to a number of exceptions inapplicable here, the FLSA defines "employee" as "any individual employed by an employer."[21]  29 U.S.C. § 203(e)(1).  An entity "employs" an individual if it "suffer[s] or permit[s]" that individual "to work."  *Id.* § 203(g).  The term "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee."  *Id.* § 203(d).

The "determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in economic reality rather than technical concepts, determined by reference not to isolated factors, but rather upon the circumstances of the whole activity."  *Barfield*, 537 F.3d at 141 (internal citations and quotation marks omitted).  The Second Circuit has emphasized that "employment for FLSA purposes [is] a flexible concept to be determined on

---

[21] "[C]ourts have interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA."  *Jiao v. Shi Ya Chen*,  No. 03 Civ. 0165 (DF), 2007 WL 4944767, at *9 n.12 (S.D.N.Y. Mar. 30, 2007); *see also Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 342 n.25 (S.D.N.Y. 2005) ("The 'economic reality' test will be used to determine whether Lee is Yang's 'employer' as defined under both state and federal law, as there is general support for giving FLSA and the New York Labor Law consistent interpretations." (internal quotation marks and alterations omitted)).  Accordingly, the Court will use the FLSA's "economic reality" test with respect to the New York Labor Law as well.

a case-by-case basis by review of the totality of the circumstances." *Id.* at 141-42.  Its decisions

on this point "have identified different sets of relevant factors based on the factual challenges

posed by particular cases." *Id.* at 142.

In *Carter v. Dutchess Community College*, 735 F.2d 8 (2d Cir. 1984), the court noted that

the "economic reality" test "include[d] inquiries" into four factors: "whether the alleged

employer (1) had the power to hire and fire the employees, (2) supervised and controlled

employee work schedules or conditions of employment, (3) determined the rate and method of

payment, and (4) maintained employment records."  735 F.2d at 12.  The *Carter* test is

"*sufficient* to establish employer status," but did not establish "factors . . . *necessary* to establish

an employment relationship."  *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 71 (2d Cir. 2003)

(emphasis in original).  Thus a court cannot use the *Carter* factors as an "exclusive four-factor

test" to determine whether an entity is an employer under the FLSA.  *Id.*  Rather, the *Carter*

factors are most helpful "for determining when an entity exercises sufficient formal control over

a worker to be that worker's employer under the FLSA."  *Barfield*, 537 F.3d at 144.

In a later case, the Second Circuit articulated a six-factor test to measure whether "an

entity has functional control over workers even in the absence of the formal control measured by

the *Carter* factors."  *Zheng*, 355 F.3d at 72.  In that case, which dealt with garment workers, the

court considered:

> (1) whether [the garment manufacturer]'s premises and equipment were used for
> the plaintiffs' work; (2) whether the Contractor Corporations had a business that
> could or did shift as a unit from one putative joint employer to another; (3) the
> extent to which plaintiffs performed a discrete line-job that was integral to [the
> garment manufacturer]'s process of production; (4) whether responsibility under
> the contracts could pass from one subcontractor to another without material
> changes; (5) the degree to which the [garment manufacturer] or [its] agents
> supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or
> predominantly for [the garment manufacturer].

*Barfield*, 537 F.3d at 143 (quoting *Zheng*, 355 F.3d at 72).  These tests, however, provide only a "nonexclusive and overlapping set of factors to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA."[22]  *Id.*  Thus a district court is "free to consider any other factors it deems relevant to its assessment of the economic realities." *Zheng*, 355 F.3d at 71-72.  With this guidance in mind, the Court considers whether Julia Makris, George Makris, Fantis Foods, and Steve Makris are employers.

## B.  Julia Makris

Defendants argue that since Julia Makris "has no knowledge of or involvement in setting employee compensation, hiring and firing employees, determining the Restaurant's tip policy, receiving and addressing employee complaints, or making any other employment decisions," she cannot be considered an "employer" by virtue of her status as sole shareholder of Fiskardo. (Defs.' Mem at 5-6.)  Plaintiffs argue that Julia Makris is an employer because she: (1) is "the sole owner"; (2) "signed Consents as the only Shareholder of Fiskardo" and "signed a similar Consent electing only herself as Director of the Company"; (3) was "elect[ed] . . . as President/Treasurer"; (4) "authorized Ziotas to testify as the Rule 30(b)(6) deponent on behalf of the corporation"; (5) visits Thalassa once a week; (6) "receives reports from Ziotas regarding the status of the Restaurant, including how to improve the service provided by the employees"; and (7) makes recommendations about hiring, food, music, and ambience.  (Pls.' Mem at 26-27.)

The *Carter* factors do not favor a finding that Julia is plaintiffs' employer under the FLSA.  On the first factor, although Steve Makris testified that Julia sometimes makes recommendations on hiring, to the extent Julia makes recommendations about the restaurant,

---

[22] The Second Circuit has also used a five-factor test in *Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir. 1988), which is useful "to distinguish between independent contractors and employees."  *Barfield*, 537 F.3d at 143 (citing *Brock*, 840 F.2d at 1058-59).

Steve is free to disregard them.  (J. Makris Decl. ¶ 9.)  Plaintiffs have not provided any evidence indicating that Julia takes any other role with respect to hiring or firing, or that her recommendations played a material role in any employee being hired or fired.  The record is also devoid of evidence that Julia had any role in controlling work schedules, determining employee compensation, or maintaining employment records.  Indeed, Julia Makris testified that she has no role in such matters.  (*See* Aranyos Decl. Ex. AA [J. Makris] at 26:11-14, 29:20-23, 30:22-32:5, 32:16-19.)  Neither does evaluating the evidence under the *Zheng* factors indicate that Julia is an employer, and plaintiffs do not argue that the *Zheng* factors compel that conclusion.

Instead, plaintiffs argue, based on *Hernandez v. La Cazuela de Mari Restaurant, Inc.*, 538 F. Supp. 2d 528 (E.D.N.Y. 2007), and *Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184 (S.D.N.Y. 2003), that "[a]s the sole owner, Julia Makris has full authority and control over Plaintiffs' working conditions, and is clearly an employer and thus liable for all wage violations."[23]  (Pls.' Mem. at 26.)  But both cases are distinguishable.  Both cases noted that "whether [the owner] had 'operational control' over the business" is the critical inquiry in determining whether an officer or owner should be deemed an employer under the FLSA, as opposed to the officer or owner's status as such.  *Ansoumana*, 255 F. Supp. 2d at 193; *see also Hernandez*, 538 F. Supp. 2d at 534 ("Courts have consistently held that 'a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." (quoting *Moon v. Kwon*, 248 F. Supp. 2d 201, 237 (S.D.N.Y. 2002)).  Although an owner need not exercise direct control over an employee to be an employer, *see Ansoumana*, 255 F. Supp. 2d at 193, it was clear in both cases that the owner defendants in question actually exercised operational control over the daily operations of their businesses.  *See Hernandez*, 538 F. Supp. 2d at 535 ("Together,

---

[23] At oral argument, plaintiffs emphasized Julia's shareholder status in arguing that she is an employer.

they own La Cazuela de Mari, and they both acted as managers of the restaurant."); *Ansoumana*, 255 F. Supp. 2d at 193 ("Clearly, however, Weinstein and Pilavin exercised operational management . . . and that is sufficient under the law to satisfy the broad statutory definition of 'employer.'").  That reasoning comports with the approach of the Second Circuit in *Herman v. RSR Security Services Ltd.*, 172 F.3d 132 (2d Cir. 1999), in which the court rejected an individual defendant's contention that "direct control" was the only relevant inquiry, found that "operational control" was a "relevant" inquiry, and distinguished cases dealing solely with stock ownership status on the grounds that the individual defendant "had direct involvement with the security guard operations from time to time and was generally involved with all of RSR's operations."  172 F.3d at 140-41.

There are no such factual allegations in this case.  Although Julia Makris visits Thalassa approximately once a week, it is as a patron.  (*See* J. Makris Decl. ¶ 11; *see also* Goodman Decl. Ex. 3 [Diaz de la Vega] at 91:2-21.)  She receives reports from Ziotas and makes some recommendations to Steve Makris, but there is no indication that those interactions rise to the same level of operational control present in *Hernandez* and *Ansoumana*.  Accordingly, neither of those cases compel a conclusion that Julia is an employer of plaintiffs.

As to her status as sole shareholder and President of Fiskardo, the courts that have addressed the question of whether stock ownership or a position as corporate officer in and of themselves make an individual an employer under the FLSA have answered the question in the negative.  *See Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1160-62 (11th Cir. 2008) (finding that majority stockholder who "did not take . . . an active role in the day-to-day operations" of the business and whose sons "exercised considerable control . . . since 1998, the year [the majority stockholder] had a heart attack" was not an employer under the

FLSA even though he "remained the designated managing agent" and "could have played a greater role in the day-to-day operations of the [business] if he had desired"); *Patel v. Wargo*, 803 F.2d 632, 637-38 (11th Cir. 1986) (finding that president, director, and principal stockholder was not an employer because "[t]o be personally liable, an officer must either be involved in the day-to-day operation or have some direct responsibility for the supervision of the employee," both of which were lacking for the individual in question); *Wirtz v. Pure Ice Co.*, 322 F.2d 259, 262-63 (8th Cir. 1963) (finding that "majority stockholder and dominant personality" in corporation "could have taken over and supervised the relationship between the corporation and its employees had he decided to do so" but that "[a] careful reading of the record . . . indicates that he did not do so" and therefore he was not an employer under the FLSA).  Courts that have found majority or sole shareholders liable have not relied solely on shareholder status, but have looked also to the degree of operational control a shareholder exerts over the corporation's functions.  *See RSR Sec. Servs.*, 172 F.3d at 141 ("Portnoy was, of course, not only a 50 percent stockowner; he had direct involvement with the security guard operations from time to time and was generally involved with all of RSR's operations."); *Dole v. Elliott Travel & Tours*, 942 F.2d 962, 963, 966 (6th Cir. 1991) (noting, in a case where "Jared Schubiner owns, jointly with his wife, 100 percent of the stock of Elliott Travel, and he is the president of the corporation," that "[t]he economic realities of this case indicate that Schubiner was an employer within the meaning of the FLSA, and he is chargeable with personal liability for failure to comply with the FLSA" because "Schubiner was the chief corporate officer, had a significant ownership interest in the corporation, and had control over significant aspects of the corporation's day-to-day functions, including determining employee salaries"); *cf. Donovan v. Agnew*, 712 F.2d 1509, 1513 (1st Cir. 1983) ("We agree that it should not lightly be inferred that Congress intended to

83

disregard in this context the shield from personal liability which is one of the major purposes of doing business in a corporate form.  It is difficult to accept . . . that Congress intended that any corporate officer or other employee with ultimate operational control over payroll matters be personally liable for the corporation's failure to pay minimum and overtime wages as required by the FLSA.").

Accordingly, plaintiffs' reliance on Julia's status as sole shareholder of Fiskardo as well as on actions she took solely in that capacity appears misplaced, especially since, in answering the question of whether an individual is an employer under the FLSA, "the overarching concern is whether the alleged employer possessed the power to control the workers in question." *RSR Sec. Servs.*, 172 F.3d at 139.

### C.  Fantis Foods

Next, defendants argue that Fantis Foods is not an employer of plaintiffs under the FLSA. First, defendants argue that Fantis lacks formal control over plaintiffs under the *Carter* factors. (Defs.' Mem. at 8-9.)  Indeed, there is little evidence that Fantis Foods hired or fired Thalassa employees, that it supervised or controlled conditions of employment, that it determined the rate or method of payment of the plaintiffs, or maintained the employment records of plaintiffs, and plaintiffs do not contest defendants' *Carter*-based argument.  (*See* Pls.' Opp'n at 7-10.)

Instead, plaintiffs argue that two of the *Zheng* factors preclude summary judgment.  In particular, plaintiffs contend that the factors of whether Fantis Foods' premises and equipment were used for plaintiffs' work and the degree to which Fantis Foods' agents supervised plaintiffs' work favor their case.  (Pls.' Opp'n at 7.)  They argue that this is so because: (1) the owners of Fantis Foods are all members of the Makris family; (2) Fantis Foods was Steve Makris's sole employer from 2002 to 2009 and during that time, he was Julia Makris's "eyes and ears" at

Thalassa; (3) Fantis Foods shares Ziotas and Zotos as employees with Thalassa; (4) Thalassa's

payroll and banquet records are sent to Fantis Foods's office in New Jersey, and Thalassa and

Fantis Foods use the same outside payroll processing vendor; (5) Steve Makris met with certain

employees and members of Thalassa's management team in Fantis Foods's office to discuss

Thalassa's business; and (6) George and Jerry Makris were listed on a phone number list on a

wall for use by Thalassa employees alongside numbers for the rest of Thalassa's staff.  (*See* Pls.'

Opp'n at 7-10.)

      Plaintiffs' factual assertions fail to show the sort of "functional control" that the *Zheng*

factors are intended to evaluate; although they show some overlap between Fantis Foods and

Thalassa in personnel and use of office space, they fall short of allowing a reasonable juror to

conclude that Fantis Foods exerted functional control over Thalassa.  For example, *Zheng*

explained that "[t]he first factor—namely, whether a putative joint employer's premises and

equipment are used by its putative joint employees—is relevant because the shared use of

premises and equipment may support the inference that a putative joint employer has functional

control over the plaintiffs' work."  *Zheng*, 355 F.3d at 72.  But here, none of the plaintiffs

actually used Fantis Foods's premises or equipment.  Rather, the record evidence shows only that

Fantis Foods's New Jersey office was used for payroll processing, banquet records storage, and

the occasional interview or meeting involving Steve Makris.  None of these uses are uses "by

[Fantis Foods's] putative joint employees."  *Id.*  There is no evidence in the record, for example,

of any plaintiff performing any of his duties at the New Jersey location.  The Thalassa-related

uses of the Fantis Foods location, therefore, do not show that Fantis Foods is plaintiffs' joint

employer.

The joint employment of Ziotas and Zotos also does not transform the Fantis Foods-Thalassa relationship into one of joint employers.  Although Ziotas and Zotos process the payroll for both companies, they receive separate paychecks from both employers, and there has been no suggestion in this case that either employee exerts Fantis Foods's influence over Thalassa.

Neither do the Makris family relationships or the listing of George and Jerry Makris's phone numbers at Thalassa make a joint-employer relationship.  Plaintiffs rely on *Lin v. Great Rose Fashion*, No. 08-cv-4778 (NGG)(RLM), 2009 WL 1544749 (E.D.N.Y. June 3, 2009), to show that Fantis Foods is intertwined with Thalassa, arguing that it "considered a factual situation similar to the one at issue here."  (Pls.' Opp'n at 10.)  Although in *Great Rose Fashion*, the Court considered the fact that "the Lins controlled both companies" alleged to be joint employers, 2009 WL 1544749, at *16, the companies in that case entertained a far more intertwined relationship than the record demonstrates in this case.  There, for example, "the Factory's space was distinguished from Great Wall's space by nothing more than a pile of paper boxes."  *Id.* at *15.  Also, "Great Wall was Silver Fashion's landlord and sole client" and "Silver Fashion manufactured garments exclusively for Great Wall."  *Id.* at *16.  Thus, the *Great Rose Fashion* court found that "[n]early every aspect of these businesses was intertwined" and that "[t]hese entities were functioning as complementary components of a single business enterprise." *Id.*  Here, in contrast, Fantis Foods is not exclusively dependent on Thalassa for its food distribution; less than 1% of its sales are to Thalassa.  Neither does Thalassa depend exclusively on Fantis Foods as its food supplier.  Rather than showing the "dubious uses of the corporate form" present in *Great Rose Fashion*, the evidence in this case of the family relationships allows only the inference that Thalassa and Fantis Foods have some overlap, but not one that they are the sort of interlocking entities present in *Great Rose Fashion*.

86

Although Steve Makris's situation might be read to show that a Fantis Foods "agent" was supervising plaintiffs here, considering the "totality of the circumstances," as this Court must, such an inference would be unwarranted.  It is true that Steve Makris was exclusively in the employ of Fantis Foods prior to becoming the General Manager of Thalassa.  But there is no indication in this case that Steve was exerting authority on behalf of Fantis Foods at Thalassa or using his authority at Thalassa to benefit Fantis Foods or any person associated with Fantis Foods.  Rather, what authority he had at Thalassa was that delegated to him by his mother; all parties agree that he served as Julia's "eyes and ears" at Thalassa.

Considering all of the circumstances in this case, then, plaintiffs have ferreted out bits of overlap between Thalassa and Fantis Foods, but nothing indicates that the Makrises have disregarded the corporate form in the way that the employers in *Great Rose Fashion* did or that Fantis Foods exercised the sort of control, required for one to be an "employer" under the FLSA.  Accordingly, summary judgment is granted to defendants on this issue.

### D.  George Makris

Next, defendants argue that George Makris is not an employer under the FLSA, relying primarily on *Chao v. Vidtape, Inc.*, 196 F. Supp. 2d 281, 291 (E.D.N.Y. 2002), in which the court, after a bench trial, held that the father of two individuals found to be employers under the FLSA was not himself an employer.  In so holding, the court reasoned that the father "was never an owner, shareholder, or officer of Vidtape," he "never received a paycheck from Vidtape," and "never gave orders, hired fired, or set policies for the employees."  196 F. Supp. 2d at 291.  Although "[e]mployees did see him at the factory . . . and most thought he was a 'boss' when asked," the court found "this testimony . . . insufficient to support a definition of employer under the economic realities test."  *Id.*  Furthermore, "[a]lthough he occasionally gave the employees

orders or directions and did attend some employee meetings, he did not hold an integral role in Vidtape's operations, or in setting work policies, schedules or conditions of employment." *Id.*

Plaintiffs attempt to distinguish *Vidtape* using several factual allegations. First, various employees testified that George Makris would instruct Thalassa employees about certain aspects of Thalassa's business, such as how the employees could be better sellers and the décor of the restaurant. Second, George Makris was present at salary discussions that Sait Dogan had in Steve Makris's office at Fantis Foods. (Goodman Decl. Ex. 4 [Dogan] at 48:19-22.) Third, plaintiffs assert that "[t]here is also evidence that George Makris met with Thalassa's managers about the Restaurant's business." (Pls.' Opp'n at 6.) Fourth, George Makris is the majority shareholder in Fantis Foods. And fifth, Lantigua testified that Kurt told him that he suspended Matute because George Makris had told him to do so. (Goodman Decl. Ex. 1 [Lantigua] at 261:2-13.)

Plaintiffs' first four contentions are insufficient to find that George is an employer. First, neither *Carter* nor *Zheng* uses suggestion-making as a factor relevant in determining whether an entity is an employer, and the Court finds it irrelevant in this case. It is not the case that simply because George Makris told employees how the restaurant could be improved, he exerts the sort of control that one would expect of an FLSA employer; indeed, *Vidtape* rejected such a contention. *See Vidtape*, 196 F. Supp. 2d at 291 (finding the father of two "employers" of the FLSA was not plaintiffs' employer even though "he occasionally gave the employees orders or directions and did attend some employee meetings"). Second, the evidence about Sait Dogan's discussion about pay fails to specify what role, if any, George took in those discussions, and no other evidence indicates that George ever took a role with respect to setting compensation. Third, the evidence that George Makris met with Thalassa managers about the restaurant's

business, in context, comes in a deposition question as to the basis for Diaz de la Vega's erroneous belief that George Makris is an owner of Thalassa. (*See* Goodman Decl. Ex. 3 [Diaz de la Vega] at 90:5-13.) And in *Vidtape*, the court found that the father there was not an employer despite the perception of employees that he was a "boss." *Vidtape*, 196 F. Supp. 2d at 291. Likewise, here, Diaz de la Vega's perception that George Makris is an "owner" does not make him an employer. And fourth, the Court has found that Fantis Foods is not plaintiffs' employer, so evidence that George is Fantis Foods' majority shareholder is irrelevant. In short, plaintiffs' first four contentions closely parallel the situation in *Vidtape* and are rejected for similar reasons.

The addition of plaintiffs' contention that Matute was suspended on George's direction does not compel a different conclusion. Even taking Lantigua's testimony, which is based on what Kurt told him about what George Makris said, as true,[24] ultimately Kurt, not George Makris, effected the suspension. Although this contention inches closer to sufficing to allow a reasonable jury to conclude that George Makris is plaintiffs' employer, ultimately, considering the lack of other probative evidence and the totality of the circumstances, plaintiffs' evidence falls short of carrying that burden.[25]

### E.  Steve Makris

Plaintiffs move for summary judgment on whether Steve Makris is an employer. Plaintiffs argue that summary judgment is warranted because: (1) Steve has been the "eyes and

---

[24] Matute himself testified that Kurt suspended him on Steve Makris's direction. (*See* Aranyos Decl. Ex. AAA [Matute] at 93:3-17.) Kurt denies having suspended Matute and mentions only the involvement of Tasso Zapantis and Steve Makris. (*See* Goodman Decl. Ex. 46 [Kurt NLRB] at 740:9-24.) Neither person mentions any involvement of George Makris with respect to Matute's suspension or firing.

[25] Defendants also argue that George and Julia Makris are not employers under the New York State and City Human Rights Laws. As "New York courts have also applied the 'economic realities' test to the HRL," *Dantuono v. Davis Vision, Inc.*, No. 07-CV-2234 (TCP)(ETB), 2009 WL 5196151, at *10 (E.D.N.Y. Dec. 29, 2009), George and Julia Makris are not employers under those laws. Plaintiffs offer no argument on this point specific to the New York State and City Human Rights Laws. (*See* Pls.' Opp'n at 5 n.2.)

ears" of his mother at Thalassa; (2) he determined the management structure of Thalassa, placing himself at the top; (3) all previous general managers, Special Events Coordinators, maitre d's, and chefs reported to him regarding decisions about employment, food, service, and customer satisfaction, and was in charge of day-to-day employment decisions along with Ziotas; and (4) he represents to customers and the public that he is the owner of Thalassa.

Defendants offer several counterarguments that purport to show material disputes of fact, but these arguments are unavailing. They argue first that "[a]lthough admittedly Steve Makris had the authority to hire and fire employees, he rarely exercised that authority." (Defs.' Opp'n at 8.) But "[c]ontrol may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitations on control 'do[] not diminish the significance of its existence.'" *RSR Sec. Servs.*, 172 F.3d at 139 (quoting *Donovan v. Janitorial Servs., Inc.*, 672 F.2d 528, 531 (5th Cir. 1982)). They also argue that "Steve Makris was not on the front-lines of making employment-related decisions." (Defs.' Opp'n at 8.) But the Second Circuit has rejected the contention that "direct control" over employees is required for one to be an employer. *RSR Sec Servs.*, 172 F.3d at 140 ("Portnoy contends that evidence showing his authority over management, supervision, and oversight of RSR's affairs in general is irrelevant, and that only evidence indicating his direct control over the guards should be considered. Such a contention ignores the relevance of the totality of the circumstances in determining Portnoy's operational control of RSR's employment of the guards."). The argument that Steve Makris lacks an ownership interest is not on point as well, as "[p]ersonal liability has been found even against a corporate officer who lacks an ownership interest in the corporation, or who has minimal ownership interest." *Agnew*, 712 F.2d at 1511 (internal citations omitted); *see also Donovan v. Sabine Irrigation Co.*, 695 F.2d 190, 195 (5th

Cir. 1983) ("[N]either the Act nor jurisprudence designates stock ownership in a corporate employer as the *sine qua non* of employer status where other forms of control of the employment relationship have been proven.").

The remainder of defendants' arguments—that Steve Makris did not receive a paycheck from Thalassa, that he conferred with Ziotas about the employees' rate of pay, and that he did not maintain any employment records—also do not preclude summary judgment on this issue. "Technical concepts" such as these do not constitute the test of who is an employer under the FLSA, *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961), and "the overarching concern is whether the alleged employer possessed the power to control the workers in question." *RSR Sec. Servs.*, 172 F.3d at 139.  Here, where the undisputed facts show that Steve Makris possessed and used the power to hire and fire employees, set work schedules for those employees, represents that he is Thalassa's owner, was responsible for Thalassa's management structure, made compensation decisions, and received reports from other managers and supervisory employees on employment, food, service, and customer satisfaction matters, plaintiffs have shown as a matter of law that Steve Makris is an employer under the FLSA.

### XIV.   Liquidated Damages

Finally, plaintiffs argue that they are entitled as a matter of law to liquidated damages under the FLSA and the New York Labor Law.

### A.  FLSA

"Under the FLSA, a district court is generally required to award a plaintiff liquidated damages equal in amount to actual damages."  *Barfield,* 537 F.3d at 150 (citing 29 U.S.C. § 216(b)).  District courts are afforded "discretion to deny liquidated damages where the employer shows that, despite its failure to pay appropriate wages, it acted in subjective 'good

faith' with objectively 'reasonable grounds' for believing that its acts or omissions did not violate the FLSA." *Id.* (citing 29 U.S.C. § 260). The employer's burden is "a difficult one," and "double damages are the norm and single damages the exception." *Id.*

"To establish the requisite subjective 'good faith,' an employer must show that it took 'active steps to ascertain the dictates of the FLSA and then act to comply with them.'" *Id.* (quoting *RSR Sec. Servs. Ltd.*, 172 F.3d at 142). Here, defendants point to their compliance with industry standards and Ziotas's periodic consultations with an accountant preclude summary judgment. As for industry standards, the law in this Circuit is that "simple conformity with industry-wide practice" fails to demonstrate good faith under the FLSA. *Reich v. S. New England Telecom. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997).

As for consulting with an accountant, defendants rely on *Genao v. Blessed Sacrament School*, No. 07 CV 3979 (CLP), 2009 WL 3171951, at *11 (E.D.N.Y. Oct. 1, 2009), where the court declined to award liquidated damages on the grounds that the employer "at worst mistakenly believed that the School and the Church were two separate employers, was not aware of the intricacies of the FLSA, and relied on the accountant to review the parish records, but the evidence also demonstrates that when plaintiff worked overtime for the Church, he was paid overtime in accordance with the rules." Plaintiffs rely on *Doty v. Elias*, 733 F.2d 720, 726 (10th Cir. 1984), where the court found that although an employer's "accountant told him eight or ten years before trial that his method of compensating waiters and waitresses was legal," that was insufficient to carry his burden of showing that he had reasonable grounds for believing that his actions complied with the FLSA.

This case lies somewhere in the middle. In *Genao*, the accountant's role was more prominent; the employer hired the accountant to "to review the work of the Church's

bookkeeper, to perform the bank reconciliations, and to file the payroll tax returns for the

employees." 2009 WL 3171951, at *5. In *Doty*, the accountant's role was less so; Ziotas

periodically consulted an accountant, rather than relying on eight-year-old advice.

Nevertheless, defendants' evidence is insufficient for a finding of good faith under the

FLSA. Even though Ziotas's consultation with an accountant constitutes an "active step," "its

purpose was plainly not 'to ascertain the dictates of the FLSA' with respect to the issue at hand,"

namely the prerequisites for taking a "tip credit" under the FLSA and the calculation of overtime

wages. *Barfield*, 537 F.3d at 151; *see also S. New England Telecom. Corp.*, 121 F.3d at 72

("Significantly, however, SNET failed to ask the appropriate question in its inquiry. Instead of

seeking advice on whether compensation is required when outside craft employees are required

to remain at open sites to ensure the security and safety of the site, they asked simply whether

compensation was required by the fact that outside craft workers were required to remain on

site."). Rather, Ziotas testified only that he "requested information on things that I was not

aware of, such as minimum wage, if it increased during the year, and that information was

provided to me." (Second Aranyos Decl. Ex. A [Fiskardo 30(b)(6) at 133:10-24.)

But even if defendants' evidence could show subjective good faith, it fails to show

objectively reasonable grounds. Defendants point to no advice that the accountant with whom

Ziotas consulted gave them that would have led them to think that that either their failure to

inform employees that they were taking a tip credit or their failure to calculate overtime properly

were legal. For that reason as well, the "norm" rather than the "exception" applies in this case.

### B. New York Labor Law

At the commencement of this suit, New York Labor Law § 198(1-a) provided that "In

any action instituted upon a wage claim by an employee . . . in which the employee prevails, the

court shall allow such employee . . . , upon a finding that the employer's failure to pay the wage required by this article was willful, an additional amount as liquidated damages equal to twenty-five percent of the total amount of the wages found to be due."[26]  The "willful" standard under the New York Labor Law "does not appreciably differ from the FLSA's willfulness standard" in connection with its statute of limitations.[27]  *Kuebel v. Black & Decker Inc.*, --- F.3d ----, 2011 WL 1677737, at *11 (2d Cir. May 1, 2011) (internal quotation marks omitted).  Under that standard, "[a]n employer willfully violates the [law] when it either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the Act."  *Id.* (internal quotation marks omitted).

With all inferences drawn in favor of defendants on this issue, a triable issue of fact remains.  The cases to which plaintiffs cite involve violations of the law committed with greater awareness.  In *Chan*, for example, "the defendants, who routinely referred to the banquet fees as tips both with customers and among themselves, and treated those fees as tips for internal accounting purposes, subjectively and reasonably believed themselves to be taking a percentage of plaintiffs' tips."  2007 WL 313483, at *29.  The court so found because "[t]he Mandarin and Cantonese words used by restaurant managers in describing the charge to customers (and to each other) are best translated as 'tips,'" because "a manager at the restaurant and a non-party to this litigation, testified that he had told customers that the 15% payment would be provided to the employees as tips," and because "[t]he defendants' wage and accounting practices treated the

---

[26] That provision now reads: "In any action instituted in the courts upon a wage claim by an employee or the commissioner in which the employee prevails, the court shall allow such employee to recover the full amount of any underpayment, all reasonable attorney's fees, prejudgment interest as required under the civil practice law and rules, and, unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law, an additional amount as liquidated damages equal to one hundred percent of the total amount of the wages found to be due."  N.Y. Lab. Law § 198.  The provision has been amended twice; both amendments took effect after the events and commencement of this litigation.

[27] The statute of limitations for FLSA claims is two years, or three years if the employer acted willfully.  29 U.S.C. § 255(a).

portion of the banquet monies they paid to plaintiffs and other employees in the same way they treated tips from non-banquet customers." *Id.* at *14-15. Thus in that case, the court found the defendants' violations of the New York Labor Law to be "knowing and willful," as they were blatant attempts to take charges that were clearly tips away from its service staff. *See id.* at *29.

In *Moon v. Kwon*, 248 F. Supp. 2d 201, 231, 234-35 (S.D.N.Y. 2002), the court found the defendants' violations to be willful because although they "had knowledge of federal and state minimum wage and overtime laws and consulted outside attorneys for advice on those laws," they also "knew [plaintiff] was not paid overtime and that the hotel never was advised by any lawyer that it was permissible not to pay him overtime," and also "also flagrantly violated basic recordkeeping requirements and knowingly paid employees off-the-books in cash without reporting those cash payments to the tax authorities."[28]

Here, a reasonably jury could examine defendants' consultations with an accountant, the specific contents of which are not in the record, and come to the conclusion that defendants' violations are not willful. Accordingly, summary judgment is denied on this issue.

## XV.   Equitable Tolling

Finally, defendants seek summary judgment on the issue of whether the claims of plaintiffs Guachun, Matute, and Copantitla are entitled to equitable tolling. "Equitable tolling allows courts to extend the statute of limitations beyond the time of expiration as necessary to avoid inequitable circumstances." *Johnson v. Nyack Hosp.,* 86 F.3d 8, 12 (2d Cir.1996). It is,

---

[28] Plaintiffs also contend that "[t]he failure of an employer to take any steps to determine the lawfulness of its conduct constitutes evidence of willful violations." (Pls.' Mem. at 31 (citing *Wiliamowsky*, 833 F.2d at 18).) But in *Wiliamowsky*, the Second Circuit relied on its view that "the question of whether or not a defendant had a good-faith or reasonable basis for believing its acts were lawful differs little, if at all, from the question of whether or not its acts were performed with reckless disregard for their legality." 833 F.2d at 18. The Supreme Court later rejected this view in *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 n.13 (1988), where it found that "[i]f an employer acts unreasonably, but not recklessly, in determining its legal obligation, then, although its action would be considered willful under petitioner's test, it should not be so considered under *Thurston* or the identical standard we approve today."

however, "applied only in rare and exceptional circumstances."  *Jenkins v. Greene*, 630 F.3d 298, 302 (2d Cir. 2010).   The relevant question when considering a request to toll is "whether a reasonable plaintiff in the circumstances would have been aware of the existence of a cause of action, and despite all due diligence he was unable to obtain vital information bearing on the existence of his claim."  *Lanzetta v. Florio's Enters., Inc.*, --- F. Supp. 2d ----, 2011 WL 253961, at *4 (S.D.N.Y. Jan. 25, 2011) (Chin, J.).   Thus, "the failure to provide an employee the notice required by the FLSA 'may be a sufficient basis for tolling,' but only if that failure contributed to the employee's unawareness of his rights."  *Id.* (quoting *Saigon Grill*, 595 F. Supp. 2d at 259).

Here, plaintiffs' arguments are based on defendants' failure to make an "effort to provide [plaintiffs] with notice."  (Pls.' Opp'n at 50.)  Under such circumstances, equitable tolling is not warranted, as "[t]here is no allegation that defendants engaged in anything more, *e.g.,* some sort of deception."  *Cao v. Wu Liang Ye Lexington Rest., Inc.*, No. 08 Civ. 3725 (DC), 2010 WL 4159391, at *1 (S.D.N.Y. Sept. 30, 2010).  As such, "the circumstances are not extraordinary and equitable relief is not warranted."  *Id.* (citing *Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 479 (S.D.N.Y. 2008)).

## CONCLUSION

For the foregoing reasons, plaintiffs' motion **[95]** is GRANTED in part and DENIED in part.  Specifically, summary judgment is GRANTED on the issues of whether defendants illegally retained charges purported to be gratuities; whether defendants violated minimum wage laws, overtime laws, and spread-of-hours law; whether Fiskardo and Steve Makris are "employers"; and whether plaintiffs are entitled to liquidated damages under federal law. Summary judgment is DENIED on the issues of whether Julia Makris is an employer and whether plaintiffs are entitled to liquidated damages under state law.

Defendants' motion **[99]** is also GRANTED in part and DENIED in part.  Specifically, summary judgment is GRANTED as to: George Makris, Julia Makris, and Fantis Foods's status as "employers"; Vargas's false imprisonment claim; Diaz de la Vega's state-law sexual harassment claim; the retaliation claims of Maldonado and S. Lopez; and the issue of equitable tolling.  Defendants George Makris, Julia Makris, and Fantis Foods are DISMISSED from this action.  Defendants' motion is DENIED as to: disqualification of counsel; the New York uniform law claim; Melendez's sexual harassment claims; and defendants' procedural arguments to strike factual allegations and claims.


SO ORDERED.

Dated: New York, New York
      May **27**, 2011

Richard J. Holwell
United States District Judge

97